Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ABRAMSKI *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 12–1493.  Argued January 22, 2014—Decided June 16, 2014

Petitioner Bruce Abramski offered to purchase a handgun for his uncle. The form that federal regulations required Abramski to fill out (Form 4473) asked whether he was the "actual transferee/buyer" of the gun, and clearly warned that a straw purchaser (namely, someone buying a gun on behalf of another) was not the actual buyer.  Abramski falsely answered that he was the actual buyer.  Abramski was convicted for knowingly making false statements "with respect to any fact material to the lawfulness of the sale" of a gun, 18 U. S. C. §922(a)(6), and for making a false statement "with respect to the information required . . . to be kept" in the gun dealer's records, §924(a)(1)(A).  The Fourth Circuit affirmed.

*Held:*

  1. Abramski's misrepresentation is material under §922(a)(6). Pp. 7–22.

    (a) Abramski contends that federal gun laws are entirely unconcerned with straw arrangements: So long as the person at the counter is eligible to own a gun, the sale to him is legal under the statute.  To be sure, federal law regulates licensed dealer's transactions with "persons" or "transferees" without specifying whether that language refers to the straw buyer or the actual purchaser.  But when read in light of the statute's context, structure, and purpose, it is clear this language refers to the true buyer rather than the straw.  Federal gun law establishes an elaborate system of in-person identification and background checks to ensure that guns are kept out of the hands of felons and other prohibited purchasers.  §§922(c), 922(t).  It also imposes record-keeping requirements to assist law enforcement authorities in investigating serious crimes through the tracing of guns to their buyers.  §922(b)(5), 923(g).  These provisions would mean little

if a would-be gun buyer could evade them all simply by enlisting the aid of an intermediary to execute the paperwork on his behalf. The statute's language is thus best read in context to refer to the actual rather than nominal buyer. This conclusion is reinforced by this Court's standard practice of focusing on practical realities rather than legal formalities when identifying the parties to a transaction. Pp. 7–19.

(b) Abramski argues more narrowly that his false response was not material because his uncle could have legally bought a gun for himself. But Abramski's false statement prevented the dealer from insisting that the true buyer (Alvarez) appear in person, provide identifying information, show a photo ID, and submit to a back-ground check. §§922(b), (c), (t). Nothing in the statute suggests that these legal duties may be wiped away merely because the actual buyer turns out to be legally eligible to own a gun. Because the dealer could not have lawfully sold the gun had it known that Abramski was not the true buyer, the misstatement was material to the lawfulness of the sale. Pp. 19–22.

2. Abramski's misrepresentation about the identity of the actual buyer concerned "information required by [Chapter 44 of Title 18 of the United States Code] to be kept" in the dealer's records. §924(a)(1)(A). Chapter 44 contains a provision requiring a dealer to "maintain such records . . . as the Attorney General may . . . prescribe." §923(g)(1)(A). The Attorney General requires every licensed dealer to retain in its records a completed copy of Form 4473, see 27 CFR §478.124(b), and that form in turn includes the "actual buyer" question that Abramski answered falsely. Therefore, falsely answering a question on Form 4473 violates §924(a)(1)(A). Pp. 22–23.

706 F. 3d 307, affirmed.

KAGAN, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1493

_____

## BRUCE JAMES ABRAMSKI, JR., PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 16, 2014]

JUSTICE KAGAN delivered the opinion of the Court.

Before a federally licensed firearms dealer may sell a gun, the would-be purchaser must provide certain personal information, show photo identification, and pass a background check. To ensure the accuracy of those submissions, a federal statute imposes criminal penalties on any person who, in connection with a firearm's acquisition, makes false statements about "any fact material to the lawfulness of the sale." 18 U. S. C. §922(a)(6). In this case, we consider how that law applies to a so-called straw purchaser—namely, a person who buys a gun on someone else's behalf while falsely claiming that it is for himself. We hold that such a misrepresentation is punishable under the statute, whether or not the true buyer could have purchased the gun without the straw.

I

A

Federal law has for over 40 years regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands. See Gun Control Act of 1968, 18 U. S. C. §921 *et seq.* Under §922(g), certain classes

of people—felons, drug addicts, and the mentally ill, to
list a few—may not purchase or possess any firearm. And
to ensure they do not, §922(d) forbids a licensed dealer
from selling a gun to anyone it knows, or has reasonable
cause to believe, is such a prohibited buyer. See *Huddle-
ston* v. *United States*, 415 U. S. 814, 825 (1974) ("[T]he
focus of the federal scheme," in controlling access to weap-
ons, "is the federally licensed firearms dealer").

The statute establishes a detailed scheme to enable the
dealer to verify, at the point of sale, whether a potential
buyer may lawfully own a gun. Section 922(c) brings the
would-be purchaser onto the dealer's "business premises"
by prohibiting, except in limited circumstances, the sale of
a firearm "to a person who does not appear in person" at
that location. Other provisions then require the dealer to
check and make use of certain identifying information
received from the buyer. Before completing any sale, the
dealer must "verif[y] the identity of the transferee by
examining a valid identification document" bearing a
photograph. §922(t)(1)(C). In addition, the dealer must
procure the buyer's "name, age, and place of residence."
§922(b)(5). And finally, the dealer must (with limited
exceptions not at issue here[1]) submit that information
to the National Instant Background Check System (NICS)
to determine whether the potential purchaser is for
any reason disqualified from owning a firearm. See
§§922(t)(1)(A)–(B).

The statute further insists that the dealer keep certain
records, to enable federal authorities both to enforce the
law's verification measures and to trace firearms used in
crimes. See H. R. Rep. No. 1577, 90th Cong., 2d Sess., 14

---

[1] The principal exception is for any buyer who has a state permit that
has been "issued only after an authorized government official has
verified" the buyer's eligibility to own a gun under both federal and
state law. §922(t)(3).

(1968).  A dealer must maintain the identifying infor-
mation mentioned above (*i.e.,* name, age, and residence) in
its permanent files.  See §922(b)(5).  In addition, the dealer
must keep "such records of . . . sale[ ] or other disposi-
tion of firearms . . . as the Attorney General may by regu-
lations prescribe."  §923(g)(1)(A).  And the Attorney Gen-
eral (or his designee) may obtain and inspect any of those
records, "in the course of a bona fide criminal investiga-
tion," to "determin[e] the disposition of 1 or more fire-
arms."  §923(g)(7).

   To implement all those statutory requirements, the
Bureau of Alcohol, Tobacco, Firearms and Explosives
(ATF) developed Form 4473 for gun sales.  See Supp. App.
1–6.  The part of that form to be completed by the buyer
requests his name, birth date, and address, as well as
certain other identifying information (for example, his
height, weight, and race).  The form further lists all the
factors disqualifying a person from gun ownership, and
asks the would-be buyer whether any of them apply (*e.g.,*
"[h]ave you ever been convicted . . . of a felony?").  *Id., at* 1.
Most important here, Question 11.a. asks (with bolded
emphasis appearing on the form itself):

> "Are you the actual transferee/buyer of the firearm(s)
> listed on this form?  **Warning**: **You are not the ac-
> tual buyer if you are acquiring the firearm(s) on
> behalf of another person.  If you are not the ac-
> tual buyer, the dealer cannot transfer the fire-
> arm(s) to you.**"  *Ibid.*

The accompanying instructions for that question provide:

> "**Question 11.a.   Actual Transferee/Buyer:**  For
> purposes of this form, you are the actual transferee/
> buyer if you are purchasing the firearm for yourself
> or otherwise acquiring the firearm for yourself . . . .
> You are also the actual transferee/buyer if you are le-
> gitimately purchasing the firearm as a gift for a third

party. **ACTUAL TRANSFEREE/BUYER EXAM-
PLES:** Mr. Smith asks Mr. Jones to purchase a fire-
arm for Mr. Smith. Mr. Smith gives Mr. Jones the
money for the firearm. Mr. Jones is **NOT THE
ACTUAL TRANSFEREE/BUYER** of the firearm
and must answer **"NO"** to question 11.a." *Id.*, at 4.

After responding to this and other questions, the customer
must sign a certification declaring his answers "true,
correct and complete." *Id.*, at 2. That certification pro-
vides that the signator "understand[s] that making any
false . . . statement" respecting the transaction—and,
particularly, "answering 'yes' to question 11.a. if [he is] not
the actual buyer"—is a crime "punishable as a felony
under Federal law." *Ibid.* (bold typeface deleted).

Two statutory provisions, each designed to ensure that
the dealer can rely on the truthfulness of the buyer's dis-
closures in carrying out its obligations, criminalize certain
false statements about firearms transactions. First and
foremost, §922(a)(6), provides as follows:

> "It shall be unlawful . . . for any person in connection
> with the acquisition or attempted acquisition of any
> firearm or ammunition from [a licensed dealer] know-
> ingly to make any false or fictitious oral or written
> statement . . . , intended or likely to deceive such
> [dealer] with respect to any fact material to the law-
> fulness of the sale or other disposition of such firearm
> or ammunition under the provisions of this chapter."

That provision helps make certain that a dealer will re-
ceive truthful information as to any matter relevant to a
gun sale's legality. In addition, §924(a)(1)(A) prohibits
"knowingly mak[ing] any false statement or representa-
tion with respect to the information required by this chap-
ter to be kept in the records" of a federally licensed gun
dealer. The question in this case is whether, as the ATF
declares in Form 4473's certification, those statutory

provisions criminalize a false answer to Question 11.a.—
that is, a customer's statement that he is the "actual
transferee/buyer," purchasing a firearm for himself, when
in fact he is a straw purchaser, buying the gun on someone
else's behalf.

## B

The petitioner here is Bruce Abramski, a former police
officer who offered to buy a Glock 19 handgun for his
uncle, Angel Alvarez. (Abramski thought he could get the
gun for a discount by showing his old police identification,
though the Government contends that because he had
been fired from his job two years earlier, he was no longer
authorized to use that card.) Accepting his nephew's offer,
Alvarez sent Abramski a check for $400 with "Glock 19
handgun" written on the memo line. Two days later,
Abramski went to Town Police Supply, a federally licensed
firearms dealer, to make the purchase. There, he filled
out Form 4473, falsely checking "Yes" in reply to Question
11.a.—that is, asserting he was the "actual transferee/
buyer" when, according to the form's clear definition, he
was not. He also signed the requisite certification, ac-
knowledging his understanding that a false answer to
Question 11.a. is a federal crime. After Abramski's name
cleared the NICS background check, the dealer sold him
the Glock. Abramski then deposited the $400 check in his
bank account, transferred the gun to Alvarez, and got back
a receipt. Federal agents found that receipt while execut-
ing a search warrant at Abramski's home after he became
a suspect in a different crime.

A grand jury indicted Abramski for violating §§922(a)(6)
and 924(a)(1)(A) by falsely affirming in his response to
Question 11.a. that he was the Glock's actual buyer.
Abramski moved to dismiss both charges. He argued that
his misrepresentation on Question 11.a. was not "material
to the lawfulness of the sale" under §922(a)(6) because

Alvarez was legally eligible to own a gun. And he claimed that the false statement did not violate §924(a)(1)(A) because a buyer's response to Question 11.a. is not "required . . . to be kept in the records" of a gun dealer. After the District Court denied those motions, see 778 F. Supp. 2d 678 (WD Va. 2011), Abramski entered a conditional guilty plea, reserving his right to challenge the rulings. The District Court then sentenced him to five years of probation on each count, running concurrently.

The Court of Appeals for the Fourth Circuit affirmed the convictions. 706 F. 3d 307 (2013). It noted a division among appellate courts on the question Abramski raised about §922(a)(6)'s materiality requirement: Of three courts to have addressed the issue, one agreed with Abramski that a misrepresentation on Question 11.a. is immaterial if "the true purchaser [here, Alvarez] can lawfully purchase a firearm directly." *Id.*, at 315 (quoting *United States* v. *Polk*, 118 F. 3d 286, 295 (CA5 1997)).[2] The Fourth Circuit, however, thought the majority position correct: "[T]he identity of the actual purchaser of a firearm is a constant that is always material to the lawfulness of a firearm acquisition under §922(a)(6)." 706 F. 3d, at 316. The court also held that Abramski's conviction under §924(a)(1)(A) was valid, finding that the statute required a dealer to maintain the information at issue in its records. *Id.*, at 317.

We granted certiorari, 571 U. S. ___ (2013), principally to resolve the Circuit split about §922(a)(6). In this Court, Abramski renews his claim that a false answer to Question 11.a. is immaterial if the true buyer is legally eligible to purchase a firearm. But Abramski now focuses on a

_____

[2] Compare *Polk*, 118 F. 3d, at 294–295, with *United States* v. *Morales*, 687 F. 3d 697, 700–701 (CA6 2012) (a misrepresentation about the true purchaser's identity is material even when he can legally own a gun); *United States* v. *Frazier*, 605 F. 3d 1271, 1279–1280 (CA11 2010) (same).

new and more ambitious argument, which he concedes no court has previously accepted. See Brief for Petitioner i.[3] In brief, he alleges that a false response to Question 11.a. is *never* material to a gun sale's legality, whether or not the actual buyer is eligible to own a gun. We begin with that fundamental question, next turn to what has become Abramski's back-up argument under §922(a)(6), and finally consider the relatively easy question pertaining to §924(A)(1)(a)'s separate false-statement prohibition. On each score, we affirm Abramski's conviction.

## II

Abramski's broad theory (mostly echoed by the dissent) is that federal gun law simply does not care about arrangements involving straw purchasers: So long as the person at the counter is eligible to own a gun, the sale to him is legal under the statute. That is true, Abramski contends, irrespective of any agreement that person has made to purchase the firearm on behalf of someone else— including someone who cannot lawfully buy or own a gun himself. Accordingly, Abramski concludes, his "false statement that he was the [Glock 19's] 'actual buyer,'" as that term was "defined in Question 11.a., was not material" —indeed, was utterly irrelevant—"to the lawfulness of the sale." *Id.*, at 31 (emphasis deleted); see also *post,* at 4 (opinion of SCALIA, J.). In essence, he claims, Town Police Supply could legally have sold the gun to him even if had truthfully answered Question 11.a. by disclosing that he was a straw—because, again, all the federal firearms law cares about is whether the individual standing at the

───────────

[3]Reflecting that prior consensus, neither of Abramski's principal *amici*—the National Rifle Association and a group of 26 States—joins Abramski in making this broader argument. They confine themselves to supporting the more limited claim about straw purchases made on behalf of eligible gun owners, addressed *infra*, at 19–22.

dealer's counter meets the requirements to buy a gun.[4]

At its core, that argument relies on one true fact: Federal gun law regulates licensed dealers' transactions with "persons" or "transferees," without specifically referencing straw purchasers. Section 922(d), for example, bars a dealer from "sell[ing] or otherwise dispos[ing] of" a firearm to any "person" who falls within a prohibited category—felons, drug addicts, the mentally ill, and so forth. See *supra*, at 1–2; see also §922(b)(5) (before selling a gun to a "person," the dealer must take down his name, age, and residence); §922(t)(1) (before selling a gun to a "person," the dealer must run a background check). Similarly, §922(t)(1)(C) requires the dealer to verify the identity of the "transferee" by checking a valid photo ID. See *supra,* at 2; see also §922(c) (spelling out circumstances in which a "transferee" may buy a gun without appearing at the dealer's premises). Abramski contends that Congress's use of such language alone, *sans* any mention of "straw purchasers" or "actual buyers," shows that "[i]t is not illegal to buy a gun for someone else." Brief for Petitioner 15–16; Reply Brief 1; see also *post,* at 2–6.

––––––––––––

[4]The dissent reserves the question whether the false statement would be material if the straw purchaser knew that the true buyer was not eligible to own a firearm. *Post,* at 6, n. 2. But first, that reservation is of quite limited scope: Unlike Abramski's back-up argument, which imposes liability whenever the true purchaser cannot legally buy a gun, the dissent's reservation applies only when the straw has knowledge of (or at least reasonable cause to believe) that fact. And as we will later note, straws often do not have such knowledge. See *infra,* at 12–13. Second, the reservation (fairly enough for a reservation) rests on an uncertain legal theory. According to the dissent, a straw buyer might violate §922(a)(6) if a dealer's sale to him aids and abets his violation of §922(d)—a provision barring knowingly transferring a gun to an ineligible person, see *infra,* at 8, 17–18. But that reasoning presupposes that a firearms dealer acting in the ordinary course of business can ever have the intent needed to aid and abet a crime—a question this Court reserved not six months ago. See *Rosemond* v. *United States,* 572 U. S. ___ (2014) (slip op., at 12, n. 8).

But that language merely raises, rather than answers, the critical question: In a straw purchase, who *is* the "person" or "transferee" whom federal gun law addresses? Is that "person" the middleman buying a firearm on someone else's behalf (often because the ultimate recipient could not buy it himself, or wants to camouflage the transaction)?  Or is that "person" instead the individual really paying for the gun and meant to take possession of it upon completion of the purchase?  Is it the conduit at the counter, or the gun's intended owner?[5] In answering that inquiry, we must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, "structure, history, and purpose." *Maracich* v. *Spears*, 570 U. S. ___, ___ (2013) (slip op., at 26).  All those tools of divining meaning—not to mention common sense, which is a fortunate (though not inevitable) side-benefit of construing statutory terms fairly—demonstrate that §922, in regulating licensed dealers' gun sales, looks through the straw to the actual buyer.[6]

---

[5]The dissent claims the answer is easy because "if I give my son $10 and tell him to pick up milk and eggs at the store, no English speaker would say that the store 'sells' the milk and eggs to me." *Post*, at 4. But try a question more similar to the one the gun law's text raises: If I send my brother to the Apple Store with money and instructions to purchase an iPhone, and then take immediate and sole possession of that device, am I the "person" (or "transferee") who has bought the phone or is he?  Nothing in ordinary English usage compels an answer either way.

[6]Contrary to the dissent's view, our analysis does not rest on mere "purpose-based arguments."  *Post*. at 7.  We simply recognize that a court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context.  As we have previously put the point, a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988).

The overarching reason is that Abramski's reading would undermine—indeed, for all important purposes, would virtually repeal—the gun law's core provisions.[7] As noted earlier, the statute establishes an elaborate system to verify a would-be gun purchaser's identity and check on his background. See *supra,* at 2. It also requires that the information so gathered go into a dealer's permanent records. See *supra,* at 2–3. The twin goals of this comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes. See *Huddleston*, 415 U. S., at 824; *supra,* at 2–3. And no part of that scheme would work if the statute turned a blind eye to straw purchases—if, in other words, the law addressed not the substance of a transaction, but only empty formalities.

To see why, consider what happens in a typical straw purchase. A felon or other person who cannot buy or own a gun still wants to obtain one. (Or, alternatively, a person who could legally buy a firearm wants to conceal his purchase, maybe so he can use the gun for criminal purposes without fear that police officers will later trace it to him.) Accordingly, the prospective buyer enlists an intermediary to help him accomplish his illegal aim. Perhaps he conscripts a loyal friend or family member; perhaps more often, he hires a stranger to purchase the gun for a price. The actual purchaser might even accompany the straw to the gun shop, instruct him which firearm to buy, give him the money to pay at the counter, and take possession as they walk out the door. See, *e.g., United States*

---

[7]That reading would also, at a stroke, declare unlawful a large part of what the ATF does to combat gun trafficking by criminals. See Dept. of Treasury, Bureau of Alcohol, Tobacco & Firearms, Following the Gun: Enforcing Federal Laws Against Firearms Traffickers, p. xi (June 2000) (noting that in several prior years "[a]lmost half of all [ATF firearm] trafficking investigations involved straw purchasers").

v. *Bowen*, 207 Fed. Appx. 727, 729 (CA7 2006) (describing a straw purchase along those lines); *United States* v. *Paye*, 129 Fed. Appx. 567, 570 (CA11 2005) (*per curiam*) (same). What the true buyer would *not* do—what he would leave to the straw, who possesses the gun for all of a minute—is give his identifying information to the dealer and submit himself to a background check. How many of the statute's provisions does that scenario—the lawful result of Abramski's (and the dissent's) reading of "transferee" and "person"—render meaningless?

Start with the parts of §922 enabling a dealer to verify whether a buyer is legally eligible to own a firearm. That task, as noted earlier, begins with identification—requesting the name, address, and age of the potential purchaser and checking his photo ID. See §§922(b)(5), (t)(1)(C); *supra,* at 2. And that identification in turn permits a background check: The dealer runs the purchaser's name through the NICS database to discover whether he is, for example, a felon, drug addict, or mentally ill person. See §§922(d), (t)(1); *supra,* at 2. All those provisions are designed to accomplish what this Court has previously termed Congress's "principal purpose" in enacting the statute—"to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'" *Huddleston*, 415 U. S., at 824 (quoting S. Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968)). But under Abramski's reading, the statutory terms would be utterly ineffectual, because the identification and background check would be of the wrong person. The provisions would evaluate the eligibility of mere conduits, while allowing every criminal (and drug addict and so forth) to escape that assessment and walk away with a weapon.

Similarly, Abramski's view would defeat the point of §922(c), which tightly restricts the sale of guns "to a person who does not appear in person at the licensee's business premises." See *supra,* at 2. Only a narrow class of

prospective buyers may ever purchase a gun from afar—
primarily, individuals who have already had their eligibil-
ity to own a firearm verified by state law enforcement
officials with access to the NICS database. See 27 CFR
§478.96(b) (2014), 18 U. S. C. §922(t)(3); n. 1, *supra.* And
even when an individual fits within that category, he still
must submit to the dealer a sworn statement that he can
lawfully own a gun, as well as provide the name and ad-
dress of the principal law enforcement officer in his com-
munity. See §922(c)(1). The dealer then has to forward
notice of the sale to that officer, in order to allow law
enforcement authorities to investigate the legality of the
sale and, if necessary, call a stop to it. See §§922(c)(2)–(3).
The provision thus prevents remote sales except to a small
class of buyers subject to extraordinary procedures—
again, to ensure effective verification of a potential pur-
chaser's eligibility. Yet on Abramski's view, a person
could easily bypass the scheme, purchasing a gun without
ever leaving his home by dispatching to a gun store a
hired deliveryman. Indeed, if Abramski were right, we see
no reason why anyone (and certainly anyone with less-
than-pure motives) would put himself through the proce-
dures laid out in §922(c): Deliverymen, after all, are not so
hard to come by.

And likewise, the statute's record-keeping provisions
would serve little purpose if the records kept were of
nominal rather than real buyers. As noted earlier, dealers
must store, and law enforcement officers may obtain,
information about a gun buyer's identity. See §§922(b)(5),
923(g); *supra,* at 3. That information helps to fight serious
crime. When police officers retrieve a gun at a crime
scene, they can trace it to the buyer and consider him as a
suspect. See *National Shooting Sports Foundation, Inc.* v.
*Jones,* 716 F. 3d 200, 204 (CADC 2013) (describing law
enforcement's use of firearm tracing). Too, the required
records enable dealers to identify certain suspicious pur-

chasing trends, which they then must report to federal
authorities. See §923(g)(3) (imposing a reporting obliga-
tion when a person buys multiple handguns within five
days). But once again, those provisions can serve their
objective only if the records point to the person who took
actual control of the gun(s). Otherwise, the police will at
most learn the identity of an intermediary, who could not
have been responsible for the gun's use and might know
next to nothing about the actual buyer. See, *e.g., United
States* v. *Juarez*, 626 F. 3d 246, 249 (CA5 2010) (straw
purchaser bought military-style assault rifles, later found
among Mexican gang members, for a buyer known "only as
'El Mano'"). Abramski's view would thus render the re-
quired records close to useless for aiding law enforcement:
Putting true numbskulls to one side, anyone purchasing a
gun for criminal purposes would avoid leaving a paper
trail by the simple expedient of hiring a straw.

To sum up so far: All the prerequisites for buying a gun
described above refer to a "person" or "transferee." Read
Abramski's way ("the man at the counter"), those terms
deny effect to the regulatory scheme, as criminals could
always use straw purchasers to evade the law.[8] Read the
other way ("the man getting, and always meant to get, the
firearm"), those terms give effect to the statutory provi-

_____

[8]The dissent is mistaken when it says that the ATF's own former
view of the statute refutes this proposition. See *post,* at 11–12. As we
will later discuss, see *infra,* at 21–22, the ATF for a time thought that
§922(a)(6) did not cover cases in which the true purchaser could have
legally purchased a gun himself. But Abramski's principal argument
extends much further, to cases in which straws buy weapons for crimi-
nals, drug addicts, and other prohibited purchasers. For the reasons
just stated, that interpretation would render the statute all but useless.
And although the dissent appeals to a snippet of congressional testi-
mony to suggest that ATF once briefly held that extreme view of the
statute, it agrees that by at least 1979 (well over three decades ago),
ATF recognized the unlawfulness of straw purchases on behalf of
prohibited persons.

sions, allowing them to accomplish their manifest objects. That alone provides more than sufficient reason to understand "person" and "transferee" as referring not to the fictitious but to the real buyer.

And other language in §922 confirms that construction, by evincing Congress's concern with the practical realities, rather than the legal niceties, of firearms transactions. For example, §922(a)(6) itself bars material misrepresentations "in connection with the *acquisition*," and not just the purchase, of a firearm. That broader word, we have previously held, does not focus on "legal title"—let alone legal title for a few short moments, until another, always intended transfer occurs. *Huddleston*, 415 U. S., at 820. Instead, the term signifies "com[ing] into possession, control, or power of disposal," as the actual buyer in a straw purchase does. *Ibid.* Similarly, we have reasoned that such a substance-over-form approach draws support from the statute's repeated references to "the sale *or other disposition*" of a firearm. §922(a)(6); see §922(d) (making it unlawful to "sell *or otherwise dispose* of" a gun to a prohibited person). That term, we have stated, "was aimed at providing maximum coverage." *Id.*, at 826–827. We think such expansive language inconsistent with Abramski's view of the statute, which would stare myopically at the nominal buyer while remaining blind to the person exiting the transaction with control of the gun.

Finally, our reading of §922 comports with courts' standard practice, evident in many legal spheres and presumably known to Congress, of ignoring artifice when identifying the parties to a transaction. In *United States* v. *One 1936 Model Ford V-8 Deluxe Coach, Commercial Credit Co.*, 307 U. S. 219 (1939), for example, we considered the operation of a statute requiring forfeiture of any interest in property that was used to violate prohibition laws, except if acquired in good faith. There, a straw purchaser had bought a car in his name but with his

brother's money, and transferred it to the brother—a known bootlegger—right after driving it off the lot. See *id.,* at 222–223. The Court held the finance company's lien on the car non-forfeitable because the company had no hint that the straw was a straw—that his brother would in fact be the owner. See *id.,* at 224. But had the company known, the Court made clear, a different result would have obtained: The company could not have relied on the formalities of the sale to the "'straw' purchaser" when it knew that the "real owner and purchaser" of the car was someone different. *Id.,* at 223–224. We have similarly emphasized the need in other contexts, involving both criminal and civil penalties, to look through a transaction's nominal parties to its true participants. See, *e.g., American Needle, Inc.* v. *National Football League*, 560 U. S. 183, 193 (2010) (focusing on "substance rather than form" in assessing when entities are distinct enough to be capable of conspiring to violate the antitrust laws); *Gregory* v. *Helvering,* 293 U. S. 465, 470 (1935) (disregarding an intermediary shell corporation created to avoid taxes because doing otherwise would "exalt artifice above reality"). We do no more than that here in holding, consistent with §922's text, structure, and purpose, that using a straw does not enable evasion of the firearms law.

Abramski, along with the dissent, objects that such action is no circumvention—that Congress made an intentional choice, born of "political compromise," to limit the gun law's compass to the person at the counter, even if merely acting on another's behalf. Reply Brief 11; *post,* at 10–11. As evidence, Abramski states that the statute does not regulate beyond the initial point of sale. Because the law mostly addresses sales made by licensed dealers, a purchaser can (within wide limits) subsequently decide to resell his gun to another private party. See Reply Brief 11. And similarly, Abramski says, a purchaser can buy a gun for someone else as a gift. See Brief for Petitioner 26–

27, n. 3. Abramski lumps in the same category the trans-
fer of a gun from a nominal to a real buyer—as something,
like a later resale or gift, meant to fall outside the stat-
ute's     (purported)     standing-in-front-of-the-gun-dealer
scope. See Reply Brief 13; see also *post,* at 7–9.

But Abramski and the dissent draw the wrong conclu-
sion from their observations about resales and gifts. Yes,
Congress decided to regulate dealers' sales, while leaving
the secondary market for guns largely untouched. As we
noted in *Huddleston*, Congress chose to make the dealer
the "principal agent of federal enforcement" in "restricting
[criminals'] access to firearms." 415 U. S., at 824. And
yes, that choice (like pretty much everything Congress
does) was surely a result of compromise. But no, straw
arrangements are not a part of the secondary market,
separate and apart from the dealer's sale. In claiming as
much, Abramski merely repeats his mistaken assumption
that the "person" who acquires a gun from a dealer in a
case like this one is the straw, rather than the individual
who has made a prior arrangement to pay for, take pos-
session of, own, and use that part of the dealer's stock.
For all the reasons we have already given, that is not a
plausible construction of a statute mandating that the
dealer identify and run a background check on the person
to whom it is (really, not fictitiously)  selling a gun. See
*supra,* at 9–15. The individual who sends a straw to a gun
store to buy a firearm *is* transacting with the dealer, in
every way but the most formal; and that distinguishes
such a person from one who buys a gun, or receives a gun
as a gift, from a private party.[9] The line Congress drew

---

[9]The dissent responds: "That certainly distinguishes" the individual
transacting with a dealer through a straw from an individual receiving
a gun from a private party; "so would the fact that [the former] has
orange hair." *Post,* at 9. But that is an example of wit gone wrong.
Whether the purchaser has orange hair, we can all agree, is immaterial
to the statutory scheme. By contrast, whether the purchaser has

between those who acquire guns from dealers and those who get them as gifts or on the secondary market, we suspect, reflects a host of things, including administrative simplicity and a view about where the most problematic firearm transactions—like criminal organizations' bulk gun purchases—typically occur. But whatever the reason, the scarcity of controls in the secondary market provides no reason to gut the robust measures Congress enacted at the point of sale.

Abramski claims further support for his argument from Congress's decision in 1986 to amend §922(d) to prohibit a private party (and not just, as originally enacted, a licensed dealer) from selling a gun to someone he knows or reasonably should know cannot legally possess one. See Firearm Owners' Protection Act, §102(5)(A), 100 Stat. 451–452. According to Abramski, the revised §922(d) should be understood as Congress's exclusive response to the potential dangers arising from straw purchases. See Brief for Petitioner 26–27. The amendment shows, he claims, that "Congress chose to address this perceived problem in a way other than" by imposing liability under §922(a)(6) on a straw who tells a licensed dealer that he is the firearm's actual buyer. Reply Brief 14, n. 2.

But Congress's amendment of §922(d) says nothing about §922(a)(6)'s application to straw purchasers. In enacting that amendment, Congress left §922(a)(6) just as it was, undercutting any suggestion that Congress some-

_____

transacted with a licensed dealer is integral to the statute—because, as previously noted, "the federal scheme . . . controls access to weapons" through the federally licensed firearms dealer, who is "the principal agent of federal enforcement." *Huddleston* v. *United States*, 415 U. S. 814, 824, 825 (1974); see *supra,* at 16. In so designing the statute, Congress chose not to pursue the goal of "controll[ing] access" to guns to the nth degree; buyers can, as the dissent says, avoid the statute's background check and record-keeping requirements by getting a gun second-hand. But that possibility provides no justification for limiting the statute's considered regulation of *dealer* sales.

how intended to contract that provision's reach. The amendment instead performed a different function: Rather than ensuring that a licensed dealer receives truthful information, it extended a minimal form of regulation to the *secondary* market. The revised §922(d) prevents a private person from knowingly selling a gun to an ineligible owner no matter when or how he acquired the weapon: It thus applies not just to a straw purchaser, but to an individual who bought a gun for himself and later decided to resell it. At the same time, §922(d) has nothing to say about a raft of cases §922(a)(6) covers, including all the (many) straw purchases in which the frontman does not know that the actual buyer is ineligible. See *supra,* at 13. Thus, §922(d) could not serve as an effective substitute for §922(a)(6). And the mere potential for some transactions to run afoul of both prohibitions gives no cause to read §922(d) as limiting §922(a)(6) (or vice versa). See, *e.g., United States* v. *Batchelder*, 442 U. S. 114, 118–126 (1979).[10]

Abramski's principal attack on his §922(a)(6) conviction therefore fails. Contrary to his contention, the information Question 11.a. requests—"[a]re you the actual transferee/buyer[?]" or, put conversely, "are [you] acquir-

---

[10] Nor do we agree with the dissent's argument (not urged by Abramski himself) that the rule of lenity defeats our construction. See *post,* at 12–14. That rule, as we have repeatedly emphasized, applies only if, "after considering text, structure, history and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich* v. *Spears*, 570 U. S ___, ___ (2013) (slip op. at 26) (quoting *Barber* v. *Thomas*, 560 U.S. 474, 488 (2010)). We are not in that position here: Although the text creates some ambiguity, the context, structure, history, and purpose resolve it. The dissent would apply the rule of lenity here because the statute's text, taken alone, permits a narrower construction, but we have repeatedly emphasized that is not the appropriate test. See, *e.g., Muscarello* v. *United States*, 524 U. S. 125, 138 (1998); *Smith* v. *United States*, 508 U. S. 223, 239 (1993).

ing the firearm(s) on behalf of another person[?]"—is
relevant to the lawfulness of a gun sale. That is because,
for all the reasons we have given, the firearms law con-
templates that the dealer will check not the fictitious
purchaser's but instead the true purchaser's identity and
eligibility for gun ownership. By concealing that Alvarez
was the actual buyer, Abramski prevented the dealer from
transacting with Alvarez face-to-face, see §922(c), record-
ing his name, age, and residence, see §922(b)(5), inspect-
ing his photo ID, see §922(t)(1)(C), submitting his identify-
ing information to the background check system, see
§922(t)(1)(B), and determining whether he was prohibited
from receiving a firearm, see §922(d). In sum, Abramski
thwarted application of essentially all of the firearms law's
requirements. We can hardly think of a misrepresentation
any more material to a sale's legality.

## III

Abramski also challenges his §922(a)(6) conviction on a
narrower ground. For purposes of this argument, he
assumes that the Government can make its case when a
straw hides the name of an underlying purchaser who is
legally ineligible to own a gun. But, Abramski reminds us,
that is not true here, because Alvarez could have bought a
gun for himself. In such circumstances, Abramski claims
that a false response to Question 11.a. is not material. See
Brief for Petitioner 28–30. Essentially, Abramski con-
tends, when the hidden purchaser is eligible anyway to
own a gun, all's well that ends well, and all should be
forgiven.

But we think what we have already said shows the
fallacy of that claim: Abramski's false statement was
material because had he revealed that he was purchasing
the gun on Alvarez's behalf, the sale could not have pro-
ceeded under the law—even though Alvarez turned out to
be an eligible gun owner. The sale, as an initial matter,

would not have complied with §922(c)'s restrictions on absentee purchases. See *supra,* at 11–12. If the dealer here, Town Police Supply, had realized it was in fact selling a gun to Alvarez, it would have had to stop the transaction for failure to comply with those conditions. Yet more, the sale could not have gone forward because the dealer would have lacked the information needed to verify and record Alvarez's identity and check his background. See §§922(b)(5), (t)(1)(B)–(C); *supra,* at 10–12. Those requirements, as we have explained, pertain to the real buyer; and the after-the-fact discovery that Alvarez would have passed the background check cannot somehow wipe them away. Accordingly, had Town Police Supply known Abramski was a straw, it could not have certified, as Form 4473 demands, its belief that the transfer was "not unlawful." Supp. App. 3.

An analogy may help show the weakness of Abramski's argument. Suppose a would-be purchaser, Smith, lawfully could own a gun. But further suppose that, for reasons of his own, Smith uses an alias (let's say Jones) to make the purchase. Would anyone say "no harm, no foul," just because Smith is not in fact a prohibited person under §922(d)? We think not. Smith would in any event have made a false statement about who will own the gun, impeding the dealer's ability to carry out its legal responsibilities. So too here.

Abramski objects that because Alvarez could own a gun, the statute's core purpose—"keeping guns out of the hands" of criminals and other prohibited persons—"is not even implicated." Brief for Petitioner 29. But that argument (which would apply no less to the alias scenario) misunderstands the way the statute works. As earlier noted, the federal gun law makes the dealer "[t]he principal agent of federal enforcement." *Huddleston*, 415 U. S., at 824, see *supra,* at 16. It is that highly regulated, legally knowledgeable entity, possessing access to the expansive

NICS database, which has the responsibility to "[e]nsure that, in the course of sales or other dispositions . . . , weapons [are not] obtained by individuals whose possession of them would be contrary to the public interest." 415 U. S., at 825. Nothing could be less consonant with the statutory scheme than placing that inquiry in the hands of an unlicensed straw purchaser, who is unlikely to be familiar with federal firearms law and has no ability to use the database to check whether the true buyer may own a gun. And in any event, keeping firearms out of the hands of criminals is not §922's only goal: The statute's record-keeping provisions, as we have said, are also designed to aid law enforcement in the investigation of crime. See *supra,* at 2–3, 12–13. Abramski's proposed limitation on §922(a)(6) would undercut that purpose because many would-be criminals remain legally eligible to buy firearms, and thus could use straws to purchase an endless stream of guns off-the-books. See, *e.g., Polk*, 118 F. 3d, at 289 (eligible gun buyer used straw purchasers to secretly accumulate an "arsenal of weapons" for a "massive offensive" against the Federal Government).

In addition, Abramski briefly notes that until 1995, the ATF took the view that a straw purchaser's misrepresentation counted as material only if the true buyer could not legally possess a gun. See Brief for Petitioner 7–8; n. 8, *supra.* We may put aside that ATF has for almost two decades now taken the opposite position, after reflecting on both appellate case law and changes in the statute. See Tr. of Oral Arg. 41; Brady Handgun Violence Prevention Act of 1993, §103, 107 Stat. 1541 (codified at 18 U. S. C. §922(t)). The critical point is that criminal laws are for courts, not for the Government, to construe. See, *e.g., United States* v. *Apel*, 571 U. S. ___, (2014) (slip op., at 9) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference"). We think ATF's old position no more relevant than its current one—

which is to say, not relevant at all. Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to in construing §922(a)(6)), a court has an obligation to correct its error. Here, nothing suggests that Congress—the entity whose voice *does* matter—limited its prohibition of a straw purchaser's misrepresentation in the way Abramski proposes.

## IV

Finally, Abramski challenges his conviction under §924(a)(1)(A), which prohibits "knowingly mak[ing] any false statement . . . with respect to the information required by this chapter to be kept in the records" of a federally licensed dealer. That provision is broader than §922(a)(6) in one respect: It does not require that the false statement at issue be "material" in any way. At the same time, §924(a)(1)(A) includes an element absent from §922(a)(6): The false statement must relate to "information required by this chapter to be kept in [a dealer's] records." Abramski notes that the indictment in this case charged him with only one misrepresentation: his statement in response to Question 11.a. that he was buying the Glock on his own behalf rather than on someone else's. And, he argues, that information (unlike the transferee's "name, age, and place of residence," which he plausibly reads the indictment as not mentioning) was not required "*by this chapter*"—but only by Form 4473 itself—to be kept in the dealer's permanent records. Brief for Petitioner 32.

We disagree. Included in "this chapter"—Chapter 44 of Title 18—is a provision, noted earlier, requiring a dealer to "maintain such records of . . . sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." §923(g)(1)(A); *supra,* at 3. Because of that statutory section, the information that the Attorney General's regulations compel a dealer to keep is information

"required by this chapter." And those regulations (the validity of which Abramski does not here contest) demand that every licensed dealer "retain . . . as a part of [its] required records, each Form 4473 obtained in the course of" selling or otherwise disposing of a firearm. 27 CFR §478.124(b). Accordingly, a false answer on that form, such as the one Abramski made, pertains to information a dealer is statutorily required to maintain.[11]

## V

No piece of information is more important under federal firearms law than the identity of a gun's purchaser—the person who acquires a gun as a result of a transaction with a licensed dealer. Had Abramski admitted that he was not that purchaser, but merely a straw—that he was asking the dealer to verify the identity of, and run a back-ground check on, the wrong individual—the sale here could not have gone forward. That makes Abramski's misrepresentation on Question 11.a. material under §922(a)(6). And because that statement pertained to information that a dealer must keep in its permanent records under the firearms law, Abramski's answer to Question 11.a. also violated §924(a)(1)(A). Accordingly, we affirm the judgment of the Fourth Circuit.

*It is so ordered.*

---

[11]The dissent argues that our view would impose criminal liability for a false answer even to an "ultra vires question," such as "the buyer's favorite color." *Post,* at 15. We need not, and do not, opine on that hypothetical, because it is miles away from this case. As we have explained, see *supra* at 9–19, Question 11.a. is not ultra vires, but instead fundamental to the lawfulness of a gun sale. It is, indeed, part and parcel of the dealer's determination of the (true) buyer's "name, age, and place of residence," which §922(b)(5) requires the dealer to keep. That section alone would justify Abramski's conviction under §924(a)(1)(A) if the indictment here had clearly alleged that, in addition to answering Question 11.a. falsely, he lied about that buyer's "name, age, and place of residence."

# SUPREME COURT OF THE UNITED STATES

————————

No. 12–1493

————————

## BRUCE JAMES ABRAMSKI, JR., PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 16, 2014]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Bruce Abramski bought a gun for his uncle from a federally licensed gun dealer, using money his uncle gave him for that purpose. Both men were legally eligible to receive and possess firearms, and Abramski transferred the gun to his uncle at a federally licensed gun dealership in compliance with state law. When buying the gun, Abramski had to fill out Form 4473 issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). In response to a question on the form, Abramski affirmed that he was the "actual/transferee buyer" of the gun, even though the form stated that he was not the "actual transferee/buyer" if he was purchasing the gun for a third party at that person's request and with funds provided by that person.

The Government charged Abramski with two federal crimes under the Gun Control Act of 1968, as amended, 18 U. S. C. §§921–931: making a false statement "material to the lawfulness of the sale," in violation of §922(a)(6), and making a false statement "with respect to information required by [the Act] to be kept" by the dealer, in violation of §924(a)(1)(A). On both counts the Government interprets this criminal statute to punish conduct that its plain language simply does not reach. I respectfully dissent from the Court's holding to the contrary.

## I. Section 922(a)(6)

### A

Under §922(a)(6), it is a crime to make a "false . . . statement" to a licensed gun dealer about a "fact material to the lawfulness of" a firearms sale. Abramski made a false statement when he claimed to be the gun's "actual transferee/buyer" as Form 4473 defined that term. But that false statement was not "material to the lawfulness of the sale" since the truth—that Abramski was buying the gun for his uncle with his uncle's money—would not have made the sale unlawful. See *Kungys* v. *United States*, 485 U. S. 759, 775 (1988) (plurality opinion) (materiality is determined by asking "what would have ensued from official knowledge of the misrepresented fact"); accord *id.,* at 787 (Stevens, J., concurring in judgment). Therefore, Abramski's conviction on this count cannot stand.

Several provisions of the Act limit the circumstances in which a licensed gun dealer may lawfully sell a firearm. Most prominently, the Act provides that no one may "sell or otherwise dispose of" a firearm to a person who he knows or has reasonable cause to believe falls within one of nine prohibited categories (such as felons, fugitives, illegal-drug users, and the mentally ill). §922(d). But the Government does not contend that either Abramski or his uncle fell into one of those prohibited categories. And no provision of the Act prohibits one person who is eligible to receive and possess firearms (*e.g.,* Abramski) from buying a gun for another person who is eligible to receive and possess firearms (*e.g.,* Abramski's uncle), even at the other's request and with the other's money.

The Government's contention that Abramski's false statement was material to the lawfulness of the sale depends on a strained interpretation of provisions that mention the "person" to whom a dealer "sell[s]" (or "transfer[s]," or "deliver[s]") a gun. A dealer may not "sell or

deliver" a firearm to a "person" without recording "the name, age, and place of residence of such person." §922(b)(5). He may not, without following special procedures, "sell" a firearm to a "person" who does not appear in person at the dealer's business. §922(c). He may not "transfer" a firearm to a "person" without verifying that person's identity and running a background check. §922(t)(1). And he may not "sell or deliver" a firearm to a "person" who he knows or has reasonable cause to believe resides in a different State. §922(b)(3).

The Government maintains that in this case *Abramski's uncle* was the "person" to whom the dealer "s[old]" the gun, and that the sale consequently violated those provisions. It bases that assertion on the claim that the Gun Control Act implicitly incorporates "principles of agency law." Brief for United States 17. Under those principles, it contends, the individual who walks into a dealer's store, fills out the requisite forms, pays the dealer, and takes possession of the gun is not necessarily the "person" to whom the dealer "sell[s]" the gun. Instead, it says, we must ask whether that individual bought the gun as a third party's common-law agent; if so, then the third party is the "person" to whom the dealer "sell[s]" the gun within the meaning of the relevant statutory provisions. The majority agrees: Although it never explicitly mentions agency law, it declares that if an individual is "buying a firearm on someone else's behalf," the "someone else" is the "person" to whom the dealer "sell[s]" the gun within the meaning of the statute. *Ante,* at 9.

I doubt that three of the four provisions at issue here would establish the materiality of Abramski's falsehood *even if* Abramski's uncle were deemed the "person" to whom the dealer "s[old]" the gun.[1] But §922(b)(3) would

――――――――

[1] Sections 922(b)(5), (c), and (t)(1) require the dealer to follow certain procedures with respect to that "person," such as recording his name,

unquestionably do so, since it prohibits a dealer from selling a gun to a person who resides in another State, as Abramski's uncle did. That is of no moment, however, because Abramski's uncle was not the "person" to whom the gun was "s[old]."

The contrary interpretation provided by the Government and the majority founders on the plain language of the Act. We interpret criminal statutes, like other statutes, in a manner consistent with ordinary English usage. *Flores-Figueroa* v. *United States*, 556 U. S. 646, 650–652 (2009); *Jones* v. *United States*, 529 U. S. 848, 855 (2000); *Bailey* v. *United States*, 516 U. S. 137, 144–145 (1995). In ordinary usage, a vendor sells (or delivers, or transfers) an item of merchandise to the person who physically appears in his store, selects the item, pays for it, and takes possession of it. So if I give my son $10 and tell him to pick up milk and eggs at the store, no English speaker would say that the store "sells" the milk and eggs to me.[2] And even if we were prepared to let "principles of agency law" trump ordinary English usage in the interpretation of this criminal statute, those principles would not require a different

_____

dealing with him in person, and checking his background. I doubt whether a falsehood that causes the dealer to neglect those procedures (here, by applying them to the wrong person) is *material to the lawfulness of the sale* within the meaning of §922(a)(6) if the sale could have been executed lawfully had the truth been disclosed. Moreover, if that were so—if a falsehood that introduced procedural error into a gun sale were *always* material to lawfulness—then §924(a)(1)(A) (discussed in Part II of this opinion), which prohibits making false statements with respect to information required to be recorded in a dealer's records, would be superfluous.

[2] The majority makes the puzzling suggestion that the answer would be different if the sale involved consumer electronics instead of groceries. *Ante,* at 9, n. 5. But whether the item sold is a carton of milk, an iPhone, or anything else under the sun, an ordinary English speaker would say that an over-the-counter merchant "sells" the item to the person who pays for and takes possession of it, not the individual to whom that person later transfers the item.

result. See, *e.g.,* Restatement (Second) of Agency §366, Illustration 1 (1957) ("On behalf of P, his disclosed principal, A makes a written contract with T wherein A promises to buy from T, *and T agrees to sell to A*, certain machinery for $1000. . . . [If there is fraud in the inducement and A has already paid], A can maintain an action against T for the thousand dollars" (emphasis added)).

*Huddleston* v. *United States*, 415 U. S. 814 (1974), on which the majority relies, *ante,* at 14, does not suggest otherwise. There we addressed the *types* of transactions covered by the statutory term "acquisition" in §922(a)(6) (a term whose meaning is not at issue here), holding that they were not limited to "sale-like transaction[s]" but included a "pawnshop redemption of a firearm." 415 U. S., at 819. We said nothing about the distinct question of *to whom* a dealer "sell[s]," "transfer[s]," or "deliver[s]" a firearm in a given transaction. Nor does the case stand, as the majority believes, for "a substance-over-form approach," *ante,* at 14. We said the term "acquisition" was "'aimed at providing maximum coverage,'" *ibid.* (quoting 415 U. S., at 826–827), not because substance over form demands that, nor because everything in the Act must be assumed to provide maximum coverage, but because "[t]he word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of,'" which gives "no intimation . . . that title or ownership would be necessary." *Id.,* at 820.

Contrary to the majority's assertion that the statute "merely raises, rather than answers, the critical question" of whether Abramski or his uncle was the "person" to whom the dealer "s[old]" the gun, *ante,* at 9, the statute speaks to that question directly. Giving the text its plain, ordinary meaning, Abramski, not his uncle, was that "person." That being so, the Government has identified no reason why the arrangement between Abramski and his uncle, both of whom were eligible to receive and possess

firearms, was "material to the lawfulness of" the sale.[3]

## B

The majority contends, however, that the Gun Control Act's "principal purpose" of "curb[ing] crime by keeping firearms out of the hands of those not legally entitled to possess them" demands the conclusion that Abramski's uncle was the "person" to whom the dealer "s[old]" the gun. *Ante,* at 11 (internal quotation marks omitted). But "no law pursues its purpose at all costs," and the "textual limitations upon a law's scope" are equally "a part of its 'purpose.'" *Rapanos* v. *United States*, 547 U. S. 715, 752 (2006) (plurality opinion). The majority's purpose-based arguments describe a statute Congress reasonably might have written, but not the statute it wrote.

The heart of the majority's argument is its claim that unless Abramski's uncle is deemed the "person" to whom the gun was "s[old]," the Act's identification, background-check, and record-keeping requirements would be "render[ed] meaningless." *Ante,* at 11. That vastly overstates the consequences. Perhaps the statute would serve the purpose of crime prevention *more effectively* if the requirements at issue looked past the "man at the counter" to the person "getting, and always meant to get, the fire-

---

[3]The facts of this case provide no occasion to address whether—as ATF maintained for many years before adopting its current position—a misrepresentation in response to Form 4473's "actual buyer/transferee" question would be "material to the lawfulness of the sale" if the customer intended to transfer the gun to a person who he knew or had reasonable cause to believe was prohibited by the Act from receiving or possessing firearms. A falsehood that conceals an intention of that sort may be material because a dealer who sold the gun knowing of that intention might be "unlawfully aiding" the customer's violation of §924(d) (and the prohibited person's violation of §924(g)). Cf. ATF, Industry Circular 79–10 (1979), in (Your Guide To) Federal Firearms Regulation 1988–89 (1988), p. 78; *infra*, at 10–11. I need not decide that question here.

arm." *Ante,* at 13.  But ensuring that the person taking possession of the firearm from the dealer is eligible to receive and possess a firearm, and recording information about that person for later reference, are by no means worthless functions.  On the contrary, they indisputably advance the purpose of crime prevention by making it harder for ineligible persons to acquire guns and easier for the Government to locate those guns in the future; they simply do not advance that purpose to the same degree as a more exacting law might have done.

That the Act's focus on the "man at the counter" in this situation does not render its requirements "meaningless" is confirmed by the Government's concession that the Act has a similar focus in many comparable situations where the gun's immediate purchaser is—to use the majority's phrase—a "mere condui[t]" for a contemplated transfer of the gun to a different person who will "take possession of, own, and use" it.  *Ante,* at 11, 16.  Consider the following scenarios in which even the Government regards the man at the counter as the "person" to whom the dealer "sell[s]" the gun:

- *Guns Intended as Gifts.*  In the Government's view, an individual who buys a gun "with the intent of making a gift of the firearm to another person" is the gun's "true purchaser."  ATF, Federal Firearms Regulations Reference Guide 165 (2005) (hereinafter 2005 ATF Guide).  The Government's position makes no exception for situations where the gift is specifically requested by the recipient (as gifts sometimes are).  So long as no money changes hands, and no agency relationship is formed, between gifter and giftee, the Act is concerned only with the man at the counter.

- *Guns Intended for Resale.*  Introducing money into

the equation does not automatically change the outcome. The Government admits that the man at the counter is the true purchaser even if he immediately sells the gun to someone else. Tr. of Oral Arg. 34–35. And it appears the Government's position would be the same even if the man at the counter purchased the gun with the *intent* to sell it to a particular third party, so long as the two did not enter into a common-law agency relationship.

- *Guns Intended as Raffle Prizes.* The Government considers the man at the counter the true purchaser even if he is buying the gun "for the purpose of raffling [it] at an event"—in which case he can provide his own information on Form 4473 and "transfer the firearm to the raffle winner without a Form 4473 being completed or a [background] check being conducted" on the winner. 2005 ATF Guide 195.

If the statute's requirements were "render[ed] meaningless" by treating Abramski rather than his uncle as the true purchaser, then they would be every bit as meaningless in the scenarios just described. The Government's concession that the statute is operating appropriately in each of those scenarios should cause the majority to reevaluate its assumptions about the type and degree of regulation that the statute regards as "meaningful." The majority, it is clear, regards Abramski's interpretation as creating a loophole in the law; but even if that were a fair characterization, why is the majority convinced that a statute with so many *admitted* loopholes does not contain this *particular* loophole?

The majority's answer to this argument is that "the individual who sends a straw to a gun store to buy a firearm is transacting with the dealer, in every way but the

most formal." *Ante,* at 16 (emphasis deleted). That certainly distinguishes that individual from the intended subsequent donee or purchaser; so would the fact that he has orange hair. But it does not establish why that individual, any more than the others, should be thought to be covered by statutory language (the "person" to whom a dealer "sell[s]" a gun) that does not naturally apply. The only thing which can justify *that* leap is the false imperative to make the statute as effective as possible, rather than as effective as the language indicates Congress desired.[4]

What the scenarios described above show is that the statute typically *is* concerned only with the man at the counter, even where that man is in a practical sense a "conduit" who will promptly transfer the gun to someone else. Perhaps that is because Congress wanted a rule that would be easy to understand and to administer, which the Government's proposed agency test—and the majority's apparent adoption of that test *sans* any mention of agency law—certainly is not. (When counsel for the Government was pressed about hypothetical situations not giftwrapped as neatly as this case, he said, frankly but unhelpfully, that they would turn on the "factual question" of "[w]hether the purchase was made on behalf of someone

---

[4] The majority's claim that its analysis "does not rest on mere 'purpose-based arguments,'" *ante,* at 9, n. 6, rings hollow. The majority says it is relying on the principle that when a statutory provision is "ambiguous" but "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law," we should adopt that meaning. *Ibid.* (internal quotation marks omitted). But even if the text at issue here were ambiguous, it is clear that the "substantive effect" of the narrower interpretation is "compatible with"—indeed, it is downright congenial to—"the rest of" the Gun Control Act. The majority's contrary conclusion rests, not on anything in the text or structure of the Act, but on the majority's guess about how far Congress meant to go in pursuit of its crime-prevention "purpose."

else." Tr. of Oral Arg. 49–50.)

Or perhaps Congress drew the line where it did because the Gun Control Act, like many contentious pieces of legislation, was a "compromise" among "highly interested parties attempting to pull the provisions in different directions." *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 461 (2002); see *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 135–136 (1995). Perhaps those whose votes were needed for passage of the statute *wanted* a lawful purchaser to be able to use an agent. A statute shaped by political tradeoffs in a controversial area may appear "imperfect" from some perspectives, but "our ability to imagine ways of redesigning the statute to advance one of Congress' ends does not render it irrational." *Preseault* v. *ICC*, 494 U. S. 1, 19 (1990). We must accept that Congress, balancing the conflicting demands of a divided citizenry, "'wrote the statute it wrote'—meaning, a statute going so far and no further." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. ___, ___ (2014) (slip op., at 11).

That Abramski's reading does not render the Act's requirements "meaningless" is further evidenced by the fact that, for decades, even ATF itself did not read the statute to criminalize conduct like Abramski's. After Congress passed the Act in 1968, ATF's initial position was that the Act did not prohibit the sale of a gun to an eligible buyer acting on behalf of a third party (even an ineligible one). See Hearings Before the Subcommittee To Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., pt. 1, 118 (1975). A few years later, ATF modified its position and asserted that the Act did not "prohibit a dealer from making a sale to a person who is actually purchasing the firearm for another person" *unless* the other person was "prohibited from receiving or possessing a firearm," in which case the dealer could be guilty of "unlawfully aiding the prohibited

person's own violation."   ATF, Industry Circular 79–10 (1979), in (Your Guide To) Federal Firearms Regulation 1988–89 (1988), p. 78.   The agency appears not to have adopted its current position until the early 1990's.   See *United States* v. *Polk*, 118 F. 3d 286, 295, n. 7 (CA5 1997).

The majority deems this enforcement history "not relevant" because the Government's reading of a criminal statute is not entitled to deference. *Ante,* at 22.   But the fact that the agency charged with enforcing the Act read it, over a period of roughly 25 years, not to apply to the type of conduct at issue here is powerful evidence that interpreting the Act in that way is natural and reasonable and does not make its requirements "meaningless."

## C

Even if the statute were wrongly thought to be ambiguous on this point, the rule of lenity would defeat the Government's construction.   It is a "familiar principle" that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Skilling* v. *United States*, 561 U. S. 358, 410 (2010).   That principle prevents us from giving the words of a criminal statute "a meaning that is different from [their] ordinary, accepted meaning, and that disfavors the defendant." *Burrage* v. *United States*, 571 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 12).   And it means that when a criminal statute has two possible readings, we do not "'choose the harsher alternative'" unless Congress has "'spoken in language that is clear and definite.'" *United States* v. *Bass*, 404 U. S. 336, 347–349 (1971).   For the reasons given above, it cannot be said that the statute unambiguously commands the Government's current reading.   It is especially contrary to sound practice to give this criminal statute a meaning that the Government itself rejected for years.

The majority does not mention the rule of lenity apart from a footnote, *ante*, at 18, n. 10, responding to this dis-

sent.  The footnote concedes that "the text creates some
ambiguity" but says that "context, structure, history, and
purpose resolve it."  *Ibid.*  But for the reasons given above,
context and structure do not support the majority's inter-
pretation, history refutes it by showing that the Govern-
ment itself interpreted the statute more leniently for
many years, and "purpose" supports it only if one imputes
to the statute a crime-fighting purpose broader than the
text discloses (a practice that would nullify the rule of
lenity in all cases).  See Part I–B, *supra.*[5]  If lenity has no
role to play in a clear case such as this one, we ought to
stop pretending it is a genuine part of our jurisprudence.

Contrary to the majority's miserly approach, the rule of
lenity applies whenever, after all legitimate tools of inter-
pretation have been exhausted, "a reasonable doubt per-
sists" regarding whether Congress has made the defend-
ant's conduct a federal crime, *Moskal* v. *United States*, 498
U. S. 103, 108 (1990)—in other words, whenever those
tools do not decisively dispel the statute's ambiguity.
*Skilling, supra,* at 410; see, *e.g., Scheidler* v. *National
Organization for Women, Inc.*, 537 U. S. 393, 409 (2003);
*Cleveland* v. *United States*, 531 U. S. 12, 25 (2000); *Cran-
don* v. *United States*, 494 U. S. 152, 158 (1990).  "[W]here
text, structure, and history fail to establish that the Gov-
ernment's position is unambiguously correct . . . we apply
the rule of lenity and resolve the ambiguity in [the de-
fendant]'s favor."  *United States* v. *Granderson*, 511 U. S.
39, 54 (1994).  It cannot honestly be said that the text,
structure, and history of the Gun Control Act establish as
"unambiguously correct" that the Act makes Abramski's
conduct a federal crime.

By refusing to apply lenity here, the majority turns its

---

[5]The majority is thus entirely wrong to charge that I would apply the
rule of lenity "because the statute's text, taken alone, permits a nar-
rower construction," *ante,* at 18, n. 10.

back on a liberty-protecting and democracy-promoting rule that is "perhaps not much less old than construction itself." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.); see, *e.g.,* 1 W. Blackstone, Commentaries on the Laws of England 88 (1765) ("Penal statutes must be construed strictly"). As Chief Justice Marshall wrote, the rule is "founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *Wiltberger, supra,* at 95. It forbids a court to criminalize an act simply because the court deems that act "of equal atrocity, or of kindred character, with those which are enumerated." *Id.,* at 96. Today's majority disregards that foundational principle.

## II. Section 924(a)(1)(A)

Under §924(a)(1)(A), it is a crime to make a "false statement . . . with respect to the information *required by this chapter* to be kept in the records of" a federally licensed gun dealer (emphasis added). "[T]his chapter" refers to chapter 44 of title 18 of the United States Code, which contains the Gun Control Act. §§921–931.

The question Abramski answered falsely was whether he was buying the gun for someone else. Did the Act itself require the dealer to record this information? It did not; it simply required him to record "the name, age, and place of residence" of the "person" to whom the firearm was "s[old] or deliver[ed]." §922(b)(5). As explained above, that "person" was Abramski, not his uncle. See Part I, *supra*.

But, the majority says, the Act also directs dealers to "'maintain such records . . . as the Attorney General may by regulations prescribe.'" *Ante,* at 22 (quoting §923(g)(1)(A)). So did a regulation require this information to be recorded? Again, no. The relevant regulation provides that a dealer shall

"obtain a Form 4473 from the transferee showing the

transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; the transferee's country of citizenship; the transferee's INS-issued alien number or admission number; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." 27 CFR §478.124(c)(1) (2014).

The long list of information that this regulation requires to be kept in the dealer's records does not include whether the transferee is buying the gun for an eligible third party.

But wait! the majority says: Another provision of the regulation requires a dealer to "'retain . . . as part of [its] required records, each Form 4473 obtained in the course of'" selling or disposing of a firearm. *Ante,* at 23 (quoting 27 CFR §478.124(a)). Therefore, according to the majority, any "false answer on that Form"—even an answer to a question that is not among those enumerated in the regulation—necessarily "pertains to information a dealer is statutorily required to maintain." *Ante,* at 23.

That carries the text of the statute a bridge too far. On the majority's view, if the bureaucrats responsible for creating Form 4473 decided to ask about the buyer's favorite color, a false response would be a federal crime. That is not what the statute says. The statute punishes misstatements "with respect to *information* required to be kept," §924(a)(1)(A) (emphasis added), not with respect to "information contained in forms required to be kept." Because neither the Act nor any regulation requires a dealer to keep a record of whether a customer is purchasing a gun for himself or for an eligible third party, that

question had no place on Form 4473—any more than
would the question whether the customer was purchasing
the gun as a gift for a particular individual and, if so, who
that individual was. And the statute no more criminalizes
a false answer to an ultra vires question on Form 4473
than it criminalizes the purchaser's volunteering of a false
e-mail address on that form. Information regarding
Abramski's status as a "straw purchaser" was not "infor-
mation required to be kept," and that is an end of the
matter. In my view, that is the best—indeed, the only
plausible—interpretation of §924(a)(1)(A). But at a mini-
mum, the statute is ambiguous, and lenity does the rest.
See Part I–C, *supra*.[6]

\*      \*      \*

The Court makes it a federal crime for one lawful gun
owner to buy a gun for another lawful gun owner. Whether
or not that is a sensible result, the statutes Congress
enacted do not support it—especially when, as is appro-
priate, we resolve ambiguity in those statutes in favor of
the accused. I respectfully dissent.

———————

[6] The majority professes that it "need not, and do[es] not, opine on"
whether it would impose liability for "a false answer even to an 'ultra
vires question'" because, given its reasoning on Count One, the ques-
tion at issue here was "part and parcel of the dealer's determination of
the (true) buyer's 'name, age, and place of residence,' which §922(b)(5)
requires the dealer to keep." *Ante,* at 23, n. 11. But if that is really all
the majority means to decide, then why bother to invoke the require-
ment that the dealer keep such records as the regulations prescribe and
the regulation requiring the dealer to keep Form 4473? See *ante,* at
22–23. If the majority's ruling is as limited as it claims, it ought to cite
§922(b)(5) and be done.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

APPALACHIAN RESOURCES DEV. CORP., )
d/b/a BEND OF THE RIVER, )
)
Petitioner, )
)
v. )          No. 2:01-0061
)          JUDGE HAYNES
HARRY L. McCABE, III, in his official capacity )
as Director, Industry Operations, Nashville Div., )
Bureau of Alcohol Tobacco & Firearms, )
)
Respondent. )

## MEMORANDUM

Petitioner, Appalachian Resources Development Corporation d/b/a Bend of the River,

filed this petition for judicial review under 28 U.S.C. § 1331, the federal question jurisdiction

statute, and the Gun Control Act ("GCA"), 18 U.S.C. § 923(f)(3), against Director Harry L.

McCabe, III ("Director"), in his official capacity as the Director of the Bureau of Alcohol,

Tobacco & Firearms' ("ATF") Industry Operations in Nashville, Tennessee. Petitioner asserts

that the Director lacked sufficient evidence to revoke Petitioner's federal firearm licenses for

allegedly willfully violating 18 U.S.C. § 922(b)(1) and 27 C.F.R. § 178.99(b), that prohibit the

sale of handgun ammunition to individuals whom the licensee knows or has reason to believe

are under 21 years of age.

Before the Court are the Respondent's and Petitioner's cross-motions for summary

judgment. (Docket Entry Nos. 14 and 24). Respondent asserts, in sum, that there are not any

issues of material fact on Petitioner's federal sale of the ammunition to an underage person, and

the evidence in the record establishes Petitioner's willfulness. Thus, the Respondent asserts

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP on 4-1-03 By ___



entitlement to judgment as a matter of law. Petitioner, however, contends, in essence, that there is insufficient evidence to establish that it willfully violated the GCA because: (1) the alleged violation involves a single sale; (2) the purchaser appeared to be 21 years of age; and (3) that Petitioner did not violate the GCA because the ammunition at issue can be used interchangeably with rifles.

Both Petitioner and Respondent have filed responses and replies to the opposing party's motion for summary judgment. In addition, the Court has granted the parties' joint motion for a ruling without an additional evidentiary hearing. (Docket Entry No. 42, Order).

## A. FINDINGS OF FACT[1]

### 1. Procedural History

On March 17, 2000, ATF Director of Industry Operations Harry McCabe III, pursuant to 18 U.S.C. § 923(e), issued notices of revocation of the Petitioner's firearm licenses for willful violations of 18 U.S.C. §§ 922(b)(1), 923(g)[2], and 27 C.F.R. § 178.99(b). (Docket Entry No. 19, Administrative Record, Government Exhibit 1). The Director revoked four firearms licenses: 1-62-067-06-0L-11419, as an ammunition manufacturer, and 1-62-067-01-0L-1137, as a firearms

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, under Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52,106 S. Ct. 2505, 91 L. Ed.2d 202 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). Based upon the parties' stipulation, the Court concludes that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

[2] Respondent concedes that the revocation notices erroneously alleged a violation, and repeated violations, of the record keeping requirements under 18 U.S.C. § 923(g). (Docket Entry No. 32 at ¶¶ 23-25).

dealer, issued to the Petitioner's store located at 2880 Standing Stone Hwy., Cookeville, Tennessee; and 1-62-071-06-1A-21097, as an ammunition manufacturer, and 1-62-071-01-0M-21096, as a firearms dealer, issued to the Petitioner's store at 515 West Broad Street, Cookeville, Tennessee. Id., Director's Findings of Fact and Conclusions of Law at pp. 12-13. Pursuant to 18 U.S.C. § 923(f)(2), Charles Pardue, the Petitioner's president, requested a hearing on the revocation of all the firearms licenses. Id. at Government Exhibit 2. On November 30, 2000, a hearing was held to review the revocation of Petitioner's firearms licenses. Id. at Government Exhibit 3; Transcript at p. 1.

Based on the evidence presented at the hearing, Hearing Officer Donna S. Forrester recommended that Petitioner's four firearms licenses be revoked. Id., Hearing Officer Report at p. 11. The Director, in turn, reaffirmed his earlier decision to revoke Petitioner's firearms licenses, concluding that Petitioner had willfully violated 18 U.S.C. § 922(b)(1). Id., Director's Findings of Fact and Conclusions of Law at pp. 12-13.

## 2. Sale at Issue

Prior to the revocation of Petitioner's firearms licenses, ATF licensed Petitioner to sell firearms, and to manufacture and sell ammunition. (Docket Entry No. 27, Statement of Material Facts at ¶ 1). Charles Pardue is the Petitioner's president, and William West is an employee at the 515 West Broad Street Bend of the River store. Id. at ¶ 2. Both Pardue and West understood their obligations to comply with all laws and regulations relating to firearms. Id. at ¶ 3. In addition, Pardue and West knew of the prohibition against selling handgun ammunition to persons under 21 years of age. Id. at ¶ 4. Pardue also stated that he knew these requirements because they were in a firearms regulation book. Id. at ¶ 5. West also knew of the above

3

requirements because he learned them from Pardue and from a book. Id. at ¶ 9.

Patrick W. Hand, ATF's Special Agent, interviewed Pardue about Bend of the River's policy for selling ammunition to which Pardue responded that "if we have it and they have the money, we sell it." (Docket Entry No. 27 at ¶ 8). Similarly, West testified that "[i]f I felt that the person was of the age to buy the ammunition I'd sell it to them." (Docket Entry No. 19, Administrative Record, Transcript at p. 97). Pardue testified, however, that if a person looked old enough, identification was not a requirement to obtain identification for sales of ammunition. Id. at pp. 235-36. As of 1997, West did not recall asking any person to verify his or her age for a sale. (Docket Entry No. 27, Petitioner's Response to Respondent's Statement of Undisputed Facts at ¶8).

On July 16, 1997, Aaron Rains, who was then 18 years of age, purchased a box of ammunition from the Bend of the River store at 515 West Broad Street in Cookeville, Tennessee. (Docket Entry No. 27 at ¶¶ 13, 14). Sometime after obtaining this ammunition, Aaron Rains committed suicide. (Docket Entry No. 19, Administrative Record, Transcript at pp. 127-35).

On July 16, 1997, Pardue and West were working at the store. (Docket Entry No. 27 at ¶ 14). At the revocation hearing, however, Pardue testified that he did not know for certain whether Aaron Rains came to the Bend of the River store on the day in question. (Docket Entry No. 19, Administrative Record, Transcript of ATF Hearing at p. 207). West also testified that he did not remember whether Aaron Rains came into the store. Id. at p. 96. West testified that on July 16, 1997, he did not know of any person who purchased ammunition and who was under 21 or who gave them reason to question the purchaser's age. Id. at p. 98.

At the revocation hearing, the ATF presented a check number 172 signed by Aaron Rains,

4

made payable to Bend of the River for $11.85, on July 16, 1997 and bearing the initials "WW" at the upper left hand corner of the check. (Docket Entry No. 27 at ¶ 15; see also Docket Entry No. 19, Administrative Record, Exhibits 4a and 4b). Pardue agreed that the receipt in question was from a Bend of the River store and that the "WW" initials in Aaron Rains' check were in William West's handwriting. (Docket Entry No. 19, Administrative Record, Transcript at pp. 238-39). At the hearing, Bobby W. Rains, Aaron Rains' father, testified that he was familiar with his son's handwriting and that the check was in his son's handwriting. Id. at p. 134.

Bobby Rains testified that on July 16, 1997, he did not see his son, Aaron, id. at p. 126, and that on the next day, Bobby Rains noticed that his handgun was missing. Id. at p. 127. On the morning of July 18, 1997, Bobby Rains also found a K-Mart bag in Aaron Rains' bedroom that contained "B.B. gun" ammunition and a register receipt from Bend of the River. Id. at pp. 127, 128. The Bend of the River receipt was for a sale of ammunition in the amount of $11.85,[3] and is dated July 16, 1997. Id., Administrative Record, Government Exhibit 5.

It is undisputed that the check that Aaron Rains wrote to Bend of the River for $11.85 matched the amount of the register receipt for an ammunition purchase that Bobby Rains found. (Docket Entry No. 27 at ¶ 16). Further, when Aaron Rains' body was found, a box of Winchester .25 ACP automatic caliber 50 gr. full metal jacket centerfire cartridges with a Bend of the River price tag affixed thereto were also found in his vehicle. Id. at ¶ 17; see also Docket Entry No 19, Administrative Record, Government Exhibits 6-8. It is undisputed that Aaron Rains used a .25 ACP caliber pistol to commit suicide. (Docket Entry No. 32 at ¶ 10).

---

[3] The receipt is for a sale of $10.95 plus $0.90 in tax, totaling $11.85. Id. at Exhibit 5. In addition, the receipt bears a sales code 34 that represents a sale of ammunition. Id., Transcript at pp. 27-28.

Several photographs of Aaron Rains were introduced as evidence at the administrative hearing (Docket Entry No. 19, Administrative Record, Government Exhibits 13-16), including a color reproduction of his Tennessee driver's license issued on June 26, 1997. None of these photographs, however, shows Aaron Rains' appearance on July 16, 1997. (Docket Entry No. 32, Petitioner's Statement of Additional Material Facts at ¶ 5). Yet, sometime on July 16, 1997, Aaron Rains went to a K-Mart store and spoke with Rick Martin, a sporting goods clerk. (Docket Entry No. 19, Administrative Record, Government Exhibit 11, Martin Deposition at p. 11).

Aaron Rains asked Martin how old someone had to be to purchase .25 caliber ammunition. (Docket Entry No. 27 at ¶ 19). Martin responded that one would have to be 21 years of age, but "didn't ask [Rains] for his I.D," (Docket Entry No. 19, Administrative Record, Government's Exhibit No. 12, Martin Deposition at p. 6), because Aaron Rains produced his identification and admitted he was only 18 years old. (Docket Entry No. 32, Petitioner's Statement of Additional Material Facts at ¶ 20). According to Martin, if Rains had not produced his identification, "I would have carded him myself." Id. at p. 6.

In addition, Martin testified as to his observations about Aaron Rains' appearance on July 16, 1997:

Q:  Did he appear to you to be [18 years] old, or even possibly older just from looking at him?

A:  He looked questionable.

Q:  Okay.

A:  Definitely someone that I would ask to see an I.D. No doubt about it someone I would ask to see his I.D.

6

Q:    But I mean, did he look like he could have been – what would you say the range of his age was by looking at him when he came in?

A:    He could have been sixteen. He could have been twenty-two. Somewhere in there.

(Docket Entry No. 19, Administrative Record, Exhibit 11, Martin Deposition at pp. 15-16) (emphasis added).

The parties agree that if ammunition sold by Bend of the River could be used in either a handgun or a rifle or shotgun, then the ammunition at issue could be legally sold to someone who was 18 years of age or older. (Docket Entry No. 32 at ¶ 16). Pardue testified that under federal firearm regulations, a person under 21, but over 18 years of age may purchase handgun ammunition that is interchangeable as rifle ammunition:

A:    The ages for [legally being able to purchase] ammunition [are that], you have to be, at least, 18 to buy it for a . . . rifle, or long-gun ammunition, and you have to be 21 to buy handgun ammunition.

Q:    What happens if the ammunition is interchangeable?

A:    If they say they're using it for a rifle we're supposed to be able to sell it to them.

Q:    In other words, if it could be used in either a handgun or a long-gun you could sell it if they're 18?

A:    Yes.

(Docket Entry No. 19, Administrative Record, Transcript at pp. 204-05). Yet, Pardue admitted that on July 16, 1997, he was unaware of any rifle that could fire .25 ACP ammunition. (Docket Entry No. 27 at ¶ 34).

### 3.  Expert Testimony

Both parties presented expert testimony as to the possible interchangeable uses of .25

ACP caliber ammunition between handguns and rifles. Respondent submitted the declaration of Curtis H.A. Bartlett, the ATF's Chief of the Firearms Technology Branch in Washington, D.C. (Docket Entry No. 19, Administrative Record, Government Exhibit 22, Bartlett Declaration at ¶ 1). Bartlett, who has been assigned to the ATF's Firearm Technology Branch sing 1974, advises ATF agents about the origin, function and classification of firearms and ammunition. Id., Qualifications at ¶ 2. Bartlett has testified over 200 times as an expert witness in the field of firearms identification, origin and classification in both federal and state courts throughout the United States. Id. at ¶ 10.

Bartlett made the following statements about the .25 ACP caliber ammunition at issue in this action:

> . . . The cartridge known in the United States as .25 ACP uses a bullet measuring approximately .25 inches in diameter. The designation 'ACP' is an abbreviation for 'Automatic Colt Pistol'.
>
> The .25 ACP cartridge was initially used in the United States in a pistol introduced in 1908 by the Colt Firearms Company. The .25 ACP cartridge is also known under the metric designation 6.35mm Browning.
>
> . . . Due to its small size and relatively low power the .25 ACP cartridge is suitable for use in small handguns.
>
> There are also various other .25 caliber cartridges having bullets measuring approximately .25 inches in diameter but having a cartridge case with different dimensions. Other .25 caliber cartridges which are used in rifles include cartridges such as .25-20, .25-35, and .25-06. Because these other cartridge cases have different dimensions, they are not interchangeable with .25 ACP.
>
> Over 100 types of handguns have been manufactured over the past 95 years which use .25 ACP ammunition. Millions of pistols chambered for .25 ACP have been produced.

\*  \*  \*

8

> [The] .25 ACP ammunition is currently listed in major ammunition manufacturer's catalogs under the category of pistol or handgun cartridges . . . .
>
> [The] .25 ACP ammunition is identified in various standard ammunition reference books [like Cartridges of the World, Cartridges, Centerfire Pistol and Revolver Cartridges] as a pistol or handgun cartridge . . . .
>              *     *     *
>
> I am unfamiliar with any type of rifle chambered for .25 ACP ammunition and in my professional experience of over 25 years I do not ever recall seeing any rifle chambered for .25 ACP.

Id., Bartlett Declaration at ¶¶ 2-6, 8-9, 11 (emphasis added).

Petitioner presented a letter from Dough Wicklund, the Senior Curator at the National Firearms Museum in Fairfax, Virginia. Id., Petitioner Exhibit 6. In his letter, Wicklund opined as to the manufacture of rifles that use .25 ACP ammunition:

> ...the answer is that domestically Firearms International (Garcia) of Washington, DC made up a small run of .25 ACP semi-auto pistol/rifle combination guns . . . . This firm is long out of business and I have only seen one of these .25 ACP rifles myself. On the foreign marketplace, at least one Belgian firm in the 1920s produced a semi-automatic rifle chambered for the 6.35mm (.25 ACP) cartridge. I have seen one of these rifles in the USA, at a gunshow. I have also heard of an individual in California that converted an Armalite AR-7 semi-auto rifle from .22LR to .25 ACP.

Id. (emphasis added). Yet, Wicklund cautioned that "Please note that despite being the Senior Curator of the National Firearms Museum, I do not in any way consider myself to be an 'expert' on firearms." Id.

Petitioner has also submitted the affidavit of J.B. Wood, a gunsmith who has studied firearms since 1948. (Docket Entry No. 26, Wood Affidavit at ¶ 1). Wood stated that he has written "more than a thousand published articles that have appeared in firearms publications," has been the gunsmithing editor of Shooting Times, and has authored 14 books on firearms. Id. Wood has also served as a "technical witness and forensic consultant" in more than 200 cases

involving technical matters related to firearms. Id. at ¶ 2. Wood states that he is familiar with

.25 caliber cartridges, and stated:

> . . . I personally examined a Clement carbine[4] [manufactured in Liege, Belgium, between 1906 and 1910] in .25 automatic chambering at a gun show in Evansville, Indiana in the early 1960's . . . .

> Around 1950, Vincenzo Bernardelli, S.p.A. of Italy offered a carbine in two camberings, .22 long rifle and .25 auto . . . .

> One of the better-known carbines made in .25 auto chambering was the 'Dreyse,' manufactured beginning in 1908 by the Rehinische Metallwaaren und Maschinenfabrik in Sommerda, Germany. This carbine was initially made in both .25 and .32 versions, but by 1911 only the .32 was still in production . . . .

> Between 1900 and 1942, thousands of 'boys rifles' were manufactured for use with a .25 Rimfire cartridge in two lengths, the .25 Stevens Rimfire and the .25 Stevens Short Rimfire. After the .25 RF round was discontinued, many of these rifles were converted to use .25 automatic cartridges . . . .

> The designation of .25 auto ammunition as a pistol or handgun cartridge in ammunition manufacturer's catalogs or in ammunition reference books does not mean that this ammunition cannot be used interchangeably in rifles. Many types of cartridges that are typically designated as pistol or hadngun ammunition in manufacturer's catalogs or reference books, including .38 special, .357 magnum, .44 special, .44 magnum and .45 long colt cartridges, can also be interchangeably used in rifles.

Id. at ¶¶ 6-10.

## B.  CONCLUSIONS OF LAW

### 1.  GCA

The GCA provides, in relevant part, that "[n]o person shall engage in the business of

importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition,

---

[4] A carbine is defined as either "a light, gas operated semiautomatic rifle," or as "any of various short-barreled muskets or rifles used originally by cavalry troops." Webster's College Dictionary 204 (1996).

until he has filed an application with and received a license to do so from the Secretary." 18

U.S.C. § 923(a).[5] The procedures and requirements to obtain a federal firearms license are set

forth in 18 U.S.C. § 923(d). The GCA prohibits a licensed firearms dealer, inter alia, from

selling or delivering

> . . . any firearm or ammunition to any individual who the licensee knows or has
> reasonable cause to believe is less than eighteen years of age, and, if the firearm, or
> ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to
> any individual who the licensee knows or has reasonable cause to believe is less than
> twenty-one years of age . . . .

Id. § 922(b)(1) (emphasis added).[6]

The Secretary possesses the authority to revoke a firearms license for willful violations of

the GCA:

> The Secretary may, after notice and opportunity for hearing, revoke any license
> issued under this section if the holder of such license has willfully violated any
> provision of this chapter or any rule or regulation prescribed by the Secretary under
> this chapter . . . .

Id. § 923(e) (emphasis added).

If the Secretary revokes a firearms license for a willful violation of the GCA, the licensee

may petition a United States District Court to conduct a de novo review of the Secretary's

decision.

> If after a hearing . . . the Secretary decides not to reverse his decision to deny an
> application or revoke a license, the Secretary shall give notice of his decision to the
> aggrieved party. The aggrieved party may at any time within sixty days after the date
> notice was given under this paragraph file a petition with the United States district

---

[5] The GCA defines "Secretary" as "the Secretary of the Treasury or his delegate." Id. §
921(a)(18).

[6] The Secretary has promulgated a regulation regarding the prohibition of firearm sales to minors
that closely tracks the statutory language. See 27 C.F.R. § 178.99(b) (2002).

> court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held .... If the court decides that the Secretary was not authorized to deny the application or to revoke the license, the court shall order the Secretary to take such action as may be necessary to comply with the judgment of the court.

Id. § 923(f)(3) (emphasis added).

As to the district court's review, the Seventh Circuit noted that the "review may be confined to the administrative record or may be supplemented by the admission of additional evidence. In either event, although the trial court need not accord any particular weight to the Secretary's findings and decision, it may, in the exercise of its discretion, accord them such weight as it believes they deserve." Stein's, Inc. v. Blumenthal, 649 F.2d 463, 467 (7th Cir. 1980). Further, in its discretion and in due consideration of judicial economy, the district court may rule on the petition for review without an evidentiary hearing or a trial. Id. at 466; Perri v. Department of Treasury, 637 F.2d 1332, 1335 (9th Cir. 1981).

Here, the parties agree that an evidentiary hearing is not required and they rely on the administrative record. Thus, the issue is whether the Administrator's decision is "supported by a preponderance of the evidence." Benjamin v. Bureau of Alcohol, Tobacco & Firearms, 771 F.Supp. 307, 310 (D.Or. 1991).

### a. Definition of "Willful" Under 18 U.S.C. § 923(e)

Petitioner first argues that the evidence is insufficient to support a finding that it willfully violated 18 U.S.C. § 922(b)(1). (Docket Entry No. 25 at p. 8). According to Petitioner, the definition of "willful" was set forth by the Supreme Court in Bryan v. United States, 524 U.S. 184 (1998) and applies here. In Petitioner's view, Bryan holds that "more proof is needed to

12

establish that an act was done 'willfully' than is needed to prove that the act was done 'knowingly.'" Id. (quoting Bryan, 524 U.S. at 193). In Petitioner's view, under Bryan, "[w]hen an alleged violation of a criminal statute is at issue, conduct is considered 'willful' when the act is undertaken with a 'bad purpose.'" 524 U.S. at 191-92) (emphasis added).

Petitioner also contends that Bryan overruled the decisions[7] Respondent relies upon to argue that the "Bend of the River employees knew of their legal obligations and 'purposely disregarded or were plainly indifferent to the requirements" of the GCA. Petitioner also contends Bryan applies to criminal and civil proceedings because the "penal statutes such as 18 U.S.C. § 922(b)(1) are to be construed in both criminal and licensing proceedings, and has rejected the respondent's contention that a criminal statute can be construed more broadly in a civil proceeding," citing FCC v. ABC, 347 U.S. 284, 296 (1954).

Respondent contends that Bryan does not apply to administrative violations under the GCA and that Bryan does not require a showing of bad purpose. (Docket Entry No. 31 at p. 5). Respondent argues that Bryan applies only to wilfulness to prove a criminal violation of 18 U.S.C. § 924(a)(1)(D). Id. (citing 524 U.S. at 186). Respondent quotes Bryan as holding that "the standard of proof of willfulness for a criminal violation is that '[t]he jury must find that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful.'" Id. at p. 6 (citing 524 U.S. at 193). Respondent also contends that willfulness in the administrative context can be satisfied by proof that the licensee knows of his legal obligation and either purposefully disregards or is plainly indifferent to his legal

---

[7] Lewin v. Blumenthal, 590 F.2d 268 (8th Cir. 1979); Powers v. ATF, 505 F. Supp. 695 (M.D. Fla. 1980); Shyda v. ATF, 448 F. Supp. 409 (M.D. Pa. 1977)).

13

obligations, Id. (citing 18 U.S.C. § 923(e); 27 C.F.R. § 178.74; Sturdy v. Bentsen, 1997 WL 611765, *2 (8th Cir. 1997) (stating that to show a wilful violation, ATF must prove that the petitioner "knew of the legal record-keeping requirements and 'purposefully disregarded' or was 'indifferent to' them"). Respondent also argues that ABC is inapplicable here because the issue there was whether a FCC regulation was beyond the scope of its authorizing statute, that is not at issue here. Id. at p. 8.

As a threshold matter, the Sixth Circuit explained that in Bryan the Supreme Court "held that '[a]s a general matter, when used in the criminal context, a 'willful act' is one undertaken with a bad purpose." United States v. Chowdhury, 169 F.3d 402, 406 (6 th Cir. 1999). The Sixth Circuit then observed that the Supreme Court upheld the following jury instruction: "A person acts willfully if he acts intentionally and purposely and with the intent to disobey or disregard the law. Now the person need not be aware of the specific rule or law that his conduct may be violating. But he must do something that the law forbids." Id. (quoting Bryan, 524 U.S. at 190).[8]

As to the parties' arguments, the Court concludes that the Supreme Court did not overrule any of the lower court decisions interpreting "willful" under the GCA. Rather, the Supreme Court merely noted that the lower courts have not uniformly interpreted the term "willfully" under the GCA. 524 U.S. at 196. Moreover, the Supreme Court also noted that "while these cases support the notion that disregard of a known legal obligation is sufficient to establish a willful violation, they in no way stand for the proposition that it is required." Id. at 197-98.

Although Petitioner is correct that under ABC a penal statute cannot be construed more

---

[8]. The Court noted exceptions to this rule and that "a more particularized showing is required for "highly technical statutes" subject to extensive regulation. 524 U.S. at 194-95, nns. 18 and 22.

broadly in civil proceedings than in criminal proceedings, in Bryan, the Supreme Court stated that the meaning of willfully "often depends on the context in which it appears." 524 U.S. at 190. The Sixth Circuit defined the term "willful" in a revocation proceedings under the GCA, in Al's Jewelry & Loan, Inc. v. United States Dept. of Treasury, Bureau of Alcohol, Tobacco & Firearms, 1996 WL 683528, *4 (6th Cir. 1996). In Al's Jewelry, the Sixth Circuit affirmed the district court's grant of summary judgment for the ATF because the petitioner "willfully violated the federal gun control laws and regulations . . . ." Id. The Sixth Circuit approved the district court's definition of "willful" in a license revocation context, stating that:

> Courts uniformly hold that where . . . a licensee understood his legal obligations for record keeping, but repeatedly failed to abide by these obligations, his license can be properly denied or revoked pursuant to 18 U.S.C. § 923(e) on the ground that he willfully violated the record keeping requirements of the [GCA].

1996 WL 683528 at **4 n.5 (additional citations omitted).

Here, following Al's Jewelry, the Court concludes that "willful" for this violation under 18 U.S.C. § 923(e) requires evidence that Petitioner knew of its obligation not to sell to underage person and evidence of repeated violations of that obligation. Here, Pardue and West testified that they were aware of the legal obligation not to sell ammunition to underage person. In addition, the Director's evidence was that on July 16, 1997, Aaron Rains purchased handgun ammunition at Petitioner's Bend of the River store in Cookeville, Tennessee. Although West, a store employee, testified that he did not remember whether Aaron Rains came into the store on that day, Aaron's check number 172 for $11.85 with West's initials ("WW"). The Bend of the River register receipt was found in Aaron Rains' home was for the same amount as Aaron Rains' check to Bend of the River. A box of Winchester .25 ACP automatic caliber cartridges with a

15

Bend of the River price tag were found in Aaron Rains' vehicle. This proof is sufficient to show

that a sale of ammunition occurred and that West took Aaron Rains' check at the time of the

transaction.

As to whether Petitioner sold this handgun ammunition "knowing or having reasonable

cause to believe" that Aaron Rains was under 21, Petitioner denies actual knowledge of Aaron

Rains' age and there is no direct evidence of Petitioner's knowledge. The Circuits are split on

what evidence is required to satisfy "reasonable cause to believe." In United States v. Prather,

205 F.3d 1265 (11th Cir. 2000), the Eleventh Circuit discussed a district court's jury instructions

that "knows or has reasonable cause to believe" under 18 U.S.C. § 241(d)(2), that prohibits the

distribution of pseudoephedrine knowing or having reasonable cause to believe that the substance

would be used to manufacture methamphetamine. Id. at 1268. The district court's jury

instructions provided as follows:

> [T]he government must show that based on the facts known to the
> defendant-- although not showing actual knowledge of the defendant--based
> on these facts, these facts would cause a reasonable person knowing those
> facts to reasonably conclude that the pseudoephedrine was being diverted to
> the illegal manufacture of a controlled substance.... [T]he question is what
> would a reasonable person reasonably have believed based on the evidence
> known to the defendant.

After deliberating for some time, the jury requested further instructions to clarify
the standards. In those instructions, the judge attempted to explicate further the
'reasonable cause to believe' standard by explaining:

> [W]hat it seems to me that it's getting at is requiring people to exercise
> reasonable or ordinary care in the conduct of a business involving listed
> chemicals. Here the focus is not on what it is proven that he actually knew.
> Here the standard is[,] based on what he did know, would a reasonable
> person, an abstract reasonable person have cause to believe that the
> pseudoephedrine in the count would be diverted.

16

Id. at 1271 (emphasis added). Yet, the Eleventh Circuit did not decide the case on this issue because the defendant had not raised the issue in the district court and the evidence of the defendant's actual knowledge was "overwhelming." Id.

The Tenth Circuit, however, in United States v. Saffo, 227 F.3d 1260 (10th Cir. 2000), considered whether 21 U.S.C. § 841(d)(2) unconstitutionally allowed a conviction without the mens rea requirement. Id. at 1267. The statute at issue in Saffo likewise prohibited the knowing or intentional possession or distribution of "a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance . . . ." Id. (quoting § 841(d)(2)) (emphasis in original). The Tenth Circuit noted that the Supreme Court and lower courts have concluded that other federal statutes with the identical phrase imposed a constitutionally sufficient mens rea requirement. Id. at 1268. (Citations omitted).

Thus, the Tenth Circuit held the statute constitutional because "the 'knowing or having reasonable cause to believe' standard in 21 U.S.C. § 841(d)(2) requires a showing of a knowledge "akin to actual knowledge, i.e., mens rea. 227 F.3d at 1268. In so holding, the Tenth Circuit explained:

> In this context, the "reasonable cause to believe" standard is one akin to actual knowledge. See State v. Smith, 22 N.J. 59, 64-65, 123 A.2d 369 (1956) (stating, in the context of a discussion of a statute's "reason to believe" standard, that "[k]nowledge within the meaning of law . . . may consist of credible information on material facts and circumstances sufficient in content and quality to generate a reasonable belief.") (citation omitted). The "reasonable cause to believe" standard thus comports with the subjective "guilty mind" or "guilty knowledge" requirement for imposing criminal liability. As further stated in Smith 's discussion of a "reason to believe" statutory standard:
>
> Guilt is personal; the determinant here is the reasoned conviction of the mind of the accused, a subjective inquiry, not a theoretical, vicarious belief of the

17

hypothetical reasonable man, as the State and the accused would have it, akin to the standard governing reparation in damages for the civil wrong occasioned by negligence.

Id. at 1268-69 (emphasis added and footnote and citation omitted).

Here, the Court follows the Tenth Circuit's interpretation of "knows or has reasonable cause to believe" to conclude that evidence of "reasonable cause to believe" means evidence "akin to actual knowledge."

As to whether the circumstances here are "akin to actual knowledge" for a reasonable person to know that Aaron Rains was under the age of 21, Rick Martin, the K-Mart clerk, testified that from Aaron's appearance on July 16, 1997, he would have checked Rains' identification or age. Yet, Martin also testified that "He could have been sixteen. He could have been twenty-two. Somewhere in there." GCA regulations do not require a licensed seller to verify the purchaser's age. Yet, the photograph of Aaron Rains nearest the time of the sale at issue, clearly suggest that he was less than 21 years of age. Thus, the Court concludes that the circumstances at the time of the sale at issue here are "akin to actual knowledge" that Aaron Rains was under 21 years of age.

Petitioner argues that the revocation of fire licenses for a single violation is impermissibly and insufficient to prove willfulness. Respondent concedes that the ATF has not received any other complaints involving Petitioner about sales of firearms or ammunition to underage buyers. (Docket Entry No. 32, Respondent's Response to Petitioner's Statement of Additional Material Facts at ¶28). Yet, a court has held a single violation to justify revocation of a license. Benjamin, 771 F.Supp. at 311 ("A single willful violation of this statute is a sufficient basis to revoke a license.").

18

The record reflects that the Director's decision was not based on a single sale. Although Pardue states that he operates his business as if he were selling liquor, the proof is that as of 1997, including the sale to Aaron Rains, West never verified a purchaser's age. Pardue and West express a laissez faire type of approach to selling ammunition and weapons that are subject to statutory regulations, to wit: "if we have it and they have the money, we sell it." (Docket Entry No. 27 at ¶ 8). The Hearing Officer cited "the licensee's policy for determining the age of the purchaser was that of a casual observation or asking suspicious purchasers their age" as a showing "either purposeful disregard or plan indifference and therefore willfully violated the law." (Docket Entry No. 7, Hearing Report at p. 10).

Here, the revocation was based upon more than a single sale. The prohibited sale, coupled with Pardue's and West's laissez faire type attitude evincing a lack of concern with compliance with express statutory commands and the likely prospect of other unlawful sales, led the Director to find willfulness. In this context, the Court concludes this proof to be a sufficient showing of willfulness.

As to the proof that the sale of the ammunition was legal because the ammunition could be used in a rifle, Petitioner's proof refers to weapons manufactured in the early 1900s. The most recent cited use of this ammunition for rifles was in the 1960s. To avoid any circumvention of the statutory prohibition of these sales, the Court concludes that Petitioner's proof must be that the purchaser's owned the pertinent rifle for which the cited ammunition could be substituted and/or proof of more contemporary usages of such ammunition in rifles, such as proof from manufacturers of rifles that allow such substitution of ammunition.

Accordingly, after a de novo review of the record, the Court concludes that Petitioner's

motion for summary judgment should be denied and Respondent's motion for summary judgment should be granted.

An appropriate Order is filed herewith.

Entered this the _31st_ day of March, 2003.

WILLIAM J. HAYNES, JR.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

APPALACHIAN RESOURCES DEV. CORP., )
d/b/a BEND OF THE RIVER, )
)
Petitioner, )
)
v. )            No. 2:01-0061
)            JUDGE HAYNES
HARRY L. McCABE, III, in his official capacity )
as Director, Industry Operations, Nashville Div., )
Bureau of Alcohol Tobacco & Firearms, )
)
Respondent. )

## ORDER

In accordance with the Memorandum filed herewith, Respondent Harry L. McCabe's

motion for summary judgment (Docket Entry No. 14) is **GRANTED**. Petitioner Appalachian

Resources Development Corporation d/b/a Bend of the River's motion for summary judgment

(Docket Entry No. 24) is **DENIED**.

The Respondent's decision to revoke the Petitioner's federal firearm licenses for

violations of the Gun Control Act, 18 U.S.C. § 922(b)(1), and its regulation promulgated

thereunder, 27 C.F.R. § 178.99(b) is **AFFIRMED**.

This constitutes the Final Order in this action.

It is so **ORDERED**.

ENTERED this the _31st_ day of March, 2003.

_William J. Haynes Jr._
WILLIAM J. HAYNES, JR.
United States District Judge

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP on 4-1-03 By GN

H5

Not Reported in F.Supp.2d, 2010 WL 1408829 (M.D.Tenn.)
**(Cite as: 2010 WL 1408829 (M.D.Tenn.))**



Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee,
Columbia Division.
Franklin Dewey SHAFFER, d/b/a Rebel Pawn
Shop, Plaintiff,
v.
Eric HOLDER, Attorney General of the United
States, et al., Defendants.

No. 1:09–0030.
March 30, 2010.

John I. Harris, III, Schulman, Leroy & Bennett,
Nashville, TN, for Plaintiff.

Debra Teufel Phillips, Michael L. Roden, Office of
the United States Attorney, Nashville, TN, for Defendants.

*MEMORANDUM*
ROBERT L. ECHOLS, District Judge.
***1** Defendants Eric Holder, Attorney General
of the United States, the United States Department
of Justice, and the Bureau of Alcohol, Tobacco,
Firearms and Explosives ("ATF") filed a Motion
For Summary Judgment (Docket Entry No. 22), to
which Plaintiff Franklin Dewey Shaffer d/b/a Rebel
Pawn Shop in Lawrenceburg, Tennessee
("Shaffer") filed a response in opposition (Docket
Entry No. 44), and Defendants filed a reply (Docket
Entry No. 45).

*I. FACTS*
Shaffer held federal firearms license ("FFL")
number 1–62–099–02–9D–38350, which authorized
him to engage in business as a dealer, including
pawnbroker, in firearms other than destructive
devices, pursuant to the Gun Control Act of 1968
("GCA"), as amended, 18 U.S.C. Chapter 44.
(Docket Entry No. 29, Certified Administrative Record
("CAR"), Gov't. Ex. 1.) This FFL number was

issued to Shaffer as a sole proprietor after Shaffer's
business partner died in February 1997 and their
prior joint FFL, held since the late 1980's, was superseded. (CAR at 214.)

On October 1, 1998, ATF Inspector Melinda
Whitworth conducted a compliance inspection at
Shaffer's business. At the conclusion of the inspection,
Inspector Whitworth cited Shaffer for a violation
of 27 C.F.R. § 178.124 FN1 because the ATF
Forms 4473 he obtained from customers contained
errors and/or omissions. (CAR, Gov't.Ex. 5.) In the
section for corrective action in the Report of Violations,
Inspector Whitworth wrote: "All future transfers—proprietor
will have forms completed as required."
(*Id.*) She signed the Report of Violations. (
*Id.*) Shaffer also signed the Report of Violations acknowledging
that he had received a copy of the report.
(*Id.*)

FN1. Pursuant to the Homeland Security
Act of 2002, Title 27, Code of Federal
Regulations, Part 178 was recodified and is
now contained within 27 C.F.R. Part 478.
*See* 68 Fed.Reg. 3744 (2003).

On March 24, 2000, ATF Inspector William
Gallivan conducted a compliance inspection at
Shaffer's business. Inspector Gallivan cited Shaffer
for five separate violations, among them failure to
obtain properly executed ATF Forms 4473, 27
C.F.R. § 178.124, and failure to enter acquisitions
and dispositions of firearms in a timely and accurate
manner in the Acquisitions & Dispositions Record
("A & D Record"), 27 C.F.R. § 178.125(e).
(CAR, Gov't.Ex. 6.) Inspector Gallivan provided
explicit written corrective actions that were required
to be taken as well as deadlines for making
the corrections. Inspector Gallivan signed the form,
and Kathleen Giles, on behalf of Shaffer, also
signed the form, acknowledging that she had received
a copy of it.

On the same day, as part of the compliance in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1408829 (M.D.Tenn.)
**(Cite as: 2010 WL 1408829 (M.D.Tenn.))**

spection, Inspector Gallivan educated Ms. Giles about the application of numerous federal firearms laws and requirements. (CAR, Gov't Ex. 7.) Ms. Giles signed a form which listed the firearm regulations covered by Inspector Gallivan. (*Id.*) Above Ms. Giles' signature appeared the pre-printed statement: "I agree the above information was thoroughly explained to me by an ATF inspector and any questions regarding the above information were answered." (*Id.*) Inspector Gallivan also signed the form. (*Id.*)

**\*2** On June 26, 2000, ATF issued a warning letter to Shaffer which again listed the five separate violations of the federal firearms laws Inspector Gallivan had found during the March 24, 2000 inspection. (CAR Gov't Ex. 17.) The letter reminded Shaffer that "your Federal firearms license is conditioned upon your compliance with Federal laws and regulations. Repeat violations of those listed above will be viewed as willful, and may result in the revocation of your license." (*Id.*) The letter was sent to Shaffer at Rebel Pawn Shop by certified mail, return receipt requested. The mail was received and signed for by Ms. Giles. (*Id.*)

In April and May 2007, a team of ATF investigators headed by Inspector Malcolm Lockridge conducted another compliance inspection at Shaffer's business. This time Inspector Lockridge cited Shaffer for twelve violations of the federal firearms laws. (CAR Gov't Ex. 15.) Among other things, Shaffer was cited for (1) transferring firearms where Shaffer had reason to believe the purchaser was a prohibited individual, in violation of 18 U.S.C. § 922(d) and 27 C.F.R. § 478.99(c); (2) making a false entry in the A & D Record and in Shaffer's copy of a Theft/Loss Report previously filed with the ATF, in violation of 18 U.S.C. § 922(m) and 27 C.F.R. § 125(e); (3) failing to make accurate and timely entries in the A & D Record, in violation of 18 U.S.C. § 922(m) & 923(g)(1)(A), and 27 C.F.R. § 478.125(e); (4) failing to obtain properly completed ATF Forms 4473 in violation of 18 U.S.C. §§ 922(m) & 923(g)(1)(A), and 27

C.F.R. §§ 478.21(a) & 478.124(c); (5) failing to record Tennessee Instant Check System ("TICS") information in violation of 18 U.S.C. §§ 922(m) & 922(t) and 27 C.F.R. §§ 478.21(a) & 478.124(c); and (6) failing to report dispositions of multiple handguns in violation of 18 U.S.C. § 923(g)(3)(A) and 27 C.F.R. § 478.126a.

In the Report of Violations, Inspector Lockridge set out explicit corrective actions to be taken as to each type of violation. The Report of Violations was signed on May 7, 2007, by Inspector Lockridge and Brian Shaffer as manager of Rebel Pawn Shop. (CAR Gov't Ex. 15.)

Also on May 7, 2007, at least one inspector explained to Brian Shaffer numerous federal firearms regulations that must be followed. (CAR Gov't Ex. 16.) Brian Shaffer placed his initials in boxes next to the firearm regulations that were discussed, and he also signed the form beneath a pre-printed statement that said:

> The investigator explained the above information to me on 07/May/07 and answered my questions regarding this information. I have received a copy of this for my records as a reference. I understand that this is only a general overview of the regulations and that I will be responsible for familiarizing myself with all of the laws and regulations governing my licensed firearms business.

(*Id.*) The form was also signed by Inspector Lockridge and another inspector. (*Id.*)

On May 2, 2008, ATF issued to Shaffer a Notice Of Revocation Of License. (CAR Gov't Ex. 2.) As reasons for the revocation, the ATF referred to the April–May 2007 compliance inspection and listed five grounds: (1) transfer of firearms to persons with reason to believe they were prohibited persons; (2) disposition falsely recorded; (3) acquisitions not recorded; (4) ATF Forms 4473 not properly completed; and (5) failure to file multiple handgun sales reports. Each of these grounds for revocation was supported by extensive factual in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

formation. The ATF notified Shaffer that he could request a hearing to review the revocation of his license; that if he requested a hearing, it would be held as provided in 27 C.F.R. Part 478; and if his request for a hearing was filed in a timely manner, the effective date of the license revocation would be stayed pending review pursuant to the hearing. ( *Id.*)

**\*3** Shaffer obtained counsel and filed a timely request for a hearing. The hearing was held in Brentwood, Tennessee, on November 4, 2008. (CAR, H'rg Tr. at 6–227.) Deborah Rankin of the ATF served as the hearing officer.

At the beginning of the hearing, Ms. Rankin stated that the hearing was being conducted under 18 U.S.C. § 923(f)(2) and 27 C.F.R. § 478.74.[FN2] Ms. Rankin and the ATF attorney both referred to the hearing as an "informal hearing." (CAR, Hr'g Tr. at 11, 16.) Through his counsel, Shaffer objected prior to and during the hearing that he had made requests for additional information from the Director of Industry Operations that was not received; the ATF attorney did not supply him with copies of the exhibits prior to the hearing; the rules of discovery and the Administrative Procedures Act ("APA") were not applied to the hearing; other ATF witnesses that defense counsel wished to call to testify were not produced by ATF at the hearing; and ATF counsel refused to allow Inspector Lockridge to testify about ATF policies and procedures on the grounds that such information was privileged law enforcement material.

> FN2. The statute, 18 U.S.C. § 923(f)(2), provides:
>
> If the Attorney General denies an application for, or revokes, a license, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation. In the case of a revocation of a license, the Attorney General shall upon the request of the holder of the license stay the effective date of

the revocation. A hearing held under this paragraph shall be held at a location convenient to the aggrieved party.

The regulation, 27 C.F.R. § 478.74, provides in pertinent part that, upon receipt of a request for a hearing:

> the Director of Industry Operations shall, as expeditiously as possible, make necessary arrangements for the hearing and advise the licensee of the date, time, location and the name of the officer before whom the hearing will be held. Such notification shall be made no less than 10 days in advance of the date set for the hearing. On conclusion of the hearing and consideration of all the relevant presentations made by the licensee or the licensee's representative, the Director shall render a decision and shall prepare a brief summary of the findings and conclusions on which the decision is based. If the decision is that the license should be revoked ... a certified copy of the summary shall be furnished to the licensee with the final notice of revocation ... on ATF Form 4501.

Inspector Lockridge was the only witness called by the ATF attorney, although Lockridge was not sworn to testify under oath. Through Inspector Lockridge, the ATF attorney introduced the exhibits concerning the 1998, 2000, and 2007 compliance inspections. Inspector Lockridge explained in detail the April–May 2007 compliance inspection he conducted and the specific violations found during that inspection. Shaffer's counsel cross-examined Inspector Lockridge at length.

Shaffer then called himself as a witness. He stated that, based on the 2000 inspection and the communications he had with ATF at that time, he made changes to his operating practices and procedures and trained his employees in an effort to improve his compliance with the federal regula-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions. (CAR, Hr'g Tr. at 209–10.) Shaffer denied that he or any of his employees willfully violated the obligations of a federal firearms licensee. (*Id.* at 210–11.) On cross-examination, Shaffer acknowledged that the federal firearms business is heavily regulated, that he keeps a copy of the Federal Firearms Regulations Reference Guide, ATF Publication 5300.4, at his business, that he received letters and newsletters from ATF concerning application of firearms laws and regulations, that he did not attend any ATF seminars, that he was aware that maintaining a federal firearms license was contingent on compliance with the laws and regulations, that he was responsible for the acts or omissions of all the people who worked for him in the business, that he signed the 1998 Report of Violations and his employees signed the 2000 and 2007 Reports of Violations, and that he would be surprised if he did not see the June 2000 letter of warning, although he could not specifically recollect seeing it. (*Id.* at 211–218.) Shaffer also testified that he had no reason to believe that Gov't Exhibit 10 was not an accurate summary of information in his business' A & D Record, and that other government exhibits appeared to be copies of documents that were part of his business. (*Id.* at 220–22.) When asked if he had any practice of conducting comparisons of his firearms inventory to the A & D Record, Shaffer stated that personally he did not, but his manager was supposed to do it. Shaffer was not aware how frequently such a comparison was supposed to take place. (*Id.* at 222–23.)

**\*4** On January 15, 2009, Hearing Officer Rankin issued to the Director of Industry Operations a Report of the Hearing on the Notice of Revocation of License for Shaffer. (CAR at 478–493.) This document set forth a summary of the evidence presented at the hearing as to each ground alleged for license revocation. The report also included findings of fact and conclusions of law. Rankin found that Shaffer transferred firearms to persons with reason to believe those persons were prohibited from receiving firearms, that Shaffer failed to enter correct information and entered false informa-

tion with regard to a theft of firearms, that Shaffer failed to record timely the purchase or other acquisition of approximately 17 firearms, that Shaffer transferred firearms to purchasers without obtaining properly completed ATF Forms 4473, and Shaffer failed to complete Multiple Sales Reports on 13 occasions. (CAR at 485–87.) In addition, Rankin determined that each violation was "willful" because Shaffer knew of a legal obligation and purposefully disregarded the obligation or was plainly indifferent to it. (*Id.* at 488–89.) Rankin recommended that Shaffer's license be revoked under 18 U.S.C. § 923(e). (*Id.* at 490.)

Because Shaffer's license expired effective April 1, 2009, Shaffer filed a timely application for renewal of the license. His renewal application automatically converted the pending proceeding from a revocation of Shaffer's license to consideration of the renewal application for the same license.

On April 9, 2009, the Director, Industry Operations, issued a Final Notice of Denial Of Application or Revocation of Firearms License (CAR 494–522) denying Shaffer's application to renew his license pursuant to 18 U.S.C. § 923(d)(1)(C). The license was revoked effective June 8, 2009. In support of the Final Notice, the Director issued a Summary of Findings and Conclusions that essentially tracked the findings of fact and conclusions of law made by Hearing Officer Rankin. The Final Notice informed Shaffer that he could file a petition for review in federal court pursuant to 18 U.S.C. § 923(f)(3).

Shaffer timely filed the instant Complaint in this Court on June 5, 2009 (Docket Entry No. 1), and subsequently he filed a First Amended Complaint on August 3, 2009. (Docket Entry No. 19.) In addition to seeking *de novo* review and reversal of the ATF's Final Notice on the ground the ATF's decision was an arbitrary and capricious abuse of discretion, Shaffer claims the ATF violated the APA, the Paperwork Reduction Act, and Shaffer's federal due process rights. ATF has allowed Shaffer to continue his business operations by granting Letters of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1408829 (M.D.Tenn.)
**(Cite as: 2010 WL 1408829 (M.D.Tenn.))**

Authorization while this action is pending. Shaffer seeks reinstatement of his license, an Order requiring ATF to continue to issue Letters of Authorization pending a final decision in this case, and attorney's fees and expenses.

## II. STANDARD OF REVIEW

Title 18 U.S.C. § 923(f)(3) provides in pertinent part:

**\*5** The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held under paragraph (2). If the court decides that the Attorney General was not authorized to deny the application or to revoke the license, the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court.

While Shaffer is entitled to *de novo* judicial review of the ATF decision, the decision itself is entitled to no presumption of correctness; the district court may give the ATF decision as much weight as the court deems appropriate in light of the evidence in the administrative record and any evidence the court receives to supplement that record. *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 348 F.Supp.2d 1299, 1306 (S.D.Ala.2004), *aff'd,* 415 F.3d 1274 (11th Cir.2005); *Stein's, Inc. v. Blumenthal,* 649 F.2d 463, 467 (7th Cir.1980); *Arwady Hand Trucks Sales, Inc. v. Vander Werf,* 507 F.Supp.2d 754, 758 (S.D.Tex.2007). It is the Court's own decision whether to receive evidence in addition to the administrative record. [FN3] *Arwady,* 507 F.Supp.2d at 758. Although the Court must conduct *de novo* review, the Court is not required to hold an evidentiary hearing. *Id.* (citing *Stein's, Inc.,* 649 F.2d at

467).

> FN3. In opposition to the summary judgment motion, Shaffer provided his own affidavit (Docket Entry No. 37–4), and the Court exercises its discretion to consider the contents of that affidavit in conjunction with the administrative record. On February 22, 2009, the Magistrate Judge granted Defendants' motion to stay discovery and ruled that Shaffer was precluded from engaging in civil discovery pending this Court's ruling on the summary judgment motion. (Docket Entry No. 47, Order.)

"A federal court reviewing the government's revocation of a federal firearms license may grant summary judgment 'if no genuine issue of material fact exists about whether [the licensee] willfully violated an applicable statutory or regulatory provision.' " *Garner v. Lambert,* 2009 WL 2749709 at \*3 (6th Cir. Sept.1, 2009) (quoting *Armalite, Inc. v. Lambert,* 544 F.3d 644, 647 (6th Cir.2008)). Factual evidence must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be construed in that party's favor. *Id.*

## III. SUPPLEMENTARY EVIDENCE

The following additional facts are taken from Shaffer's affidavit submitted with his opposition to the summary judgment motion. Shaffer has had an FFL as a sole proprietor since approximately 1997. Prior to that, Shaffer and his business partner jointly held an FFL since the late 1980's. (Docket Entry No. 37–4, Shaffer Aff. ¶ 1.)

Shaffer did not receive training from the ATF when or shortly after the current FFL was issued. Shaffer established his operating procedures and practices dating back to the late 1980's based on what he understood to be the requirements for operating as a firearms dealer. Most of these practices were based on advice from other dealers, individuals, and from intermittent contact with ATF agents. (*Id.* ¶ 2.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1408829 (M.D.Tenn.)
**(Cite as: 2010 WL 1408829 (M.D.Tenn.))**

**\*6** Shaffer's records reflect that the business trades on new and used guns in the pawn business. In 1998, the first full year after this FFL was issued, Rebel Pawn Shop conducted 772 firearm transactions. For the years 1999 through 2006, the business averaged between 615 and 820 firearm transactions per year. The business had a total of 6,454 firearm transactions from the date it began operating under this FFL through the date of the 2007 inspection. (*Id.* ¶ 3.)

To Shaffer's recollection, the first ATF compliance inspection was in 1998 and was relatively brief. The ATF inspector advised him that there were some errors on some of the firearms transaction record forms (the ATF Forms 4473) that were filled out by purchasers, and the forms needed to be completed. Shaffer did not receive any warning letter or conference at that time. He instructed the people who worked in the pawn shop that it was important to make sure that the firearms transaction records were properly filled out and that the background checks were done on each sale. From time to time, Shaffer would review the paperwork in an effort to make sure that his employees were doing things correctly and it appeared to him that the forms he reviewed were proper. (*Id.* ¶ 4.)

Rebel Pawn Shop was again inspected in 2000. In that inspection, the ATF inspector pointed out several things that were being done wrong that Shaffer did not realize were problems. For example, Shaffer collects firearms and had 75 of his personal guns at the pawn shop, but they were not listed in the pawn shop inventory of guns. Shaffer discussed this with the ATF inspector and was told that his personal guns still had to be entered in the A & D Record even if they were not part of his pawn shop inventory. That had not been Shaffer's understanding. He was also told that he had to put the TICS confirmation number on the Form 4473s. TICS had gone into operation only recently. Pawn shop employees were keeping the confirmation number on a form that TICS provided on which the employee also obtained the fingerprint of the purchaser, and then the employee stapled the TICS form to the ATF form. Shaffer did not realize the number had to be written on both forms and that stapling them together was not good enough. Shaffer was also told that customers actually had to write out "Yes" and "No" to various questions and that they could not put just "Y" and "N." Again, Shaffer and his employees did not understand that the law was this picky about how those questions were answered since for many years it had been perfectly okay to answer such questions with a "Y" or "N." Shaffer was also told that he had to list some of his employees on the license, but he did not realize that employees had to be listed on the license since that was not brought up at the prior inspection. Finally, Shaffer was told that the pawn shop failed to keep good records. The pawn shop employees had been keeping inventories, filing out forms and reporting lost or stolen guns when they discovered such problems, as they understood they were required to do. It seemed to Shaffer that the problems the ATF inspector was talking about were either occasional errors on some of the forms or a difference in what the ATF required of the pawn shop concerning how to keep records. Shaffer received a warning letter. (*Id.* ¶ 5.)

**\*7** Shaffer worked with his employees to fix everything that the ATF said was being done wrong and he talked with the employees about how important it was to keep good records. Shaffer told them that the information needed to be checked carefully and that if they had any questions about how to handle something they needed to check with Shaffer and he would find out the right way to handle the matter. Shaffer checked on his employees and believed they were keeping the records and doing what needed to be done in accordance with what the ATF told Shaffer was reasonably required. (*Id.* ¶ 6.)

Rebel Pawn Shop was inspected again in 2007. This inspection spanned several weeks over two months and was disruptive to the business. Unlike the prior inspections, it seemed the ATF inspectors

Not Reported in F.Supp.2d, 2010 WL 1408829 (M.D.Tenn.)
**(Cite as: 2010 WL 1408829 (M.D.Tenn.))**

wanted to look at every possible piece of paper that was kept as part of the firearms records and they were doing this to document as many errors as possible. It did not appear the ATF inspectors were trying to help teach Shaffer or his employees or to identify and talk about areas where employees needed clarification, assistance, or had misunderstood. Rather, the inspectors were only interested in filing out forms and worksheets of their own. Looking back, it seemed to Shaffer that the inspectors were investigating a crime rather than working with the pawn shop employees. When the inspectors left in May 2007, they met with Shaffer's son and provided a report which Shaffer reviewed and discussed with his son. The report again said the inspectors believed the pawn shop had errors in its records. The inspectors did not seem to take into consideration that they were reviewing seven years of records and more than 4,000 transactions. Although the inspectors told the pawn shop employees what needed to be done, the employees felt they had addressed each of the inspectors' concerns by the time the inspection ended. Inspector Lockridge confirmed that understanding during the agency hearing in 2008. Shaffer and his employees thought they were doing a pretty good job of complying with the law as they understood it. (*Id.* ¶ 7.)

In May 2008, approximately a year after the inspection ended, Shaffer received a notice of revocation from ATF. He had not heard from ATF regarding the inspection a year earlier, and he was shocked and angered that ATF was revoking his license. Shaffer felt the pawn shop was in compliance with the laws as he understood them and that there were simply human errors or misunderstandings by some of the employees that Shaffer had been trying since 2000 to reduce, catch and correct. (*Id.* ¶ 8.)

The notice of revocation listed several areas in which the ATF said Shaffer had violated the law, but Shaffer does not believe that the ATF's findings are accurate. According to Shaffer, there are many errors with the ATF's interpretation of the facts. (*Id.*

¶ 9.)

ATF claims Shaffer willfully sold guns to people when he had reason to believe that they might be prohibited. Shaffer has looked over the list of 16 people that ATF said are prohibited persons and he thinks ATF is wrong. It appears these people may have answered one yes/no question wrong on a portion of the firearms transactions records but they were all approved by the Tennessee Bureau of Investigation. Most of these people are regular customers and Shaffer believes that his employees may not have looked closely enough at the forms to realize that a single question out of the many that are asked on the form was answered erroneously. These are people who live in the small community and the pawn shop employees see on a regular basis. Of the 16 errors identified by the ATF out of more than 4,300 transactions, two were in 2000, four were in 2001, one was in 2002, three were in 2003, three were in 2004, two were in 2005, one was in 2006 and there were none in 2007. Shaffer's attorneys asked ATF Inspector Lockridge during the hearing whether any of these people was actually checked and identified by the ATF as having violated federal law by buying a gun and he said no. (*Id.* ¶ 10.)

**\*8** Shaffer next averred that ATF claimed the pawn shop reported a shotgun as lost or stolen that was not lost or stolen. In reviewing the records and talking to the employees, it appeared to Shaffer that the pawn shop called in a theft report to ATF on December 28, 2001 and gave them a list of guns that could not be found. ATF provided an incident number and instructed the employee to fax in a form with specific information on the guns, which was done four days later on December 31, 2001. Apparently, after the phone report was made, the employee thought an additional shotgun was lost or stolen and added it at some point to the list. It appears that it may have been added to the list by an employee who did not realize that another employee had already faxed the list to ATF. The pawn shop has two fax confirmations, on the same day

and a few minutes apart, to the ATF reporting center. It also appears from the pawn shop records that there were two identical guns and that the serial numbers were different by one digit. It is possible the employee had the empty box and took the wrong serial number off the box instead of the gun. It was Shaffer's understanding and that of his son that the faxed form would supercede the information on the initial phone call but the ATF agent at the hearing said it did not. (*Id.* ¶ 11.)

ATF stated the pawn shop had 17 guns that should have been listed in the A & D Record. Six of the guns were parts guns that were used by the gunsmith. They were not complete guns or had broken frames. Shaffer and his employees did not understand that these parts had to be treated like firearms in the books. Three of the guns were misidentified by ATF and were in fact in the book. One of the guns was a personal Winchester rifle that was not part of the inventory. The seven remaining guns were customer guns being worked on by the gunsmith and employees did not realize those guns needed to be in the books. (*Id.* ¶ 12.)

ATF claims that 24 of the more than 4,300 ATF Forms 4473 covering the period from mid–2000 to early 2007 had one or more answers to questions that were wrong or missing. For example, some of the errors were the failure to answer "state of residence" although that question is asked twice on the form and usually is answered the first time by the buyer and it is overlooked the second time on some forms. Another question that is not answered by some buyers is the country of citizenship although on the forms the buyers do state they are born in the United States by giving their city and state of birth, again a duplicate question. Other errors appear to be transposition of numbers, confusion over the date of the month, and oversights by the buyers in answering questions. Shaffer has made an effort since the 2000 inspection to periodically review with his employees the importance of filling out these forms and has performed spot checks from time to time. Based on this, Shaffer

felt like the pawn shop was doing a good job of keeping the records and that the number and types of errors identified by the ATF are the result of occasional human errors. (*Id.* ¶ 13.)

**\*9** The ATF requires the pawn shop to file additional reports if someone makes multiple handgun purchases over a five-day window. That can be hard to do if the purchases are not made at the same time or handled by the same employee. However, the pawn shop is aware of this obligation and normally files the reports. The ATF cited one occasion in 2001, two in 2002, three in 2003, five in 2004, none in 2005, one in 2006 and none in 2007. Upon reviewing the ATF's allegations, Shaffer again realized the ATF's records are wrong. For example, the ATF claimed that the first identified transaction for purchaser Jimmy King involved two pistols but the Form 4473 clearly lists the second gun as a HiPoint 995 and identifies it as an "Auto Rifle." This gun is a 9mm carbine rifle and is misidentified by the ATF in its charges. As for the other transactions, it appears they were occasional oversights by employees who had been trained to and generally did file these reports as required. (*Id.* ¶ 14.)

In his efforts to make sure employees were doing things right, Shaffer decided that one employee who seemed to be involved in several of the transactions identified by the ATF as a basis for the revocation was having problems with paperwork in general in the pawn shop so he let her go some time ago. (*Id.* ¶ 15.) In maintaining the books and records, Shaffer tried to abide by the law as he understood it to be and had implemented steps since the 2000 inspection (such as doing periodic inventories to determine if there were lost or stolen guns, checking the transactions that had not been updated, and periodically double checking randomly the other forms) in an effort to identify any problems or employee misunderstandings or inability to complete the records appropriately. (*Id.* ¶ 16.)

Shaffer avers he is not attempting to avoid, intentionally or otherwise, any of his duties as a gun dealer since it is very important to his pawn shop

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

business. He had nothing to gain by doing so with respect to entering information into inventory books and keeping necessary sales records. He took steps to train his employees and double check their work from time to time. He believed that he and his employees were doing a good job and he corrected or removed employees who seemed to have problems. (*Id.* ¶ 17.)

Finally, in the last two pages of his affidavit Shaffer states that he thought he took care of all the problems noted at the end of the 2007 inspection. He points out that no ATF inspector has returned to his pawn shop in the last two years to conduct a followup inspection. Shaffer claims it is not a violation of federal law to lose a firearm or have it stolen, and federal law does not require periodic inventories for the purpose of identifying lost or stolen firearms, although the pawn shop started doing such inventories after the 2000 inspection, and that is how the missing guns were found in 2001. (*Id.* ¶¶ 18–21.) None of the issues involved in this revocation action were addressed in detail in the 1998 or 2000 inspections other than ATF saying the forms needed to be completed. It was not Shaffer's understanding that ATF was requiring absolute and 100% perfection or that there were no allowances for occasional or inadvertent errors. (*Id.* ¶ 23.)

**\*10** Prior to the 2007 inspection, Shaffer had a copy of what is commonly referred to as the "Green Book." It is dated in 2000, some 12 years after he first got in the business. The book contains 167 pages of three-column print in a very small print. It is indexed, but it can be and often is difficult to find information in the book because of its length and the fact that topics can be addressed in several different places in the book. (*Id.* ¶ 24.)

Shaffer again repeats his statements that he thought he and his employees were doing a good job; they were not knowingly ignoring any of the record keeping, sales, or other requirements; he trained his employees in accurate record keeping; his employees cooperated with ATF Inspector Lockridge during the 2007 inspection; and they did

everything they were told to do to make corrections following the inspection and are willing to further modify procedures to minimize future errors or omissions. (*Id.* ¶¶ 25–29.) The pawn shop is primarily a family run business and it would be an extreme financial hardship on Shaffer and his family to lose the ability to sell and trade in firearms. (*Id.* ¶ 30.)

### IV. ANALYSIS

An application for a federal firearms license will not be approved if the applicant has willfully violated any provision of the Gun Control Act or the regulations issued under it. 18 U.S.C. § 923(d)(1)(C). "[A] dealer violates the statute when, with knowledge of what the law requires, it intentionally or knowingly violates the GCA's requirements or acts with plain indifference to them (i.e. recklessly violates them)." *Armalite, Inc. v. Lambert,* 544 F.3d 644, 647 (6th Cir.2008). The Sixth Circuit has joined five other circuits in holding that a willful violation of the GCA requires a deliberate, knowing or reckless violation of its requirements; a negligent violation of the statute is not sufficient to establish a cognizable violation. *Id.; Garner v. Lambert,* 2009 WL 2749709 at *4 (6th Cir. Sept.1, 2009). "Willfulness" under the GCA does not require a heightened showing of "bad purpose" or evil motive; rather, evidence of an individual's disregard of a known legal obligation is entirely sufficient. *Procaccio v. Lambert,* 233 Fed.Appx. 554, 558 (6th Cir.2007). A single willful violation of the GCA is enough to deny a federal firearms license application or revoke a federal firearms dealer's license. *Appalachian Resources Dev. Corp. v. McCabe,* 387 F.3d 461, 464 (6th Cir.2004).

To preclude the grant of summary judgment, Shaffer must establish that genuine issues of material fact exist as to each of ATF's charged violations. *See Armalite, Inc.,* 544 F.3d at 649. Having reviewed *de novo* and in a light most favorable to Shaffer all of the information in the certified administrative record and in Shaffer's supplemental affidavit, the Court concludes that Shaffer has not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

generated any genuine issues of material fact to be tried on the issue of willfulness. The Court concludes from the evidence presented that Shaffer's violations were willful as a matter of law and that the Attorney General was authorized to revoke Shaffer's federal firearms license and to deny Shaffer's application for a renewal of that license. 18 U.S.C. § 923(f)(3); *Nationwide Jewelry & Pawn, Inc. v. United States,* 455 F.Supp.2d 1379, 1386 (M.D.Ga.2006). As a result, Defendants' motion for summary judgment will be granted.

**\*11** Shaffer cannot successfully plead ignorance of the law, although he certainly made the point numerous times in his affidavit that he followed the law as he understood it to be. "[T]he gravity of the policy objectives of the Gun Control Act, from both a law enforcement standpoint and a safety standpoint, strongly militates in favor of allowing the ATF to insist on total compliance as a condition of retaining the privilege of dealing in firearms." *Willingham Sports, Inc.,* 348 F.Supp.2d at 1309 n. 14. Shaffer concedes that he and his employees were familiar with most of the applicable firearms regulations and the importance of keeping accurate records at the pawn shop. *See Nationwide Jewelry & Pawn, Inc.,* 455 F.Supp.2d at 1386 ("Without accurate and meticulous compliance with these 'paper work' requirements, the very foundation of [the] regulatory system would be compromised.") Shaffer acknowledged that he had been in the business since the late 1980's, he received letters and newsletters from ATF on matters affecting his firearms business, and he and his employees took direct instruction from ATF inspectors. Shaffer and his employees signed statements after the 1998 and 2000 ATF inspections acknowledging that the inspectors had educated them on the firearms laws and regulations. The pawn shop also continuously maintained a copy of the ATF "Green Book" as required, even if Shaffer claims it is printed in small type and hard to read. Shaffer knew that he and his employees were charged with full knowledge of the federal firearms laws and regulations as a prerequisite to holding a federal firearms

license. Indeed, after the 2000 inspection, Shaffer was reminded by the ATF in a warning letter that his federal firearms license was conditioned upon his compliance with federal laws and regulations. He was also advised in that warning letter that repeat violations like those found in the 2000 inspection would in the future be viewed as willful and may result in the revocation of his license. The factual evidence, even taken in a light favorable to Shaffer, would compel a reasonable factfinder to conclude that Shaffer and his employees intentionally, knowingly or recklessly violated the known legal requirements.

One of the reasons Shaffer's license was not renewed was because the pawn shop transferred firearms to persons who appeared to be prohibited persons, in violation of 18 U.S.C. § 922(d) and 27 C.F.R. § 478.99. Shaffer contends that none of the 16 persons was actually prohibited from owning a firearm based on background checks. The "no harm no foul" defense, however, does not help Shaffer here. ATF Inspector Lockridge discovered 16 ATF Forms 4473 on file at Shaffer's pawn shop which included indications from transferees that they were prohibited from owning a firearm based on a "yes" answer to a question in a prohibited category or a "no" answer regarding whether the transferee was the actual buyer. An answer that the transferee is not the actual buyer leads to the inference that the actual purchaser is either in a prohibited category or cannot lawfully make the purchase for some other reason. As ATF Inspector Lockridge explained during the agency hearing, Shaffer's employees should have stopped the firearms sales based on the transferees' answers to those questions pending further investigation. Director of Industry Operations McCabe stated in his final decision that this was the third time ATF had cited Shaffer for this violation because it was disclosed in the 1998 and 2000 inspections, and it was also included in the warning letter sent after the 2000 inspection.

**\*12** Shaffer has not presented any evidence to contradict the transferees' answers on the ATF

Form 4473s or to show that the forms were correct and proper when the firearms were transferred. Shaffer was previously cited and warned about tolerating these kinds of errors on the ATF Form 4473. Thus, no genuine issue of material fact has been generated and these violations were willful as a matter of law.

Another reason for declining to renew Shaffer's license was a false entry in the A & D Record, in violation of 18 U.S.C. §§ 922(m) and 923(g) and 27 C.F.R. § 478.125(e). ATF Inspector Lockridge stated at the agency hearing that the licensee reported the loss of four firearms to ATF on a Theft/Loss Report, ATF Form 3310.11 (ATF Hotline Incident Number F20010002419) dated December 31, 2001, and then after filing the Theft/Loss Report with the ATF, the licensee recorded on the licensee's copy of the ATF Form 3310.11 an additional fifth firearm and entered a false entry in the A & D Record as a disposition stating that the fifth firearm was reported lost on ATF Incident Number F20010002419. The fifth firearm was not entered on the Theft/Loss Report filed with ATF and was also omitted on the Theft/Loss Report filed with the local police department. The licensee then attempted to sell or actually sold, the fifth firearm to Brandon Edward Dailey on an ATF Form 4473 which indicated a TICS "denial" on January 16, 2002. This sale or purported sale occurred approximately two weeks after the date of the Theft/Loss Report. The circumstances lead to an inference that the fifth firearm was transferred to a prohibited person with knowledge or reason to believe that person was prohibited from receiving a firearm and then the licensee attempted to conceal the transaction by adding the description of the firearm to the licensee's copy of the Theft/Loss Report previously filed with the ATF.

Shaffer attempted to explain this violation at the agency hearing and in his affidavit as a simple mixup in paperwork sent to the ATF or as one employee not knowing what the other was doing. The critical aspect of this violation that Shaffer has not adequately explained is why his employees would report the firearm stolen and then sell or attempt to sell the same firearm two weeks later. The Court concludes that Shaffer has not generated a genuine issue of material fact. Because this violation involved a false entry in the A & D Record, willfulness arose from intentional and knowing conduct, not just reckless conduct.

A third reason for refusing to renew Shaffer's license was his failure to record acquisitions in the A & D Record in a timely manner, in violation of 18 U.S.C. §§ 922(m) & 923(g) and 27 C.F.R. § 478.125(e). ATF Inspector Lockridge and his team inspected the firearms on hand at the pawn shop and determined that seventeen (17) of them were not entered as acquisitions in the A & D Record. Even taking as true Shaffer's contention that the ATF was wrong about three of the guns and that those firearms were, in fact, entered in the A & D Record, the only explanation Shaffer can offer as to why the other 14 guns were not entered is that he and his employees did not understand that gun parts or customer guns brought to the gunsmith for work had to be entered in the A & D record.

**\*13** As stated previously, it is Shaffer's obligation as a federal firearms licensee to know, understand, and comply with the firearms regulations. This was the second time that ATF inspectors cited Shaffer for this violation, as the same violation was also disclosed in the 2000 inspection. Shaffer received a warning letter at that time notifying him that retention of his federal firearms license depended on his compliance with the law. A reasonable factfinder could only determine that Shaffer and his employees were plainly indifferent to their legal obligations or reckless in the keeping of the pawn shop's paperwork for firearms transactions. This violation was willful.

The fourth reason for not renewing Shaffer's license was the failure to obtain properly executed ATF Forms 4473. During the 2007 inspection, inspectors discovered more than 700 ATF Forms 4473 at Rebel Pawn Shop that contained errors or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

omissions. At the agency hearing, Inspector Lockridge produced 24 of the forms as a sample to demonstrate the types of errors and omissions he and the other inspectors found, in violation of 18 U.S.C. §§ 922(m) & 922(g) and 27 C.F.R. § 478.124(c).

Shaffer does not present an adequate explanation for this huge record-keeping problem. He points out that some of the questions on the ATF Forms 4473 are duplicative and customers answered the question the first time but not the second time. He claims some errors were simply transpositions of numbers and oversights by the buyers. He claims it should be sufficient if a customer answers a question "Y" instead of "Yes." He complains "we did not understand that the law was this picky about how those questions were answered[.]"

It is not Shaffer's place to decide unilaterally which federal firearms regulations are so "picky" that they need not be followed. See Willingham Sports, Inc., 348 F.Supp.2d at 1309. "If ever there were a statutory scheme where a licensee should be obligated to 'sweat the details,' irrespective of how trifling they may appear, the Gun Control Act would appear to fit that bill." Id. at 1309 n. 14. That Shaffer conducted spot checks of his employees' work and felt they were doing a good job does not overcome ATF's strong evidence that Shaffer and his employees repeatedly failed to comply with applicable federal law. Shaffer was previously cited for this same violation and warned to bring his operations into compliance with the law. Where inspectors found in 2007 that there were approximately 700 instances of failure to ensure that customers' ATF Forms 4473 were fully and correctly completed and Shaffer did not adequately challenge the factual findings with regard to the examples presented, either at the agency hearing or in this action, there are no genuine issues of material fact to be tried.

While Shaffer contends that ATF has not proved intentional or reckless violations, relying on

Jim's Pawn Shop, Inc. v. Bowers, No. 5:05–CV–525–H (3) (E.D.N.C. Sept. 16, 2008) (decided following bench trial), (Docket Entry No. 44–1), the Court determines otherwise on the record before it. Also, under Sixth Circuit law, "[a]t some point, repeated negligence becomes recklessness, and that point arrived for [Shaffer] in [2007]." Armalite, Inc., 544 F.3d at 650. The failure to complete ATF Forms 4473 properly after being previously cited and warned to do so was a willful violation of the firearms laws. See Willingham Sports, Inc., 348 F.Supp.2d at 1308 (where Willingham's evidence called into doubt a small percentage of violations and overwhelming majority of charged violations were undisputed, Willingham could not avert summary judgment).

**\*14** The fifth and last reason why Shaffer's license was not renewed was the failure to report multiple sales of handguns. During the 2007 inspection, investigators found 13 instances when multiple sales of two or more pistols and revolvers—a total of 27 firearms—were not reported as multiple sales to ATF, in violation of 18 U.S.C. § 923(g)(3)(A) and 27 C.F.R. §§ 478.21(a) and 478.126a.

Shaffer's explanation is that the ATF inspectors were wrong about some of the sales, but that others were "occasional oversights," and his employees normally reported multiple handgun sales. Considering Shaffer's duty to comply with the laws and the scope of his and his employees' reckless disregard for that duty, this violation, too, was willful, and there are no factual issues to be tried.

Shaffer contends that he has taken steps since the 2007 inspection to reform his business and that it would be a hardship for him to lose the right to deal in firearms. Unfortunately for Shaffer, evidence that he reformed his business practices after the 2007 inspection is not probative as to whether the violations observed during that inspection were willful. Willingham Sports, Inc., 348 F.Supp.2d at 1311. The statute, 18 U.S.C. § 923(e), focuses on willfulness at the time the violations occurred. Con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

sideration of post-inspection evidence would prevent ATF from ever revoking a license because the licensee could recover the license simply by coming into compliance before judicial review. *Id.* What matters is the conduct of Shaffer and his employees at the time the violations occurred. *See Procaccio,* 233 Fed.Appx. at 559. So Shaffer's argument that he tried to correct the problems after the 2007 inspection is immaterial to the question of willfulness at the time the violations occurred.

The record reveals Shaffer's pervasive history and tolerance for mistakes. "A simple mistake does not on its own constitute willfulness.... But at some point, a series of purported mistakes may evince a tolerance for errors and thus a plain indifference to the applicable statutory and regulatory requirements." *Garner,* 2009 WL 2749709 at *6. " '[W]hen such errors continue or even increase in the face of repeated warnings given by enforcement officials, accompanied by explanations of the severity of the failures, one may infer as a matter of law that the licensee simply does not care about the legal requirements. *At that point,* the failures show the licensee's plain indifference and therefore become willful.' " *Id.* (quoting *RSM, Inc. v. Herbert,* 466 F.3d 316, 322 (4th Cir.2006) (emphasis in original)).

The Court concludes there is no merit to Shaffer's argument that ATF should have applied the APA to the agency hearing. The APA's formal proceeding standards are only applicable when the governing statute specifies that an agency must conduct a "hearing on the record," as opposed to a statutory requirement of a "hearing" or a "full hearing." *Arwady,* 507 F.Supp.2d at 759. The GCA provides that "[i]f the Attorney General denies an application for, or revokes, a license, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation." 18 U.S.C. § 923(f)(2). The regulations similarly refer to "a hearing." 27 C.F.R. §§ 478.72 and 478.73. Neither the GCA nor the regulations promulgated under the GCA call for a "hearing on the record."

Therefore, the Court concludes that the hearing Shaffer requested and received was not a formal, adversarial hearing to which the APA standards applied. *See id.* at 759–760. In any event, under the express exception language of the APA, the formal hearing procedures of the APA do not apply to "a matter subject to a subsequent trial of the law and the facts de novo in a court." 5 U.S.C. § 554(a)(1); *Arwady,* 507 F.Supp.2d at 760. The GCA allows a district court reviewing an ATF license denial to conduct a trial *de novo* when the court deems it necessary. *Arwady,* 507 F.Supp.2d at 760. This Court has conducted *de novo* review here and considered Shaffer's supplemental evidence submitted by his affidavit, finding no factual issues to be tried *de novo.* Thus, because Shaffer was always entitled to and received *de novo* review in federal court, the APA formal hearing procedures did not apply to the agency hearing.

**\*15** Concomitantly, there is no merit to Shaffer's claim that his due process rights have been violated. Shaffer received due process in accordance with the GCA and regulations through an agency hearing to review the license revocation and denial of his renewal application for a license, and he has received due process in this federal action for judicial review.

Finally, there is no merit to Shaffer's argument under the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501, et seq.[FN4] In his First Amended Complaint, Shaffer alleges that the increasing ambiguity, complexity, and length of ATF Form 4473 violates the purposes of the PRA. (Docket Entry No. 19 ¶ 123.) Shaffer concedes that the PRA does not create any private right of action, but asserts that the PRA provides an absolute defense where a form "does not display a valid control number assigned by the Director" of the Office of Management and Budget ("OMB"), 44 U.S.C. § 3512. (*Id.* ¶ 124.) Shaffer alleges that, although ATF Form 4473 displays a number issued by OMB, the number was issued based on incomplete and/or misleading statements to the OMB that the form has no im-

pact on small business, and Shaffer alleges the OMB erred in approving it. (*Id.* ¶¶ 125–126.) Shaffer also asserts that the ATF acted inappropriately both in its applications made to the OMB for revisions of Form 4473 and in its actual use of Form 4473 for license revocation proceedings such as this one. (*Id.* ¶ 127.)

> FN4. The PRA requires an agency to engage in notice-and-comment rulemaking and receive approval from the Office of Management and Budget before the agency collects information. 44 U.S.C. § 3507(a) & (c); 5 C.F.R. § 1320.5(a)(2). All agencies in their substantive rulemaking process must first publish such rules in the Federal Register to give them effect. 5 U.S.C. § 552; *Morton v. Ruiz,* 415 U.S. 199, 233 & n. 27, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

Shaffer has not produced any evidence that he made an objection to ATF Form 4473 during the notice and comment period. More importantly, the instant *de novo* review of ATF's license denial is limited by 18 U.S.C. § 923(f)(3) to a determination of whether or not ATF's action in refusing to renew Shaffer's federal firearms license was authorized. The Court finds that this is not the proper forum for Shaffer to mount an attack on OMB's approval of ATF Form 4473.

Even if Shaffer could show in this proceeding that the willful violation based on failure to complete proper ATF Forms 4473 should be disregarded due to the PRA argument, ATF has provided compelling proof that Shaffer and his employees committed four other types of willful violations, all of which the Court has discussed at length. The argument based on the PRA does not preclude entry of summary judgment in favor of ATF.

### V. CONCLUSION

For all of the reasons stated, Defendants' Motion For Summary Judgment (Docket Entry No. 22) will be granted. On *de novo* review of the certified administrative record, supplemented by Shaffer's affidavit, the ATF has established five types of willful violations of the federal firearms statutes and regulations by Shaffer and the employees of Rebel Pawn Shop. Accordingly, the ATF was authorized to revoke the federal firearms license issued to Shaffer and to deny his application to renew that license.

An appropriate Order will be entered.

M.D.Tenn.,2010.
Shaffer v. Holder
Not Reported in F.Supp.2d, 2010 WL 1408829 (M.D.Tenn.)

END OF DOCUMENT


Not Reported in F.Supp.2d, 2005 WL 1651794 (S.D.Ohio)
**(Cite as: 2005 WL 1651794 (S.D.Ohio))**

C
Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio, Eastern Division.
CLUST, INC., d/b/a Cash to Go Pawn Shop, Petitioner,
v.
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, Respondent.

No. 2:04-CV-839.
July 13, 2005.

*OPINION AND ORDER*

GRAHAM, J.

**\*1** Clust, Inc., d/b/a Cash to Go Pawn Shop, brings this petition for judicial review of the administrative decision of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") revoking Clust's license to deal in firearms. Under 18 U.S.C. § 923(f)(3), a party whose license to deal in firearms is revoked after an administrative hearing may file a petition in United States district court for de novo judicial review. 18 U.S.C. § 923(f)(3). The ATF revoked Clust's federal firearms license on June 30, 2004 after finding that Clust had willfully violated the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921, et seq.

This matter is before the Court on the ATF's unopposed motion for summary judgment. Because it is undisputed that Clust repeatedly violated the Gun Control Act, the motion is granted and the decision revoking Clust's firearms license is affirmed.

I. *Background*

A. Recordkeeping Requirements of the Gun Control Act

The GCA and its implementing regulations contain various recordkeeping requirements for dealers in firearms. *See* 18 U.S.C. § 923(g); 27 C.F.R. §§ 478.121-.134. Three of these require-

ments are important to this case. First, dealers must complete a Firearm's Transaction Record, ATF Form 4473, for every sale of a firearm. In Section A of the form, a buyer must provide identifying information, such as name, address, height, weight, sex, race, birth date, place of birth, state of residence, and country of citizenship. The dealer must then complete Sections B, C, and D, which require information about the firearm being sold, the dealer's National Instant Criminal Background Check System check on the buyer, and the buyer's identifying documentation. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.124.

Second, dealers must prepare a report of multiple sales, ATF Form 3310.4, whenever they transfer two or more handguns to an unlicensed person within any 5 consecutive business days. The dealer must send two copies of Form 3310.4 to the ATF office listed on the form and one copy to state or local law enforcement. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a.

Third, firearms dealers must maintain a bound book, known as the "Acquisition and Disposition Book," identifying every firearm placed into and taken out of its inventory. Entries of acquisitions in the Book must identify the gun by manufacturer, model, serial number, type, and caliber or gauge, as well as identify the person who sold the gun to the dealer and the date the dealer received the gun. The dealer must record these entries by the close of the business day following the acquisition. Entries of dispositions must include the date the gun was transferred out of the dealer's inventory and the name and address of the person to whom the gun was transferred. The dealer must record these entries no later than 7 days after the disposition. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.125(e), (g).

The ATF conducts inspections during the license application process to ensure that the licensee understands the GCA's recordkeeping requirements.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1651794 (S.D.Ohio)
**(Cite as: 2005 WL 1651794 (S.D.Ohio))**

Compliance inspections are conducted periodically to review the licensee's records and inventory for determining whether the licensee is complying with the GCA's requirements.

B. Inspections of Clust

**\*2** The following statement of facts is taken from the administrative record below. Clust's President is Samuel Katz and its Vice President is Edward Shnayder. ATF issued a federal firearms license to Clust in 1994. The license authorized Clust to serve as a dealer, including pawnbroker, in firearms other than destructive devices at its store at 4896 West Broad Street in Columbus, Ohio. In 1996, ATF issued another firearms license for Clust's store at 1975 Morse Road in Columbus, Ohio.

In 1996, as part of the firearms license application process, ATF Inspector Devon Stokes completed an application inspection at the Morse Road store. During the inspection, Inspector Stokes informed Mr. Shnayder about the GCA's recordkeeping and business conduct requirements. Inspector Stokes reviewed with Mr. Shnayder how to properly complete the ATF Form 4473 and the Acquisition and Disposition Book. Mr. Shnayder signed a Firearm's Application Inspection Worksheet, acknowledging his review of a licensee's duties under the GCA.

In May 2001, Inspector Stokes and Inspector Melissa Mehaffey conducted an unannounced inspection of Clust's 4896 West Broad Street store. Inspector Stokes reviewed Clust's ATF Forms 4473 and Acquisition and Disposition Book for the time period from May 2000 to May 2001. After conducting the inspection, ATF issued a Report of Violations to Clust for the following violations:

- failure to maintain ATF Forms 4473 in the proper format;

- failure to have purchasers fully complete Section A of ATF Forms 4473;

- failure to maintain an accurate inventory of firearms, such that the physical inventory in the store did not match the Acquisition and Disposition Book because firearms were missing; and

- failure to timely record acquisitions and dispositions of firearms.

ATF presented the Report of Violations to Mr. Katz and reviewed the violations and applicable law with him.

In March 2003, Inspector Stokes and Inspector Tim Hunt conducted another unannounced inspection of Clust's 4896 West Broad Street store. They reviewed Clust's ATF Forms 4473, Acquisition and Disposition Book, and reports of multiple sales for the time period from January 2002 to March 2003. After conducting the inspection, ATF issued a Report of Violations to Clust for the following violations:

- 50 instances of failure to have purchasers fully complete Section A of ATF Forms 4473;

- 44 instances of failing fully complete Sections B and D of ATF Forms 4473;

- 3 instances of failure to record acquisitions of firearms;

- 32 instances of failure to timely record acquisitions of firearms;

- 56 instances of failure to timely record dispositions of firearms;

- 10 instances of failure to prepare reports of multiple sales; and

- 4 instances of failure to contact the National Instant Criminal Background Check System to conduct background checks of unlicensed prospective buyers.

ATF issued a second Report of Violations, which Mr. Katz signed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

C. Administrative Hearing

**\*3** On November 21, 2003, ATF gave notice to Clust that it was revoking Clust's federal firearms license. The notice charged Clust with 7 counts of willfully violating the GCA. Mr. Katz requested a hearing to review the license revocation. *See* 18 U.S.C. § 923(f)(2). The hearing was held in Columbus, Ohio on March 17, 2004. ATF advised Mr. Katz of Clust's right to be represented by counsel and to present evidence at the hearing.

Mr. Katz appeared for Clust at the hearing. Mr. Katz did not dispute any of the evidence submitted concerning the violations found by ATF inspectors during the May 2001 and March 2003 inspections. Mr. Katz stated that many buyers did not understand the forms and that he did not have the time to ensure that all the forms were completed properly. Of the 6 counts charged against Clust, Mr. Katz disputed only Count 7, which alleged that Clust had failed to conduct the background checks. Mr. Katz produced a notebook of forms reflecting the times that he did conduct background checks and had refused to sell firearms to criminals.

In light of the undisputed evidence, the hearing officer found that Clust willfully violated the GCA, as charged in Counts 1-6. The hearing officer found that the evidence did not support the violation charged in Count 7.

The matter then went to the ATF's Director of Industry Operations in Columbus for a review of the hearing officer's findings. In a Final Notice of Revocation dated June 30, 2004, the Director found that Clust had knowledge of the GCA's requirements but was "plainly indifferent" to them and had "acted in purposeful disregard" of them in some cases. The Director concluded that Clust had willfully violated the GCA and revoked Clust's firearms license.

II. *Standard of Review*

A. Section 923(f)(3) Review

Under 18 U.S.C. § 923(f)(3), a party whose license to deal in firearms is revoked after an administrative hearing may "at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation." 18 U.S.C. § 923(f)(3). The district court "may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing." *Id.* If the district court finds that the ATF wrongly denied or revoked a petitioner's license, then "the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court." *Id.*

The ATF's decision is entitled to "no presumption of correctness," and the district court "may attach such weight, if any, as it deems appropriate to the ATF's determinations and decision." *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* 348 F.Supp.2d 1299, 1306 (S.D.Ala.2004); *see also 3 Bridges, Inc. v. United States,* 216 F.Supp.2d 655, 657 (E.D.Ky.2002) (ATF's "administrative decision is not clothed in this Court with any presumption of correctness"). The district court "need not accord any particular weight" to the ATF's decision, but may, in its discretion, give the decision such weight as the court believes it deserves. *Stein's, Inc. v. Blumenthal,* 649 F.2d 463, 467 (7th Cir.1980).

**\*4** The district court must allow the parties an opportunity to present additional evidence, even if that evidence was not presented to the hearing officer. 18 U.S.C. § 923(f)(3); *see Trader Vic's Ltd. v. O'Neill,* 169 F.Supp.2d 957, 961 (N.D.Ind.2001) ("[P]etitioners can properly supplement so long as the evidence meets the other requirements of relevancy and admissibility under the Federal Rules of Evidence."). Nonetheless, the district court need not hold an evidentiary hearing in reviewing the ATF's decision. *See Perri v. Department of Treasury; Bureau of Alcohol, Tobacco and Firearms,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

637 F.2d 1332, 1335 (9th Cir.1981); *DiMartino v. Buckley,* 19 Fed.Appx. 114, 115, 2001 WL 1127288, at *1 (4th Cir. Sept. 25, 2001).

B. Summary Judgment Standard

"A district court may grant summary judgment when reviewing a firearms license revocation pursuant to 18 U.S.C. § 923(f)(3), provided no issues of material fact are in dispute." *DiMartino,* 19 Fed.Appx. 114, 115, 2001 WL 1127288, at *1 (citing *Cucchiara v. Secretary of Treasury,* 652 F.2d 28, 29-30 (9th Cir.1981)). When the facts developed at the administrative hearing are sufficient to justify revocation and when those facts are not substantially drawn into question by the petitioner, then the court may grant summary judgment on the basis of the administrative record. *3 Bridges,* 216 F.Supp.2d at 657. As one court put it, "summary judgment is available under Section 923(f)(3) and may be appropriate if material facts developed at the administrative hearing, which the court also concludes justify nonrenewal, are not refuted or challenged by proper counter-affidavits filed pursuant to Rule 56." *Fin & Feather Sport Shop, Inc. v. U.S. Treasury Dept., Internal Revenue Service, Bureau of Alcohol, Tobacco and Firearms,* 481 F.Supp. 800, 807 (D.Neb.1979) (citation omitted); *see also Willingham Sports,* 348 F.Supp.2d at 1307; *Breit & Johnson Sporting Goods, Inc. v. Ashcroft,* 320 F.Supp.2d 671, 673 (N.D.Ill.2004).

III. *Discussion*

On August 31, 2004, Clust filed a petition for de novo review of the Director's revocation decision. The petition alleges that "there may be additional evidence" which would cause the Court to reverse the Director's decision. The petition, however, does not specify what that evidence is, and Clust has not requested an evidentiary hearing. The petition does not dispute any of the evidence presented to the hearing officer.

ATF has filed a motion for summary judgment, arguing that the evidence of Clust's repeated violations justifies revoking Clust's firearms license. Clust has not responded to the motion for summary

judgment, nor has Clust offered any additional evidence to challenge the Director's decision.

The government may revoke a firearms license if the dealer "willfully" violates a statute or regulation governing the firearm industry. *See* 18 U.S.C. § 923(e); *Appalachian Resources Development Corp. v. McCabe,* 387 F.3d 461, 464 (6th Cir.2004) . The Sixth Circuit has held that "where a licensee understands his or her legal obligations under the GCA, yet fails to abide by those obligations, his or her license can be denied or revoked on the basis that the dealer 'willfully' violated the GCA." *Appalachian Resources,* 387 F.3d at 464 (citing cases); *see also Perri v. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms,* 637 F.2d 1332, 1336 (9th Cir.1981) (holding that a willful violation occurs "when a dealer understands the requirements of the law, but knowingly fails to follow them or was indifferent to them."). A showing of bad purpose is not necessary for revoking or denying a license. *Appalachian Resources,* 387 F.3d at 464-65 .

**\*5** Here, Clust does not challenge the evidence on the administrative record concerning his failure to properly keep records. Thus, it is undisputed that Clust repeatedly failed to: maintain ATF Forms 4473 in the proper format; fill out Sections B and D of ATF Forms 4473 and have purchasers fully complete Section A of ATF Forms 4473; maintain an accurate inventory of firearms; record acquisitions of firearms; timely record acquisitions and dispositions of firearms; and prepare reports of multiple sales.

Turning to the question of willfulness, the Court notes that Clust does not contest that in 1996 ATF Inspector Stokes spoke with Clust's Vice President, Mr. Shnayder, about the GCA's recordkeeping and business conduct requirements. Inspector Stokes also reviewed with Mr. Shnayder how to properly complete ATF Form 4473 and the Acquisition and Disposition Book. Mr. Shnayder acknowledged his understanding of those requirements by signing the Firearm's Application Inspection Work-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1651794 (S.D.Ohio)
**(Cite as: 2005 WL 1651794 (S.D.Ohio))**

sheet. After the May 2001 inspection, Inspector Stokes reviewed Clust's violations and discussed the GCA's requirements with Mr. Katz.

The Court thus finds that Clust understood its obligations under the GCA. Further, Clust knowingly failed to abide by those obligations. The March 2003 inspection uncovered 195 violations (not counting the background check violations), 182 of which were of the type that Clust had committed before during the May 2001 inspection. "Courts have routinely found sufficient evidence of willfulness, as a matter of law, where a licensee engaged in repeated violations after being advised of recordkeeping defects by ATF inspectors on prior occasions." *Willingham Sports,* 348 F.Supp.2d at 1310 (S.D.Ala.2004) (citing cases).

Accordingly, the Court finds that no genuine issue of material fact exists concerning Clust's violations of the GCA. The record demonstrates that Clust repeatedly and willfully violated the GCA. Under § 923(f)(3), the ATF was authorized to revoke Clust's firearms license.

IV. *Conclusion*

For the reasons set forth above, ATF's June 6, 2005 motion for summary judgment (doc. 10) is GRANTED and Clust's petition is DISMISSED.

S.D.Ohio,2005.
Clust, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives
Not Reported in F.Supp.2d, 2005 WL 1651794 (S.D.Ohio)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 413640 (M.D.Tenn.)
**(Cite as: 2008 WL 413640 (M.D.Tenn.))**



Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee,
Nashville Division.
Nanette LAURENCE
v.
ANTEON CORPORATION.

No. 3:06-0637.
Feb. 13, 2008.

Nanette Laurence, Clarksville, TN, pro se.

Paul E. Prather, Kiesewetter, Wise, Kaplan, Schwimmer & Prather, P.L.C., Memphis, TN, for Anteon Corporation.

ORDER

TODD J. CAMPBELL, District Judge.

**\*1** Pending before the Court are a Report and Recommendation of the Magistrate Judge (Docket No.61), Objections filed by the Plaintiff (Docket No. 63), and a Response filed by the Defendant (Docket No. 64).

The Court has reviewed the Report and Recommendation, the Objections, the Response, and the file. The Objections of the Plaintiff are overruled, and the Report and Recommendation is adopted and approved.

Accordingly, Defendant Anteon Corporation's Motion for Summary Judgment (Docket No. 48) is GRANTED, and this action is DISMISSED with prejudice.

IT IS SO ORDERED.

**NANETTE LAURENCE,**

**Plaintiff,**

**v.**

**ANTEON & BLANCHFIELD HOSPITAL, ET AL.,**

**Defendants.**

*REPORT AND RECOMMENDATION*

JOE B. BROWN, United States Magistrate Judge.

For the reasons explained below, the undersigned **RECOMMENDS** that Anteon Corporation's (Anteon) motion for summary judgment (Docket Entry No. 48) be **GRANTED,** and that this action be **DISMISSED** with prejudice.

**I. BACKGROUND**

Before the Court is Aneton's motion for summary judgment. (Docket Entry No. 48) Anteon is the sole remaining defendant to this Title VII action, the complaint having been previously dismissed as to all other defendants. (Docket Entry No. 36, 46) The plaintiff has filed a response, and a revised response, to Aneton's motion for summary judgment.[FN1] (Docket Entry No. 57-58) The plaintiff also has filed two motions to "amend [her] response to the Discovery Request," that, given their content, the undersigned liberally construes, in part, as requests to supplement her two-part response to the motion for summary judgment. (Docket Entry No. 59-60) The alleged facts of this case remain as previously stated. (Docket Entry No. 31, pp. 1-2; No. 42, pp. 1-2)

> FN1. Although each is characterized as a response to Aneton's motion for summary judgment, Docket Entries 57 and 58 track Aneton's statement of undisputed material facts (Docket Entry No. 50), not Aneton's memorandum of law in support of its motion for summary judgment (Docket Entry No. 49). Notwithstanding this unorthodox method of responding to Aneton's motion of summary judgment, the plaintiff's "responses" are liberally construed as having been directed at Anteon's memorandum of law.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 413640 (M.D.Tenn.)
**(Cite as: 2008 WL 413640 (M.D.Tenn.))**

## II. ANALYSIS
### A. Summary Judgment Standard of Review

Summary Judgment is appropriate only where "there is no genuine issue as to any material fact ... and the moving party is entitled to summary judgment as a matter of law." Rule 56(c), Fed.R.Civ.P., *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Newman v. Federal Express Corp.,* 266 F.3d 401, 404-05 (6th Cir.2001). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Id.* at 249-50. Inferences from underlying facts "must be viewed in the light most favorable to the party opposing the motion." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir.2001), *cert. denied,* 534 U.S. 896, 122 S.Ct. 217, 151 L.Ed.2d 155 (2001).

In considering whether summary judgment is appropriate, the court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon County,* 203 F.3d 426, 431 (6th Cir.2000), *cert. denied,* 531 U.S. 875, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000). If there is a genuine issue of material fact" then summary judgment should be denied. *Id.* However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.' " *Hayes v. Equitable Energy Resources Co.,* 266 F.3d 560, 566 (6th Cir.2001) (quoting *Celotex Corp.,* 477 U.S. at 325).

**\*2** "Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.,* 926 F.2d 559, 561 (6th Cir.1991). The party opposing the motion for summary judgment may not rely solely on the pleadings. *Banks v. Wolfe County Bd. of Educ.,* 330 F.3d 888, 892 (6th Cir.2003) (citing *Thompson v. Ashe,* 250 F.3d 399, 405 (6th Cir.2001). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail under Title VII. *See DiCarlo v. Potter,* 358 F.3d 408, 414 (6th Cir.2004). In other words, to defeat summary judgment, the party opposing the motion "must present 'affirmative evidence' to support his/her position; a mere 'scintilla of evidence' is insufficient." *Bell v. Ohio State University,* 351 F.3d 240, 247 (6th Cir.2003) (quoting *Anderson,* 477 U.S. at 252).

### B. Title VII Race Discrimination Standard of Review

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where no direct evidence is presented of race discrimination, the district court must apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as modified by *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Wright v. Murray Guard,* 455 F.3d 702, 706 (6th Cir.2006). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination, *Burdine,* 450 U.S. at 252-253, and if she succeeds, she is then entitled to a rebuttable presumption of discrimination. *DiCarlo,* 358 F.3d at 414 (citing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Burdine,* 450 U.S. at 254).

To establish a *prima facie* case of race discrimination, the plaintiff must show that: 1) she is a member of a protected class; 2) she was subjected to adverse employment actions; 3) she was qualified for the position in question; and 4) she was replaced by someone outside the protected class, or similarly situated, non-protected employees were treated more favorably than she. *Vincent v. Brewer Col,* --- F.3d ----, 2007 WL 4409791 at * 4 (6th Cir.2007); *Wright,* 455 F.3d at 707. To compare her treatment to that of a non-protected employee, the plaintiff must show that she was similarly situated to the non-protected employee in all "relevant" respects. *Id.* at 710 (citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 353 (6th Cir.1998)).

**\*3** If a Title VII plaintiff establishes a *prima facie* case of discrimination, then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp.,* 411 U.S. at 802; *Wright,* 455 F.3d at 706-707. If the defendant is able to establish a nondiscriminatory reason for the adverse action, then the burden shifts back to the plaintiff to prove that the reason offered by the defendant was a pretext for unlawful discrimination. *McDonnel Douglas Corp.* at 804; *Wright,* 455 F.3d at 707 (citing *DiCarlo,* 358 F.3d at 414-415). "Throughout this burden-shifting approach, the plaintiff bear[s] the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright,* 455 F.3d at 707 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

The plaintiff's sole complaint is that she was discriminated against because of her race. (Docket Entry No. 1, ¶ 7, p. 3) However, because the plaintiff has provided no direct evidence of discriminatory conduct, the district court is required to analyze Aneton's motion for summary judgment under the standard set forth in *McDonnell Douglas Corp.*

**B.** *Prima Facie Showing*

Anteon argues that the plaintiff cannot establish a *prima facie* case of race discrimination because she was not replaced by a person outside the protected class. (Docket Entry No. 49, ¶ II.C, p. 4) More particularly, Anteon argues that, although the plaintiff was temporarily replaced by a white female named Michelle Lee-Elza, Demetrice Mitchell, an African-American female, who was on leave at the time of the events that gave rise to this action, assumed the position when she returned from leave. In support of their argument, Anteon provides the sworn declaration of Edna O'Dell, the plaintiff's supervisor while she worked for Anteon. In her declaration, O'Dell states that:

> I initially replaced [the plaintiff] in the Credentials Office with a temporary employee named Michelle Lee-Elza, a white female. At that time Demetrice Mitchell, an African American female, was on a leave of absence with our company. When Ms. Mitchell returned from her leave she was to resume her full time status with our company. To fill her time, she was placed in the Credentials Office, replacing Ms. Lee-Elza, to work part time and than [*sic* ] the rest of her hours were worked initially in the Call Center. After a short period of time, the Credentials office position was changed to full time and Ms [.] Mitchell then worked all of her hours in the Credential office ... [for] 1 1/2 years ...."

(Docket Entry No. 50, Ex. 2, ¶ 18, p. 4)

The plaintiff testified at her deposition that she "h[ad] [Lee-Elza's] name," and that she thought "they fell into some type of problem up there ... [and] ... they got rid of her as well." (Docket Entry No. 50, Ex. 1, pp. 112-113) [FN2] Although the plaintiff refers to Lee-Elza and Mitchell in her responses to Aneton's motion for summary judgment (Docket Entry No. 57-58, ¶ 20; No. 59-60), asserting in the case of Mitchell that she actually spoke with her, the plaintiff has failed to provide any affirmative evidence, *i.e.,* the deposition of either Lee-Elza or Mitchell, that would cast doubt on An-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

eton's claim that Lee-Elza was intended to replace the plaintiff only temporarily until Mitchell returned from leave.[FN3] In other words, the plaintiff has failed to provide any evidence that the person *actually* intended as her replacement was not another African-American Woman.

> FN2. Anteon has failed to comply with LR7.03(a), Local Rules of Court which requires that "[a]ll exhibits to pleadings shall be paginated progressively beginning with the principal document, and continuing through the last page of the document, including exhibits ." The page numbers referred to herein are the original page numbers that appear on the documents attached as exhibits.

> FN3. The plaintiff asserts that she "asked Demetrice Mitchell for an affidavit pertaining to her employment dates and the agreement that she made with Edna O'Dell before she began working in the credentials office, and she refused. Her reason was that it could cost her her job." (Docket Entry No. 59) The question is not what Aneton's agreement was with Mitchell after the fact; the question is under what circumstances Lee-Elza was placed in the plaintiff's position.

> In Docket Entry No. 59, the plaintiff also asks that Court "to obtain the employment[ ] records for Michell[e] Lee-Elza to establish when and why she was terminated and to prove that discrimination does exist in the credential[s] office." The record is devoid of any indication that the plaintiff sought to obtain this information through formal discovery. It is not for the district court to prosecute the plaintiff's case for her, nor is it the district court's place to obtain evidence sought by the plaintiff.

**\*4** As shown, *supra* at p. 4, there are two ways

to establish the fourth element of a *prima facie* case of race discrimination. Anteon has addressed only one. The other way to establish the fourth element requires the plaintiff to show that she was treated differently from similarly-situated persons who were not part of the protected class.

At her deposition, the plaintiff testified initially that she knew of other employees against whom the customer had lodged complaints. (Docket Entry No. 50, Ex. 1, p. 113) The plaintiff testified that the employee to whom she was referring was the "white female" previously identified, *supra* at p. 5, as Lee-Elza. The plaintiff later testified, however, that she did not know if Lee-Elza left, nor was she aware of anyone who, if the customer filed a complaint against them, had not been discharged.[FN4] (Docket Entry No. 50, Ex. 1, p. 114) In her response to Aneton's motion for summary judgment, the plaintiff repeats her later testimony at her deposition, *i.e.,* that she "was not in a position to know of the employment related issues surrounding another Anteon employee." (Docket Entry No. 57-58, ¶ 16) One conclusion can be drawn from the foregoing: The plaintiff has provided no evidence that she was subject to disparate treatment.

> FN4. The record shows that Juanita Joyner, employed by the Blanchfield Army Community Hospital-the customer-asked that the plaintiff not be continued in her position. (Docket Entry No. 50, Ex. 7)

For the reasons explained above, the plaintiff has failed to make a *prima facie* showing of race discrimination. Although it would be appropriate to recommend at this juncture that Anteon's motion for summary judgment be granted, Anteon has provided the additional arguments required under *McDonnell Douglas Corp.'s* burden-shifting scheme in the event that the plaintiff is deemed to have made a *prima facie* showing of race discrimination.

**C. Aneton's Additional Arguments**
Anteon offers a three-part argument in support

of its motion for summary judgment in the event it is determined that the plaintiff has made a *prima facie* showing of race discrimination: 1) the plaintiff has no evidence that Aneton's reason for discharging her was not based on legitimate, nondiscriminatory reasons; 2) the plaintiff has no evidence that Aneton's reason for discharging her was a pretext for discrimination; and 3) Anteon is entitled to the "same actor" inference set forth in *Buhrmaster v. Overnite Transportation Co.,* 61 F.3d 461 (6th Cir.1995).

**1. Anteon's Reason for Discharging the Plaintiff**

Anteon argues first that the plaintiff was discharged because of the difficulties she had using the computer, and that poor job performance ss a legitimate, nondiscriminatory reason to discharge an employee. (Docket Entry No. 49, ¶ II.D.2, pp. 5-6)

O'Dell's sworn declaration, provided by Anteon in support of its motion for summary judgment, shows that O'Dell counseled the plaintiff on her difficulties using the computer system. (Docket Entry No. 50, Ex. 2, ¶ 13, p. 3) In an "EMPLOYEE COUNSELING REPORT" signed by the plaintiff on March 21, 2005, O'Dell wrote:

> **\*5** Ms. Laurence has been observed by more than one individual having difficulty maneuvering through the basic computer screens. In doing an online training that is normally completed in less than 4 hours-she experienced multiple problems that *extended her training over several days.*

(Docket Entry No. 50, Ex. 1, Attach. Ex. 5) (underline in the original) In a memorandum dated April 15, 2005, Joyner-on behalf of the customer, Blanchfield Army Community Hospital-wrote the following to O'Dell:

> It is with regret that I request the temporary contract employee-Nanette Laurence not be continued in her current position .... Ms Laurence has had problems with utilizing the computer and the programs which we use....

We feel that someone with more knowledge of the hospital would be better suited for this position.

(Docket Entry No. 50, Ex. 1, Attach. Ex. 7)

In her deposition and response to the motion for summary judgment, the plaintiff admits that she had trouble navigating between windows during the initial HIPAA (Health Insurance Portability and Accountability Act) training, but maintains that two acting supervisors and four other employees also had trouble. (Docket Entry No. 50, Ex. 1, pp. 35-41, 45; No. 58-59, ¶¶ 8-9) Notwithstanding her claim, the plaintiff has offered no evidence, affirmative or otherwise, to show that her problems were no different than those that she claims were experienced by others, or that it took her longer to complete the online training course than others who were trained in its use. More particularly, although the plaintiff identifies six individuals whom she claims also had difficulties (Docket Entry No. 58-59, ¶ 8), including O'Dell and Joyner, the plaintiff has not provided an affidavit from any of the individuals-less O'Dell and Joyner-or any other proof, to support her claim that she was not the only one who had problems.

Poor job performance is a legitimate, nondiscriminatory reason for discharging an employee. *Stockman v. Oakcrest Dental Center, P.C.,* 480 F.3d 791, 802 (6th Cir.2007) (citing *Majewski v. Automatic Data Processing Inc.,* 274 F.3d 1106 1116 (6th Cir.2001). The plaintiff's unsubstantiated assertions that she had the same problems as others are insufficient to establish that Anteon did not have a legitimate, nondiscriminatory for discharging her. *See Lujan,* 497 U.S. at 888.

**2. Pretext**

Anteon argues next that the plaintiff cannot establish that its reason for discharging her was a pretext for discrimination. Anteon argues first that the plaintiff testified at her deposition that she knew of no employee who was permitted to remain on the job after the customer had filed a complaint against

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

them and, as such, she cannot establish pretext on a theory of disparate treatment; and second, that the plaintiff's subjective opinion about why she was discharged is legally insufficient to establish pretext. (Docket Entry No. 49, ¶ II.D.3, pp. 6-7)

As to Aneton's first argument, as previously discussed, *supra* at pp. 5-6, the plaintiff has provided no evidence that she was treated differently from other similarly situated employees. Consequently, the plaintiff cannot establish pretext on grounds of disparate treatment.

**\*6** Aneton's second argument pertains to the plaintiff's testimony at her deposition that Jane Russell, a federal employee who worked in quality assurance, began to talk with Joyner and O'Dell, turning them against her. (Docket Entry No. 50, Ex. 1, pp. pp. 46-47, 57, 95) The plaintiff testified that she "h[as] no idea" what Russell told Joyner and O'Dell, but that Joyner's and O'Dell's attitude toward her changed. (Docket Entry No. 50, Ex. 1, pp. 50-52, 114-115) Although the plaintiff testified at her deposition that Russell made negative remarks, the only example she provided was an alleged remark "about how some women are just so scandalous and walk around in their night clothes all day long." (Docket Entry No. 50, Ex. 1, pp. 52-53) The plaintiff testified that she believed the remark was made about her because sometimes she would go to the mailbox in her pajamas. (Docket Entry No. 50, Ex. 1, pp. 53-54) The plaintiff repeats these general allegations in her response to the motion for summary judgment. (Docket Entry No. 57-58, ¶¶ 13, 15, 18-19)

A plain reading of the deposition shows that the plaintiff's race discrimination claim was based solely on her personal opinion and speculation. (Docket Entry No. 50, Ex. 1, pp. 46, 50-53, 57, 95, 112-113, 115, 121-122) When questioned, the plaintiff could not, or would not, provide any specifics. In fact, when afforded an opportunity to provide those details, she answered on one occasion, "I don't want to rehash all that," and on another, "I don't really want to go through all that."

(Docket Entry No. 50, Ex. 1, pp. 50, 52) When pressed in the latter instance, the only specific example that the plaintiff provided was Russell's alleged remark about "some women ... walk[ing] around in their night clothes all day long." (Docket Entry No. 50, p. 53)

Apart from conclusory allegations and her subjective beliefs, the plaintiff has provided no evidence of pretext. Conclusory allegations and subjective beliefs are insufficient to establish pretext. *See e.g., Mitchell v. Toledo Hosp.,* 964 F.2d 577, 585 (6th Cir.1992) (collecting cases standing for the proposition asserted).

### 3. "Same Actor" Inference

Anteon argues finally that, under the "same actor" inference, the plaintiff cannot establish discriminatory intent. (Docket Entry No. 49, ¶ II.D.1, pp. 4-5)

Under the "same actor" doctrine, "[w]here the same person hires the employee and fires him within a short period of time ... there is a strong contrary inference of discriminatory intent." *Stockman,* 480 F.3d at 801 (citing *Buhrmaster,* 61 F.3d at 464 ("An individual who is willing to hire ... a person of a certain class is unlikely to fire them simply because they are part of that class. This general principal applies regardless of whether the class is age, race, sex, or some other protected classification.")). However, in *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564 (6th Cir.2003), the Sixth Circuit diminished the relevance of the "same actor" inference, holding that "where ... the fact finder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact. *Id.* at pp. 573-774.

**\*7** In her sworn declaration, O'Dell states that she "was responsible for interviewing and hiring" the plaintiff, and that she hired the plaintiff on February 20, 2005.[FN5] (Docket Entry No. 50, Ex. 2, ¶ 10, p. 3) O'Dell also states that it was she who discharged the plaintiff, and that she did so on April

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

19, 2005.[FN6] (Docket Entry No. 50, Ex. 2, ¶ 15, p. 4) Apart from the specific date that she was hired, discussed below at n. 5, the plaintiff does not dispute O'Dell's statements. (Docket Entry No. 50, Ex. 1, pp. 21-23)

> FN5. The plaintiff asserts that she was hired on February 28, 2005, not February 20 as O'Dell states in her sworn declaration. (Docket Entry No. 59) It appears from the record that the plaintiff was, in fact, hired on February 28.

> FN6. The record shows that Anteon formally extended a job offer to the plaintiff by letter dated February 28, 2005 (Docket Entry No. 50, Ex. 3), and that Anteon formally discharged the plaintiff by letter dated April 19, 2005 (Docket Entry No. 50, Ex. 6). The letters were signed by Luanne Houck and Karen Dickman respectively, both Vice Presidents of Anteon.

Although this case was previously dismissed as to O'Dell (Docket Entry No. 46), the record shows that Aneton's liability derives from O'Dell's alleged discriminatory actions, actions that are imputed to Anteon through the dual common law doctrines of agency, *see Alexander v. Local 496, Laborers' Intern. Union of North America,* 177 F.3d 394, 409 (6th Cir.1999), and *respondeat superior, see McDowell v. Krawchison,* 125 F.3d 954, 961-962 (6th Cir.1997). Because Aneton's liability derives from O'Dell's alleged actions, analysis under the "same actor" inference with respect to Anteon turns on an analysis of O'Dell's actions.

The record shows that O'Dell hired *and* fired the plaintiff, and that she did so within a time frame of less than two months. Given that the plaintiff's protected classification as an African-American woman did not change during that brief period, and given that, as previously established *supra* at pp. 5-10, the plaintiff has failed to establish that a genuine issue of material fact exists, the "same actor" inference applies to Anteon.

As reasoned above, no discriminatory intent may be inferred from O'Dell's actions in firing the plaintiff under the "same actor" inference. For reasons stated above, that inference is imputed to Anteon.

### D. Conclusion

As reasoned herein, the plaintiff has failed to establish a *prima facie* case of race discrimination; she has failed to show that Anteon did not have a legitimate, nondiscriminatory reason for discharging her; and she has failed to establish that the reason for her discharge was a pretext for discrimination. Anteon also is entitled to the "same actor" inference. For these reasons, Anteon is entitled to judgment as a matter of law.

### III. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that Anteon's motion for summary judgment (Docket Entry No. 48) be **GRANTED**, and that this action be **DISMISSED** with prejudice.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation within which to file with the District Court any written objections to the proposed findings and recommendations made herein. Any party opposing shall have ten (10) days from receipt of any objections filed regarding this Report within which to file a response to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation may constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435, *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

**\*8 ENTERED** this the 25th Day of January, 2008.

M.D.Tenn.,2008.
Laurence v. Anteon Corp.
Not Reported in F.Supp.2d, 2008 WL 413640

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 413640 (M.D.Tenn.)
**(Cite as: 2008 WL 413640 (M.D.Tenn.))**

(M.D.Tenn.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.)))**

C

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA6 Rule 28 and
FI CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
AL'S JEWELRY & LOAN, INC., Plaintiff-Appel-
lant,
v.
UNITED STATES of America, DEPARTMENT
OF TREASURY, BUREAU OF ALCOHOL, TO-
BACCO AND FIREARMS, Defendant-Appellee.

No. 95-1765.
Nov. 22, 1996.

On Appeal from the United States District Court for
the Eastern District of Michigan, No. 94-73971;
Paul D. Borman, Judge.
E.D.Mich.

AFFIRMED.

Before: NELSON, MOORE and COLE, Circuit
Judges.

COLE, Circuit Judge.
**\*1** Al's Jewelry & Loan, Inc. appeals the dis-
trict court's grant of summary judgment in favor of
appellee, the United States Department of Treasury,
Bureau of Alcohol, Tobacco and Firearms ("ATF"),
affirming the denial of its application for a federal
firearms license. For the reasons that follow, we
AFFIRM the decision of the district court.

I.

Al's Jewelry & Loan, Inc., formerly known as
Al's Loan Office, Inc. ("Appellant"), was licensed
by ATF to engage in business as a firearms dealer.

Federal law and regulations mandate that licensees
comply with certain record-keeping requirements.
FN1 Between 1976 and 1988, Appellant repeatedly
violated these requirements by (i) failing to main-
tain appropriate records of firearms acquisitions
and dispositions; (ii) failing to ensure that the re-
quired ATF forms were completed when firearms
were sold; and (iii) making numerous sales of fire-
arms to individuals prohibited by law from owning
them.

FN1. These record-keeping requirements
are set forth in 18 U.S.C. § 923(g) and 27
C.F.R. Part 178.

In 1982, ATF sent Appellant an admonitory
letter warning of the possible loss of its license if it
failed to comply with all applicable laws and regu-
lations. FN2 Despite this warning and repeated in-
structions on proper record-keeping methods, in-
spections in 1983, 1985, 1987 and 1988 revealed
that Appellant continually violated federal firearms
laws and regulations. Finally, on March 31, 1989,
ATF gave written notice to Appellant that its li-
cense would be revoked.

FN2. The Gun Control Act of 1968 gov-
erns the requirements for holding a fire-
arms dealer's license. *See* Gun Control Act
of 1968, Pub.L. No. 90-618, 82 Stat. 1213
(codified as amended at 18 U.S.C. §§ 921-
930 (1996)). The regulations implementing
the Act's licensing provisions are contained
in 27 C.F.R. §§ 178.41-178.60.

After Appellant requested and received a hear-
ing, an ATF hearing officer recommended revoca-
tion of its license. An ATF inspector recommended
approval, as did the inspector's supervisor, but this
recommendation was rejected by ATF's regional
director. With the concurrence of the regional dir-
ector, ATF revoked Appellant's license, effective
September 18, 1989. Appellant subsequently filed a
petition for de novo review of that decision in the

103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.)))**

United States District Court for the Eastern District of Michigan. The district court affirmed the revocation, holding: "There is no question of fact that petitioner's failure to correct its record keeping was willful and plainly indifferent to the record keeping requirements."[FN3]

> FN3. *Al's Loan Office, Inc. v. United States Dep't of Treasury,* 738 F.Supp. 221, 224 (E.D.Mich.1990).

On March 31, 1993, Appellant, under the name of "Al's Jewelry and Loan, Inc.," applied to ATF for another federal firearms license. Following the proposed denial of the application by ATF's regional director, Appellant requested an administrative hearing. Upon conclusion of the hearing, ATF denied the appeal, citing in its written decision the repeated willful violations by Appellant of the Gun Control Act. A final notice of denial was issued on August 5, 1994. Appellant filed the present suit in the United States District Court for the Eastern District of Michigan, seeking review of ATF's denial.

After hearing oral argument and considering the evidence de novo, the district court granted ATF's motion for summary judgment. In support of its decision to affirm ATF's denial of a license, the district court found that management of the business had not changed in any significant way; in fact, Appellant's present management was integrally involved in managing the business during the 12 years when violations occurred. The district court thus concluded that the willful violations committed by "Al's Loan Office, Inc." between 1976 and 1988 were properly attributable to the applicant, "Al's Jewelry and Loan, Inc." The district court also observed that Appellant had not taken adequate measures to prevent the recurrence of the type of violations which had occurred in the past. Specifically, the court noted that serious record-keeping violations continued even after Appellant had instituted a computerized system designed to prevent such violations.

**\*2** This timely appeal followed the decision of the district court.

## II.

This court reviews a district court's grant of summary judgment and all legal conclusions drawn by that court de novo, using the same standard employed by the district court. *See Moore v. Phillip Morris Cos., Inc.,* 8 F.3d 335, 339 (6th Cir.1993). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III.

Appellant argues that the district court erred in granting ATF's motion for summary judgment because it based its revocation of Appellant's license on an "impermissible standard." Specifically, pointing to statements made by ATF witnesses, the Appellant asserts that ATF denied its application because it incorrectly interprets the Gun Control Act to prohibit an applicant from ever holding a firearms license if that applicant has previously had its license revoked due to a willful violation. Appellant contends that, despite its previous willful violations of the Gun Control Act and the revocation of its license, ATF possesses the discretion to grant it a new license and should do so because of the corrective measures Appellant has undertaken.

ATF, on the other hand, denies the interpretation of the Gun Control Act which Appellant attributes to it, arguing quite the opposite. ATF contends that the only issue before the court is whether, under 18 U.S.C. § 923(d)(1)(C), ATF's denial of Appellant's application was proper given its record of serious, willful violations of the Gun Control Act and its accompanying regulations. ATF argues that § 923(d)(1) merely establishes when an application

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.)))**

"shall be approved," and not when an application shall be denied. Thus, the ATF posits that although it must grant a license to an applicant who has never violated the Gun Control Act and who otherwise qualifies, it *may* grant a license to one who has had a prior violation. Accordingly, ATF agrees with Appellant that it has the discretion to issue a license to an applicant who has willfully violated federal gun control laws and regulations, but argues that it chose not to do so due to Appellant's extensive record of such violations.[FN4]

> FN4. At oral argument, ATF acknowledged that it has granted firearms licenses to past violators of the Gun Control Act.

Our inquiry must begin with the statute in question, Section 923(d)(1), which provides:

(d)(1) Any application submitted under ... this section shall be approved if-

(A) the applicant is twenty-one years of age or over;

(B) the applicant ... is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under ... this chapter;

**\*3** (C) the applicant has not willfully violated any of the provisions of this chapter or regulations issued thereunder;

(D) the applicant has not willfully failed to disclose any material information required, or has not made any false statements as to any material fact, in connection with his application;

(E) the applicant has in a State (i) premises from which he conducts business subject to license under this chapter ..., or (ii) in the case of a collector, premises from which he conducts his collecting ...; and

(F) the applicant certifies that-(i) the business to be conducted under the license is not prohibited

by State or local law in the place where the licensed premise is located ...

18 U.S.C. § 923(d)(1) (emphasis added). The statute's accompanying regulation, 27 C.F.R. § 178.47(b), sets out the same six criteria and states that ATF shall approve a license application if those criteria are met.

While the statutory language indicates that ATF shall approve an application if the applicant meets all criteria, it does not state what ATF must do if the applicant cannot meet one or more of those criteria. Two different interpretations of the statute are possible: (1) ATF *must* issue a license to an applicant who satisfies all six criteria, and *may* issue a license to an applicant who does not; or (2) ATF has the authority to issue a license to an applicant *only if* the applicant meets all six of the statutory criteria.

Adopting the first position, ATF and Appellant argue that the standards set forth in § 923(d)(1) are merely a limitation on the agency's discretion to deny a license and not upon its discretion to grant one. This interpretation may be supported by the difference in terminology used in the Gun Control Act and the statute which it replaced, the Omnibus Crime Control and Safe Streets Act of 1968 (OCCSSA). The OCCSSA provided that a license application "shall be disapproved" if the stated conditions were not met. However, the Gun Control Act, passed later that year, amended the OCCSSA language to require that a license application "shall be approved" if the conditions were met, establishing an affirmative obligation to grant a license to a qualified applicant. *See* H.Rep. No. 1577, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410.

However, the only grant of licensing authority given to ATF is set forth in 18 U.S.C. § 923(c). Pursuant to that section, the Secretary of the Treasury shall issue a firearms license to a "qualified applicant...." *See* 18 U.S.C. § 923(c). Neither the statute nor the regulations define the term "qualified

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.)))

applicant," but the mention of "qualified" in the statute is "an apparent reference to the qualifications set forth in § 923(d)(1)." *National Coalition to Ban Handguns v. Bureau of Alcohol, Tobacco and Firearms,* 715 F.2d 632, 637 (D.C.Cir.1983). It can therefore be argued that when an applicant cannot satisfy each of the factors in section 923(d)(1), the applicant is not "qualified" to hold a federal firearms license and ATF has no statutory authority to grant one.

*4 Like the court in *National Coalition,* we need not reach this "more ambitious contention." *See National Coalition,* 715 F.2d at 637. Although no court has addressed the issue of whether ATF possesses the discretion to issue a license to an applicant who does not meet each of the requirements of 18 U.S.C. § 923(d)(1)(A)-(F), federal courts have uniformly upheld ATF's denial of firearms licenses to those applicants who have willfully violated the federal gun control laws. *See Cucchiara v. Secretary of the Treasury,* 652 F.2d 28, 29 (9th Cir.1981) (where the applicant willfully failed to comply with ATF regulations, the district court properly affirmed ATF's refusal to renew the applicant's firearms license), *cert. denied,* 455 U.S. 948 (1982); *Prino v. Simon,* 606 F.2d 449, 451 (4th Cir.1979) (affirming the district court's decision that ATF properly denied an application for renewal due to the applicant's willful violations of the federal gun control laws); *Lewin v. Blumenthal,* 590 F.2d 268, 269 (8th Cir.1979) (where substantial evidence showed that an applicant's record-keeping violations were willful, ATF was "justified in its refusal to issue a renewal license....".) [FN5] Because it is undisputed that Appellant willfully violated the federal gun control laws and regulations, [FN6] and because there was ample evidence of Appellant's failure to institute satisfactory corrective measures to prevent such violations, we hold that ATF properly denied its application for a license. We thus hold that the district court correctly granted summary judgment in favor of ATF.

FN5. *See also Al's Loan Office, Inc. v.*

*United States Dept. of the Treasury,* 738 F.Supp. 221, 224 (E.D.Mich.1990) ("Courts uniformly hold that where, as here, a licensee understood his legal obligations for record keeping, but repeatedly failed to abide by these obligations, his license can be properly denied or revoked pursuant to 18 U.S.C. § 923(e) on the ground that he willfully violated the record keeping requirements of the Gun Control Act."); *Powers v. Bureau of Alcohol, Tobacco and Firearms,* 505 F.Supp. 695, 698 (N.D.Fla.1980) (noting that "[o]ne requirement of eligibility" for a federal firearms license is that the applicant has not willfully violated the federal gun control laws, and holding that where ATF had proven "repeated, willful violations by [the applicant] of the statutes and regulations governing firearms dealers ... [i]ts decision to deny [the applicant] a firearms license was well considered and correct."); *Fin & Feather Sport Shop, Inc. v. United States Treasury Dept.,* 481 F.Supp. 800, 804, 807 (D.Neb.1979) (holding that ATF was entitled to summary judgment where it had refused to renew an applicant's license due to the applicant's willful violations); *Service Arms Co., Inc. v. United States,* 463 F.Supp. 21, 22, 27 (W.D.Okla.1978) (affirming ATF's refusal to renew the license of an applicant who had willfully violated the federal gun control laws and regulations); *Rich v. United States,* 383 F.Supp. 797, 799 (S.D.Ohio 1974) (noting that ATF must issue a firearms license "unless the applicant is disqualified by the carefully defined exceptions of § 923(d)(1) ."); *Mayesh v. Schultz,* 58 F.R.D. 537, 540 (S.D.Ill.1973) (holding that an applicant's willful violations "justify refusal of [the applicant's] license renewal.").

FN6. The United States District Court for the Eastern District of Michigan noted,

103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.)))**

> In the case at bar, petitioner does not dispute the fact that it has repeatedly and continuously violated the record keeping requirements of the federal firearms laws from the years 1976 through 1988.... There is no question of fact that petitioner's failure to correct its record keeping was willful and plainly indifferent to the record keeping requirements.

*Al's Loan Office,* 738 F.Supp. at 223-24.

IV.

For these reasons, we AFFIRM the judgment of the district court.

C.A.6 (Mich.),1996.
Al's Jewelry & Loan, Inc. v. U.S. Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms
103 F.3d 128, 1996 WL 683528 (C.A.6 (Mich.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



# United States v. Beaufort

United States Court of Appeals for the Fourth Circuit
December 29, 1995, Submitted ; April 24, 1996, Decided
No. 94-5554, No. 95-5002

**Reporter:** 1996 U.S. App. LEXIS 9275

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. WILLIE BEN BEAUFORT, Defendant-Appellant. UNITED STATES OF AMERICA, Plaintiff-Appellee, v. MATTHEW J. PERRY, Defendant-Appellant.

**Notice:** **[*1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** Reported in Table Case Format at: _83 F.3d 416_; _1996 U.S. App. LEXIS 23668_.

**Prior History:** Appeals from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (CR-94-22).

**Disposition:** AFFIRMED

| Core Terms |
| --- |

firearm, straw, purchaser, transferee, sentence, convicted felon, district court, buyer, making false statements, conspiracy, acceptance of responsibility, transferor, convicted

| Case Summary |
| --- |

**Procedural Posture**

Defendant appealed his conviction in the United States District Court for the District of South Carolina for conspiracy to make false statements with respect to a licensed firearms dealer's records, sale of a firearm to a convicted felon, and making false statements with respect to a firearms dealer's records. His co-defendant appealed his sentence for conspiracy to make false statements and for possession of a firearm by a convicted felon.

**Overview**

Defendant, a pawnshop employee, allowed an informant for the Bureau of Alcohol, Tobacco, and Firearms (ATF), who said he was a convicted felon, to purchase a firearm, and instructed the informant to fill out the federal forms using false answers. He then procured "straw buyers" for the informant so that he could purchase additional firearms, circumventing the rule that only one firearm could be purchased in a 30-day period. The court rejected defendant's argument that the false statements representing the straw buyers as the purchasers were technically true, because the firearm was momentarily given to the straw buyer and then handed to the informant outside. The ATF form used the term "Transferee (Buyer)." The representation that the straw buyers were buyers was false. He next argued that the informant was not really a convicted felon, so that he did not violate _18 U.S.C.S. § 922(d)(1)_, because the money was supplied by ATF and ATF agents took possession of the firearm after the sale. This argument was meritless because _§ 922(d)(1)_ made it a crime to sell a firearm to a person either knowing or having reasonable cause to believe that the person was a convicted felon.

**Outcome**

The court affirmed defendant's convictions and both defendants' sentences for making false

statements in reports required to be made by federally licensed firearms dealers.

---

**LexisNexis® Headnotes**

Criminal Law & Procedure > ... > Weapons Offenses > Firearms Licenses > General Overview

Criminal Law & Procedure > ... > Firearms Licenses > Businesses > Inspections & Recordkeeping

*HN1* To prove a violation of *18 U.S.C.S. § 924(a)(1)(A)*, the government must show that a gun dealer made a false statement with respect to information that the law requires a federally licensed firearms dealer to keep.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN2* A conviction must be affirmed if there is substantial evidence, taken in the light most favorable to the government, to support it. Circumstantial evidence is considered, and the government is given the benefit of all reasonable inferences from the facts proved to those sought to be proved.

Criminal Law & Procedure > ... > Weapons Offenses > Firearms Licenses > General Overview

*HN3* The essence of the offense of sale of a firearm to a convicted felon is the deliberate sale of a firearm to a convicted felon who cannot legally purchase a firearm. *18 U.S.C.S. § 922(d)(1)*.

Criminal Law & Procedure > ... > Weapons Offenses > Firearms Licenses > General Overview

Criminal Law & Procedure > ... > Weapons Offenses > Trafficking in Weapons > Elements

*HN4* *18 U.S.C.S. § 922(d)(1)* makes it crime to sell a firearm to a person either knowing or having reasonable cause to believe that the person is a convicted felon.

Criminal Law & Procedure > Trials > Jury Instructions > Requests to Charge

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

*HN5* A district court's refusal to give an instruction requested by a defendant is reversible

error only if the requested instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; (3) and dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > General Overview

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Findings of Fact

*HN6* A court's factual finding concerning acceptance of responsibility is reviewed under the clearly erroneous standard.

Criminal Law & Procedure > Criminal Offenses > Acts & Mental States > General Overview

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Sentences

*HN7* To receive an acceptance of responsibility reduction in sentence, a defendant must admit guilty intent as well as the acts he committed.

Criminal Law & Procedure > Sentencing > Sentencing Guidelines > General Overview

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Mitigating Role

*HN8* A minimal participant is among the least culpable of those involved, as shown by his lack of understanding of the scope and structure of the activities of the others involved. *U.S. Sentencing Guidelines Manual § 3B1.2*, comment.

**Counsel:** Ann Briks Walsh, Assistant Federal Public Defender, Charleston, South Carolina; Judith Archer, Chatham, New Jersey, for Appellants.

J. Preston Strom, Jr., United States Attorney, A. Peter Shahid, Jr., Assistant United States Attorney, Charleston, South Carolina, for Appellee.

**Judges:** Before HALL, NIEMEYER, and MICHAEL, Circuit Judges.

Opinion

PER CURIAM:

Willie Ben Beaufort appeals his conviction and his 24-month sentence for conspiracy to make false statements with respect to records kept by a federally licensed firearms dealer, *18 U.S.C. § 371 (1988)* (Count 1); sale of a firearm to a convicted felon, *18 U.S.C. § 922(d)(1) (1988)*, *18 U.S.C.A. § 924(a)(2) (West Supp. 1995)* (Count 10); and making false statements with respect to records kept by a firearms dealer, *18 U.S.C.A. § 924(a)(1) (West Supp. 1995)*, *18 U.S.C. § 2 (1988)* (Counts 11, 12, 14). Matthew [*2] J. Perry appeals only his 33-month sentence for conspiracy (Count 1), making false statements to a firearms dealer (Count 12), and possession of a firearm by a convicted felon, *18 U.S.C.A. § 922(g)(1) (West Supp. 1995)* (Count 13). Finding no error, we affirm Beaufort's convictions and each Appellant's sentence.

In October 1993, Anthony Brown, a confidential informant for the Bureau of Alcohol, Tobacco, and Firearms (ATF), purchased a firearm at the A & A Pawnbrokers in North Charleston, South Carolina. Willie Beaufort worked in the pawnshop. Anthony Brown told Beaufort that he had a prior felony conviction but wanted to buy a gun. Beaufort agreed to sell him a gun and instructed Brown to answer "No" to the questions on the federal and state forms. After Brown signed the forms, co-defendant Herman Young, the store owner, signed as the transferor. Brown then said he would like bring in some friends who were in the same situation as he, to which Beaufort was agreeable.

On November 2, 1993, Anthony Brown brought an undercover agent, Frank Preston, to the pawnshop and introduced him to Beaufort as "Flex." Beaufort would not allow Brown to be a straw purchaser for Preston because under **[*3]** South Carolina law only one firearm may be purchased in a 30-day period. Instead, Beaufort tried without success to find another person to complete the required forms.

On November 9, Beaufort telephoned Preston and asked whether he was still interested in buying a gun and would be willing to pay a straw purchaser for completing the forms. On November 12, Beaufort again called Preston and arranged to sell him three firearms through straw purchasers. Later that day, Preston went to the A & A Pawn Shop wearing a recorder. Beaufort filled out the required purchase form, co-defendant Jones Lowe signed the forms as the purchaser, and Young signed as the transferor. Preston gave Beaufort $ 25 for Lowe; Beaufort kept some for himself. Beaufort then directed Lowe to carry the firearm outside the store and hand it to Preston.

A short time later, a second purchase was made with Matthew Perry acting as the straw purchaser. Perry signed the forms, was paid, and afterward carried the firearm outside and handed it to Preston. Perry then asked Preston if he could earn more money by finding a third straw purchaser. After some delay, Perry brought in co-defendant Curtis Brown, who went through the **[*4]** same procedure to complete the sale.

Beaufort and Perry went to trial and attempted to persuade the jury that the straw purchasers did not make any false statements on the purchase forms because the firearms had in fact been transferred to the straw purchasers, however briefly. In his cross-examination of Agent Preston, Beaufort's attorney introduced the dictionary definitions of the words buyer, transferee, seller, and transferor, to establish the difference between a sale or purchase and a transfer. Defense counsel unsuccessfully sought a jury instruction on the meanings of these terms. However, the district court declined to give one, finding that the terms were used only

on the ATF form, not in the statute, and were ordinary words which did not need special explanation. Beaufort was convicted of conspiracy, selling a firearm to a person he believed to be a convicted felon (Anthony Brown), and making false statements in connection with the straw purchases by Preston. Perry was convicted of conspiracy, making false statements in connection with his straw purchase for Preston, and being a felon in possession of a firearm. He was acquitted of complicity in the straw purchase made [*5] by Curtis Brown.

*Beaufort's Conviction and Sentence*

Beaufort contends that he was not guilty of conspiracy to make false statements or of making false statements in connection with the straw purchases because he accurately represented each straw purchaser as the transferee, a term used on the ATF Form 4473. He argues that the statements he made were technically true because the firearm was momentarily transferred to the straw purchaser, even though he knew that the firearm was being purchased for Agent Preston with money supplied by Agent Preston and even though he believed Agent Preston to be a convicted felon. In effect, Beaufort contends that the straw purchases were perfectly legal.

*HN1* To prove a violation of *§ 924(a)(1)(A)* (charged in Counts 11, 12, and 14 in connection with the three straw purchases), the government was required to show that Beaufort made a false statement with respect to information that the law requires a federally licensed firearms dealer to keep. *HN2* A conviction must be affirmed if there is substantial evidence, taken in the light most favorable to the government, to support it. *Glasser v. United States, 315 U.S. 60, 80, 86 L. Ed. 680, 62 S. Ct. 457 (1942).* Circumstantial evidence [*6] is considered, and the government is given the benefit of all reasonable inferences from the facts proved to those sought to be proved. *United States v. Tresvant , 677 F.2d 1018, 1021 (4th Cir. 1982).*

The term used on the ATF Form 4473 is "Transferee (Buyer)." *HN3* The essence of the

offense is the deliberate sale of a firearm to a convicted felon who cannot legally purchase a firearm. *United States v. Howell, 37 F.3d 1197, 1202 (7th Cir. 1994),* cert. denied , *514 U.S. 1090, 131 L. Ed. 2d 735, 63 U.S.L.W. 3772, 115 S. Ct. 1810* (U.S. Apr. 25, 1994) (No. 94-8594). Thus, the statements representing each of the straw purchasers as the transferee/buyer were false. *Id.*; *United States v. Ortiz-Loya, 777 F.2d 973, 979 (5th Cir. 1985)* (holding in prosecution under *18 U.S.C. § 922(a)(6)* that straw purchaser makes a misstatement in signing ATF form which is misrepresentation of material fact); *United States v. Lawrence, 680 F.2d 1126, 1128 (6th Cir. 1982)* (holding in prosecution under *§ 922(a)(6)* that straw purchaser is not transferee or buyer). Consequently, the evidence was sufficient to convict Beaufort of conspiracy and of the substantive counts of making false statements in connection with the three straw purchases.

[*7] In a related argument, Beaufort claims that, if the actual buyer of the firearm (the person who supplies the money and ultimately takes possession) is also the transferee, then he cannot be guilty under Count 10 of unlawfully selling a firearm to Anthony Brown, a convicted felon, because Brown was a straw purchaser for the ATF. He points out that the money for the purchase was supplied by ATF and ATF agents took possession of the firearm immediately after the sale.

This argument is meritless because *HN4 § 922(d)(1)* makes it crime to sell a firearm to a person either knowing or having reasonable cause to believe that the person is a convicted felon. Anthony Brown told Beaufort he had a prior felony conviction and Beaufort went ahead with the sale, instructing Brown to give false answers on the ATF form. The fact that it was a straw purchase for the ATF means that Brown did not commit a crime, but does not absolve Beaufort.

Beaufort also contends that the district court erred in refusing to instruct the jury on the legal

meanings of the terms buyer, seller, transferee, and transferor. *HN5* A district court's refusal to give an instruction requested by a defendant is reversible error only **[*8]** if the requested instruction ″(1) was correct; (2) was not substantially covered by the court's charge to the jury; (3) and dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.″ *United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995)* (quoting *United States v. Camejo, 929 F.2d 610, 614* (11th Cir.), *cert. denied*, *502 U.S. 880 (1991))*.

Here, the terms buyer, seller, transferor, and transferee did not have special legal meaning which required explanation for the jury to understand either the elements of the offense or Beaufort's defense. Therefore, the district court did not err in declining to give the requested instruction.

In sentencing Beaufort, the district court refused him an acceptance of responsibility adjustment both because he had gone to trial and because he had used cocaine and crack while on pre-trial release. *HN6* We review the court's factual finding concerning acceptance of responsibility under the clearly erroneous standard. *United States v. Curtis, 934 F.2d 553, 557 (4th Cir. 1991)*. Beaufort contends that, even though he went to trial, he was entitled **[*9]** to an acceptance of responsibility adjustment for two reasons: first, because he cooperated in the prosecution of the pawnshop owner after his conviction and, second, because he did not deny his actions but simply contested the applicability of the statute to his conduct. *See* *USSG § 3E1.1*, comment. (n.2). At the sentencing hearing, the government argued that Beaufort had not acknowledged the wrongfulness of his conduct. ATF Agent Paula Almond, responding to a question from Beaufort's attorney, expressed the same opinion.

The district court found that Beaufort's was not one of the rare cases in which a defendant who goes to trial can receive an acceptance of responsibility reduction. We agree. *HN7* A defendant must admit guilty intent as well as the acts he committed. *United States v. Castner, 50 F.3d 1267, 1280 (4th Cir. 1995)*. Because Beaufort did not unambiguously acknowledge his criminal conduct, the district court's determination was not clearly erroneous.

*Perry's Sentence*

Perry argued that he should be awarded a reduction for acceptance of responsibility because he was not intelligent enough to understand the illegality of his conduct before or after his conviction. **[*10]** We find that the district court did not clearly err in rejecting this contention.

Perry also argued that he was a minimal participant. *HN8* A minimal participant is among the least culpable of those involved, as shown by his lack of understanding of the scope and structure of the activities of the others involved. *USSG § 3B1.2*, comment. (n.1). The district court found that Perry was not a minimal participant because there was evidence that Perry recruited Curtis Brown to be the third straw purchaser, and may have been paid for this service. The court's finding that Perry was a minor, but not a minimal, participant was not clearly erroneous.

We therefore affirm Beaufort's convictions and the sentences imposed on Beaufort and Perry. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*


# Taylor v. Hughes

United States District Court for the Middle District of Pennsylvania
September 20, 2012, Decided; September 20, 2012, Filed
Civil No. 1:12-CV-138

**Reporter:** 2012 U.S. Dist. LEXIS 134422; 2012 WL 4327035

SCOTT W. TAYLOR, d/b/a TAYLOR'S TRADING POST, Petitioner v. ALPHONSO HUGHES, Director of Industry Operations, Bureau of Alcohol, Tobacco, Firearms and Explosives, Respondent

**Subsequent History:** Magistrate's recommendation at *Taylor v. Hughes, 2012 U.S. Dist. LEXIS 186438 (M.D. Pa., Dec. 27, 2012)*

<div style="border:1px solid">Core Terms</div>

revocation, license, firearm, discovery, summary judgment, district court, revoke, summary judgment motion, willful violation, internal policy, notice, licensee, evidentiary hearing, de novo

**Counsel:** [*1] For Scott W. Taylor, doing business as Taylor's Trading Post, Plaintiff: Scott L. Braum, Timothy R. Rudd, Scott L. Baum & Associates, LTD., Dayton, OH; William John Fulton, Harrisburg, PA.

For Alphonso Hughes, Director of Industry Operations, Bureau of Alcohol Tobacco Firearms and Explosives, Defendant: Kate L. Mershimer, U.S. Attorneys Office, Harrisburg, PA.

**Judges:** Martin C. Carlson, United States Magistrate Judge. Judge Jones.

**Opinion by:** Martin C. Carlson

<div style="border:1px solid">Opinion</div>

## MEMORANDUM OPINION

## I. INTRODUCTION

Scott Taylor, who does business as Taylor's Trading Post in Adams County, Pennsylvania, brought this action to challenge the Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF") revocation of his license to sell firearms pursuant to the Gun Control Act, *18 U.S.C. §§ 921-931*, after finding that Taylor had willfully committed over 10,000 violations of the Act over several years. ATF has moved for summary judgment on Plaintiff's claims, and seeks entry of an order upholding the revocation decision.

In response, the Petitioner has moved pursuant to *Rule 56(d) of the Federal Rules of Civil Procedure* for an extension of time to conduct discovery that he has propounded upon the Respondent, apparently in an effort principally [*2] to learn about ATF's internal policies, procedures, and documents in the agency's possession regarding this and other unrelated investigations and revocation decisions. Respondent has opposed the motion, arguing that it is overly burdensome and irrelevant to the legal issues before the Court. Specifically, Respondent argues that Petitioner's proposed discovery is an improper effort to discover information that has no bearing on the actual issue before the Court in this action, namely, whether Petitioner violated the GCA, and whether he did so willfully.

Upon consideration, although we agree with Petitioner that in some cases discovery may be warranted in actions challenging firearms license revocations, we do not agree that the discovery

Petitioner seeks in this case is necessary or appropriate given the issues presented. We also do not find that Petitioner has accurately defined the scope of the Court's inquiry in these proceedings, and has based his discovery request in part upon legally inaccurate assertions regarding the legal standards governing our review of ATF's decision. Accordingly, for the reasons that follow, the motion will be denied and the parties will be directed to **[*3]** complete briefing on Respondent's pending summary judgment motion, which has been held in abeyance pending resolution of Petitioner's *Rule 56(d)* motion.

## II. BACKGROUND

On September 14, 2011, following inspections of Petitioner's business premises and records over a period of approximately 10 months, ATF investigators found that Petitioner had committed more than 10,000 violations of the Gun Control Act of 1968 (GCA), *18 U.S.C. §§ 921-931*, and its regulations, *27 C.F.R. §§ 478.121 - 478.134*, largely through repeated and longstanding failures to keep required records regarding acquisitions and dispositions of firearms over multiple years. This investigation also revealed that Taylor was in possession of a firearm with an obliterated serial number, which is unlawful. (R. 42-47.)

As a result of these findings of violations of the GCA, ATF issued a Notice of Revocation of License to Taylor on February 9, 2011. (R. 172-74.) The Notice alleged that Taylor willfully violated the GCA and related regulations, and as a result Taylor's license to sell firearms was to be revoked on a date to be determined. (Id.) Taylor requested a hearing on the Notice, and the revocation was stayed. On August 31, **[*4]** 2011, ATF held a hearing to consider the revocation. At that hearing, Taylor was represented by counsel, and provided the opportunity to present evidence and cross-examine government witnesses. (R. 28-171) (hearing transcript.)

Following these proceedings, on November 21, 2011, Respondent issued a Final Notice of Revocation to Taylor. (R. 15-27.) In that Final Notice, Respondent concluded that the ATF inspection established that Taylor had willfully violated the GCA, and his FFL was revoked accordingly. (Id.) Taylor requested that the effective date of the FFL revocation be stayed pending review by a federal district court. Respondent granted this request, and on January 24, 2012, Taylor commenced the instant action, seeking *de novo* judicial review of ATF's revocation of his federal firearms license pursuant to *18 U.S.C. § 923(f)(3)*. (Doc. 1.)

Respondent answered the petition for review on March 23, 2012, (Doc. 9.), and thereafter on March 30, 2012, moved for summary judgment. (Doc. 14.) Rather than respond substantively to the motion for summary judgment, on April 13, 2012, Petitioner filed the motion that is presently before the Court, through which Petitioner seeks an enlargement **[*5]** of time to complete discovery pursuant to *Rule 56(d) of the Federal Rules of Civil Procedure*, on the grounds that such discovery is necessary for Petitioner to fully and fairly challenge ATF's revocation decision in these proceedings. (Docs. 33, 34.)

In response to this motion, the Court stayed briefing on Respondent's summary judgment motion pending the resolution of Taylor's discovery motion. (Doc. 32.) Respondent filed a brief opposing the discovery motion on April 30, 2012, (Doc. 35.), and Taylor filed a reply brief in further support of his motion on May 14, 2012. (Doc. 37.) Petitioner's motion for an enlargement of time to conduct additional discovery in aid of his efforts to overturn ATF's revocation of his FFL is now fully briefed and is ripe for disposition.

## III. DISCUSSION

## A. Summary Judgment and Motions for Discovery Pursuant to *Rule 56(d)*

*Rule 56(a) of the Federal Rules of Civil Procedure* provides as follows:

> A party may move for summary judgment, identifying each claim or

defense - or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and **[\*6]** the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

*Fed. R. Civ. P. 56(a)*. For purposes of *Rule 56*, a fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. (quoting *Anderson, 477 U.S. at 248-49*).

In appropriate instances, in response to a motion for summary judgment, the nonmoving party may file a motion pursuant to *Rule 56(d)*, which provides as follows:

**(d) When Facts Are Unavailable to the Nonmovant.**

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to **[\*7]** take discovery; or

(3) issue any other appropriate order.

*Fed. R. Civ. P. 56(d)*. In the declaration accompanying a motion filed pursuant to *Rule 56(d)*, the moving party must specify: "(1) what particular information is sought; (2) how, if uncovered, it would preclude summary judgment; and (3) why it has not previously been obtained." *Speth v. Goode, No. 95-0264, 2012 U.S. Dist. LEXIS 112040, 2012 WL 3277105, at \*7 (D.N.J. Aug. 9, 2012)* (citing *Pa. Dept. of Pub. Welfare v. Sebelius, 674 F.3d 139, 157 (3d Cir. 2012)* (further citations omitted); see also *St. Surin v. Virgin Islands Daily News, 21 F.3d 1309, 1313, 30 V.I. 373 (3d Cir. 1994)*.

If the party opposing summary judgment files an affidavit addressing these requirements, the Third Circuit has held that a continuance for purposes of allowing discovery should be liberally granted. See *Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir. 2007)* ("If discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting [summary judgment]."). However, a court may decline to delay ruling on a motion for summary judgment, or may otherwise deny a *Rule 56(d)* motion, where the additional discovery being sought by the nonmoving **[\*8]** party would not preclude summary judgment. *Dowling v. City of Philadelphia, 855 F.2d 136, 140 (3d Cir. 1988)*. This is because in order for a motion under *Rule 56(d)* to prevail, the movant must show as a threshold matter (1) what particular information is being sought and (2) how, if uncovered, the information would preclude summary judgment. *Pa. Dept. of Pub. Welfare v. Sebelius, 674 F.3d 139, 157 (3d Cir. 2012)*. It necessarily follows that where the information sought would not preclude summary judgment, or would not be relevant to the Court's inquiry, the motion for discovery under *Rule 56(d)* may be denied. *Dowling, 855 F.2d at 140*.

**B. Firearms License Revocations Under the GCA**

With these procedural standards in mind, we turn to the relevant legal guidelines governing actions

brought to challenge revocations of federal firearms licenses.

Under *18 U.S.C. § 923(d)(1)*, a federal firearms license is required for anyone "engage[d] in the business of importing, manufacturing, or dealing in firearms." A licensed firearms dealer must maintain accurate and detailed "records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such **[*9]** period, and in such form, as the Attorney General may by regulations prescribe." *18 U.S.C. § 923(g)(1)(A)*.

Under *§ 923(e) of the GCA*, "the Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter." *18 U.S.C. § 923(e)*. Courts have held that because the statute empowers the Attorney General to revoke a Federal Firearms License upon the fining of a willful violation of "any" provision of the GCA, a single violation of the GCA, or its rule and regulations, is sufficient to revoke a firearms license. *The General Store, Inc. v. Van Loan, 560 F.3d 920, 924 (9th Cir. 2009)*; *Armalite, Inc. v. Lambert, 544 F.3d 644, 647 (6th Cir. 2008)*.

## C. Judicial Review of GCA Revocation Decisions

A licensee may challenge an ATF revocation by filing a petition for review with the appropriate federal district court. *18 U.S.C. § 923(f)(3)*. The GCA provides that review of a revocation decision is *de novo*. Id.; see also *Shawano Gun & Loan, LLC v. Hughes, 650 F.3d 1070, 1076 (7th Cir. 2011)*. The relevant **[*10]** statutory provision provides for the process to be filed in an action challenging ATF's revocation of a federal firearms license:

> If after a hearing held under *paragraph (2)* the Attorney General decides not to reverse his decision to deny an application or revoke a license, the Attorney General shall give notice of his decision to the aggrieved party. The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held under *paragraph (2)*. If the court decides that the Attorney General was not authorized to deny the application or to revoke the license, the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court.

*18 U.S.C. § 923(f)(3)*. Thus, "[a] federal court reviewing such a revocation may grant summary judgment **[*11]** 'if no genuine issue of material fact exists about whether [the licensee] willfully violated an applicable statutory or regulatory provision.'" *American Arms International v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009)* (quoting *Armalite, Inc. v. Lambert, 544 F.3d 644, 647 (6th Cir. 2008))*.

The Seventh Circuit Court of Appeals has explained the district court's wide discretion in determining what evidence to consider in a proceeding challenging the revocation of the federal firearms license:

> In a proceeding brought under *§ 923(f)(3)*, the district court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the administrative hearing. The district

court is afforded discretion to receive evidence additional to that contained in the administrative record "when some good reason to do so either appears in the administrative record or is presented by the party petitioning for judicial review."

*Shawano Gun & Loan, LLC, 650 F.3d at 1076* (quoting *Stein's Inc. v. Blumenthal, 649 F.2d 463, 466 (7th Cir. 1980)*); see also *18 U.S.C. § 923(f)(3)* (district court "may" consider any evidence submitted by the parties, but statute does not require [*12] court to do so). Additionally, "[u]nder the de novo standard of review for a decision of the ATF, the district court may give the agency's finding and decision such weight as it believes they deserve, but need not accord any particular deference to those findings." *Gilbert v. Bangs, 813 F. Supp. 2d 669, 672-73 (D. Md. 2011)* (internal quotation marks omitted). Stated differently, the decision under review "is not necessarily clothed with any presumption of correctness or other advantage." *Stein's, 649 F.2d at 466-67*. Although the court's review is *de novo*, "the statute makes it clear that the focus of that review is narrow: whether the Attorney General was 'authorized' to revoke the license." *Suydam v. ATF, 847 F. Supp. 2d 146, 156 (D. Me. 2012)*. As this permissive standard suggests, in actions brought pursuant to *18 U.S.C. § 923(f)(3)*, district courts are not obligated to hold evidentiary hearings, or even to consider evidence in addition to that presented during the administrative proceedings. See *Shawano Gun & Loan, LLC, 650 F.3d at 1076* (quoting *Stein's Inc. v. Blumenthal, 649 F.2d 463, 466 (7th Cir. 1980)* (good reason to hold evidentiary hearing must appear in the record); *Cucchiara v. Secretary of the Treasury, 652 F.2d 28, 30, n.1 (9th Cir. 1981)* [*13] (district court did not abuse its discretion in ruling without conducting an evidentiary hearing, where the court found no

substantial basis to receive additional evidence); *Perri v. Dep't of Treasury, 637 F.2d 1332, 1335 (9th Cir. 1981)*; *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco & Firearms, 348 F. Supp. 2d 1299, 1306 (S.D. Ala. 2004)* ("Nonetheless, that the Gun Control Act provides for de novo review of administrative decisions is not to vest a firearm dealer with an absolute right to an evidentiary hearing in appealing from an adverse ATF decision. Case law is to the contrary."). Another district court has characterized motions for summary judgment brought in actions challenging license revocations as follows:

> As recognized in Stein's v. Blumenthal, under the traditional summary judgment standard, "technically fact finding is inappropriate and all reasonable inferences must be draw in favor of the party opposing the motion." *649 F.2d 463, 468 n. 7 (7th Cir.1980)*. In contrast, *§ 923(f)(3)* authorizes the district court to hear any evidence it wishes and make findings of fact, even without the benefit of conducting an evidentiary hearing. *Id. at 466* ("The ultimate decision [*14] as to the law and the facts remains with the trial judge."). Thus, while the Court's decision may be "summary" in nature as a matter of form, procedurally the Court may issue a decision even if material issues of fact exist, based upon its evaluation of the record and any additional evidence it has received.

*Pinion Enterprises, Inc. v. Ashcroft, 371 F. Supp. 2d 1311, 1314 n.6 (N.D. Ala.2005)*.

Accordingly, in conducting a *de novo* review of an ATF revocation decision, in order to uphold the ATF decision a district court must be satisfied that ATF appropriately found that (1) the licensee violated one or more provisions of the GCA, and (2) the licensee willfully

committed the violation. 27 C.F.R. § 478.73 ("[W]henever the Director has reason to believe that a licensee has willfully violated any provision of the Act or this part, a notice of revocation of the license, ATF Form 4500, may be issued."); see also Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, and Firearms, 415 F.3d 1274, 1276 (11th Cir. 2005); 18 U.S.C. § 923(f)(3).

**D. Plaintiff's Rule 56(d) Motion Fails Because the Discovery He Seeks Leave to Take Is Not Relevant to the Legal Issues Presented in this Action**

In addition **[*15]** to the two undisputed elements that must be found to uphold a revocation of a federal firearms license - violations of the GCA or its regulations, committed willfully - Petitioner argues that there is a third issue that the Court must consider if it ultimately finds that Petitioner willfully violated any provision of the GCA: "whether ATF's controlling internal policies permit his revocation - that is, was ATF authorized to revoke Taylor's FFL." (Doc. 34, at 6.)

Petitioner bases his motion for an extension of time to take discovery in substantial part upon this assertion that ATF's internal policies are somehow relevant to the Court's de novo review of ATF's revocation decision in this case. [1] However, although Petitioner offers statutory and caselaw citations purportedly in support of this assertion regarding the applicable standard of review, (Doc. 34, at 6.), examination of this authority reveals that it does not stand for the legal proposition offered. Indeed, this Court's own research has uncovered no caselaw, statute, or regulation that suggests in any way that ATF's internal policies have any relevance to the question of whether ATF was entitled to revoke a federal firearms license **[*16]** upon findings of

willful violations of the GCA. Instead, federal courts have clearly and consistently held that in reviewing ATF's revocation decision, the Court is to consider evidence from the parties, and to determine (1) whether the licensee violated a provision of the GCA and, if so, (2) whether the licensee willfully committed the violation. See, e.g., Borchardt Rifle Corp. v. Cook, 684 F.3d 1037, 1040 (11th Cir. 2012); American Arms International v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009); Armalite, Inc., 544 F.3d at 647; Stein's, Inc., 649 F.2d at 466-67.

Respondent has also brought to the Court's attention that this is not the first time that Petitioner's counsel, together with a former ATF employee, James Zammillo, have attempted to challenge ATF's alleged failure to follow its internal policies and procedures as a basis for appealing a revocation of a federal firearms license. See Weaver v. Harris, 856 F. Supp. 2d 854, 2012 U.S. Dist. LEXIS 32353, 2012 WL 848054 (S.D. Miss. Mar. 12, 2012). In that case, the district court flatly rejected this argument, and concluded that:

> Zammillo states the ATF violated its own policies and procedures by revoking Weaver's license in this way. Nevertheless, there appears to be no legal reason why the ATF is limited in its ability to initiate revocation proceedings in the face of a violation. The pertinent regulation provides that "[w]henever the Director has reason to believe that a licensee has willfully violated any provision of the Act or this part, a notice of revocation of the license, ATF Form 4500, may be issued." 27 C.F.R. § 478.73. Because the Court's review is limited to whether the ATF's actions were

---

[1] Among his various discovery requests propounded upon ATF, Petitioner seeks discovery of "files related to every FFL holder from January 1, 2008, through the present whose license has been revoked by ATF," "files related to every FFL holder from January 1, 2008, through the present who has been inspected and found to have violated the Gun Control Act in any manner within the past five years, but whose license is ultimately not revoked," and "files related to every petition for judicial review by FFL holders from January 1, 2008, through the present that has been brought pursuant to 18 U.S.C. § 923(f)(3) of the Gun Control **[*17]** Act." (Doc. 34-2, at 6-7 (Petitioner's First Set of Discovery Requests, at 9-10).)

"authorized", the evidence regarding [*18] how another official would have exercised the ATF's discretion under these circumstances is not helpful.

*2012 U.S. Dist. LEXIS 32353, [WL] at *4.* [2] In the absence of any persuasive authority to the contrary, we agree with the district court in *Weaver* that the discovery that Plaintiff seeks to take from ATF regarding internal policies and decisions made in other cases involving violations of the Gun Control Act is simply not germane to the issues presented in this proceeding. Accordingly, we find no merit to Plaintiff's motion that he should be permitted leave to take additional discovery of, *inter alia*, ATF's internal policies and procedures, past instances of violations, and other revocation decisions made over the past several years. [3]

Although his brief seems to focus chiefly on the third element that he attempted to graft onto the Court's review of the revocation decision pursuant to *18 U.S.C. § 923(f)(3)*, Petitioner also makes assorted other arguments in his motion that we likewise do not find persuasive. First, Petitioner indicates that he intends to challenge the ATF's finding of willfulness, and represents that he "intends to present evidence in support of such a conclusion, but it necessarily includes information that is solely in ATF's possession that ATF refuses to provide unless compelled to do so by this Court." (Doc. 34. at 10.) But aside from arguments regarding ATF's internal policies and procedures, Petitioner's brief is silent on what information in ATF's possession has relevance to the issue of whether his violations were willful, and why such information is not equally available to him. [4]

In short, we find Petitioner's assertions regarding the relevance of ATF's internal policies and procedures to be unpersuasive and

[2]  In *Weaver*, the petitioner had also filed a *Rule 56(d)* motion seeking discovery, and relied upon arguments similar to those made to the Court in this case. The *Weaver* court denied that motion, having found the petitioner's inquiries regarding internal policies and procedures to be "completely unrelated to the issue of Weaver's willfulness" and therefore "any such discovery would not be reasonably calculated to lead to the discovery of admissible evidence as required by *Fed. R. Civ. P. 26(b)(1)*." [*19] (Doc. 35, Ex. 2) (Weaver v. Harris, No. 1:10cv574, 2011 U.S. Dist. LEXIS 156240 (S.D. Miss. Sept. 12, 2011) (2011 U.S. Dist. LEXIS 156240 at *6).)

[3]  In his moving papers, Petitioner suggests that the Supreme Court's decisions in INS v. Yang, 519 U.S. 26, 32, 117 S. Ct. 350, 136 L. Ed. 2d 288 (1995) and Morton v. Ruiz, 415 U.S. 199, 235, 94 S. Ct. 1055, 39 L. Ed. 2d 270 (1974), provide support for his view that ATF's internal policies and procedures should be subject to discovery in these proceedings brought pursuant to *18 U.S.C. § 923(f)(3)*. Specifically, Petitioner focuses on language in Yang where the Supreme Court stated that if "[INS] announces and follows — by rule or by settled course of adjudication — a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act, *5 U.S.C. § 706(2)(A)*." *519 U.S. at 32.* The Court made this observation immediately prior to finding that "the INS has not, however, disregarded its general policy here . . . ." Id.

Although Petitioner faults Respondent for not squarely addressing Yang, we disagree that Yang is even relevant [*20] in this context. Even assuming arguendo that the Supreme Court's observation in Yang constitutes a holding and not dicta, our research has found no case that has applied Yang in the manner that Petitioner suggests. Indeed, federal courts considering similar arguments have found that the revocation decisions conducted pursuant to the GCA are not subject to the Administrative Procedure Act, *5 U.S.C. § 706(2)(A)*. See, e.g., Shaffer v. Holder, No. 1:09-0030, 2010 U.S. Dist. LEXIS 31415, 2010 WL 1408829, at *14 (M.D. Tenn. Mar. 30, 2010) (APA does not apply to GCA revocation proceedings); Arwady Hand Truck Sales, Inc. v. Vander Werf, 507 F. Supp. 2d 754, 759 (S.D. Tex. 2007) (same). We find these decisions persuasive, and we thus disagree that the Supreme Court's observation in the factually and legally distinct context presented in Yang has any relevance to the issues before the Court. Again, those issues are straightforward, and require that we conduct a *de novo* review of ATF's revocation decision, in order to determine whether Petitioner willfully violated one or more provisions of the Gun Control Act or its regulations. We are not charged with examining the internal operating procedures of the ATF as part of this [*21] undertaking.

[4]  We note that our decision to deny Petitioner's *Rule 56(d)* motion does not necessarily mean that the Court has determined not to receive any additional evidence that Petitioner may wish to submit bearing upon the relevant question of whether his apparently acknowledged violations of the Gun Control Act [*22] were "willful". The Court will make a determination about whether to hold

without compelling legal support. We also do not find that Taylor has adequately explained how the discovery he wishes to seek is relevant to the issues before the Court in these proceedings, or how he has been frustrated in obtaining the information he would present in support of his claims in this litigation. Accordingly, we do find that Taylor has not sustained his burden under *Rule 56(d)*, and his motion will be denied. The Court will set a final briefing schedule on the pending motion for summary judgment, and after the briefing has closed the Court will determine whether to convene an evidentiary hearing and entertain argument in this matter. [5]

## IV. ORDER

Accordingly, upon due consideration, and for the reasons set forth above, IT IS HEREBY ORDERED THAT Petitioner's motion for an extension of time to complete discovery pursuant to *Rule 56(d) of the Federal Rules of Civil Procedure* (Doc. 33.) is DENIED.

IT IS FURTHER ORDERED THAT the stay imposed by this Court's prior order (Doc. 32.) is LIFTED.

IT IS FURTHER ORDERED THAT the following briefing schedule shall apply to Respondent's motion for summary judgment:

1. Petitioner shall file a brief in opposition to the motion, together with a counterstatement of material facts pursuant to *Local Rule 56.1*, on or before **Monday, October 8, 2012.**

2. Respondent shall be permitted to file a reply brief in further support of its motion for summary judgment within 14 days of the date on which Petitioner's opposition brief is filed.

3. All briefs must comport with the requirements prescribed by *Local Rule 7.8*.

4. No additional briefing other than that provided for in this order shall be permitted without leave of court.

*/s/ Martin C. Carlson*

Martin C. Carlson

United States Magistrate Judge

Dated: September 20, 2012

---

an evidentiary hearing, and whether to invite additional evidence at such a hearing, after Respondent's motion for summary judgment is fully briefed.

[5]  We encourage Petitioner to explain in his briefs what additional evidence he would have the Court consider in support of his contention that his violations of the GCA were not willful, and  **[*23]** explain the relevance of the evidence he would submit.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

TOP BRASS SPORTS, INC.,                )
                                       )
    Plaintiff,                     )
                                       )
v.                                     )     No. <u>05-2455 D/P</u>
                                       )
ALBERTO GONZALEZ, Attorney             )
General of the United States;          )
UNITED STATES DEPARTMENT OF            )
JUSTICE; and THE BUREAU OF             )
ALCOHOL, TOBACCO, FIREARMS AND         )
EXPLOSIVES,                            )
                                       )
    Defendants.                    )

---

## ORDER DENYING MOTION TO COMPEL

---

Before the court is plaintiff Top Brass Sports, Inc.'s ("Top Brass") Motion to Compel Discovery Responses and to Amend the Scheduling Order If Necessary (D.E. 29). Defendants Alberto Gonzales, the Department of Justice, and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") filed a response opposing the motion. For the reasons below, the motion to Compel is DENIED.

### I.  BACKGROUND

According to the complaint, Top Brass operates a firearms and sporting goods business in Millington, Tennessee. (Compl. ¶ 3). Since June of 1985, Top Brass has been licensed by ATF to sell firearms. (<u>Id.</u>) Beginning on July 21, 2003, Drew Elmer, an employee of ATF, performed a three-day inspection of Top Brass's

inventory and records dating back to 1985. (Id. ¶ 13). Following his inspection, Elmer recommended that Top Brass's firearms license be revoked. (Id. ¶ 20). Prior to the July 2003 inspection, Top Brass had never received from ATF a verbal warning, a written warning, or a warning conference indicating that it was in violation of any of its obligations as a licensee, even though it had undergone ATF inspections in 1991 and 1994. (Id. ¶ 18). On October 15, 2003, ATF issued a Notice of Revocation of License to Top Brass. (Id. ¶ 21). The notice alleged that Top Brass willfully failed to maintain records and receipts for the sale of 105 firearms and sold four firearms without first obtaining the required law enforcement certification from its purchasers. (Compl., Ex. A) All of these allegations were based on Elmer's July 2003 inspection. (Id. ¶ 21).

On December 9, 2004, an administrative hearing was conducted in Nashville, Tennessee, before ATF officer Connie Tuell. (Id. ¶ 29). Prior to the hearing, Top Brass made several requests to ATF for information relating to Top Brass's firearms license, including a request for information under the Freedom of Information Act ("FOIA").[1] (Id. ¶¶ 23-29). Top Brass objected to going forward with the scheduled hearing because the dispute

---

[1]For example, in a September 28, 2003 letter, Top Brass's attorney asked for "a complete copy of the Licensee's file, records and correspondence with the [ATF] . . . and/or written notes and materials obtained, prepared or in the possession of by the [ATF] at any time with respect to this Licensee." (Id. ¶ 25).

regarding the FOIA request had not yet been resolved. (Id. ¶ 30). On May 2, 2005, ATF's Director of Industry Operations Harry L. McCabe provided Top Brass with his "Findings of Fact and Conclusions of Law" which summarized the hearing. McCabe simultaneously issued Top Brass a "Final Notice of Denial of Application or Revocation of Firearms License." (Id. ¶ 48, Ex. B).

On June 24, 2005, Top Brass filed the present complaint, seeking a *de novo* judicial review of the administrative hearing pursuant to 18 U.S.C. § 923(f)(3) (the "Gun Control Act"). Top Brass also asserted that the complaint was being brought pursuant to 5 U.S.C. §§ 701 et seq. for violations of the Administrative Procedures Act ("APA"). Top Brass alleged that ATF failed to disclose pertinent, discoverable information prior to the December 2004 administrative hearing, and that the non-disclosure prevented Top Brass from preparing an adequate defense. Top Brass alleged further that the December 2004 hearing failed to comply with the requirements of the APA, and that the administrative record is therefore incomplete and unreliable for purposes of a *de novo* review. Finally, Top Brass claimed that ATF's policies and procedures are designed and implemented in an arbitrary and capricious manner and thus violate constitutional standards of due process and equal protection. (Id. ¶¶ 36-48).

On December 30, 2005, defendants filed a motion asking this court to enter a protective order precluding either party from

conducting any discovery in this case. Defendants argued that discovery should not be allowed in a *de novo* review of an administrative hearing unless "substantial doubt infects the agency's findings of fact." (Def. Mem. at 12) (quoting <u>Stein's, Inc. v. Blumenthal</u>, 639 F.2d 463, 466 (7th Cir. 1980)). In the alternative, the defendants sought to limit discovery to issues that undermine ATF's findings from its December 2004 administrative hearing. This court denied the motion, concluding that because 18 U.S.C. § 923(f)(3) expressly allows for the admission of additional evidence at the trial court's discretion, Top Brass should not be prohibited from seeking discovery in this case. However, the court left open the issue of what type of discovery would be permissible.

On June 22, 2006, Top Brass served 16 interrogatories and 66 document requests on the defendants. Generally, these discovery requests seek information regarding (1) whether the substantive and procedural rights under the APA apply to license revocation proceedings under the Gun Control Act, and if so, whether ATF violated those rights in this case;[2] and (2) whether ATF's policies and procedures are designed and implemented in an arbitrary and capricious manner, and thus violate constitutional standards of due

---

[2]These discovery requests include Interrogatory numbers 5-9 and 13-15, and Requests to Produce numbers 5-10, 13, 18-29, 31-32, 35, 43-45, and 51.

process and equal protection.[3]  In summary, the interrogatories request the following information: (1) the identity of all persons who have knowledge of the facts that form the basis of this lawsuit and a summary of their knowledge (no. 1);[4] (2) the identity of all individuals who have knowledge or information of the term "willfully" as used in § 923(e) (no. 2); (3) the identity of all individuals with knowledge of the training provided to ATF agents regarding firearms inspections, penalties, and administrative hearings since the passage of the Firearms Owners Protection Act in 1986 ("FOPA") (nos. 3-5); (4) the identity of all individuals with knowledge concerning the extent to which the APA applies or was intended to apply to firearms licensee proceedings (no. 6); (5) the identity of all individuals who participated in the research, writing, and approval of a Department of Justice report titled "Inspection of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives" dated July 2004 (no. 7); (6) the identity of all individuals who have knowledge of ATF inspection guidelines considered, drafted, and/or adopted since the passage of FOPA in 1986 (no. 8); (7) the identity of all individuals who have evaluated the government's oversight, inspection, discipline or review of firearms licenses, since the passage of the Gun Control

---

[3]These discovery requests include Interrogatory numbers 2-5, 7-11, 13-15, and Requests to Produce numbers 4-65.

[4]The defendants fully responded to this interrogatory, and therefore Top Brass's motion to compel does not involve this interrogatory.

Act in 1968 (no. 9); (8) the identity of all individuals who have provided training to or supervised Drew Elmer, the ATF Inspector who worked on this case, since the date of his initial employment with the government (no. 10); (9) the identity of all individuals who have been authorized to give sworn testimony regarding firearm licensee inspections, since January 1, 2001 (no. 11); (10) the identity of each expert witness the government plans to use in this case (no. 12);[5] (11) a description of the government's involvement and prosecution of all firearms licensee adverse actions, since January 1, 2001 (no. 13); (12) the identity of all expert witnesses who have testified for or against the government in any licensee adverse action proceeding, since January 1, 2001 (nos. 14 and 15); and (13) a description of all databases used by the government to track information concerning licensee inspections (no. 16).[6]

In summary, Top Brass's 66 document requests seek production of the following documents: (1) documents relating to this litigation and Top Brass (nos. 1-3);[7] (2) documents relating to other firearm license proceedings, presumably since passage of the Gun Control Act in 1968 (nos. 4 and 5); (3) documents describing ATF's inspection and review process, since 1986 (nos. 6-9); (4) documents relating to the meaning of and proposed changes to the

---

[5]The motion to compel does not involve this interrogatory.

[6]The motion to compel does not involve this interrogatory.

[7]The motion to compel does not involve this interrogatory.

term "willfully" in § 923(e) since 1986, including all communications between the government and third parties such as the National Rifle Association (nos. 10-12); (5) documents that comment on or suggest modifications to ATF's licensee inspection policies and practices since 1986, and government reports from January 1, 2001 to the present that were referenced in the ATF's July 2004 Inspection of Firearms Dealers report (nos. 13 and 14); (6) documents evidencing that the ATF's records databases on licensee inspections are inaccurate and a copy of ATF document B 5370.1 (nos. 15 and 16);[8] (7) documents that establish the distinction between "minor violations" or "minor infractions" as compared to "serious infractions" in the ATF's regulations, since 1986 (no. 17); (8) documents relating to ATF's policies and standards for imposing different types of adverse action (no. 18); (9) ATF's policies and standards for establishing willfulness, since 1986 (nos. 19-24); (10) documents that establish the responsibility of Division Counsel in reviewing a recommendation of adverse action, since 1986 (no. 25); (11) training or instructional materials for ATF employees regarding the licensee inspection program and how to conduct a hearing, since 1986 (nos. 26-29); (12) documents showing all instances when Drew Elmer's or any other ATF inspector's licensee compliance inspection was rejected or modified, or when

---

[8]The defendants apparently have produced the document identified in request 16.

-7-

Harry McCabe or other director of industry operations refused to
adopt a report and recommendation of a hearing officer, since 1986
(nos. 30-32); (13) documents used by defendants to communicate to
federal firearms licensees the standards by which it evaluates the
issues of "willful violations" and adverse actions (no. 33); (14)
documents showing errors made in other ATF inspections, since
January 1, 2001 (no. 34); (15) drafts of government policies
relating to licensee inspections, adverse actions, and/or hearing
procedures that the government claims is not subject to disclosure
under FOIA (no. 35); (16) employment-related reprimands issued to
the ATF inspectors and officials who worked on Top Brass's license
proceedings (no. 36); (17) sworn testimony given by those
inspectors and officials regarding licensee inspections and/or
adverse actions (nos. 37-41); (18) documents used to prepare the
July 2004 Inspection of Firearms Dealers report (no. 42); (19)
documents relating to the licensee inspection process submitted to
Congress or distributed as internal memoranda (nos. 43 and 44);
(20) survey responses issued by the Department of Justice to ATF
employees regarding the ATF inspection program referenced in the
July 2004 Inspection of Firearms Dealers report (no. 45), and
documents establishing the average time spent on inspections as
provided in that report (no. 46); (21) documents comparing
violations by "large-scale retailers" to other licensees (no. 47);
(22) documents relating to whether and to what extent the

-8-

government has implemented licensee inspections inconsistently, as referenced in the July 2004 Inspection of Firearms Dealers report (no. 48); (23) all versions and drafts of the ATF Inspector Handbook since 1986 (no. 49), and supplemental instructions and forms related to the handbook (nos. 50 and 51); (24) documents relating to compliance inspection times and procedures, since 2000 (nos. 52-54); (25) ATF's May 2003 guidelines for initiating adverse action (no. 55), and documents relating to amendments and notices regarding these guidelines (nos. 56 and 57); (26) documents relating to the reinspection of licensees who were issued adverse action (no. 58); (27) an internal policy memo titled "Guidelines for Conducting Federal Firearms Licensee Compliance Inspections" (no. 59), and documents related to that memo (no. 60); (28) documents relating to the standards applicable to determining when mitigating circumstances might warrant against an adverse action (no. 61); (29) documents that were requested by the Office of Inspector General on page 86 of the July 2004 Inspection of Firearms Dealers report (no. 62); (30) documents relating to the practice of using fines and/or suspensions as a means of adverse action toward licensees, since 1986 (no. 63); (31) documents relating to the falsification of ATF reports and institutional perjury (no. 64 and 65); and (32) documents used to prepare a recent statement by a Deputy Assistant Director of ATF before the House of Representatives (no. 66).

In response to these interrogatories and document requests, the defendants produced certain information relating to Top Brass's license and hearing, but objected to the vast majority of the requests. The defendants assert that the requests seek irrelevant information, are overbroad and unduly burdensome, seek production of information that fall outside the scope of this court's *de novo* review of the administrative hearing, and seek privileged information.

## II. ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) allows for the discovery of "any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). The rule provides further that the scope of discovery is broader than evidence that will be admissible at trial. Material is discoverable if it is "reasonably calculated to lead to the discovery of admissible evidence." <u>Id.</u>; <u>see also</u> <u>United Oil Co. v. Parts Associates, Inc.</u>, 227 F.R.D. 404, 410 (D. Md. 2005) ("[R]elevance for discovery purposes is viewed more liberally than relevance for evidentiary purposes."). However, the court need not compel discovery of relevant material if it concludes that the request is "unreasonably cumulative or duplicative . . . [or] the burden or expense of the proposed discovery outweighs its likely benefit. . . ." Fed. R. Civ. P. 26(b)(2)(i), (iii).

Once an objection to the relevance of the information sought

is raised, the party seeking discovery must demonstrate that the requests are relevant to the claims or defenses in the pending action.  Allen v. Howmedica Leibinger, 190 F.R.D. 518, 522 (W.D. Tenn. 1999).  If that party demonstrates relevancy, the party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules.  United Oil, 227 F.R.D. at 411; MJS Janitorial v. Kimco Corp., No. 03-2102, 2004 WL 2905409, at *6 (W.D. Tenn. Apr. 19, 2004) (unpublished); see also Fed. R. Civ. P. 26(b)(2)(i), (iii).

As this court stated in its March 28 order denying the government's motion to prohibit discovery, 18 U.S.C. § 923 governs the licensing requirements for businesses engaged in the sale of firearms.  Subsection (f) sets forth the appeals process for any individual or business whose application for a license has been denied or for any license holder whose license has been revoked. It provides in relevant part:

> If after a hearing held under paragraph (2) the Attorney
> General decides not to reverse his decision to deny an
> application or revoke a license, the Attorney General
> shall give notice of his decision to the aggrieved party.
> The aggrieved party may at any time within sixty days
> after the date notice was given under this paragraph file
> a petition with the United States district court for the
> district in which he resides or has his principal place
> of business for a de novo judicial review of such denial
> or revocation.  In a proceeding conducted under this
> subsection, the court may consider any evidence submitted
> by the parties to the proceeding whether or not such
> evidence was considered at the hearing held under
> paragraph (2).  If the court decides that the Attorney

General was not authorized to deny the application or to
revoke the license, the court shall order the Attorney
General to take such action as may be necessary to comply
with the judgment of the court.

18 U.S.C. § 923(f)(3) (2005). The district court therefore
conducts a *de novo* review of the administrative decision to revoke
a federal firearms license. See Kuss v. United States, No. 04-453,
2005 U.S. Dist. LEXIS 28773, at *9-10 (E.D. Ky. Nov. 18, 2005).
Although the district court need not conduct a trial *de novo*, the
"administrative decision is not clothed . . . with any presumption
of correctness." 3 Bridges, Inc. v. United States, 216 F. Supp. 2d
655, 657 (E.D. Ky. 2002).

Courts interpreting an earlier version of 18 U.S.C.
§ 923(f)(3) concluded that "Congress intended to afford the
district court the discretion to receive additional evidence to be
considered along with that in the administrative record when some
good reason to do so either appears in the administrative record or
is presented by the party petitioning for judicial review."[9]

---

[9]The earlier version of 18 U.S.C. § 923(f)(3) considered by these
courts read as follows:

If after a hearing held under paragraph (2) the Secretary
decides not to reverse his decision to deny an
application or revoke a license, the Secretary shall give
notice of his decision to the aggrieved party. The
aggrieved party may at any time within 60 days after the
date notice was given under this paragraph file a
petition with the United States district court for the
district in which he resides or has his principal place
of business for a judicial review of such denial or
revocation. In a proceeding conducted under this
subsection, the court may consider any evidence submitted

-12-

Stein's Inc., 639 F.2d at 466; Perri v. Dept. of Treasury, BATF, 637 F.2d 1332, 1335 (9th Cir. 1981).

Section 923(f)(3) was amended in 1986, however, to provide specifically that "[i]n a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding *whether or not such evidence was considered at the hearing under paragraph (2)*." See 18 U.S.C. § 923(f)(3) 1986 Amendments Pub. L. 99-308, § 103(6)(A) (emphasis added). Thus, nothing in the language of 18 U.S.C. § 923(f)(3) suggests that the court must first find good cause or have substantial doubt in the agency's findings of fact to accept evidence that was not submitted by the parties for the administrative hearing. Rather, it is within the court's discretion to consider evidence that was not offered at the administrative hearing. Kuss, 2005 U.S. Dist. LEXIS 28773, at *10; see also Clust, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, No. 04-839, 2005 WL 1651794, at *4 (S.D. Ohio July 13, 2005) ("The district court must allow the parties an opportunity to present additional evidence, even if that evidence was not presented to the hearing officer."); Trader Vic's, Ltd. v. O'Neill,

---

by the parties to the proceeding. If the court decides that the Secretary was not authorized to deny the application or to revoke the license, the court shall order the Secretary to take such action as may be necessary to comply with the judgment of the court.

Stein's, Inc., 649 F.2d at 465 n.3.

-13-

169 F. Supp. 2d 957, 961 (N.D. Ind. 2001) (permitting additional evidence "so long as the evidence meets the other requirements of relevancy and admissibility under the Federal Rules of Evidence"); DiMartino v. Buckles, 129 F. Supp. 2d 824, 827 (D. Md. 2001) ("The reviewing court can consider any evidence submitted by the parties regardless of whether that evidence was submitted in the administrative proceeding.").

Although the district court may, in its discretion, consider new evidence on appeal, and the parties are not necessarily precluded under § 923 from obtaining discovery in connection with the appeal, the question remains as to whether the discovery requested by Top Brass is warranted under the facts of this case. For several reasons, the court concludes that Top Brass's discovery requests fall well outside the scope of proper discovery under Rule 26.

First, the court finds that the discovery requests, on their face, are patently overbroad and would clearly result in production of irrelevant information. Almost all of the interrogatories and document requests seek information dating as far back as 1986, and some even seek information going as far back as 1968. The requests for the most part provide no limits whatsoever on the type of information sought. For example, interrogatory 2 reads in its entirety as follows:

> 2.   Identify, as that term is herein defined, each individual who has knowledge or information concerning

-14-

the meaning of the term "willfully" (including its root
and derivatives) as that term was added by Congress to 18
U.S.C. section 923(e) with the passage of Section 103 of
the Firearms Owners Protection Act (P. Law 99-308, 100
Stat. 449 (1986)).  Without limiting the scope of your
response, your response should include but is not limited
to: (a) each individual who writes or has written
training and/or instructional materials (including
drafts) for or at the request of the Government with
respect to the term; (b) each individual who provides or
has provided training or instructional guidance to
Government employees (or others) for or at the request of
the Government with respect to the term; (c) each
individual who worked as a lobbyist and/or in the
function of a lobbyist with respect to the drafting,
endorsement, pursuit or otherwise was involved in efforts
to influence legislation or amendments thereto, including
but not limited to the Firearms Owners Protection Act,
where the term (or a similar term) was offered, proposed
or used with respect to licensee investigations or
proceedings; (d) each individual who has testified or
given sworn testimony on behalf of the Government with
respect to the use and/or interpretation of the term by
the Government with respect to firearms licensees; (e)
each individual who has given testimony before any
legislative body on behalf of the Government regarding or
addressing the term; and (f) each individual who has
written or participated in the preparation of any report,
memorandum or analysis of the Government's use of that
term with respect to licensees.

Virtually all of Top Brass's other discovery requests seek the

same wide-ranging level of information as interrogatory 2, and a

complete response from the defendants would result in production of

irrelevant information.  For example, according to the defendants'

response to interrogatory 2, during the one Fiscal Year ending

September 30, 2005, ATF investigators conducted 11,011 firearms

compliance and application inspections.  Each inspection report

which describes violations discovered would involve a discussion or

interpretation of the term "willfulness," and thus each inspector

and report reviewer has knowledge and information concerning "willfulness." The number of inspections for FY 2001 through 2004 were approximately 10,000 per year. Additionally, from 1998 to 2004, there have been a total of approximately 741 federal firearms licenses revoked and applications for license renewals denied. Of these actions which resulted in administrative hearings, almost all of them involved testimony by ATF personnel concerning the willfulness of the violation. Thus, as can be seen from this response alone, the information that is being sought by Top Brass is not relevant to Top Brass's appeal. In addition, because Top Brass's motion to compel does not address the relevancy of each discovery request, but instead argues generally that all of its requests seek relevant information, Top Brass has not met its burden of demonstrating the relevancy of each request. Allen, 190 F.R.D. at 522.

Second, the district courts have narrowly construed the de novo standard of review under § 923(f)(3), holding that review is limited to deciding only whether the Attorney General's decision "was not authorized." See Pinion Enterprises, Inc. v. Ashcroft, 371 F. Supp. 2d 1311, 1314-15 (N.D. Ala. 2005) ("The language of § 923(f)(3) does not call upon this Court to decide whether it would revoke the license on it's [sic] own judgment, but whether all of the evidence presented is sufficient to justify the Attorney General's revocation of the license."); see also Morgan v. U.S.

-16-

Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, 473 F. Supp. 2d 756, 762 (E.D. Mich. 2007) (applying narrow *de novo* standard of review articulated in Pinion Enterprises); Procaccio v. Lambert, No. 5:05-MC-0083, 2006 WL 2090166, at *2 (N.D. Ohio July 25, 2006) ("the Court considers whether the Attorney General's revocation was authorized, not whether this Court would make the same decision if originally presented with the issue."), aff'd on other grounds, No. 06-4299, 2007 WL 1544956 (6th Cir. May 29, 2007);[10] Francis v. U.S. Bureau of Alcohol, Tobacco and Firearms, No. CIV-05-380, 2006 WL 1047026, at *2 (E.D. Okla. April 20, 2006) ("In fact, the standard of review [under § 923(f)(3)] is quite narrow. The *de novo* review simply allows the Court to go beyond the evidence considered at the § 923(f)(2) hearing and to make an independent determination, giving no special deference to the ATF, of whether the revocation was authorized. Other courts analyzing the last sentence of § 923(f)(3) have also found a narrow review standard."); E & B Sporting Goods v. McCarron, No. 3:04 cv 1535, 2006 WL 417351, at *4 (D. Conn. Feb. 21, 2006) (applying *de novo* standard of review articulated in Pinion Enterprises); Cisewski v. Dept. of the Treasury, Bureau of Alcohol, Tobacco & Firearms, 773 F. Supp. 148,

---

[10]Because the plaintiff in Procaccio did not challenge on appeal the district court's application of the *de novo* standard of review, the Sixth Circuit expressly declined to decide this issue. Procaccio, 2007 WL 1544956, at *2.

150 (E.D. Wisc. 1991) ("the court's review is limited to determining whether the decision made by the Secretary was authorized."). Although the District Judge (and not the undersigned) will ultimately decide the proper scope of *de novo* review that should apply in this case, the court nevertheless believes that for purposes of deciding the present discovery dispute, the narrow standard of review adopted by the courts militates strongly against the broad and far-reaching discovery sought by Top Brass. Top Brass has not cited – and the court in conducting its own extensive research could not find – any case in which a court has permitted a petitioner to obtain discovery of information even remotely similar to the information sought by Top Brass in this case.

Third, although Top Brass cites to language contained in a Senate Report from 1968 which makes reference to the applicability of APA to firearms licensing, Top Brass has not provided the court with any case authority in support of its position that the APA's formal procedural requirements apply to firearms license revocation proceedings. Instead, it would appear from the face of the statute that the administrative hearing in this case is exempt from the APA requirements under 5 U.S.C. § 554. As with the court's discussion above regarding the *de novo* standard of review, the District Judge will ultimately determine whether Top Brass's APA-based claim has any merit. However, in light of the absence of case authority to

support Top Brass's APA claim, coupled with the narrow standard of review, the court must conclude that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence.

Finally, with respect to discovery relating to information about the "willfulness" standard and how the defendants define this term, the court likewise concludes that the information sought is not relevant under Rule 26. The Sixth Circuit has clearly defined the meaning of "willfulness" under § 923, and thus the discovery sought by Top Brass would not aid the court in its review of the petition. See Procaccio v. Lambert, No. 06-4299, 2007 WL 1544956, at *3 (6th Cir. May 29, 2007) ("'willfulness' under the Gun Control Act does not require the heightened showing of 'bad purpose.' Rather, evidence of an individual's 'disregard of a known legal obligation' is entirely sufficient."); Appalachian Resources Development Corp. v. McCabe, 387 F.3d 461, 465 (6th Cir. 2004) (same); see also Article II Gun Shop, Inc. v. Gonzales, 441 F.3d 492, 498 (7th Cir. 2006); RSM, Inc. v. Herbert, 466 F.3d 316, 321 (4th Cir. 2006).

### III.  CONCLUSION

For the reasons above, the motion to compel is denied.[11]  All

_____

[11]The court does not reach the other arguments raised by the defendants, such as whether any privilege might apply to the documents.

-19-

other relief sought by Top Brass in its motion is likewise denied.

　　　IT IS SO ORDERED.

　　　　　　　　　　　　　　　　s/ Tu M. Pham
　　　　　　　　　　　　　　　　─────────────────────────────
　　　　　　　　　　　　　　　　TU M. PHAM
　　　　　　　　　　　　　　　　United States Magistrate Judge


　　　　　　　　　　　　　　　　July 18, 2007
　　　　　　　　　　　　　　　　─────────────────────────────
　　　　　　　　　　　　　　　　Date