1      United States Department of Justice
       Bureau of Alcohol, Tobacco, Firearms and Explosives

2
       --------------------------------x
3      In the Matter of:                :
                                         :
4      Revocation of License issued      :
       to Dick's Sporting Goods, Inc.    :
5      d/b/a Dicks' Sporting Goods,      :
       Inc., Store Number 375            :
6                                        :
       FFL # 1-62-157-01-3K-03207        :
7      --------------------------------x

8                           February 5, 2014

9                           ATF Memphis Field Office
                            2600 Thousand Oaks Boulevard
10                          Suite 2300
                            Memphis, Tennessee 38118
11

12
               The hearing was convened, pursuant to notice,
13     at time, MICHAEL T. REILLY, Hearing Officer, presiding.

14

15     APPEARANCES:

16         PATRICIA LANCASTER, Nashville Division Counsel

17         B. TODD MARTIN, Nashville Division Counsel

18         MARK BARNES, Counsel for Licensee

19

20

21

22

23

24

25

1                           I N D E X

2    Witness:              Examined By:                  Page:

3    Thomas Williams       Ms. Lancaster - direct          16
                           Mr. Barnes - cross              42
4                          Ms. Lancaster - redirect        64
                           Mr. Barnes - re-cross           73
5
     Richard Howard        Ms. Lancaster - direct          80
6                          Mr. Barnes - cross              86
                           Ms. Lancaster - redirect        89
7                          Mr. Barnes - recross            90

8    Kevin Dodson          Mr. Barnes - direct             94
                           Mr. Martin - cross             113
9                          Mr. Barnes - redirect          122

10   Tommy Wittman         Mr. Barnes - direct            130
                           Mr. Martin - cross             138
11
     Wally Nelson          Mr. Barnes - direct            140
12                         Mr. Martin - cross             148
                           Mr. Barnes - redirect          154

13

14

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

EXHIBITS

| Exhibit: | Description | Marked | Received |
|---|---|---|---|
| **Government** | | | |
| 1 | Federal licensing system printout | 15 | 15 |
| 2 | Notice of Revocation | 15 | 15 |
| 3 | Request for hearing | 15 | 15 |
| 4 | Power of attorney | 15 | 15 |
| 5 | Notice of hearing | 15 | 15 |
| 6 | Notice of rescheduled hearing | 15 | 15 |
| 7 | Report of violation | 28 | -- |
| 8 | Mr. Brady's 4473 | 32 | 42 |
| 9 | Denial from TICS | 32 | 42 |
| 10 | Mrs. Brady's 4473 | 35 | 92 |
| 11 | Sign-off sheet | 41 | 42 |
| 12 | TICS log | 34 | 42 |
| 13 | Acknowledgement | 70 | 70 |
| 14 | Form 4473 | 72 | 72 |
| **Licensee** | | | |
| 1 | Dick's gun manual | 95 | 110 |
| 2 | Operational procedure | 98 | 110 |
| 3 | Indiana documents | 105 | 110 |
| 4 | Rescind request | 112 | 112 |
| 5 | Reports of interviews | 140 | 140 |

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

1      P R O C E E D I N G S

2                                    (9:18 a.m.)

3         HEARING OFFICER:  Okay, good morning.  This is

4   a hearing being conducted under the provisions of

5   § 923(f)(2), Title 18, the United States Code, and

6   § 478.74, Title 27, Code of Federal Regulations.

7         The time is 9:18, the date is February 5th.  An

8   audio recording is being made of these proceedings for

9   the record.  The place is the ATF Memphis Field Office at

10  2600 Thousand Oak Boulevard, Suite 2300, in the City of

11  Memphis, in the County of Shelby, in the State of

12  Tennessee.

13        At this time, I'll ask the Licensee and those

14  present on their behalf to state and spell their last

15  name, and give their relationship to the hearing.

16        MR. BARNES:  Mark Barnes.  I'm attorney for the

17  Licensee and the last name is spelled B-A-R-N-E-S.

18        MR. NELSON:  I'm Wally Nelson.  I'm the

19  consultant to Mark Barnes.  Last name, N-E-L-S-O-N.

20        MR. DODSON:  Kevin Dodson from Dick's Sporting

21  Goods.  I'm the manager of Loss Prevention/Compliance

22  & Logistics.  Last name's spelled D-O-D-S-O-N.

23        MS. TORTORICE:  Mary Tortorice.  I am a vice

24  president in Legal and chief compliance officer of Dick's

25  Sporting Goods.  And my last name is spelled

1  T-O-R-T-O-R-I-C-E.

2          HEARING OFFICER:  On behalf of the Government,

3  we have?

4          MS. LANCASTER:  I'm Patricia Lancaster,

5  attorney for the Nashville Field Division.  I'll be

6  presenting the Government's case in chief.  And I'll ask

7  my colleagues to identify themselves.

8          HEARING OFFICER:  Can you spell your last name,

9  please?

10          MS. LANCASTER:  L-A-N-C-A-S-T-E-R.

11          HEARING OFFICER:  Thank you.

12          MR. MARTIN:  My name's Todd Martin.  I'm the

13  Division Counsel for the Nashville Field Division.  Last

14  spelling is M-A-R-T-I-N.

15          MR. WILLIAMS:  Thomas Williams, Industry

16  Operations Investigator for Nashville II Area Office.

17  The last name is spelled W-I-L-L-I-A-M-S.

18          HEARING OFFICER:  Also in attendance is the

19  Director of Industry Operations for the Nashville Field

20  Division, Kevin Boydston.

21          My name is Michael T. Reilly.  I'm the Hearing

22  Officer by the direction under the authority of the Chief

23  of the National Licensing Center for the Bureau of

24  Alcohol, Tobacco, Firearms and Explosives with the United

25  States Department of Justice.

1          This hearing is an administrative procedure,

2    is informal in nature and it is to review to the Notice

3    of Revocation of license, the ATF Form 4500, that was

4    issued under the provisions of § 923, Title 18, the

5    United States Code.

6          The license was issued to Dick's Sporting

7    Goods, Inc. doing business as Dick's Sporting Goods,

8    Inc., Store Number 375.  The address is 2393 North

9    Germantown Parkway, in the City of Memphis, in the State

10   of Tennessee.  The license was issued as a Type 01 Dealer

11   in Firearms other than Destructive Devices.

12         Who would like to speak on behalf of the

13   company?

14         MR. BARNES:  I'll be speaking on behalf of the

15   company.

16         HEARING OFFICER:  Okay.  And your position with

17   the company is what?

18         MR. BARNES:  Attorney.

19         HEARING OFFICER:  Attorney for the company?

20         MR. BARNES:  Right.

21         HEARING OFFICER:  And a result of receiving the

22   4500, you requested a hearing; is that correct?

23         MR. BARNES:  That is correct.

24         HEARING OFFICER:  Okay.  So at this time, I'll

25   ask the Government to present their case, to review their

1  circumstances into any of the investigative findings

2  that have a bearing on these proceedings.

3           MS. LANCASTER:  Thank you.  This matter is very

4  simple, and it's based on three different allegations.

5  Of course in order to be actionable, a violation of the

6  Gun Control Act must be shown to be willful according to

7  the statute which requires willfulness and case law of

8  which requires willfulness and defines willfulness.

9           The first allegation is transfer to a person

10  with reason to believe that person was prohibited, the

11  second allegation is false information in the

12  Acquisition/Disposition Record as to the purchaser, and

13  the third allegation is false information on an ATF

14  Form 4473 as to the purchaser.

15           And all three of these allegations are actually

16  all related to two transactions which are related to each

17  other as the evidence will show.

18           So that is the basis that the Government is

19  alleging as willful violations supporting this action.

20           HEARING OFFICER:  Mr. Barnes, do you have an

21  opening statement?

22           MR. BARNES: I do.  Thank you, Mr. Reilly.

23           First of all, it's our position that the FFL

24  cannot be revoked because there was no willful violation

25  of the Gun Control Act.

1      Now, willfulness means somebody knew of their

2  legal obligation and purposely disregarded it or they

3  were plainly indifferent to that obligation; we have case

4  law for that that we could submit to Mr. Reilly.  And

5  that there's also a conscious, intentional, deliberate,

6  voluntary decision; we can also submit case law on that.

7      It's clear from the legislative history when

8  the Gun Control Act was amended from Senate Report 98-583

9  that revocations are not to be based on mistakes or human

10 error.  As the evidence will show, we will show there was

11 a human error here but it was certainly inadvertent.

12      Examples of willful conduct and violation of

13 the Gun Control Act, for instance, in the DiMartino vs.

14 Buckles case which does stand for the proposition that,

15 you know, one violation can serve as a basis for

16 revocation.  But there were multiple violations in that

17 case.

18      Generally, there are multiple inspections and

19 repeated violations before ATF takes on a revocation.

20 Not always because when there's a very egregious

21 violation, that can serve as the basis for a Notice of

22 Revocation.

23      Now the actual circumstances here that we'll

24 show in the evidence is that the store clerk,

25 Mr. Krueger, nor any other Dick's employee knew or should

1  have known that the firearm was purchased for the

2  benefit of a prohibited person.

3       Mr. Brady who was the first purchaser and the

4  husband attempted to purchase as a gift for his wife --

5  and we'll introduce that evidence and the report of our

6  investigator who is in Arizona, Tommy Wittman, former

7  Assistant Special Agent in Charge to the Phoenix Field

8  Division; he interviewed the purchasers.  He attempted to

9  purchase the gun as a gift for his wife, and he didn't

10 even know that he was a prohibited person.

11      When he walked away from the purchase

12 transaction, he came back to the home, informed his wife,

13 who was supposed to go on a pheasant hunt and she needed

14 a shotgun, that there was some mix up at the Veterans

15 Administration and that he would not be able to purchase

16 the gun.  And if she wanted it, he was going to get it as

17 a gift for her, that's what he said, that she should go

18 back to the store and just buy it for herself.

19      He properly completed the paperwork and he was

20 properly denied, but the clerk forgot to put his denial

21 in the denial log.  Now the denial log, as the evidence

22 will show and as Dick's will testify, they have a very

23 complete and comprehensive internal control system in

24 Dick's to try to catch straw purchasers.  But here

25 through inadvertent error, the clerk forgot to record the

1  denial in the denial log.

2      Nine hours later when the wife returned to get

3  the shotgun, he would have checked the denial log but he

4  would have found that it was empty; there was no entry in

5  the denial log.

6      She properly completed the form.  There was no

7  other indication that she was a prohibited person.  And

8  she was, in fact, purchasing the shotgun for her own

9  account, for her own purchase.

10     Therefore, it's our contention that our FFL

11  cannot be revoked because there was no attempted or

12  actual straw purchase.

13     The definition of a straw purchase is the legal

14  purchase of a firearm by one person for another.  More

15  often than not, the recipient is a prohibited person.

16     Now, just a few weeks ago in oral argument

17  before the Supreme Court of the United States in the

18  Baranski case, the position of the United States

19  Government was very clear.  Gift transactions are

20  absolutely permissible, there's no problem with them.

21  And also in the *Federal Firearms Reference Guide*, and I

22  see we have a copy here at the table, on page 165, that

23  makes it clear.

24     So Mr. Brady went to purchase the firearm as a

25  gift, he was denied.  He came back and told his wife that

1  he could not obtain the firearm as a gift for her, that

2  he would have to, she would have to obtain it for her

3  herself, she did.  She's not a prohibited possessor.

4        And our position is there was no willfulness on

5  the part of the store.

6        The system worked as it was supposed to except

7  in one instance where the denial log had not been

8  properly amended by the clerk.  If he had amended it, he

9  would have checked it as he normally does and seen that

10  he had made a disposition or attempted disposition to

11  Mr. Brady earlier in the day, and he could have

12  interdicted the transaction.

13        We'll present his interview by Mr. Wittman, the

14  investigator, and he has no recollection except that that

15  was a very busy period during the hunting season, and

16  there were distractions that were keeping him from

17  attending to everything that he needed to attend to.  But

18  he doesn't have any recollection basically of the

19  transaction.

20        We also cannot have a license revoked.  This is

21  the first time I've seen in a Notice of Revocation

22  allegations that false recordkeeping was entered into the

23  A&D records and false information entered into the 4473.

24        We actually would be interested in hearing more

25  from the Government on that legal theory on why that's

1 appropriate because in effect, you know, when a

2 transaction is being transacted, the proper information

3 that has to go into the recordkeeping is the information

4 of the individual who is making application for the

5 firearm period, end of discussion.  There really isn't

6 any other information that can be put into the

7 recordkeeping system.

8          I think it's, or it's our legal position, it

9 would be kind of an absurd result that if we had a person

10 appearing at the counter and somebody, and they were, and

11 it were a true straw purchase situation that, you know,

12 the clerk could not be cited for entering the information

13 into the record, by entering into the record or into the

14 A&D system the information of the straw purchaser or the

15 intended recipient and then transfer the firearm to

16 somebody else.

17          So we understand the nature of the Government's

18 argument with regard to willfulness and enabling a straw

19 purchase, and that we'll be able to rebut we think very

20 effectively.  But we certainly think as a matter of law

21 the Government cannot claim that there was false

22 information entered into the recordkeeping.

23          That concludes my opening statement.

24          HEARING OFFICER:  Thank you.  Ms. Lancaster.

25          MS. LANCASTER:  The Government does not find

1  that it's appropriate to interject argument in opening

2  even though the rules don't apply here.  We will make

3  responses to various matters raised by the FFL's attorney

4  on our closing including case law that will contravene

5  what the argument has been made by the Licensee's

6  attorney.

7  　　　　　Initially in presenting the Government's case,

8  I have a number of documents which are basically in

9  administrative nature which go to the basis for our being

10  here for this hearing today and the basis for bringing

11  this action.

12  　　　　　The first one is the federal licensing system

13  printout which merely shows that Dick's Sporting Goods at

14  the location already mentioned does hold a Federal

15  Firearms License.  These requirements do not apply to a

16  person who is not licensed under the Gun Control Act.

17  　　　　　So Government Number 1 is for the proof that

18  Dick's Sporting Goods at the location stated does hold a

19  Federal Firearms License as alleged in the notice.  It's

20  Government Number 1, the federal licensing system

21  printout, page 1.  And I'll just hold all these until I

22  submit them.

23  　　　　　Government Number 2 is the Notice of Revocation

24  which we have mentioned in our openings.  It gives Dick's

25  Sporting Goods the allegations which are alleged as

1  willful violations of the Gun Control Act to support

2  the action of revocation of that license.  It is dated

3  November 21 of 2013.

4         And in addition to that notice, the Licensee

5  timely submitted a request for hearing on the

6  revocations.  Government Number 3 is that request for

7  hearing submitted on behalf of the Licensee by Attorney

8  Christopher Thomas of Mark Barnes & Associates,

9  Attorneys.  It's dated December 6, and the request was

10  submitted in writing.  It also included for convenience a

11  copy of that actual Notice of Revocation.

12         Government 4 is a power of attorney that was

13  submitted on behalf of the Licensee which appoints the

14  Mark Barnes & Associates, Attorneys, to represent them in

15  this particular matter on Store Number 375.

16         Government 5 is ATF's initial notice of hearing

17  that was submitted to the Licensee.  And initially, this

18  hearing was scheduled for January 15. So the first notice

19  of hearing dated December 18 gives notice of that hearing

20  date, January 15.  And it was submitted to the Licensee

21  and to the counsel for the Licensee.

22         It also includes information regarding

23  requirements for federal buildings and so forth.

24  Attached to that we have a copy of the certified mail

25  receipt and return domestic receipt showing that it was

1  received by counsel for the Licensee.

2         At the request of the Licensee counsel, the

3  hearing was delayed, and it was rescheduled for today at

4  this time and date and at this place.  It was issued on

5  January 3rd scheduling the hearing for today, Government

6  Number 6, and it includes a certified mail receipt and

7  domestic return receipt for delivery of that item.

8         So the Government submits Government 1 through

9  6 as described on the record for evidence at the

10 beginning of the case.

11        HEARING OFFICER:  Government Exhibits 1 through

12 6 entered into the record.

13        MS. LANCASTER:  Thank you.

14                              (Whereupon, Government's

15                              Exhibit Numbers 1 through 6

16                              were marked for

17                              identification and received

18                              into evidence.)

19        MS. LANCASTER:  At this time, we call our first

20 witness.

21 (Whereupon,

22                    THOMAS WILLIAMS

23 was called as a witness, and after having been first duly

24 sworn, was examined and testified as follows:)

25                    DIRECT EXAMINATION

1        BY MS. LANCASTER:

2    Q    State your name for the record again, please.

3    A    Thomas Williams.

4    Q    And do speak up because we have pretty

5 sensitive equipment here, but we need to make sure we get

6 a good recording so that we have an accurate recording.

7 So if you'll use a good bit of volume with your voice.

8        How are you currently employed, Mr. Williams?

9    A    I'm an Industry Operations Investigator with

10 the Nashville II Area Field Office.

11    Q    Is that commonly referred to by the

12 abbreviation IOI?

13    A    That's correct.

14    Q    Give us a brief description of your duties and

15 responsibilities as an ATF IOI?

16    A    Okay.  Briefly, I qualify individuals or

17 businesses who would, who desire or would like to become

18 Federal Firearms Licensees or Federal Explosives

19 Licensees or Permitees.

20        I also conduct compliance inspections of

21 businesses or individuals who are currently Federal

22 Firearms Licensees or Federal Explosives Permitees or

23 Licensees.

24    Q    How long have you been employed by ATF?

25    A    Since 2001.

1    Q    Were you in that same position all that time?

2    A    That's correct.

3    Q    Did you have any special training for

4 conducting your duties as an IOI?

5    A    Yes.  I was trained at FLETC, Federal Law

6 Enforcement Training Center.  I also had on-the-job

7 training and also various classes through ATF throughout

8 the years.

9    Q    The training that you had at the Federal Law

10 Enforcement Training Center, could you tell us about how

11 long that was?

12    A    Well, it was approximately two months.

13    Q    Did that include training on the requirements

14 on the Federal Firearms Laws and Regulations as applied

15 to Federal Firearms Licensees?

16    A    Yes, it did.

17    Q    Your on-the-job training, describe that for us,

18 please?

19    A    Okay.  I was assigned an experienced

20 investigator who was given the assignment to work with me

21 for a period of time whereas I would shadow him on his

22 assignments, assist him on his assignments with the

23 compliance inspections or application inspections with

24 the narratives.  And then I would work some of the

25 assignments assisted by my IOI at the time or inspector

1  at the time.  And he would review my work.

2          Once it was reviewed, my area supervisor would

3  review my work.  They would critique it and then they

4  would make their recommendations.

5          And once that timeframe was over with and I

6  successfully went through that training then I was let go

7  and assigned work independently on my own.

8      Q    Do you recall about how long it was that your

9  on-the-job training program lasted until you were

10  independently assigned your own work?

11     A    I'd say approximately a year.

12     Q    Does anyone review your work today?

13     A    Yes.

14     Q    Who reviews your work?

15     A    My area supervisor.

16     Q    You mentioned that you conduct compliance

17  inspections as well as qualification inspections for

18  Federal Firearms Licensees and applicants.  Could you

19  tell us in general what is the purpose of a compliance

20  inspection?

21     A    To make sure that licensees are in compliance

22  with the federal regulations.  It's also an educational

23  opportunity for the licensees at the same time.

24     Q    Could you explain in what way it's an

25  educational opportunity for the licensee?

1    A    Well, it gives the licensee a chance to come

2  face to face with somebody who understands the

3  regulations and can answer any types of questions as well

4  as provide information to the licensee just in case they

5  haven't been following the information on our websites or

6  gathering or coming to any of our seminars.  But it gives

7  the licensee an opportunity to ask questions and also

8  receive information.

9    Q    What about the qualification inspections for

10  applications for Federal Firearms Licensees, does that

11  include any education?

12    A    Yes, it does.  At that time we verify that the

13  applicant who they are, who they say they are.  We

14  provide information to the applicant at that time.  We

15  have an acknowledgement sheet and all applications and

16  compliance inspections where the, where we review the

17  acknowledgment sheet which is a condensed version of the

18  Federal Regulations Guide.

19         And by going through that, we're providing

20  information to the applicant at that time for his

21  compliance inspection, the same thing.

22    Q    When you say that you review that condensed

23  version of the requirements of the regulations on the

24  acknowledgement sheet, could you give us just a rough

25  estimate of about how long you do that review, how much

1 time you spend with that applicant?

2     A   When I'm going through the acknowledgement

3 sheet because, again, it's all attachments, information

4 concerning the forms that are listed on the

5 acknowledgement sheet, it usually takes me about two

6 hours to go through the actual acknowledgement stuff.

7     Q   Now what about the compliance, you had

8 mentioned that you have education of the licensee during

9 the compliance time inspection, and you also do an

10 acknowledgement sheet during that process, correct?

11     A   That's correct.

12     Q   Is that about the same or about a different

13 amount of time that you spend in reviewing those basic

14 requirements with someone already licensed that you're

15 doing a compliance --

16     A   It's usually about the same.

17     Q   Were you involved at all in the application

18 inspection for Dick's Sporting Goods at this location

19 that we're talking about today in Memphis?

20     A   Yes, I was.

21     Q   Could you tell us about when that was?

22     A   That was approximately about 2007.

23     Q   Do you recall any details from that

24 qualification inspection?

25     A   At that point in time, the store was just

1  opening or was about to open.  They had brought in a

2  manager who was familiar with opening stores.  And we

3  conducted the application inspection at that time.

4      Q    Did you follow that process that you described

5  to us just now?

6      A    Yes, I did.

7      Q    And as a part of your duties, did you conduct a

8  compliance inspection of this same location of Dick's

9  Sporting Goods in Memphis?

10      A    Yes, I did.

11      Q    Do you recall about when you conducted the

12  compliance inspection?

13      A    The compliance inspection was conducted some

14  time in June of 2013.

15      Q    Do you recall exactly how it was determined

16  that you were going to conduct an inspection of this

17  licensee at that location?

18      A    Inspections are chosen at random.  They're not

19  something that's just picked.  It's usually something

20  (indiscernible).

21      Q    Does anyone advise of which inspections to

22  conduct as your assignment?

23      A    My area supervisor advised the inspections.

24  And he gives out the inspections, he gives out the

25  assignments and from there, we conduct the inspections.

1    Q    Did anyone else from ATF accompany you on
2 this inspection?

3    A    No.

4    Q    Could you recall about how long overall you
5 were on the premises to conduct that inspection?

6    A    I'd say approximately four days.

7    Q    And approximately when was the compliance
8 inspection?

9    A    June 2013.

10    Q    Tell us just in a very basic overview what
11 actions you took in conducting that compliance inspection
12 in June of 2013.

13    A    Okay. Basically, I conducted an inventory of
14 the firearms, book to gun, gun to book; reviewed the
15 Acquisition and Disposition log; reviewed the ATF Forms
16 4473s.  And that's basically what we do, make sure that a
17 copy of their license is there on the premises posted,
18 and that's basically what we do when we go in.

19    Q    So what you're saying in this inspection it was
20 pretty much like your standard procedure in all
21 inspections?

22    A    Exactly, standard compliance inspection.

23    Q    So when you say you made a comparison of your
24 inventory found of firearms, gun to book and book to gun,
25 what records are you referring to?

1    A    The Acquisition and Disposition log.

2    Q    So how exactly do you make that comparison,

3 what do you compare?

4    A    Okay.  What I compare of the acquisitions and I

5 take the dispositions -- the open dispositions in the

6 Acquisition and Disposition log should equal the number

7 of firearms in inventory.  Those open disposition entries

8 on the acquisition side as far as the information should

9 be identical to what's on the firearm itself as far as

10 the importer, manufacturer, model, serial number, caliber

11 of the firearm.

12    Q    Is there any other information that's required

13 to be kept in the Acquisition/Disposition record other

14 than what you just described on the firearm?

15    A    Yes.  Date that the firearm was received, the

16 name and address or name and license number of the

17 Federal Firearms Licensee, wherever they're acquiring the

18 firearm from.

19        On the disposition side, it should be the date

20 of transfer; the name and complete address of the

21 individual or company that it's going to or the name and

22 FFL of the licensee that it's being transferred to; or if

23 they serialize their forms then the serial number of that

24 ATF Form 4473, that's the address.

25    Q    On the Form 4473 that you referred to, could

1  you tell us what that form is?

2      A    Okay.  Firearms Transaction Record is used to,

3  used when a firearm is being transferred to a

4  non-licensed individual from a licensee to a non-licensed

5  individual.

6          The form must be completed by the non-licensed

7  individual, and the information on that form would also

8  have the information of the background check that has

9  been completed as well as information from the licensee

10 pertaining to the firearm being transferred, and the

11 licensee as well as the transferee certifying that they

12 have read and understand the notices and instructions and

13 definitions on the form.

14     Q    Is a Firearms Transaction Record or for short,

15 the ATF Form 4473, is that required for all transfers

16 from a licensed dealer to a non-licensee?

17     A    Yes, it is.

18     Q    I'm going to show you now what I have marked as

19 Government Number 7.

20         MS. LANCASTER:  And Mr. Barnes, I provided you

21 just a few minutes ago a copy of all of our evidence, and

22 they have markings for Government numbers.  And I'll try

23 to make sure you have before you what it is we're talking

24 about at that moment.  And if I don't, please let me

25 know, and we'll get time for you to look at it.

1    MR. BARNES:  Well if I may, Mr. Reilly, is

2  this what you're referring to, Government 8 is an

3  indicated marking and --

4    MS. LANCASTER:  Yes.

5    MR. BARNES:  -- then on this document here --

6    MS. LANCASTER:  It's got two pages so there's a

7  page before it.

8    MR. BARNES:  Okay, Government Number 7.

9    MS. LANCASTER:  Yes, correct.

10    MR. BARNES:  Okay.

11    MS. LANCASTER:  So just make sure if I don't

12  notice that you don't have the one that I'm referring to

13  that I give you time to locate that in your information

14  because we provided you some materials before today but

15  not marked as evidence so not in that order.

16    MR. BARNES:  Right.

17    MS. LANCASTER:  So we'll work with ones that

18  you have from today.

19    BY MS. LANCASTER:

20    Q    I'm showing you what's marked as Government

21  Number 7 and ask you to take a moment to look at that.

22    A    Yes.

23    Q    Tell us what that is.

24    A    This is a Report of Violations that's issued

25  out during the inspection and reviewed with the licensee

1 for any violations that were found during the

2 inspection.

3     Q   Is that a part of a standard procedure in

4 conducting a compliance inspection?

5     A   Yes, it is.

6     Q   What information do you use in general as an

7 IOI to input information onto that Report of Violations?

8     A   Okay.  Basically the information will come from

9 the forms, ATF Forms 4473, or the Acquisition and

10 Disposition record.  And the regulation cite comes out of

11 the Regulation Guidebook.

12     Q   When you prepare a Report of Violations, at

13 what point in time is that done in regard to your overall

14 conducting a compliance inspection?

15     A   Well, during the inspection process, the actual

16 completion of the report is usually completed at the end

17 of the inspection or reviewed with the licensee at the

18 end of the inspection.

19     But during the inspection, that's when

20 violations are actually noted and found.  So during the

21 inspection, you come across certain issues well then

22 that's when you start to write them down and notate them

23 so that you can compile them at the end of the

24 inspection.

25     Q   In this particular compliance inspection of

1  Dick's Sporting Goods, did you follow that same process

2  that you just described?

3      A    Yes, I did.

4      Q    And do you recall if you discussed any of these

5  violations during the compliance inspection prior to the

6  end of it with any person on site representing Dick's

7  Sporting Goods?

8      A    Well, I may have discussed violation 1 possibly

9  at that time about the failure to properly record the

10  correct disposition, name and address for a stolen model.

11  I may have discussed that at that time because I'm trying

12  to find out the information at that particular point in

13  time.

14          The information about the straw purchaser, that

15  may have occurred towards the end of the inspection.  I

16  can't say with certainty because, again, it dealt with a

17  straw purchaser, and I'm going through the, all approvals

18  and all denials and so I'm comparing at the same time.

19  And many times, it's not until actually the end of the

20  inspection when I can actually look at and verify the

21  information.

22      Q    Did you review the information in the completed

23  Report of Violations with anyone representing Dick's

24  Sporting Goods at the end of your inspection?

25      A    Yes, I did.

1     Q    Do you recall with whom you reviewed that?

2     A    Yes.  There were three individuals who were

3 present at the closing. That was the loss prevention

4 manager, Mr. Karff (ph.); the acting store manager,

5 Mr. Pounds; and the district manager, Mr. Silva.

6     Q    Did any person sign that Report of Violations

7 after your review?

8     A    Yes.

9     Q    Do you recall who signed it?

10    A    Mr. Silva, the district manger; and Mr. Pounds,

11 the acting store manager.

12    Q    And did you yourself sign it on behalf of ATF?

13    A    Yes, I did.

14                     (Whereupon, Licensee's

15                     Exhibit Number 7 was marked

16                     for identification.)

17     MS. LANCASTER:  Just to clarify on the record,

18 the violation number 1 which was mentioned earlier is not

19 alleged so it's not a part of this matter.  It was

20 mentioned as example of the review of the records and

21 then recording onto this form.  But that's just a general

22 statement of what he did.  That's not alleged so we're

23 not using that (indiscernible).

24     MR. BARNES:  No, we understand that clearly

25 but, counsel, just a clarification.  So Mr. Silva and

1 Mr. Pounds both signed the Report of Violations?

2          MR. MARTIN:   Yes.

3          MR. BARNES:   Okay, thank you.

4          MS. LANCASTER:   I'm going to hold onto this

5 because it relates to other issues so we'll just go

6 through as you mentioned one by one on the allegations.

7          If you'll refer to number 3 listed on the

8 violations there, could you explain to us what number 3

9 concerns?

10          THE WITNESS:   Okay.   Number 3 is the transfer

11 of a firearm to a person, have reasonable cause to

12 believe that the person's prohibited.   With that, there

13 were two forms.   There was the approved ATF Form 4473 of

14 the individual, Laura Brady, and there was the denied ATF

15 Form 4473 of Jason Brady.

16          MS. LANCASTER:   Okay.   I'm going to show you

17 what's marked as Government Number 8.

18          And Mr. Barnes, I don't know if your copies are

19 stapled, mine are not.   So it goes through three pages of

20 a 4473 and one page on the back of it marked Tennessee

21 Instant Check System.

22          MR. BARNES:   Yeah.

23          MS. LANCASTER:   All of that constitutes

24 Government Number 8 and then your next number is

25 Government Number 9 below that.

1          MR. BARNES:  This is Government Number 9?

2          MS. LANCASTER:  Yes, correct.  That has a

3    little (indiscernible).

4          MR. BARNES: Right, got it.

5          MS. LANCASTER:  Just so you have the accurate

6    information on what document we have.

7          BY MS. LANCASTER:

8      Q    Okay, I'm showing you Government Number 8, and

9    I'll ask you to take a moment to look at that.  Does this

10   relate in any way to the information that you just gave

11   us regarding violation number 3 on your Report of

12   Violations?

13     A    Yes, it does.

14     Q    Explain what Government Number 8 is in

15   regarding to the third violation on your Report of

16   Violations?

17     A    Okay.  This individual, Mr. Jason Brady,

18   completed this ATF Form 4473, a background check was

19   initiated and completed; the response was denied.  The

20   Licensee attached the associated checklist with -- TICS

21   is the government agency that the background checks are

22   run (indiscernible).

23          They attach the response to the form indicating

24   also that the individual has a denied transaction on

25   11/6/2012.  So the response was marked denied, they've

1  attached the response also from TICS which indicates

2  the date as well as the time of the individual.

3       Q    Do you have any way knowing whether or not that

4  firearm that's described according to the Form 4473 was

5  actually transferred to Jason Wayne Brady or not?

6       A    I have reasonable cause to believe that it was

7  transferred.

8            An individual -- there was a proceed response

9  for a Ms. Laura Brady on another ATF Form 4473 where it

10 was indicated that that firearm was transferred and

11 verified with the Acquisition and Disposition record

12 showing that that firearm was transferred to Ms. Laura

13 Brady; identical name, last name, identical address,

14 identical firearm and the same clerk.

15      Q    You mentioned the Tennessee Instant Check

16 System, could you tell us what the requirement is under

17 the Gun Control Act for the instant check system?

18      A    Okay.  The requirement is that if a

19 non-licensed individual will be purchasing a firearm from

20 a licensee, a Federal Firearm Licensee, then that Federal

21 Firearms Licensee must complete a background check upon

22 that non-licensed individual.  And they receive a

23 response back, the licensee will receive the response

24 back of either approved or denied.

25      Q    And what is the importance of having the

1    instant check system for firearms licensees?

2      A    To determine if the individual's prohibited or

3    not prohibited.

4      Q    Is that a nationwide requirement for all the

5    Gun Control Acts?

6      A    It is a nationwide requirement.  The system

7    itself is the National Instant Check System.  Tennessee

8    is what we call the point-of-contact state where we pull

9    that information from NICS, but we are considered a

10   point-of-contact state.

11     Q    And does that operate the same as other states

12   which are not point-of-contact which use the National

13   Instant Check System?

14     A    It operates the same.  In addition, the

15   Tennessee Instant Check System also logs the serial

16   number of the firearm at the point of sale.  And in

17   addition, they also charge a fee.

18     Q    Did you obtain a log of the TICS transactions

19   for the date in question for Jason Wayne Brady's

20   attempted purchase?

21     A    Yes, I did.

22                              (Whereupon, Government's

23                              Exhibit Numbers 8 and 9

24                              were marked for

25                              identification.)

1    BY MS. LANCASTER:

2    Q    I'm going to show you Government 12, and I'll

3    apologize, we're going a little bit of out of order in

4    our numbering so that we can keep the same order in your

5    allegations as requested.

6    Government Number 12, tell us how that relates

7    if it does to the transactions that you just described

8    earlier with Jason Brady and Laura Brady?

9    A    Okay.  What we see here, we have the individual

10   on November 12th, I'm sorry, November 6th, 2012,

11   Mr. Brady, denied at that time.  And three transactions,

12   after three transactions have occurred on November 6th,

13   three TICS transactions, Ms. Laura Brady is approved.  So

14   there are three transactions in between the time that

15   Mr. Jason Brady was denied and Ms. Laura Brady was

16   approved.

17   Q    Did any of the records that you reviewed give

18   you any indication of the time lapse in between the

19   attempt by Jason Brady and then the successful purchase

20   by Laura Brady?

21   A    Yes.

22   Q    What documents did you obtain that information

23   from?

24   A    Okay.  The document that I obtained that

25   information from was attached to the back of the ATF Form

1  4473. It is the print out of the TICS response from

2  the Tennessee Instant Check System.

3      Q    So when you say you looked at that Tennessee

4  Instant Check System, that was for both of those

5  Form 4473s?

6      A    That is correct.

7                              (Whereupon, Government's

8                              Exhibit Number 12 was

9                              marked for identification.)

10      MS. LANCASTER:   Bear with me just a minute

11  here.

12      MR. BARNES:   That's on Mrs. Brady's exhibit.

13      MS. LANCASTER:   Correct.

14      BY MS. LANCASTER:

15      Q    I'm showing you what is marked as Government

16  Number 10, and I'll ask you to take a moment to look at

17  that please and that is the Laura Brady four pages.  Tell

18  us how that relates if it does to your information there

19  was reason to believe there was a transfer to, in

20  actuality, Jason Brady?

21      A    Okay.  On this form again, Ms. Brady, on this

22  form, this 4473, you have the same last name, identical

23  address, identical firearm, signed by the same clerk on

24  the same day of November 6th, 2012.  The only difference

25  is that this form has an approved response approximately

1  eight or nine hours later.

2      Q    Based on your training and your experience what

3  led you to conclude that the Licensee had reason to

4  believe that this was a false purchase or straw purchase?

5      A    Well, as I stated before, you have the

6  identical last name, address, firearm, signed by the

7  clerk for both forms, same clerk on both forms.  You have

8  attached to the form a sign-off sheet from the store

9  indicating that the individual has looked at the denials

10 and the approvals, the denials for this (indiscernible).

11                           (Whereupon, Government's

12                           Exhibit Number 10 was

13                           marked for identification.)

14         BY MS. LANCASTER:

15     Q    I'm showing you Government 11, and I'll ask you

16 to take a moment to look at that, please.  Tell us what

17 that document is.

18     A    Okay, this is a sign-off sheet that the store

19 uses for having their associates, their employees,

20 utilize when they're before a, well, after a transfer has

21 occurred making sure that everything is in order for the

22 ATF Form 4473.

23         It's a series of reviews reviewed by the

24 individual transferring the firearm going all the way

25 through upper management of the store.

1    Q    Is that form required at all by the Gun

2 Control Act?

3    A    No, it isn't.

4    Q    What is significant in your training and

5 experience on that form related to the violation that you

6 concluded had occurred?

7    A    Well, on here in step 1 under selling associate

8 which is the same individual who completed the Form 4473

9 for Mrs. Brady and Mr. Brady, it states here use the

10 firearms review template to verify Sections A and B on

11 the Form 4473 are complete and review the denied delay

12 log for possible straw purchase.  If all the information

13 is correct and there is no evidence of straw purchase,

14 acknowledge by signing in the space provided, complete

15 step 1 before initiating the background check.

16         And then it goes further down again selling

17 associate again reviews even further information and then

18 upper management signs and dates the form, I mean, signs

19 off on here and dates this sign-off sheet.

20    Q    So why is it significant that the clerk signed

21 that form on the clerk's portion of it indicating that it

22 was a lawful sale?

23    A    Okay.  It's significant because what they're

24 stating is that yes, they have reviewed and by their

25 review, everything was fine.

1    Q    And what would they have reviewed in order to

2  sign on Government 11?

3    A    Okay.  What they should be reviewing and what

4  they should review is the denied form verifying the

5  information there as well as the proceed form also,

6  verifying that the individual's identical to, last name

7  is identical, address is identical, the firearm is

8  identical.

9    Q    Where did you find Government 11 in your review

10 of the records?

11   A    This was attached to the form of Ms. Laura

12 Brady.

13   Q    By that you mean the Form 4473?

14   A    That's correct, Form 4473.

15   Q    When a denial is received in Tennessee from

16 TICS, when a denial is received, what is a licensee

17 required to do according to the Gun Control Act?

18   A    They are to file those forms away in a separate

19 file in either alphabetical or chronological order.

20   Q    And do you have any idea of the purpose in

21 maintaining a file of the denials in the alphabetical or

22 chronological order?

23   A    The purpose is to be able to review the forms

24 in case an individual or, well, an individual other than

25 the person who was denied may attempt to purchase a

1  firearm that they were trying to purchase when they

2  initially came into the store and the background check

3  was denied.

4      Q    So what is the importance of having the correct

5  person as the buyer on an ATF Form 4473?

6      A    It really goes back to the licensee maintaining

7  good records.  The license is the custodian of the

8  records.  Any time that a trace request is made of the

9  licensee, they have to go to their records because,

10 again, they're the custodian of the records and provide

11 that information to ATF.

12         So if you have information in there that's not

13 correct whereas the actual purchaser of the firearm is

14 not in there, is not in the firearm, it's not in the

15 records, then your recordkeeping is not correct.  And as

16 far as tracing purposes, it makes it difficult if not

17 impossible to trace a firearm.

18     Q    Could you explain the process by which a trace

19 of a firearm is conducted in general?

20     A    Okay.  When a firearm is -- when the

21 information from a firearm is given or taken off the

22 firearm which would be the make, model, serial number,

23 and submit it by law enforcement, well then the tracing

24 center follows the distribution chain, the chain of

25 distribution, from the manufacturer because, again, the

1  manufacturer's marks of identification or imports marks

2  of identification will be on the firearm itself.  And

3  they will follow that through the distribution chain from

4  the manufacturer to the wholesaler or retailer to the

5  purchaser which would be, or maybe a non-licensed

6  individual.

7       And, again, once it leaves the hands of a

8  non-licensed individual well then as far as the

9  recordkeeping requirements go, that's as far as the

10 recordkeeping requirements will, as far as the

11 information for recordkeeping will take you.

12      The final person will be the non-licensed

13 individual who is not required to maintain any type of

14 records.

15      Q    Do those records also assist the licensees in

16 determining that firearms do not go into the hands of

17 prohibited person?

18      A    Yes, they do.

19      Q    In what way?

20      A    Okay.  First of all, with denials, when you're

21 looking at the records, as far as with denials, you're

22 trying to verify that you're not going to be selling or

23 transferring firearms to someone other than the actual

24 person.

25      In question 11(a), they ask are you the actual

1  buyer or, are you the actual buyer of the firearm

2  listed on the form.  Question 11(a), if you are the

3  actual purchaser of the firearm, buyer of the firearm,

4  you will always answer yes, and that information is also

5  expanded on the information notices and instruction

6  sections.

7       If the individual is not the actual buyer and

8  they answer yes, well, then they falsified the form.  If

9  an individual who has been denied and, again, the denied

10  form is maintained on file with the licensee, with the

11  licensed dealer.  And then some other individual, another

12  individual, such as an individual with possibly the same

13  last name, same address, same type of firearm attempts to

14  purchase a firearm, well then by looking through the

15  denied file, you'll see that the individual that you're

16  transferring or who you're possibly transferring to will

17  be prohibited from would be actually a transfer to a

18  prohibited person because the individual is not the

19  person that it is actually, that is the actual purchaser

20  of the firearm itself.

21       Q    So based on your training and experience, who

22  was the actual buyer of the firearm concerned in the

23  Jason Brady and Laura Brady transactions?

24       A    Mr. Jason Brady.

25       Q    This was based on the factors that you

1  discussed earlier?

2      A    That's correct.

3      Q    What about the description of the firearm

4  itself, was that the same, similar or different?

5      A    It was identical.

6      Q    Did it have the same serial number?

7      A    Yes.

8      Q    And what about the information that was

9  recorded into the Acquisition and Disposition record?

10     A    That information had the name of Ms. Laura

11  Brady.

12                        (Whereupon, Government's

13                        Exhibit Number 11 was

14                        marked for identification.)

15     MS. LANCASTER:  All right.  All of the 4473

16  information that we've discussed goes to one and three on

17  here, on the transfer to person with reason to believe

18  prohibited, and three being the false information on the

19  Form 4473 in the name of the buyer.

20          So I have one document that's related to the

21  false information on Acquisition/Disposition record which

22  is Count 2 of the allegations.

23          HEARING OFFICER:  Government Exhibit 8 entered

24  into the record.  Government Exhibit 9 entered into the

25  record.  Government Exhibit 11 entered into the record,

1  and Government Exhibit 12 entered into the record.

2                                    (Whereupon, Government's

3                                    Exhibit Numbers 8, 9, 11

4                                    and 12 were received into

5                                    evidence.)

6        HEARING OFFICER:  Does that cover it for one?

7        MS. LANCASTER:  Yes.  That's all for one, and

8  it'll also be for three as well.

9        HEARING OFFICER:  Is that it for number 1 from

10  the Government?

11       MS. LANCASTER:  Yes.

12       HEARING OFFICER:  Mr. Barnes.

13                     CROSS EXAMINATION

14       BY MR. BARNES:

15   Q    Mr. Williams, thank you.  I have some questions

16  to go over from your testimony and then I have some other

17  questions to follow up with so let me go back.

18       You testified earlier that you had a close-out

19  conference with the Dick's employees, is that correct,

20  Mr. Karff, Ponz and Silva?

21   A    That's correct.  Pounds.

22   Q    Pounds?

23   A    Yes.

24   Q    And at that close-out conference, you did raise

25  the issue of violation number 1 or alleged count number 1

1  in the revocation, the straw purchase?

2      A    Yes.

3      Q    How did you describe that then to the Licensee?

4      A    I think --

5      Q    Let me ask it another way.  Was the Licensee

6  surprised?

7      A    Well, as far as when we say surprised it's like

8  they didn't know.  They had no idea that that had

9  occurred.

10     Q    Okay.  And at that time, did you ask to speak

11 to the first person on Government's Exhibit, I believe

12 it's number 12 if I'm correct?

13     A    The selling associate?

14     Q    That's correct, Mr. Krueger.

15     A    I did, and they said he didn't work for the, no

16 longer works for the (indiscernible).

17     Q    Okay.  But you wanted to speak to him, but you

18 did not have an opportunity to do so?

19     A    Exactly.

20     Q    Okay.  So it's your testimony then that the

21 store manger, the regional, or the district manager, all

22 three Dick's licensee or Dick's employees were, did not

23 know that this had occurred; is that correct?

24     A    Yes.  The three that were present at the

25 closing and who assisted me during the inspection.

1    Q    Did you ever speak to Mrs. Brady or Mr. Brady

2  or attempt to interview them?

3    A    No.

4    Q    I want to refer to Government's Exhibit, again,

5  Number 12, the TICS log; and let me make sure I've got

6  that.  You're familiar with this document, sir, correct?

7    A    Yes.

8    Q    Okay.  This TICS log, would this be a log that

9  Mr. Krueger or any store personnel would have seen

10  contemporaneous with the transaction in question?

11    A    No, it isn't.

12    Q    Okay.  Who has access to this log normally?

13    A    Who has access?  The Tennessee Instant Check

14  System, and they provide us with a copy of the log.

15    Q    Okay.  So this is not something that a licensee

16  can just call TICS and ask for, is that correct?

17    A    That's correct.

18    Q    Now on Government's Exhibit Number 11 that you

19  referred to which is the sign-off sheet, here on the

20  sign-off sheet it says selling associate, use the

21  Firearms Review template to verify if Sections A and B on

22  the Form 4473 are complete and review the denied/delay

23  log for possible straw purchases, okay.

24         Now, can you cite, sir, anywhere in the

25  regulations where the licensee is required to maintain

1  this kind of recordkeeping?

2      A    No.

3      Q    Can you cite, sir, anywhere in the regulations

4  where the licensee is required prior to the transfer of a

5  firearm on an approved 4473 to go back to the separate

6  file maintained under the Gun Control Act and review the

7  denials file?  No matter what day a purchase is being

8  made and no matter how far back the denials go, can you

9  cite anything in the regulation that requires the

10 licensee has a check procedure under the regulations to

11 do that?

12     A    As a check procedure, no, I can't.

13     Q    Sir, did you take a look at the Dick's

14 denied/delay log yourself?

15     A    No, I didn't.

16     Q    Okay.  So you wouldn't have been aware one way

17 or another whether or not Mr. Brady's attempt to purchase

18 a firearm would have been entered into that log, is that

19 correct, is that your testimony today?

20     A    I look at the forms.  I didn't look at the

21 denied log.

22     Q    Mr. Williams, I think it's established by your

23 counsel, by Government's counsel, that you've had

24 extensive training, correct, from FLETC and on-the-job

25 training?

1    A    Yes.

2    Q    Now you referred briefly to the instructions on

3 the Form 4473.  With regard to those instructions

4 regarding what you refer to as I believe question 11(a)

5 on the 4473, is that the correct question --

6    A    That's correct.

7    Q    -- are you the actual buyer?

8    A    Are you the actual buyer of the firearm.

9    Q    Right.  With regard to that question,

10 specifically, are there any exceptions listed on the

11 instructions on answering that question yes?  In other

12 words, are different scenarios given on where a yes is an

13 appropriate answer?

14    A    If the individual, and it states right there in

15 section 11(a), if the individual's picking up a repaired

16 firearm and they're not the individual who brought the

17 firearm in, well then they're not required to answer

18 11(a).  They can leave it blank.

19    Q    Are there any other scenarios that are listed

20 on the instructions that are acceptable for answering yes

21 to 11(a)?

22    A    In the instructions, notices and definitions

23 refers to if the firearm is being given as a gift then

24 the individual should list, should answer yes to

25 question 11(a).

1      Q    So who makes the determination of that intent

2   for a gift; is that up to the licensee, or is that up to

3   the person who's appearing before the licensee?

4      A    No, it would be the individual --

5      Q    Who's appearing before the licensee.

6      A    And also, but the licensee, because the

7   licensee -- first of all, the licensee is the first line

8   of defense just to make sure the firearm's kept out of

9   prohibited persons.

10          So if an individual who appears before the

11  licensee within say a reasonable period of time, and I

12  would definitely say a day would be a reasonable period

13  of time, appears before the licensee and they attempt to

14  purchase a firearm, they are denied.  And then

15  subsequently later on, someone else with the same last

16  name, same address, same type of firearm attempts to

17  purchase that same firearm then right there, there would

18  be an indication of a reasonable cause to look at that

19  individual and say hey, I have reason to believe that

20  you're not purchasing this firearm for yourself.

21     Q    Well let's explore that because I think that's

22  an excellent point.

23          In your experience when the government is

24  urging -- you said first line of defense so let's talk

25  about the first line of defense and let's talk about what

1  the government's purpose is in trying to prevent straw

2  purchases.

3         Every time that there may be a suspicion that a

4  straw purchase is occurring or that there are elements

5  that might give rise to a straw purchase, it's not

6  necessarily a straw purchase, correct?  In other words,

7  the licensee in your mind has an obligation to vet

8  further?

9     A    Well, what we're talking about, we're talking

10 about something that is, it's showing, it's in your face,

11 it's something that (indiscernible).

12    Q    Well sir, all I'm asking is does every scenario

13 that gives even a whiff of a potential straw purchase, is

14 that necessarily a straw purchase?

15    A    Every scenario?

16    Q    Yeah, that might -- yeah, right.

17    A    No, I wouldn't say every scenario.

18    Q    Right.  And so would you not agree that the

19 licensee in your mind at least when they're put on notice

20 of a potential straw purchase, they should make further

21 inquiry at least?

22    A    I would agree with that.

23    Q    Going back to the record of violations or the

24 Report of Violations, there is, and we don't want to get

25 the numbers mixed up, but the first violation was for an

1    incorrectly recorded disposition of a firearm?

2        A    That's correct.

3        Q    Just they transposed the name of a person?  Did

4    they get the serial number wrong or, you know, I'm just

5    trying to figure out what that violation was.

6        A    It was the disposition name and address.

7        Q    So the underlying transaction was correct?

8        A    Right.

9        Q    But they didn't get --

10       A    The name --

11       Q    -- maybe they left off the middle name or

12   perhaps something like that?

13       A    Well I don't know exactly what the information

14   as far as the name and address.  They may have actually

15   left off the name and address, but the violation was for

16   failure to properly record the correct disposition name

17   and address.

18       Q    Other than the rest of the violations in that

19   Report of Violations, if those had not existed for you as

20   an investigator and you had completed this inspection at

21   the Wolfchase store with just that one violation, in your

22   mind, would that have been a decent to fairly good

23   outcome for a licensee?

24       A    As far as an inspection of a licensee?

25       Q    Yes.

1  A    Yes.

2  Q    Okay.  I now want to go onto some questions

3  that we had for the Government's witness.

4       The revocation notice that Dick's received

5  charged a violation of 18 U.S.C. 922(d) and 27 C.F.R.

6  478.99(c) stating that Dick's transferred the Mossberg

7  Maverick, I'm not going to repeat the serial number, to

8  Wayne Brady.

9       The Report of Violations cited the same

10  regulatory scheme but stated that after Mr. Brady was

11  denied, Mrs. Brady purchased the same firearm.  Did

12  Dick's actually transfer the firearm to Mr. Brady or

13  Mrs. Brady, what's your testimony?

14  A    Did Dick's actually transfer the firearm --

15  Q    Yes.  Did they transfer dominion and control of

16  the firearm across their store counter to Mr. Brady or

17  Mrs. Brady?

18  A    Okay.  Now the clerk who was at the time --

19  Q    Mr. Krueger.

20  A    Yes.  He handed the firearm to Mrs. Brady.

21  Q    So that's giving up dominion and control to

22  another human being, isn't it?

23       HEARING OFFICER:  You asking him to make a

24  legal determination?

25       MR. BARNES:  Well I --

1          THE WITNESS:  He handed the firearm to

2    Mrs. Brady.  The clerk handed the firearm to Mrs. Brady.

3          BY MR. BARNES:

4       Q    So who was the firearm transferred to,

5    Mrs. Brady or Mr. Brady?

6       A    The clerk handed the firearm to Mrs. Brady.

7       Q    All right, so you're -- at this point, you

8    can't say who the transfer was to?

9       A    No.

10      Q    You just say it was physically handed to --

11      A    No, what I can say is that there was reasonable

12   cause to believe that the actual purchaser of the firearm

13   was Mr. Brady.

14      Q    Then if Mrs. Brady actually received, if she

15   received the firearm in question, physically received the

16   firearm in question, please explain how a Dick's transfer

17   of a firearm to Mrs. Brady after she completed the 4473

18   and underwent a TICS check for which a proceed response

19   was received violated what you cited which was 478.99(c)?

20      A    Okay.  First of all, what we're getting here to

21   is what we call a straw purchase, a straw purchase where

22   an individual who may or may not be prohibited from

23   possessing a firearm uses another person to obtain the

24   firearm for them where the actual purchase of the firearm

25   is the individual who was using the straw person to

1  obtain the firearm for them.

2  Mr. Brady, Mr. Jason Brady, stated on the form

3  that he wanted to purchase this particular firearm on

4  such and such a date, he was denied. Mrs. Brady came in

5  subsequently, later on that day, and attempted to

6  purchase that particular firearm on that day stating that

7  she was purchasing the firearm for herself.

8  So what we have here is an individual who

9  falsified the form which in turn made the Licensee's

10  records incorrect, and the actual buyer or actual

11  purchaser is Mr. Jason Brady.

12  Q    Mr. Williams, going back to your training at

13  FLETC, were you instructed on the concept of willfulness?

14  A    We've had discussions on willfulness with ATF.

15  Q    Okay. And how do you define willfulness for

16  purposes of the Gun Control Act?

17  A    Okay. Well as far as defining willfulness,

18  there's nothing in the regulations that define

19  willfulness.

20  However, in the letter that was issued out to

21  you and your client -- if you refer back to the

22  explanation of the hearing process, on the last page of

23  the information of the hearing process, it refers to the

24  last paragraph, first column, willful violations are

25  those violations meeting statutory requirements for

1 denial or revocation.  Willfulness as defined by the

2 courts, and again, by the courts means for purposeful

3 disregard of a known legal entity, known legal duty or

4 plain indifference to a licensee's legal obligation.

5 And if you read further, it'll state that ATF

6 is not required to prove you intended to violate the law

7 only that you knew your legal obligation as a licensee.

8 Q    Again going back to your training at FLETC, did

9 anybody at FLETC --

10 MS. LANCASTER:  For the record, let's just

11 identify where he was reading from; it's Government

12 Number 5.

13 MR. BARNES:  That's fine, thank you.

14 BY MR. BARNES:

15 Q    Going back to your training at FLETC, were you

16 ever instructed at FLETC that the statute was amended in

17 1986 by the Firearms Owners Protection Act, and that the

18 legislative history talks about why the amendment was

19 made for willfulness.

20 And in section 103 which amended 18 U.S.C.

21 923(e), it's clear in the legislative debate that the

22 purpose of this change is to ensure that licenses are not

23 revoked for inadvertent errors or technical mistakes.

24 So is that concept of inadvertent error or

25 technical mistake ever brought out in your training at

1  FLETC?

2      A    I don't remember.

3      Q    Let's go back to the recordkeeping that you did

4  review at Dick's.

5          If an FFL maintains an extra regulatory record

6  like the proceed or the denial log that Dick's has which

7  is referred to in one of the Government's exhibits, the

8  certification statement that we looked at earlier in your

9  testimony, and then the employees fails to make a record

10  in that store so that a previously denied person could

11  not be determined, would that make then a subsequent sale

12  to another person who had the same last name and lived at

13  the same address a violation of the Gun Control Act or

14  its regulations?

15          In other words, to put it simply, if we can

16  show, and we will show, that Mr. Krueger did not make an

17  entry in the denial log and the procedure, the internal

18  control procedure, in the store was for Mr. Krueger to

19  come back in and check that denial log to prevent straw

20  purchases, and indeed we'll present other evidence today

21  about other internal controls to prevent straw purchases

22  on a system-wide basis in this are of Tennessee, if he

23  went and looked at that log and saw no last name, Brady,

24  in the log and then proceeded to make the sale or the

25  transfer to Mrs. Brady, would that still in your opinion

1  be a straw purchase, enabling a straw purchase?

2       A    Could you just repeat that again, please?

3       Q    You presented, or counsel for the Government

4  introduced an extra regulatory document not required to

5  be kept by the Gun Control Act which --

6       A    Are you referring to their sign-off sheet?

7       Q    I am referring to sign-off sheet.

8       A    Okay.

9       Q    And on that sign-off sheet, step number 1 which

10 you went over, clearly refers to the retail personnel

11 going to the denial log to review the denial log.  The

12 purpose of that review as stated on the Government's

13 introduced exhibit is to ascertain whether or not there

14 might be a possibility of a straw purchase; you would

15 agree with that, correct, that's what it says anyway?

16      A    Right, I would agree.

17      Q    Right.  If Mr. Krueger went to that log and as

18 a result of his own inadvertent error had failed to

19 record Mr. Jason Brady on that log, but still checked it

20 anyway, and then went and made the disposition to

21 Mrs. Brady, would that still be a straw purchase in your

22 mind, in your opinion?

23      A    If he, where you say if he failed --

24      Q    Mr. Krueger failed to put in, he had failed to

25 put in the information about Jason Brady in the denial

1  log but as required by step number 1, he went to the

2  log as he was making a gun transfer and checked the log

3  and saw that there was no last name of Brady there; it

4  was due to his own error, but it wasn't there, he had no

5  consciousness, but assume for purposes of this question

6  he had no consciousness, and then he still went made the

7  disposition to Mrs. Brady, would that still be enabling

8  the straw purchase?

9      A    Two things when you refer to that question.

10  First of all, as far as a disposition log, a denial log,

11  a licensee is required by regulations to maintain the

12  forms either in alphabetical or chronological order for

13  all the denials.

14      Q    And you found those did you not at the store?

15      A    Yes, I did.

16      Q    And they were in good order, were they not?

17      A    As far as I can remember.

18      Q    Yes.

19      A    Now, you have those forms, those forms are

20  there for a reason.  Not only that, you have the same

21  individual who initiated the transaction at the very

22  beginning.  So you have the same individual and you have

23  the denial forms.

24      So as far as a denial log, I mean, they could

25  have whatever denial log they want, I mean, that's fine,

1  that's great.  But a denial log is only as good as the

2  information's that in it.  But still the records that

3  were required and that you're required to have are the

4  denied files, denied forms.

5       Q    Right, we all agree on that, sir.  But let me

6  ask you this.  Are you aware of the Don't Lie For the

7  Other Guy program?

8       A    Yes, I am.

9       Q    Right, and would it be your opinion that the

10  purpose of that program is to create a partnership

11  between ATF and the trade in order to prevent the illegal

12  diversion of firearms for whatever reason, straw

13  purchases, for whatever reason?

14       A    Well I can't say for the program now, but I

15  remember when it was initiated, and it was initiated as a

16  partnership between ATF and the NSSF.

17       Q    Right, and do you recall as a part of that

18  initiative by ATF and by the trade that ATF encouraged

19  the industry to come up with systems that would help spot

20  straw purchase transactions outside of just maintaining

21  the denial 4473s?

22       A    Okay.  I don't know about that, but I do know

23  that ATF has always encouraged licensees to always be

24  vigilant and be aware of straw purchases and anything

25  pertaining to that matter.

1    Q   So would it be your opinion, sir, that if any

2 retailer including my client, Dick's, had developed a

3 system --

4    HEARING OFFICER: Mr. Barnes, let's keep it,

5 let's tie it back into Count 1. I think we're straying

6 away from here.

7    MR. BARNES: Okay. Well --

8    HEARING OFFICER: You're asking him about

9 opinions of what the industry should do in partnership

10 with the government and all that. Let's stick to

11 Count 1, please.

12    MR. BARNES: Okay, Mr. Reilly. I'm just trying

13 to focus in on the system that was being maintained to

14 spot straw purchases. Dick's -- and I'm going to ask

15 counsel this. You did say that your documents were

16 supporting the other counts in the revocation, the first

17 exhibits that you just entered into the record I think

18 Group 1.

19    MS. LANCASTER: Counts 1 and 3 are both related

20 so the Hearing Officer requested that we do Allegation 1

21 and Allegation 2 then Allegation 3. And this is actually

22 intertwined with one and three.

23    MR. BARNES: So are you going to do further

24 direct with Mr. Williams on Count 2?

25    MS. LANCASTER: Yes, but it'll be very short

1  because it also relates to the other things.  The only

2  thing I'm doing on Count 2 is I'm adding the

3  Acquisition/Disposition record and the name on it.  But

4  it's also based on these other, all the other bases.

5           MR. BARNES: Well, I'll come back to two and

6  three then.

7           HEARING OFFICER:  We don't have to go in the

8  order of one, two, three; if you want to go one, three

9  two or whatever, that's fine.  But I'm just saying, we

10 pause at the end of each count to afford the opportunity

11 for cross.

12          MS. LANCASTER:  Sure.  Yeah so it doesn't get

13 so far a field.

14          I'm just saying that one and three are pretty

15 much the same, and we're not going to be going through a

16 repetition on three because we've already said it on one.

17.         HEARING OFFICER:  Understood.

18          MR. BARNES:  Okay.  Well, let me stick on one.

19          BY MR. BARNES:

20    Q    Mr. Williams, how do you know that Dick's

21 employees knew the gun was going to be transferred by

22 Laura Brady to Wayne Brady?

23    A    How do I know?

24    Q    Yes.

25    A    Well, as I said it before, you have the

1  individual who was denied initially at the beginning of

2  the day and then you had another individual with the

3  identical last name, address, firearm by the same person,

4  completed by the same person, within so many hours so

5  there was reasonable cause to believe that that firearm

6  was going to be in the hands of Mr. Jason Brady and not

7  Ms. Laura Brady.

8      Q    Is it your position that a straw purchase was

9  still enabled even if that weren't the case, that

10 Mrs. Brady bought a gift or bought the gun for herself

11 and maintained dominion and control over the firearm?

12     A    Well, like I stated, there was reasonable cause

13 to believe that this is what occurred.

14     Q    Okay.  So is it your position that a licensee

15 should lose their license even if there's no underlying

16 straw purchase?  It's just simple question, sir.

17         HEARING OFFICER:  Yeah, but it's not a question

18 that he -- Mr. Williams, did you make the determination

19 that you were going to revoke the license?

20         THE WITNESS:  I'm sorry?

21         HEARING OFFICER:  Did you make the

22 determination that this license was going to be revoked?

23         THE WITNESS:  As far as -- are you saying

24 that --

25         HEARING OFFICER:  Who made the decision to

1 issue a Notice of Revocation?

2         THE WITNESS: Well, that decision as far as --

3 is that what you're asking?

4         HEARING OFFICER: Yes. I'm asking who made the

5 decision in the Nashville Field Division to issue a

6 Notice of Revocation. Would that be the Director of

7 Industry Operations?

8         THE WITNESS: As far as final decision?

9         HEARING OFFICER: Yes.

10         THE WITNESS: As far as once everything has

11 been determined?

12         HEARING OFFICER: No, sir. To issue the

13 initial Notice of Revocation that we're here today, yes.

14         THE WITNESS: To issue the notice?

15         HEARING OFFICER: Right.

16         THE WITNESS: Okay. I'm trying to, I was

17 trying to understated exactly what you were saying but to

18 issue the notice then yes, it is the Director who makes

19 the final decision to issue the Notice of Revocation.

20         HEARING OFFICER: Okay.

21         MR. BARNES: Mr. Williams, is it a violation of

22 the Gun Control Act for a non-prohibited person who owns

23 firearms to live at the same address as a prohibited

24 person, assuming they maintain dominion and control over

25 the guns?

1          MS. LANCASTER:  Could you use a little more

2    common language than dominion and control.

3          THE WITNESS:  Well --

4          MR. BARNES:  Okay.

5          BY MR. BARNES:

6     Q    A lawful, we have a lawful gun owner in one, in

7    a house --

8     A    In a house.

9     Q    -- and there's a person who may not have access

10   to have firearms for any number of reasons, can the

11   lawful gun owner   --

12    A    They don't have access or control of the

13   firearm?

14    Q    Correct.

15    A    Okay.  Then no, there shouldn't be any issue

16   with that.

17    Q    Thank you.  Does an FFL have a legal duty to

18   maintain a training manual, standard operating procedures

19   and/or training for employees under the regulations?

20    A    Under the regulations?

21    Q    Yeah.

22    A    No, they don't have -- no, they would

23   (indiscernible).

24    Q    Does an FFL have a legal duty to maintain a

25   multiple-sale tracking system, not multiple handgun

1  reporting, but a system that tracks buyers in general?

2      A    No.

3      Q    Can you tell me how the Dick's employees

4  behaved during the inspection?

5      A    They were cordial, very helpful, friendly and

6  professional.

7      Q    I don't want to tread back over old territory,

8  but how were the stores' other compliance operations or

9  their general compliance, firearms compliance, operations

10  in general?  I mean, did they appear to be organized with

11  their inventory and other things that, I mean, you were

12  doing book to gun and gun to book, did that go fairly

13  smoothly?

14      A    Everything else appeared to be (indiscernible).

15      Q    In your experience, do you examine other Dick's

16  stores in Tennessee besides Wolfchase, do you do audits

17  and inspections?

18      A    I can't think of another one that was assigned

19  to me as a compliance, but I do remember assisting on one

20  recently within the past 12 months.

21      Q    During the course of your inspection, did you

22  check on whether or not they had any unanswered trace

23  requests from that store?  Was that a part of your

24  inspection?

25      A    Yes.

1      Q    And how did they do there?

2      A    There were no issues.

3           MR. BARNES:  All right.  Thank you, Mr. Reilly,

4  I'll hold the rest of my questions.

5           HEARING OFFICER:  Ms. Lancaster, redirect?

6           MS. LANCASTER:  Briefly.

7                    REDIRECT EXAMINATION

8           BY MS. LANCASTER:

9      Q    We talked about the TICS log which is

10  Government Number 12, and it was established that the

11  Licensee would not have access to this particular

12  document, correct?

13     A    That's correct.

14     Q    Would the Licensee, however, have access to all

15  the information that is recorded on Government 12?

16     A    Well, as far as having access, TICS sends out a

17  bill to all their licensees monthly which has all of

18  their approvals and denials that they can check against.

19          I don't know if that has the, what other

20  information there may -- there's this listing, I know you

21  have a transaction number, I think you have a response.

22  So I know they send out a monthly bill that has

23  everything that occurred within that month.

24          And again, the printouts, the TICS printouts,

25  when they conduct a background check.

1     Q    When you said the printouts, what

2 specifically are you referring to?

3     A    The response sheets for approval or denials.

4     Q    Those are those papers that were attached --

5     A    Attached to (indiscernible).

6     Q    -- to the Forms 4473 that we saw earlier, one

7 for Jason Brady that showed denial and one for

8 Laura Brady that showed approval?

9     A    Right, correct.

10     MS. LANCASTER:  That's all.

11     HEARING OFFICER:  Okay.  Government can proceed

12 in either direction they want.

13     MS. LANCASTER:  Do we want, I can --

14     HEARING OFFICER:  We've been at it for an hour

15 and a half so (indiscernible) a break.  If someone needs

16 a break, they just got to let me know; it's not a big

17 deal.

18     MR. BARNES:  It just depends.  I was going to

19 suggest a bathroom break, but if counsel is going to be

20 relatively --

21     MS. LANCASTER:  Well, I would say this is what

22 we have going on here and we can decide.

23     It's going to be really quick to present

24 Allegation Number 2 which is going to be just adding the

25 A&D record to what's already been entered into evidence

1    and then just a few general things.

2         So it's going to be fairly fast for our

3    remaining presentation, and we're fine to take a break

4    now and come back and do 15-20 more minutes and then

5    whatever cross you have so whatever preference is.

6         MR. BARNES:  Let me ask if my group needs a

7    break 'cause I'd rather just get the 15 minutes in then

8    we can come back and do the defense.

9         HEARING OFFICER:  Okay.

10         MS. LANCASTER:  That way you'll have time to

11   confer with your client and go forth if you wish.

12         MR. BARNES:  Yes.

13         MS. LANCASTER:  All right. And Allegation

14   Number 2 is the false information in the

15   Acquisition/Disposition record as to the purchaser.

16         BY MS. LANCASTER:

17    Q    I'm showing you what's marked as Government

18   Number 9, and I'll ask you to take a moment to look at

19   that; and also if you would look back at Government

20   Number 7 which we've not entered yet, your Report of

21   Violations, the second violation that you listed on that

22   and tell us if it does, how Government Number 9 would

23   relate to the second violation you recorded onto the

24   Report of Violations?

25    A    Okay.  What this, this regulation refers to

1  recordkeeping. The information that's listed on the

2  Acquisition and Disposition log is Ms. Laura Brady, and

3  Ms. Laura Brady as far as the actual purchaser is not the

4  actual purchaser.  So what we have here is the

5  information in the A&D log book of the individual is not

6  the actual purchaser of the firearm.

7      Q    What exactly is recorded on Government Number 9

8  as the purchaser?

9      A    Laura Brady.

10     Q    And based on all the other documentation that

11 you've reviewed in accordance with Allegation 1 and 3

12 that we've already talked about, who should be listed

13 there as the actual purchaser?

14     A    Mr. Jason Brady.

15         MS. LANCASTER:  All right.  I'll enter into

16 evidence at this time Government 7 and 9.

17         HEARING OFFICER:  Government Exhibits 7 and 9

18 entered into the record.

19                              (Whereupon, Government's

20                              Exhibit Numbers 7 and 9

21                              were received into

22                              evidence.)

23         MS. LANCASTER:  And I have some more questions

24 that really relate kind of to everything here.  I'll

25 briefly go through.

1    BY MS. LANCASTER:

2    Q    If you look at Government 13, that's the

3    acknowledgement.  Almost at the end; yeah, that's the

4    one, you got it right there.  It's that one, first page.

5    A    Okay.

6    Q    Tell us what that document is?

7    A    Okay.  This is the acknowledgement of Federal

8    Firearms Regulations.  This form is completed at every

9    application and every compliance inspection.  It's a

10   review of the topics that are listed in the Federal

11   Firearms Regulations book as well as rulings.  And

12   there's also a page number for those who are not familiar

13   yet with using the regulation site itself.

14        At the very end, we ask the licensee or

15   applicant to sign and date the form stating that they

16   have reviewed the form, also checking or initialing the

17   boxes indicating all the sections that they have

18   reviewed, that we have reviewed together.

19        And at the very end of it, end of the second

20   page, we have our website where we inform the licensee or

21   applicant where they can go and obtain even more

22   information as well as our contact numbers, our direct

23   lines to the IOI who conducted the inspection or

24   application inspection as well as the area office numbers

25   and additional phone numbers to the licensing center and

1  also other additional phone numbers.

2      Q    When you say that it has page numbers on there

3  and that's referring to the *Federal Firearms Regulations*

4  *Reference Guide*, are you referring to what we normally

5  call the white book; *ATF Publication 5300.4,* September,

6  2005?

7      A    Yes.

8      Q    And is this document related to the explanation

9  that you gave earlier of your review of the overall

10 summary of the basic requirements for a licensee when you

11 conduct a compliance inspection?

12     A    Yes, it is.

13     Q    And is it the same as what you do in conducting

14 an application inspection or a qualification inspection

15 for an applicant for a Federal Firearms License?

16     A    Yes, it is.

17     Q    Did you obtain a copy of the acknowledgement

18 that was associated with your conducting the

19 qualification inspection for this particular location of

20 Dick's Sporting Goods?

21     A    Yes, I did.

22     Q    Do you have a copy today?

23     A    I do not have a copy today.

24     Q    And why do you not have it today?

25     A    Because that would be in the inspection file.

1    MS. LANCASTER:  I'll offer into evidence

2  Government Number 13.

3    HEARING OFFICER:  Government Exhibit 13 entered

4  into the record.

5                    (Whereupon, Government's

6                    Exhibit Number 13 was

7                    marked for identification

8                    and received into

9                    evidence.)

10    BY MS. LANCASTER:

11    Q    I'm showing you now Government 14; if you would

12  take a moment to look at that.  Tell us what that is for

13  identification.

14    A    Okay.  This is a Firearms Transaction Record,

15  the ATF Form 4473.  It's utilized whenever a transfer

16  occurs between licensed, a Federal Firearms Licensee and

17  a non-licensed individual.  Section A is completed by the

18  non-licensee, by the transferee; and Sections B and D are

19  completed by the licensee.

20    At the every end, both individuals, the

21  non-licensee and the licensee, will sign and date the

22  form stating that they have, they understand what's on

23  the form basically, and that they've done everything to

24  assure that everything was true and correct on this form,

25  and they also understand that there are fines and

1  possible punishment that goes along with falsifying the

2  form.

3      Q    And this a blank form that we have, a sample

4  form?

5      A    Yes, it is.

6      Q    Does that form, which does include the

7  instructions unlike those that we put into evidence

8  earlier, does those instructions have any reference to

9  information regarding the actual buyer or true buyer

10 portion of that document?

11     A    Yes.

12     Q    If you would turn to that and give us just a

13 very brief overview of what's contained there for

14 instructions?

15     A    Okay.  On page 4, column 1 under question

16 11(a), if refers to actual transferee/buyer.  And with

17 this, it states for purposes of this form you are the

18 actual transferee/buyer if you're purchasing the firearm

19 for yourself or otherwise acquiring the firearm for

20 yourself.  Examples, redeem the firearm from pawn,

21 retrieving from consignment firearm, rifle

22 (indiscernible).  You're also the actual transferee/buyer

23 if you are legitimately purchasing the firearm as a gift

24 for a third party.  Then it gives examples.

25         Mr. Smith asked Mr. Jones to purchase a firearm

1  for Mr. Smith.  Mr. Smith gives Mr. Jones the money for

2  the firearm.  Mr. Jones is not the actual buyer, not the

3  actual transferee/buyer of the firearm and may answer,

4  and must answer no to question 11(a).

5      The licensee may not transfer the firearm to

6  Mr. Jones; however, if Mr. Brown gave it to, goes to buy

7  a firearm with his own money to give to Mr. Black as a

8  present then Mr. Brown's the actual transferee/buyer of

9  the firearm and should answer yes to question 11(a).

10 However, you may not transfer a firearm to any person you

11 know or have reasonable cause to believe it's prohibited

12 under 18 U.S.C. 922(g) and/or (x).

13      Then it notes the exception, if you are picking

14 up a repaired firearm for another person, you are not

15 required to answer 11(a) and may proceed to question

16 11(b).

17     Q    Does this information relate to what you have

18 referred to as a straw purchase earlier in your

19 descriptions?

20     A    Yes, it does.

21          MS. LANCASTER:  All right, that's all the

22 questions I have.

23          HEARING OFFICER:  Okay.

24          MS. LANCASTER:  And I'll enter Government 14.

25                    (Whereupon, Government's

1    Exhibit Number 14 was

2    marked for identification

3    and received into

4    evidence.)

5    MR. BARNES:  Thank you, Mr. Reilly.

6              RECROSS EXAMINATION

7       BY MR. BARNES:

8    Q    Mr. Williams, did you recommend in your field

9  report revocation of the license?

10   A    On this one, in my recommendation, no, I

11 didn't.

12   Q    Thank you, sir.  Going back to question 11(a)

13 that you just read from the 4473 instructions, could you

14 -- let me ask it this way.

15        If a licensee picked up the telephone and

16 called you at the area office and said I have a

17 Mrs. Jones appearing before me right now who wishes to

18 buy the firearm for her own account, but Mr. Jones had

19 come in earlier in the day, but she has stated

20 unequivocally she's using her own money and she has a

21 hunt that she needs to attend to and she must have the

22 gun, how would you advise the licensee?

23   A    How would I advise the licensee?

24   Q    Yeah.

25   A    Well, first of all, I would tell the licensee

1  as a Federal Firearm Licensee, you are to identify who

2  you're transferring the firearm to.

3          If you feel comfortable making that transfer

4  because you've identified that individual and you know

5  who you're transferring the firearm to and the individual

6  states that they are purchasing the firearm for

7  themselves, well then at that point, I would probably

8  tell them there's a section in, there's an area in

9  Section D of the form for notes by the licensee.  I would

10  record all that information there and put the reason why.

11          And if I'm pretty certain that as far as I know

12  this individual and I know that they're going to be

13  person who's going to maintain control --

14      Q    In other words if they're credible?

15      A    Exactly.  Then I would probably tell them that

16  in those instances --

17      Q    They can proceed with --

18      A    If you're certain then I would note all that

19  and I would put it there, and I would go ahead and make

20  that transfer.

21      Q    So for you a best practice would be to create a

22  sort of contemporaneous record in, what is it block 31 or

23  30a, I can't remember?

24      A    Or on the form itself.

25      Q    Well, yeah, there's a notes column there, sure.

1       A    But again, you're identifying your customer
2   and if you have no way to know that information then --
3       Q    So 30c might be the appropriate place to put
4   that, the notes area?
5       A    Exactly.  But again, like I say, you're
6   identifying your customer because an identification, it
7   states that you're identifying your customer.  And the
8   last statement before the licensee signs off states that
9   they verified the identity of the customer and that they
10  can tell that from all indications that they are not
11  prohibited.
12          If they can't do that, then I would advise them
13  -- if I can't verify that information and even though
14  they're coming in to my premises, on my licensed
15  premises, then I would definitely tell them that I
16  wouldn't make that transfer.
17      Q    Right.  The Gun Control Act doesn't require us
18  to make a sale of a firearm for any reason, does it?
19      A    Exactly.  No, it doesn't.
20      Q    Now going back to the Federal Firearms
21  Regulations checklist that you referred to, sir, I assume
22  you've done this many, many times both with licensing
23  inspections and with the operational inspections, at the
24  end of the operational inspection?
25      A    Yes.

1    Q    Can you tell me what's the approximate size

2 of the white book in pages, just a rough guess?

3    A    Pages?

4    Q    Yeah.

5    A    No, I couldn't.

6    Q    Okay.  It wouldn't surprise you if I told you

7 it was probably a little bit near 200 or over 200 pages?

8    A    (indiscernible).

9    Q    So when you're going over each of these areas

10 of the law, is it fair to say that you're making them

11 situationally aware of that area of the regulation and if

12 they have questions at that moment, they can ask you

13 further questions about it?

14    A    They can ask me questions at any time during

15 the acknowledgement process or afterwards.  I usually

16 prefer that questions are asked afterwards, but I've

17 never denied any licensee to ask questions during the

18 process because they always have questions.  And because

19 they always have questions, it always goes on longer than

20 normally what it would actually take.

21    Q    During the course of going over the form,

22 however, with them, do you point out to them that you're

23 going to have to go read the regulation or get further

24 information if you want to go into depth on the subject

25 because isn't it a true statement that you couldn't

1    possibly cover every area of the law here even in two

2    hours?

3         A    Right, that is a true statement because again

4    it's an acknowledgement and we're going through each and

5    every section, but we're not reading every section of the

6    law because if we did that then no, there is no way that

7    we would complete that --

8         Q    A week.

9         A    -- in that two-hour timeframe.

10        Q    Right.  Now, sir, when you went over this with

11   the Licensee at the Wolfchase store, were there any

12   particular areas of compliance or operations that you

13   recall that, you know, struck you as peculiar for

14   instance that they didn't know that or they should have

15   known that?

16        A    I don't remember.  But I know every licensee

17   always has questions so whatever questions were asked at

18   that time, I'm sure they were addressed.

19        Q    Right.  The Gun Control Act of 1968 requires

20   that information be recorded into the Acquisition and

21   Disposition recordkeeping for the purchaser of a firearm

22   that's appearing personally before the licensee.

23             We have procedures for non-personal appearances

24   but they're extremely rare; I'm from Alaska, occasionally

25   they're used up there. So the applicant has to appear

1  personally before the licensee at their premises for

2  the disposition of the firearm.

3         What is your legal position then or what is

4  your position as an investigator on what should be

5  entered into the recordkeeping even though a firearm is

6  being physically transferred to the person who's filled

7  out a 4473?

8         In other words what I'm trying to ask is what

9  would you have expected Dick's to have entered into their

10  required federal recordkeeping despite the fact that

11  Mrs. Brady filled out the 4473 and that's when the

12  firearm was actually transferred to another person?

13        Because Congress is pretty clear, they say

14  that's the information that's to go into the record.

15     A    This occurred as far as when you say -- had the

16  actual buyer appeared before the Licensee at the time of

17  transfer then that is the information that would have

18  been recorded in the Acquisition and Disposition log.

19     Q    Mrs. Brady was not the actual buyer because?

20     A    Because Mr. Jason Brady was the actual buyer.

21  I had reasonable cause to believe that Mr. Jason Brady

22  was the actual buyer.

23     Q    Put another way.  In terms of the required

24  recordkeeping for entering this information into Dick's

25  required recordkeeping, have you in any other instance

1    that you can recall today for any other inspection that

2    you've ever performed cited these exact provisions as a

3    violation for a licensee enabling or you believing they

4    had reasonable cause to believe they weren't enabling a

5    straw purchase?

6              Do you recall ever citing these provisions in

7    any other Report of Violations?

8         A    I can't remember.

9              MR. BARNES:  I have no further questions.

10             HEARING OFFICER:  Ms. Lancaster?

11             MS. LANCASTER:  No.  I think break times good

12   and then we'll have one more witness to (indiscernible)

13   through.

14             HEARING OFFICER:  The time is 11:03.  We'll

15   take a short recess.

16                       (OFF THE RECORD)

17                       (ON THE RECORD)

18             HEARING OFFICER:  Okay, the time is 11:18.

19   This is the resumption of the Dick's Number 375

20   revocation hearing.  Ms. Lancaster.

21             MS. LANCASTER:  Thank you.  I'm calling my next

22   witness.

23   (Whereupon,

24                       RICHARD HOWARD

25   was called as a witness, and after having been first duly

1  sworn, was examined and testified as follows:)

2                    DIRECT EXAMINATION

3         BY MS. LANCASTER:

4     Q    If you would please state your full name?

5     A    Richard Anthony Howard; I go by Rick.

6     Q    And if you would spell your last name for the

7  record.

8     A    Sure, H-O-W-A-R-D.

9     Q    How are you currently employed, Mr. Howard?

10    A    Special agent with the Bureau of Alcohol,

11 Tobacco, Firearms and Explosives here in Memphis,

12 Tennessee.

13    Q    How long have you been in that position?

14    A    Six years, two months.

15    Q    What just briefly are you duties and

16 responsibilities as a special agent?

17    A    Investigate firearms, federal crimes, a little

18 bit of drug crime, arsons, explosives.  Right now I'm

19 working with a gang here in Memphis trying to get

20 something going on with some local street gangs.

21    Q    Now were you involved in any way in an

22 investigation by ATF related to Dick's Sporting Goods at

23 Germantown Parkway in Memphis?

24    A    Yes.

25    Q    Could you tell us what if anything you were

1  asked to do in that investigation?

2      A    I was sent out for a NICS retrieval on a

3  firearm that was purchased in Ayre (ph.), here locally.

4      Q    Could you tell us what you mean by the term

5  NICS retrieval?

6      A    It's the only one I've done here.  We don't

7  have a lot of them in Memphis.  Someone had purchased a

8  firearm, and they believed that the person was prohibited

9  so we were supposed to get the firearm back from that

10 person.

11     Q    In other words retrieve it, correct?

12     A    Right, retrieve the firearm.

13     Q    And that was to prevent a prohibited person

14 from being in further possession of that firearm?

15     A    Yes.

16     Q    Who gave you the assignment to retrieve that

17 firearm?

18     A    My RAC at the time, Marcus Watson.

19     Q    And do you recall what the description of the

20 firearm was just basically?

21     A    It was a Mossberg 12 gauge.  I don't remember

22 off the top of my head the model.

23     Q    Did you actually obtain the firearm that you

24 were asked to retrieve?

25     A    No.  We spoke to the person who had possession

1  of it, Mr. Brady, and he had signed the weapon over in

2  May of 2013 to Memphis Police Department.

3      Q    Did you follow up to find out any information

4  from Memphis Police Department as to whether they had in

5  fact obtained that firearm?

6      A    Yes.  While I was still with Mr. Brady, I was

7  able to get on their database and see that a report was

8  filed, they had taken possession of it.  And I called the

9  property and evidence room here in Memphis, and they said

10 they still had possession of it at that time.

11     Q    So when you say the property/evidence room,

12 that's Memphis Police Department property/evidence?

13     A    Memphis maintains it, but Shelby County --

14 every municipality here in Shelby County uses it.  It's

15 basically like an all-in-one evidence locker.

16     Q    When you said Mr. Brady, do you recall his

17 first name?

18     A    James, I believe.

19     Q    And did you speak with him regarding his

20 firearm whether or not he had that firearm, or whether or

21 not anyone in his household had the firearm?

22     A    Yes, I did.

23     Q    Did anyone else accompany you on that visit to

24 retrieve the firearm?

25     A    Jason Crenshaw, another special agent here in

1  the office.

2      Q    And do you recall approximately when you went

3  to visit the Brady household?

4      A    I think it was September 20th of '13.

5      Q    Do you recall where that was?

6      A    It was 70 Grove Dale in Memphis, Tennessee.

7  It's kind of out by Baptist Hospital near 240 and Walnut

8  Grove.

9      Q    Did you ask Mr. Brady anything about the

10  Mossberg shotgun?

11      A    Yes.  We asked him about the purchase of it.

12  He said he went, he was going to go on a dove hunt with

13  some, I don't remember if it was a relative or some

14  friends, and he went to go buy a shotgun so he didn't

15  have to borrow one.  He said he went to Dick's, applied,

16  did a little paperwork.

17          He had purchased guns previously, and he had,

18  can still carry a permit here in Tennessee so he just

19  went through the normal procedures.

20          He said he paid for it and then it came back

21  denied which he was, he said he was in shock.  I believe

22  he's a fireman locally, either in Memphis or Shelby

23  County, so he had no indication that he would have any

24  issues with purchasing it.

25          So he said he went home and told his wife, and

1  his wife just said well, you need the gun, I'll go back

2  and get it for you later. So he didn't, his belief that

3  they didn't think they did anything wrong at that time.

4      Q    What he told you regarding wanting a firearm

5  for that dove hunt, did he tell you about wanting it for

6  any other purpose?

7      A    No, he just said for the dove hunt. He was --

8  he only owned one other firearm at the time, I think a

9  Taurus pistol.

10      Q    Do you know whether or not Memphis Police

11  Department obtained all the firearms in that household

12  when they obtained that Mossberg?

13      A    Yes, they took the Mossberg, a Taurus pistol

14  and some ammunition out of the house.

15      Q    To your knowledge was it ever returned to the

16  Brady household?

17      A    No, it was not. They were told not to go get

18  those firearms, and we had -- I spoke with the property

19  and evidence that if somebody came to get them, they'd

20  notify me, it's supposed to be in the file.

21      Q    Did Mr. Brady mention anything to you about

22  attempting to purchase that firearm as a gift for anyone?

23      A    No. No, he said he was going to use it for a

24  dove hunt.

25      Q    Did he say whether or not anyone else

1  eventually purchased the same make and model of shotgun

2  as he had tried to purchase?

3      A    Yeah.  Like I said earlier, his wife,

4  Laura Brady, went and picked up the Mossberg 12 gauge

5  later on that afternoon, or later on that day.

6      Q    And when you say later on that day, what day

7  are you referring to?

8      A    I want to say it was November 6th of '12, I

9  believe, of 2012.

10     Q    That was the same day that Mr. Brady had

11  attempted to purchase it?

12     A    Yes.

13     Q    Did you speak with the wife, Laura Brady,

14  Mr. Brady's wife?

15     A    No, we did not.

16     Q    And why did you not speak with her?

17     A    She was at work at the time, and we were there

18  on the retrieval just to get the firearm since he was

19  prohibited.  So at that point, I told my RAC the gun was

20  in custody.  I talked to the AUSA at that time,

21  Jennifer Weber.  They were both fine with it being in

22  custody and we were for our purposes done that day.

23     Q    And just for the record when you say RAC, what

24  does that refer to?

25     A    Oh, Resident Agent in Charge.  I'm sorry, the

1  person in charge of my group here in Memphis.

2      Q    Your supervisor?

3      A    Yes.

4      Q    And the AUSA refers to?

5      A    Assistant United States Attorney.

6           MS. LANCASTER:  All right, no other questions.

7           HEARING OFFICER:  Mr. Barnes.

8                    CROSS EXAMINATION

9           BY MR. BARNES:

10     Q    Okay Special Agent Howard, has the

11 investigation been completed with regard to the Brady's?

12     A    Yeah.  We opened a general case on it as a

13 retrieval of firearm and since it was already out of his

14 custody, it was completed that day for us.

15     Q    Did you and Special Agent Crenshaw ever attempt

16 to interview Mrs. Brady subsequently after that day?

17     A    No.

18     Q    Okay.  And you testified that the Memphis

19 Police Department still has the weapon in their custody?

20     A    Yes.

21     Q    When you -- how long did you speak with

22 Mr. Brady when he was present?

23     A    We probably talked to him for about

24 20-25 minutes.

25     Q    Were you aware prior to your being dispatched

1  over for the next retrieval what his prohibited status

2  was, what the reason was for his prohibited status?

3       A    I believe that, the information given to me

4  that day through our intelligence section had that he was

5  prohibited for, something through the VA hospital.

6       Q    Mental health?

7       A    Yeah.

8       Q    Okay.  So when you interviewed him, was he

9  responsive, was he cogent, was he lucid?

10      A    Yeah, he seemed okay.

11      Q    Okay.  Did you make a report of the incident in

12  a record of interview?

13      A    I did.

14           MR. BARNES:  But the Government has not

15  introduced that record of interview, is that correct?

16           MS. LANCASTER:  Correct.

17           BY MR. BARNES:

18      Q    Did you or Special Agent Crenshaw interview the

19  Memphis PD officers who went over and retrieved the

20  weapons?

21      A    No, sir.

22      Q    Okay.  And you said there were two firearms,

23  the Mossberg, the subject Mossberg shotgun, and perhaps a

24  Taurus pistol but you're not sure?

25      A    I'm 90 percent sure it was a Taurus pistol, but

1  I would have to look at the, what actually MPD took.

2  He said they had taken a pistol from him and a shotgun.

3  And then in the report from Memphis PD showed a pistol, I

4  believe it was the Taurus, but I don't remember the exact

5  particulars of it.

6      Q    At the time that you did interview Mr. Brady,

7  he did not mention to the best of your recollection that

8  his wife, Laura Brady, was the person going on the dove

9  hunt?

10     A    No.

11     Q    Now, sir, you went out in September of 2013, is

12  that your testimony?

13     A    Yes, sir.

14     Q    Okay.  And the gun had been purchased in

15  November of 2012, is that correct?

16     A    Yes, sir.

17     Q    Was there a reason for the delay in going out

18  and getting the firearm?

19     A    It would have nothing to do with me.  I was

20  notified -- I reviewed this earlier.  I was in FLETC

21  teaching at our academy.  I got notification on the 22nd

22  of August that this NICS retrieval had come in.  I wasn't

23  due back until the 27th and then we had a holiday so I

24  came back to work on the 3rd of September.

25          I had some cases that had stacked up so I got

1  those cleared out before I went.  The due date for this

2  NICS retrieval was November 7th of '13 at the time.  So I

3  just, I fitted it somewhere in my schedule then.

4      Q    I see.  When you checked with Memphis PD, were

5  they able to tell you what date the shotgun was entered

6  into the property room --

7      A    It was on the --

8      Q    -- or approximately?

9      A    It's on the report.  It was in May of 2013.  I

10  don't remember the exact day, I'm sorry for that.

11     Q    Okay.  So you went out in September of 2013,

12  Memphis PD apparently did a retrieval in May of 2013?

13     A    Right.

14     Q    Okay.  Did you or Special Agent Crenshaw, were

15  you ever asked to interview any of the Dick's employees

16  who may have been a party to the transaction?

17     A    No.

18         MR. BARNES:  That'll be it, Mr. Reilly.  Thank

19  you.

20         HEARING OFFICER:  Okay.  Anything on redirect?

21         MS. LANCASTER:  Just a couple of questions,

22  thank you.

23                REDIRECT EXAMINATION

24     BY MS. LANCASTER:

25     Q    Did you review the report that Memphis Police

1  Department made regarding their obtaining the firearms

2  from the household?

3      A    I did.

4      Q    And do you recall the reason that they obtained

5  all the firearms from the Brady household?

6      A    They were called for a disturbance between

7  Mr. Brady and his wife.  And while they were there, I

8  think it's the normal process, they check the parties to

9  make sure they don't have any warrants and it came up

10  that he was a prohibited person.  So they asked him to

11  sign the weapons over and he did willfully.

12      Q    Do you know if they obtained any ammunition as

13  well as the two firearms?

14      A    I believe there's ammunition, but I don't

15  remember how much or what caliber.

16      MS. LANCASTER:  All right, that's all.

17      MR. BARNES:  Mr. Reilly, may I just ask one

18  recross?

19      HEARING OFFICER:  Sure.

20      RECROSS EXAMINATION

21      MR. BARNES:  On that report, was there any

22  indication of who exercised control over a particular

23  firearm?  Do you recall anything like this is my pistol,

24  that's her shotgun, anything like that?

25      THE WITNESS:  I don't recall that, I'm sorry.

1            MR. BARNES:  Okay.  We have to look at the

2    report to see what the report said, all right.

3            Thank you, Mr. Reilly.

4            HEARING OFFICER:  Ms. Lancaster, is this

5    witness excused?

6            MS. LANCASTER:  The witness is excused, and the

7    Government rests in case.

8            HEARING OFFICER:  Thank you, SA Howard, you're

9    excused.

10           And the Government has concluded its

11   presentation.  Mr. Barnes, are you ready to go?

12           MR. BARNES:  I am, but for the convenience of

13   the Hearing Officer, if I can ask Ms. Lancaster, instead

14   of introducing redundant exhibits, I just want to make

15   sure that the Government's exhibits --

16           HEARING OFFICER:  Yes, we did --

17           MR. BARNES:  -- would stand for my exhibits.

18           MS. LANCASTER:  Absolutely.  What we do in that

19   situation to be clear, if you want to rely on a

20   Government exhibit, you just say Government Number 12,

21   and we mark it in the record as Licensee 1 and

22   Government 12 and that way it's clear you are also

23   relying on that same exhibit.

24           MR. BARNES:  If you wouldn't mind, I'll give

25   you the list that you introduced and then you can cross

1 reference them.  That'll just go a lot more

2 efficiently.

3          HEARING OFFICER:  And just for the record, we

4 did -- what do we need to get in Exhibit, Government

5 Exhibit 14, I think is -- let's just say that Government

6 Exhibits 10 through 14 are entered into the record.

7                              (Whereupon, Government's

8                              Exhibit Numbers 10 through

9                              14 were received into

10                             evidence.)

11         HEARING OFFICER:  Okay?

12         MS. LANCASTER:  Okay.

13         MR. BARNES:  Yeah, no problem.

14         HEARING OFFICER:  And I can give you something

15 to mark yours if you need it.

16         MR. BARNES:  Sure.

17         MS. LANCASTER:  And it's fine to put those

18 labels onto the same Government ones as well just, you

19 know, right beside it or whatever so it's clear so that

20 we have a good, a clean record.

21         MR. BARNES:  Ms. Lancaster, if I could just, if

22 we can stipulate to these exhibits which I will rely on.

23         MS. LANCASTER:  Sure.

24         MR. BARNES:  The Notice of Revocation, the

25 request for the hearing, the notice of the hearing, the

1  Report of Violations, both sets of ATF Forms 4473, the

2  TICS log and those would be duplicative exhibits.

3  　　　　MS. LANCASTER:  Okay.

4  　　　　MR. BARNES:  So Notice of Revocation, request

5  for the hearing, notice of the hearing, Report of

6  Violations --

7  　　　　MS. LANCASTER:  Both of those notices 'cause --

8  　　　　MR. BARNES:  Both of the notices.

9  　　　　MS. LANCASTER:  -- the rescheduling is two

10 separate things so better to specify both.

11 　　　　MR. BARNES:  Yeah, all notices.  Right.

12 　　　　HEARING OFFICER:  Okay, the ROV?

13 　　　　MR. BARNES:  Yeah, the ROV and the 4473s and

14 the TICS log and that'll --

15 　　　　HEARING OFFICER:  The TICS log?

16 　　　　MR. BARNES:  Yeah, Tennessee Instant Check

17 System log.

18 　　　　MS. LANCASTER:  And the TICS log, you're

19 talking about this one, 12?

20 　　　　MR. BARNES:  Yes, I am, that's right, that's

21 correct. Okay.  Is that acceptable to the Government?

22 　　　　MS. LANCASTER:  Absolutely.

23 　　　　MR. BARNES:  Okay.  With that then Mr. Reilly,

24 I'm ready to proceed with our first defense witness.

25 　　　　HEARING OFFICER:  Sure.

1    MR. BARNES:  So I'm calling Kevin Dodson.

2    (Whereupon,

3                     KEVIN DODSON

4    was called as a witness, and after having been first duly

5    sworn, was examined and testified as follows:)

6                   DIRECT EXAMINATION

7         BY MR. BARNES:

8         Q    And if we're ready to proceed, Mr. Dodson, I'll

9    ask you to state your name for the record, please?

10        A    It's Kevin Dodson, D-O-D-S-O-N.

11        Q    And your position with Dick's Sporting Goods?

12        A    I am the manager of Loss Prevention/Compliance

13   & Logistics.

14        Q    And can you explain to the Hearing Officer what

15   that means exactly in terms of your national

16   responsibilities?

17        A    Sure.  I have responsibility for all the

18   policies and procedures related to the sale of firearms

19   at Dick's Sporting Goods across the country as well as in

20   our distribution centers, how we sell firearms, how we,

21   you know, acquire firearms at our distribution center the

22   whole way through the chain to the (indiscernible).

23        Q    And do you spend time in the field ensuring

24   that those policies are met and are carried out?

25        A    Yes, I spend time.  I have a supervisor that

1  works for me that also spends time, and we have a field

2  group of district loss prevention managers that conduct

3  routine audits throughout the year to validate that we're

4  in compliance.

5  Q   As a part of that responsibility, is it your

6  job to review the Federal Firearms laws and the

7  regulations, and to come up with practices and procedures

8  that would fully comply with those laws and regulations?

9  A   Yes, in addition to state laws and regulations

10 as well.

11 Q   With regard to those practices and procedures,

12 would one of them be how to spot, reduce and hopefully

13 eliminate attempted straw purchases at Dick's stores?

14 A   Yes, absolutely.

15 Q   Okay.  So can you describe to me what those

16 methods are?  And it may be helpful if we ask you to

17 refer to our Exhibit Number 1, the Dick's gun manual, and

18 I'll mark that for you to refer to.

19                         (Whereupon, Licensee's

20                         Exhibit Number 1 was marked

21                         for identification.)

22        THE WITNESS:  Probably the first thing,

23 anything that we do for a straw purchase recognitions are

24 our training, our internal training.  We have a couple of

25 different training resources that we utilize.

1    We have a Learning Management System which is
2  a computer application training program.  And we have a
3  gun sellers certification course that everybody that
4  sells firearms complete and pass a test with
5  100 percent.  And part of that is a straw purchase
6  scenario based, there are videos, it's a scenario based
7  training that -- it's really, it was created in house by
8  us to focus on transactions that we see on a pretty
9  routine basis at Dick's Sporting Goods.

10    And in addition to that, everybody has to watch
11 the Don't Lie For the Other Guy video related to, you
12 know, straw purchases, a video that they get and the NSSF
13 provided to us in all our stores.

14    Q    And can you tell me what's your experience with
15 the Wolfchase store in terms of their core competencies
16 that they have to acquire in complying with not only the
17 laws of the United States but Dick's procedures?

18    A    They were fine.  They were as good as anybody,
19 any other store in the company.

20    Q    Okay.  You said that you've encountered straw
21 purchases, can you just walk the Hearing Officer through
22 what the standard operating procedure is for spotting,
23 identifying, interdicting and reporting?

24    A    Okay.  So we utilize a denied/delayed log we
25 call it and any time a person comes in and they're either

1  put on a delayed -- and we don't release firearms under

2  the three business days so people can stay on the delayed

3  log for a pretty extended period.

4        Any time somebody's delayed or denied, we list

5  them on a log book, and we maintain that log book.  And

6  depending on the store, at the location where they

7  conduct the background checks.

8        So if it's a store that utilizes an online

9  background check system, it would be maintained with the

10  computer.  For the background checks that are done in

11  (indiscernible) utilizes a file that's maintained at

12  (indiscernible).

13        And our policy is any time that somebody gets

14  denied, delayed or listed in the log, any time we sell a

15  gun, we check that log and look for same address; similar

16  address; same last name; in some cases, same gun.

17        And then we also utilize a BOLO program that we

18  call it because we have a lot of stores in the vicinity.

19  So if somebody gets denied at one store depending on

20  distance to the closest store, there's a phone tree that

21  they have to utilize to call stores that are pretty close

22  because what we see is they'll get denied at this store

23  and they'll just drive 20 minutes to the other store and

24  try to have somebody go in and purchase the firearm.

25        So we send out a BOLO with a physical

1  description and denied information.

2  MR. BARNES:  Well if I may, I'd like to

3  introduce Licensee's Exhibit Number 2 which is a whole

4  system of documents.  And if you can walk the Hearing

5  Officer through what you just described and describe this

6  system of documents as Licensee Exhibit Number 2.

7  And I'm handing the Government now a copy of

8  the same thing.

9                              (Whereupon, Licensee's

10                             Exhibit Number 2 was marked

11                             for identification.)

12  THE WITNESS:  So this is the operational

13  procedure that they keep in the front of the binder just

14  so that they are aware of --

15  BY MR. BARNES:

16  Q    When you refer to they, you mean each store?

17  A    Each store, sorry.  Each store keeps it in

18  their denied/delayed folder.  And this document walks

19  them through how to use the log, where to list or what to

20  list in the log as well as the quarterly maintenance.

21  Because some of the delays turn into a proceed

22  so to keep the information small so it's easier to

23  reference, we purge that every quarter by just re-adding

24  the denied purchases and the current active delayed

25  purchases into the log and purge out all the proceed

1 transactions.

2        And then with the straw purchase alert that I
3 referred to as the BOLO, we send it to all stores in the
4 district.

5    Q    Do you have a sample of the BOLO form in that
6 system of interdicting straw purchases?

7    A    Here's a sample of the denied/delayed log.  And
8 it contains the last name, first name, street address,
9 city and state, zip, the date, the NTN number if there's
10 one provided.  And the reason I say that is we deny a lot
11 of transactions based on other factors, comments.

12        If somebody answers a prohibitive question or,
13 you know, run a background check, we're not required to
14 keep that form because there was no NICS check or TICS
15 check initiated.  But we keep these forms and list those
16 because we still have a prohibited person; it's just we
17 didn't get informed by the government they were
18 prohibited, we were informed by the customer themselves
19 that they were prohibited by the way they answered 11.

20    Q    And can you put people on that log who make
21 remarks that are very disturbing or suspicious?

22    A    Absolutely, and we do.  And we actually had a
23 space here a few years ago for description information
24 because we've had people come in that we had never
25 obtained an actual name. So three guys came in, this is

1  what they were dressed like.

2          You know, a real prominent example was the,

3  there was a case in Virginia that --

4      Q    Right.

5      A    We actually denied those people and they were

6  buying guns in another store.

7      Q    And to be clear about this log, is this log

8  that's maintained by Wolfchase just solely for

9  transactions that are occurring physically in that store,

10 or is it a combined universal log of a group of stores in

11 the Tennessee area?

12     A    It's combined, it's actually the closest two

13 districts so it would be Tennessee and depending on the

14 location, it could bleed into other states.

15     Q    And how would a person empowered to conduct

16 firearms operations at Wolfchase know to put other store

17 information on that log?  Do they receive an alert, and

18 what is that alert called?

19     A    It's the BOLO, and what it does is every

20 manager on duty carries a, it's like an iPhone, they call

21 them the manager-on-duty phone.  And so when they get an

22 e-mail, it alerts them.  They look at it and it says, you

23 know, BOLO straw purchase alert, you know, look out. And

24 then they know to go back and print this out.

25          Then they maintain this printout in the third

1   tab in their denied/delayed log but then if you see on

2   the denied/delay log they record it, but then they record

3   the store where they received the BOLO or alert from.

4         So, you know, in this case, it was from a

5   different store so they just recorded that and they

6   record the date denied. So it really limits our --

7      Q    How many stores would Wolfchase be getting data

8   from to create that BOLO log, that deny/delay log?

9      A    Off the top of my head, I would say 14.

10      Q    So when a firearms purchase is attempted, going

11   back to your procedures again, the standard procedure is,

12   is that the purchaser or the clerk must do what?

13      A    Review the deny/delay log.

14      Q    Prior to doing what?

15      A    Running the background check.

16      Q    All right. Are there any other aspects of this

17   system of what we call extra-regulatory recordkeeping

18   that you'd like to point out to the Hearing Officer?

19      A    No, nothing that I can think of at this time.

20      Q    But in summary, your BOLO system is intended

21   not only to interdict small, or straw purchasers at the

22   Wolfchase but to prevent rejectees from other Dick's from

23   coming to Wolfchase and trying to do the same thing; is

24   that correct?

25      A    That's correct. We've also actually cooperated

1    with other competitors if you will.  If it's like, you

2    know, if somebody's making some very disturbing comments,

3    they'll often notify the district loss prevention manager

4    who will notify me.  And we'll partner with the

5    compliance person from, you know, like, again

6    (indiscernible) Bass Pro Shop in a joint effort to stop a

7    straw purchase.

8        Q    And what's your track record, or what's Dick's

9    policy on informing the government about attempted straw

10   purchases?

11       A    If we have a -- we have a smart alert system

12   it's called.  It's a case management system, it's called

13   LPMS.

14            So what they'll do is they'll enter in a -- the

15   problem we see and sometimes it's not really a straw

16   purchase attempt, it's just they'll enter in just a

17   denied transaction.  So we don't inform the government of

18   a denied transaction.

19            But if it was an actual straw purchase attempt

20   or if one that transpired, we'll call the local IOI and

21   let him know.  And typically they just ask me to send

22   them the copies of the 4473s involved.

23       Q    Going back to the training that you provide

24   employees in maintaining the core competencies for Dick's

25   operations personnel, if somebody -- how do you test

1  those core competencies?

2      A    There's a test at the end of the completion

3  that they have to pass with 100 percent or they can't

4  sell firearms.

5      Q    To the best of your knowledge, did

6  Mr. Krueger who was the clerk in question in this

7  question in this transaction, did he pass that test?

8      A    Yes.

9      Q    Do you or any of your staff at the national

10  level, at the corporate level, do you conduct audits of

11  each of your Dick's stores for firearms compliance

12  operations?

13      A    We conduct random audits from the corporate

14  perspective, but our district loss prevention managers

15  conduct audits of every store.

16          We've also utilized the program the NSSF has

17  where we can have somebody come in and give us an

18  evaluation of our stores.

19      Q    You were a recipient of the Notice of

20  Revocation for the Wolfchase store, were you not?

21      A    Yes.

22      Q    And can you tell me your reaction to it when

23  you received it?

24      A    I was shocked.

25      Q    Can you explain the basis for your shock?

1     A     A couple things. First, our inspection

2 results typically are good. What I mean by that is our

3 goal is actually to have no violations which it's hard to

4 achieve that goal, but 76 percent of our inspections last

5 year had no violations.

6         And, you know, I'm actually, I track that and

7 compare it to the national average of, I believe it was

8 like 49.5 percent last year.

9         In addition, when I first got the notice of the

10 Report of Violations and I looked at what we were cited

11 for and compared that to a previous inspection where we

12 had the same violation, I told this store that this is

13 probably going to be a warning conference and we need to

14 be ready.

15         I try to make warning conferences as

16 comfortable for our store as possible. So I fly in, I

17 require a lot of, probably a lot of people to attend that

18 need to be. So our regional vice president, our loss

19 prevention director, we all go in as a group so that they

20 see, you know, it's not just me going in there to listen

21 to things that I probably already know.

22         So yeah, I was shocked to see the revocation

23 based on that because of our Bloomington, Illinois, or

24 Bloomington, Indiana, store being cited for that same

25 exact scenario and we had a warning conference.

1    Q    Now the Bloomington, Indiana, scenario

2 you're referring to, is this the case that you're

3 referring to, and I'm handing Mr. Dodson Licensee Exhibit

4 Number 3.

5    A    Uh-huh.

6    Q    We'll just maintain the, we'll turn the

7 exhibits in, in just a moment to the Hearing Officer, if

8 you'll keep them in order then.

9                              (Whereupon, Government's

10                             Exhibit Number 3 was

11                             marked for identification.)

12        BY MR. BARNES:

13    Q    And so that was, in part, the basis for your

14 shock that you saw one attempted violation, and you

15 didn't really understand the basis for this.  Did you

16 immediately commence an investigation?

17    A    At the point of the revocation, or at the point

18 of the violations being issued?

19    Q    At the point of the -- after the revocation

20 notice was received, did you initiate an investigation to

21 find out what happened at the store?

22    A    Yes.  So I actually contacted our legal

23 department, Mary.

24    Q    Can you briefly explain what the results of

25 your investigation were and what you think happened?

1    A    Well the associate was no longer employed

2 there but when I sent our district loss prevention

3 investigator in to see what happened, how did we miss

4 this, you know, how did we miss a straw purchase, what we

5 noticed was that the, Mr. Brady was denied but they

6 failed to record his information or denied/delayed log.

7    Q    They being the clerk?

8    A    The associate.

9    Q    Would that be Mr. Krueger?

10    A    Mr. Krueger, yes.  He forget to record the

11 information in the denied/delayed log which, you know, in

12 normal circumstances would lead to corrective action of,

13 to a possible termination of employment.  But he was no

14 longer with us so we couldn't take that action against

15 Mr. Krueger.

16    Q    Did you also try to investigate the facts and

17 circumstances surrounding that day, November 6th?

18    A    Yes, we did.  We looked at our gun sales to

19 see, because it was the same clerk and the same day, how

20 many firearms were actually transferred that day.

21        You know, our primary business in our lodge

22 area runs through the third and the fourth quarter which

23 essentially means from, from really September through

24 December is our peak season in the lodge business 'cause

25 that's when hunting season occurs.  So ammunition sales,

107

1 firearm sales, knives, all the other accessories that

2 go with the outdoor area, that's our peak season.

3 I think, in fact, our company sells about 75 to

4 80 percent of our firearms during the third and fourth

5 quarters throughout a year.

6 Q During that time period going back to November

7 of 2012, would you say that the firearm's inventory at

8 that time is about what it is now, or are we about the

9 same amount on display?

10 A The display racks probably, we try to keep

11 those full, but we do ramp up our inventory for the third

12 and fourth quarters so they would have had probably more

13 guns in back stock at the time.

14 Q And approximately how many guns is that?

15 A I would say total, that store probably

16 350-400 firearms at any given time.

17 Q Okay. Going further with the investigation

18 that you conducted, did you come to any conclusion about

19 the employee's conduct that day with regard to the

20 recordation of information in the denial log?

21 A Well one -- really the only other thing that we

22 kind of concluded was why the serial number was the same.

23 And it's really based on the way our stores are set up.

24 So that particular shotgun, I believe it was a

25 Maverick Mossberg 12 gauge, a lot of times what we'll do

1  is we'll show the one on display but rather than go

2  back -- we keep our display boxes on the top shelves in

3  our stockroom so unless specifically asked for the

4  customer, we won't take that display gun and get the

5  display box.  We show it, but then we go and get them --

6  we keep our stockroom organized by manufacturer, model

7  and things like that and they're on shelves.  So they

8  would just go get the top one of that gun and give it to

9  the customer.

10       So what we think happened was they grabbed the

11  top one, the guy was denied, they put it back in.  When

12  Mrs. Brady came in, they went back and grabbed the same

13  gun and transferred it over.  You know, a reasonably

14  priced item like that, we typically keep a few on hand

15  for the busy season.

16       Q    With regard, again, to your looking at the

17  facts and circumstances surrounding Mr. Krueger's action,

18  did you conclude that there was a specific reason why he

19  did what he failed or the action he failed to take?

20       A    We just -- it was because he didn't follow

21  process.  He just made a mistake and didn't write the

22  information in the denied/delayed log.

23       Q    So from your standpoint, you would look at it

24  as mere inadvertent or mere human error?

25       A    Yeah, it was human error.  That's what our,

1  that's what we walked away with.

2          MR. BARNES:  I have no further questions.

3          MR. MARTIN:  Do you want to introduce your

4  exhibits?

5          MR. BARNES:  Yeah, I'd like to ask that they

6  be, Licensee Exhibits 1, 2 and 3 be entered into the

7  record, and one and three, did somebody have -- let's see

8  if it's under here.

9          THE WITNESS:  I kind of shuffled through them,

10  sorry.

11          MR. MARTIN:  Through three will be that

12  Bloomington, Indiana.  Two looks like this, Mark.

13          MR. BARNES:  Yeah.  And let's see if we can --

14  here we go.

15          THE WITNESS:  Oh, I missed it.  I'm sorry.

16          MR. BARNES:  Yeah.  The manual is only -- for

17  Exhibit Number 1, I should have only had --

18          THE WITNESS:  This is the chapter the gun

19  manual.

20          MR. MARTIN:  Exhibit 1, I show pages 10, 11 and

21  12 as an excerpt from the manual.

22          MR. BARNES:  Yeah.  There's Exhibit 1, and

23  Exhibit 2 we had as a system of documents; let's just

24  make sure we got those.  I should probably staple these

25  but I didn't.  So you have --

1          MR. MARTIN:  I have an operation of

2     excellence (ph.)

3          MR. BARNES:  No (indiscernible).

4          MR. MARTIN:  I have firearms process.

5          MR. BARNES:  Right.

6          MR. MARTIN:  I have a denial log.

7          MR. BARNES:  One second.  Yeah.

8          MR. MARTIN:  I have a straw purchase phone

9     list.  I have a BOLO.

10          MR. BARNES:  Yeah.

11          MR. MARTIN:  I have another BOLO.  I have four

12     BOLOs.

13          MR. BARNES:  Yeah. Those were probably just

14     extra copies.  We only intended one.

15          MR. MARTIN:  Did you introduce all four, or do

16     you just want to introduce --

17          MR. BARNES:  No, just one.

18          MR. MARTIN:  All right, let me --

19          HEARING OFFICER:  They're all blank, right?

20          MR. BARNES:  Yes, sir.

21          MR. MARTIN:  Yeah, all blank.

22          HEARING OFFICER:  All right, Licensee

23     Exhibits 1, 2 and 3 entered into the record.

24                         (Whereupon, Licensee's

25                         Exhibit Numbers 1 through 3

1          were received into

2          evidence.)

3          MR. BARNES:  And excuse me, I was in error.  I

4    had one more direct examination question I wanted to

5    introduce; this will be Number 4.

6          BY MR. BARNES:

7          Q    Mr. Dodson, I hand you a document that if

8    you'll just describe for the Hearing Officer the top

9    document and then the underlying document that it was

10   responding to?

11         A    Okay.  This is the revocation notice.

12         Q    No, that's that the response to our request to

13   rescind the request --

14         A    Oh, response to rescind the revocation.

15         Q    Right.  And the underlying document was the

16   request.

17         A    And then this was our request to rescind based

18   on our investigation.

19         Q    Right.  Did you help compile that information

20   and review the document?

21         A    Yes, I did.

22         Q    And in your opinion as the individual

23   responsible for the programs and policies of Dick's for

24   compliance, is this a fair and accurate rendering of

25   Dick's complete investigation and position on the matter?

1    A   Yes, it is.

2         MR. BARNES:  All right, thank you.  I'd like to

3 enter this into the record as Licensee Exhibit Number 4.

4 And we need to give you all a copy, and I think I've got

5 one here.

6         MS. LANCASTER:  Is that the same as what you

7 submitted earlier?

8         MR. BARNES:  Yes.

9         MS. LANCASTER:  That's fine.  We'll just mark

10 our earlier copy.

11         MR. BARNES:  Okay, very good.

12         HEARING OFFICER:  Licensee Exhibit 4 entered

13 into the record.

14                           (Whereupon, Licensee's

15                           Exhibit Number 4 was marked

16                           for identification and

17                           received into evidence.)

18         MR. BARNES:  Thank you, Mr. Reilly.  Just to

19 make sure -- yeah.  That completes our direct examination

20 of Mr. Dodson.

21         HEARING OFFICER:  Does the Government have any

22 questions for Mr. Dodson?

23         MR. MARTIN:  Yes, sir.

24         HEARING OFFICER:  Okay.

25                  CROSS EXAMINATION

1        BY MR. MARTIN:

2        Q    Mr. Dodson, you testified that you go through,

3   that Dick's Sporting Goods go through a lot of training

4   for their sales associates all the way up when they're

5   dealing with firearms, right?

6        A    Correct, sales associates who work in the lodge

7   and our managers.

8        Q    Okay.  And by lodge, you're talking about the

9   area where firearms are sold within a Dick's Sporting

10  Goods retail location?

11       A    Correct, it's behind the hunting area.

12       Q    Now you testified that you all have a number of

13  other processes outside of those required by the Gun

14  Control Act and the regulations, right?

15       A    Yes.

16       Q    You do other logs, do you have this BOLO sheet,

17  other sheets things you all do, right?

18       A    Correct.

19       Q    And in fact, one of the exhibits, the

20  Licensee's Exhibit 1, is the excerpt, and it's 27.5,

21  Denied Transactions, out of Chapter 27; it's an excerpt

22  of the policies of Dick's Sporting Goods, right?

23       A    Yes.

24       Q    And example number 2 at 27.5.1 talks about

25  straw purchases in that policy.  In example 2 of that

1  very document it says the purchaser is declined --

2  these are ways that you can identify a straw purchaser

3  and example 2 is the purchaser is declined based on

4  results of the NICS background check.  Following the

5  decline, another person completes the F-4473, I believe

6  that's the Form 4473 for ATF, right?

7       A    Correct.

8       Q    Then going on, then purchases the firearm for

9  the declined or prohibited individual.  That's an example

10 that you test on and in, that's in your own policy.

11      And then looking down that page, it talks about

12 spouses and, again, this is giving examples of things

13 that, you know, they should pay attention to.  If a

14 customer selects a firearm and indicates in any way they

15 are the individual who will purchase the firearm but

16 their spouse completes the F-4473 for the transfer is

17 considered a straw purchase.  And that excludes gift

18 purchases, right?

19      A    Correct.

20      Q    Okay.  And then it gives examples of questions

21 to ask and those are identified as, is the firearm for

22 you or someone else.  If it is for someone else, you will

23 ask is it a gift.  If the customer answers no, politely

24 decline the sale and request the gun owner return to

25 complete all required forms.

1        So that's almost in your own policy sort of

2 what happened here, isn't it? Mr. Brady came in, he was

3 denied under the TICS and he left without the gun, right?

4     A    Correct.

5     Q    And then his wife, same last name, same

6 address, same day and within three firearms sales or four

7 firearms sales, made this purchase of the same make,

8 model of firearm, right?

9     A    Correct.

10     Q    So your own policy didn't work in this

11 instance, did it?

12     A    The examples that were in there?

13     Q    The examples that we talked about, the things

14 that should --

15     A    Well if he would have asked is the firearm for

16 you and she said yes --

17     Q    We don't know that though, do we?

18     A    But we don't know that. But that's why we have

19 the denied/delayed log in place to validate it because

20 typically straw purchaser's lie.

21     Q    You all go through this training and all these

22 other steps because you understand that your employee's

23 conduct is imputed back to the FFL, right?

24     A    Correct.

25     Q    And you know that there is this prohibition out

1  there for straw purchases that you have to sell it to

2  the actual purchaser unless it's a gift, right?

3      A    Correct.

4      Q    So knowing that, your employee who does this

5  activity, your policies are inadequate, ends up selling

6  the firearm to someone that it is a straw purchase,

7  right?

8          So knowing that, it still happens, the sale

9  still happens.  You knew it, and you didn't abide by the

10 law on that transaction, those two transactions.  One

11 transaction you did, you denied it; the second

12 transaction, you didn't, right?

13     A    I would say correct. There was a mistake made.

14     Q    So you heard the testimony of the Industry

15 Operations Investigator, Mr. Williams, who talked about

16 this is the way that the requirement -- Mr. Barnes was

17 asking him did you know that Dick's Sporting Goods does

18 other things beyond what's required, do you remember

19 that?

20     A    Yes.

21     Q    And he said, Mr. Williams said if you put the

22 denials in chronological or alphabetical order, that's

23 what's required, you remember that?

24     A    Yes.

25     Q    So if Mr. Krueger, the sales clerk in this

1 instance, had done that, if he would put them in

2 chronological order, there would have been no other

3 denial between his and when his wife made the purchase,

4 right?  His was the only denial that day from the TICS

5 log?

6     A    Correct.  It would have been in the yearly

7 denied folder which is separate from the proceeds but in

8 a file cabinet in the back room.

9     Q    Well he got a denial, Mr. Krueger got the

10 denial back from TICS, right?

11     A    Right, and we would file it.  We file

12 chronological.

13     Q    And then if you put in alphabetical order when

14 Ms. Brady came in, he could have checked the file and

15 seen hey, here's Ms. Brady's, Mr. Brady's name, same

16 address, same firearm, everything is the same; I should

17 probably ask these questions or check on this or maybe

18 even deny the purchase outright.

19     A    We ask those questions regardless.

20     Q    We don't know if Mr. Krueger asked those

21 questions 'cause he's not here?

22     A    No, we don't.  But that's what our training is

23 intended for, is to ask the questions regardless of --

24 it's not just, it's customer service, what are you going

25 to use the gun for.  And if the guy says I'm using it for

1    squirrel and he's buying a 300 Win Mag, we're going to

2    deny the transaction just because it's pretty apparent

3    what it is.

4         But we file chronologically in a file the way

5    we're supposed to, and I think he testified that our

6    forms were in proper order.

7         Q    He did.

8         A    But to go back in to where the files are kept,

9    that's why we use the log book because it's done at the

10   point of sale and at the point of transaction, and we

11   found that to be -- that's the policy we have in place

12   'cause I don't believe we're required to go look in the

13   denied files for every sale.

14        Q    No testimony is to that at all.

15        A    Okay.

16        Q    But what we're talking about here is the steps

17   to go to prevent this from happening, that Dick's goes

18   through everything that you do outside of that.  But the

19   very thing that -- filing them chronologically, much

20   easier to go back and see Bs, Brady, there's no other B

21   or there is just one B and that's Mr. Brady and here's

22   Mrs. Brady asking for the same gun, right?

23        So you didn't take any steps, I mean, the easy

24   steps of it's right here.  You create a log that in this

25   instance just didn't work, right?

1  A  Correct, there was a mistake made.

2  Q  Now you talked about this is a high-volume time

3 for Dick's Sporting Goods?

4  A  Correct.

5  Q  And I'm not sure if you had a chance to look at

6 the TICS log in this case.  Have you had a chance to look

7 at it, it's Government's 12?

8  A  No, but I've looked at the gun sales for that

9 day.

10  Q  Okay.  Are you aware that there were five sales

11 from -- there was a sale, Mr. Brady's attempt, the three

12 other sales and then Mrs. Brady?

13  A  Yes, I am.

14  Q  And Mr. Krueger made both of, or he countered

15 both of those customers at the counter?

16  A  Correct, I'm aware of that.

17  Q  And it was within an eight/nine hour period?

18  A  Correct.

19  Q  Do you know how many sales he made otherwise?

20  A  Other types of transactions?

21  Q  Other firearm sales --

22  A  No, I don't know that off the top of my head.

23  Q  -- that day.

24  A  He's responsible for the whole lodge so it runs

25 from camping up through fishing, kayaks into the gun

1   department over in ammunition.  It's basically a

2   corner of the store.

3          So when I was referring to busyness, it wasn't

4   just the firearms portion of the business.  It was the

5   ammunition which as everybody knows is a huge, I mean,

6   busy item right now especially when you had it back then

7   and as well as all the other hunting accessories, knives,

8   scopes.   He would also do scope mounting or any other

9   items that may come into play during that period.

10      Q    He's in encountering a number of other

11  customers that are buying a number of other things?

12      A    Right, that's what I'm referring to.

13      Q    But behind the gun counter that day, he had one

14  denial for one gun, and then, what, eight or nine hours

15  later he has same last name, same address, same firearm

16  sale?

17      A    Correct.

18      Q    And one of the exhibits that was identified

19  that you participated in was the Licensee's Number 4

20  which is a letter from Mr. Barnes that was asking, you

21  know, we think that you should reconsider this and the

22  whole revocation process?

23      A    Correct.

24      Q    And you participated in creating that document,

25  reviewing it --

1     A    Providing information if requested.

2     Q    Providing information, okay.  And so did you

3  participate in any portion of like we, that Dick's did

4  not act willfully?  Did you talk about Dick's actions on

5  that part?

6     A    No.

7     Q    Okay.  You didn't review any of the legal

8  stuff, or did you do that?

9     A    I read through the document, yes.

10     Q    All right.  You said that you were surprised

11  when you found out that you had, that Dick's Sporting

12  Goods had sold this firearm, that a straw purchase had

13  occurred.  You were surprised that you --

14     A    I said I was surprised when we got the

15  revocation.

16     Q    When you got revocation of this?

17     A    Yes.

18     Q    And that's based on that Bloomington, Indiana,

19  same experience, same --

20     A    Same scenario.

21     Q    Same scenario.

22     A    Same exact scenario actually.

23     Q    You understand that this is the Nashville Field

24  Division, and each instance stands on its own, right?

25     A    I do understand that, yes.

1    Q    Okay.  Were you surprised to learn from the

2   agent, the testimony, that the Memphis Police Department

3   had to go out and get this firearm during a domestic

4   violence situation?

5    A    Yes.  Well, he didn't say, he said disturbance.

6    Q    Domestic --

7    A    But I was surprised that that's what -- I knew

8   the Memphis PD obtained the firearms already, but I was

9   surprised to hear it was because of a disturbance.

10   Q    A domestic disturbance, okay.

11   A    He just said disturbance.

12        MR. MARTIN:  That's all I have, thank you.

13        THE WITNESS:  Uh-huh.

14        MR. BARNES:  I just have a couple redirects.

15        HEARING OFFICER:  Sure.

16                REDIRECT EXAMINATION

17        BY MR. BARNES:

18   Q    Mr. Dodson, Mr. Martin said that somehow Dick's

19   knew about the straw sale but from your investigation, is

20   that the conclusion that you came to?

21   A    No, we didn't know until (indiscernible).

22   Q    Again, your conclusion was that it was just

23   mere human error in terms of failure to record into the

24   log, the denial log?

25   A    Correct.

1     Q   How far back can a denial log go so that if

2  I'm a clerk at the front counter and I'm going back or

3  I'm looking at the denial log, how much horizon does it

4  give me to go back and look at names?

5     A   A year.

6     Q   So that's a fairly lengthy period of time?

7     A   Yeah.

8     Q   Right.  In your experience, most straw purchase

9  attempts or somebody is denied and comes back, you know,

10  for lack of better words, a time to crime --

11          MR. MARTIN:  I like your choice.

12          BY MR. BARNES:

13     Q   -- in your experience, does that go on for

14  weeks or months, or is it fairly prompt that they try to

15  make another attempt?

16     A   It's usually within a week, I mean, usually

17  it's the same day.  In the majority that we see, they go

18  to another store and try it.  But it's usually the same

19  day or within a few business days after the fact.

20     Q   Okay.  And so this mechanism that you've set up

21  to have eyes on all transactions, not only in this Dick's

22  district but in all Dick's districts, there's the same

23  process obviously in place?

24     A   Yeah.

25     Q   It gives the ability for the people conducting

1 firearms operations to see readily and apparently

2 district wide who may be problematic for an attempted

3 straw purchase?

4     A    Correct.

5     Q    Okay.  And up to a year then, is that correct?

6     A    Yes.

7     Q    Okay.  Now, are there any plans to better

8 automate this system so that detection of straw purchases

9 can be perhaps a little bit more automatic?

10     A    Yes.  We actually rolled out a, we call it FMS,

11 Firearms Management System.  It rolled out to a few test

12 stores last fall and then we got it into a 100 stores

13 where we didn't need to add any kind of hardware.  But

14 it's an electronic 4473 that -- and then we'll also using

15 E-Check and we're integrated with NICS in the NICS

16 states.

17        But when we get to denied transactions, any

18 time there's a denied, there's two ways to handle it.  If

19 it's denied by the POC state or by NICS then we actually

20 keep the denied/delayed log electronically.

21        And then we also have the ability to enter a

22 new denied customer so if we wouldn't have, if they

23 wouldn't go through a NICS check then they would just

24 answer a prohibitive question incorrectly, we can go in

25 and enter their information.

1    So what the program does now is so if, you

2 know, somebody comes in and tries to buy a firearm with

3 the same last name as somebody that's denied, it'll flag

4 within a surrounding state or bordering state.  So it

5 doesn't automatically deny, but it flags and it brings up

6 that denied individual's information so you can see why

7 they were denied.

8    So it'll say, you know, the system

9 automatically denies you if you answer 11(k) no.  So say

10 a customer answered, you know, 11(k) no, that's why it's

11 flagging in this automated system.

12    So it's essentially the same process, but now

13 it's automated and it's company wide and it's checked in

14 three states or surrounding states around the store.

15    Q    And now once that flag comes up then in

16 accordance with Dick's standard operating procedures, is

17 there an obligation on the part of the store staff to vet

18 that transaction?

19    A    Yeah, absolutely.  They have to actually -- it

20 tells them it's flagged because they're a denied person,

21 they click a button, it shows them the reasons it's

22 denied.  And what it allows them to do is compare the

23 address.

24    You know, if it's Smith, I mean, it's not going

25 to -- if it's Ray Smith that lives in Cleveland, Ohio,

1  and he's, you know, the guy denied was John Smith that

2  lives in Pittsburgh, Pennsylvania, you can make the

3  determination that there's no relation.

4         What I always tell everybody is always anything

5  you don't like, you know, that's what we always do.  And

6  it surprises the, oh, yeah, that's my brother.  We're not

7  going to sell you the firearm then.  That's kind of the

8  way we handle the situation.

9      Q    You have an interrogation mechanism that works?

10     A    Sort of.  It's just something that we use to

11 get people to quickly answer if they --

12     Q    Final question.  When will the Wolfchase store

13 be able to have access to this enhanced denial tracking?

14     A    Actually, they're slated to get it this month.

15 They have the hardware, or they have the fixture in. The

16 hardware has been purchased and is at our store support

17 center getting programmed.  But they're actually getting

18 it -- it's our IT Department so I'd say they're slated to

19 get it this month but it'll March at the latest.

20     Q    In your opinion, would this help diminish or

21 even eliminate the Krueger-type error that you saw in

22 this particular transaction?

23     A    Yeah, it takes human element out, I mean,

24 almost entirely because it doesn't require you to search

25 now.  It automatically searches the flags for you.

1        MR. BARNES:  No further questions.

2        HEARING OFFICER:  Mr. Martin, he added a bit

3    there, do you want to --

4        MR. MARTIN:  No, sir.

5        HEARING OFFICER:  Okay.

6        MR. BARNES:  I'd like to call my next witness

7    which will be Tommy Wittman, former Assistant Special

8    Agent in Charge in the Phoenix Field Division.  We do

9    have to contact him on the phone; he's standing by and he

10   should be ready.

11       HEARING OFFICER:  Okay.

12       MR. BARNES:  I'm sorry, I don't know how to use

13   your system.

14       MS. LANCASTER:  Dial 9 and 1 and then your

15   number.  Do you want him on speaker to begin with?

16       MR. BARNES:  Yes, that's fine.

17       MS. LANCASTER:  It's ready for you to go.

18   (Asides)

19       MR. WITTMAN:  Hello.

20       MR. BARNES:  Hey, Tommy.  Mark Barnes, here,

21   and you're on speaker phone at the ATF Offices in

22   Memphis, Tennessee.  Hello?

23       MR. WITTMAN:  Yes, Mark.  You're

24   (indiscernible) is broken.  Let me (indiscernible).

25       MR. MARTIN:  And that's not going to work.

1     MR. BARNES: Okay. Let me try him on --

2     MR. WITTMAN: (indiscernible) broken.

3     MR. BARNES: Okay. This might be an IP phone.

4     MS. LANCASTER: It must be those storms in

5 between.

6     MR. BARNES: Tommy, can you hear me, I'm off

7 speaker? I'm going to try you on the cell phone speaker

8 because this is an IP phone and that might be part of the

9 problem. Let me try that, okay? I'll call you right

10 back.

11 (Asides)

12     MR. WITTMAN: Hello.

13     MR. BARNES: Hi Tommy, can you speak up? I put

14 you right next to --

15     MR. WITTMAN: Yeah, much better.

16     MR. BARNES: Okay, very good. Mr. Reilly,

17 we're ready to proceed and maybe if you could give

18 30 seconds to Mr. Wittman on who's in the room, or I can

19 if you wish.

20     HEARING OFFICER: Sure.

21 (Whereupon,

22                    TOMMY WITTMAN

23 was called as a witness, and after having been first duly

24 sworn, was examined and testified as follows:)

25     HEARING OFFICER: Mr. Wittman, just for the

1 record, can you state and spell your last name; state

2 your name and spell your last name, please?

3 THE WITNESS: Sure. It's Tommy Wittman,

4 W-I-T-T-M-A-N.

5 HEARING OFFICER: And you're a witness for

6 Dick's Sporting Goods, is that correct?

7 THE WITNESS: Yes, that's correct.

8 HEARING OFFICER: Okay. This is a revocation

9 hearing on the matter of Dick's Sporting Goods Store

10 Number 375.

11 I'm Mr. Reilly, Mike Reilly, I'm the Hearing

12 Officer. On behalf of the Government we have Division

13 Counsel from the Nashville Field Division, Todd Martin

14 and Pat Lancaster. We have IOI, Industry Operations

15 Investigator, Thomas Williams.

16 On behalf of Dick's Sporting Goods, we have

17 Mary Tortorice who's a Vice President of Legal and

18 Compliance matters; we have Mr. Kevin Dodson who's the

19 manager for Loss Prevention and Compliance; and we have

20 Mr. Wally Nelson who's a consultant for Dick's Sporting

21 Goods; and we have Mr. Mark Barnes representing Dick's

22 Sporting Goods.

23 As an observer at this hearing, Mr. Wittman, we

24 have the Director of Industry Operations, Mr. Kevin

25 Boydston.

1    So I want to turn it over to Mr. Barnes, and

2 he is going to gather your testimony with regards to this

3 hearing, okay?

4         THE WITNESS:  Very good.

5              DIRECT EXAMINATION

6         BY MR. BARNES:

7    Q    Mr. Wittman, can you please describe for the

8 Hearing Officer your professional background over the

9 last 30 years?

10   A    Okay.  Well my association with law enforcement

11 began back when I was a police officer in Tacoma,

12 Washington.  I was recruited from the police department

13 by ATF.  I was a street agent in Seattle, Washington, for

14 approximately 11 years then I was promoted to the

15 Resident Agent in Charge of the field office in Salt Lake

16 City.  I was there for little over three years then I was

17 promoted to Washington, D.C. where I worked at a firearms

18 division as an operations officer and then a program

19 manager and then promoted to the Special Agent in Charge

20 of the Arson and Explosive (ph.) program.  From that -- I

21 was there approximately four years also.

22        Then I was promoted to the Assistant Special in

23 Charge for Dallas Field Division.  I was probably there

24 for, again, almost another four years.  I was the Special

25 Agent in Charge for approximately four months following

1  the recalls to the (indiscernible) in Dallas.

2        And then I was laterally transferred from the

3  Dallas Field Division to the Phoenix Field Division where

4  I was ASIC there.

5        And then I retired in 1997, yeah, 1999 and then

6  opened up a private investigation business primarily

7  doing (indiscernible) government for security

8  investigations.

9      Q    Mr. Wittman, were you hired by my firm to

10  conduct an investigation into the facts and circumstances

11  surrounding a hearing or a Notice of Revocation for

12  Dick's Sporting Goods in Wolfchase, Tennessee?

13      A    Yes, I was.

14      Q    And in consulting with you with regard to the

15  investigation outlined, you determined did you not that

16  you wanted to interview the store employee, the clerk,

17  who was the first point of contact with the purchasers;

18  and you also wanted to interview the purchasers

19  themselves, is that correct?

20      A    Yes, that is correct.

21      Q    Did you, in fact, conduct those interviews?

22      A    Yes, I did.

23      Q    All right.  I have before me Licensee Exhibit

24  Number 5 which is the report of interview with

25  Matthew Krueger and with Jason Wayne Brady and with

1  Laura Carolyn Brady.  And I would ask that you outline

2  how you conducted those reports of interviews; did you do

3  them in person or telephonically?

4      A    I contacted all three individuals by telephone

5  for the purpose of the interview.

6      Q    And with regard to those interviews, can you

7  summarize for the Hearing Officer, because your reports

8  of interviews will be entered into the record, but can

9  you summarize for the Hearing Officer what you found with

10  regard to Mr. Krueger?

11      A    Mr. Krueger was the former employee of Dick's

12  Sporting Goods who was the person who actually

13  facilitated the 4473s in both instances, both Mr. Brady

14  and Mrs. Laura Brady.  Mr. Krueger had no recollection or

15  recall even after I identified Mr. Brady and Mrs. Brady

16  to him of the particulars of the actual sale.

17      We discussed how busy the store was, and he

18  indicated they're particularly very busy at the time of

19  the year, kept referring back to the purchases, I believe

20  it was on November, regarding the actual sale of the

21  Mossberg shotgun.  Again, no specific recollections.

22      I asked him to, if he was aware of the

23  circumstances under which a straw purchase could occur.

24  He recounted to me scenarios of which he had seen four as

25  an employee of Dick's where straw purchases were actually

1  attempted that he prevented.  He walked me through the

2  normal procedure whereby he would notify a supervisor and

3  notations would be made in an attempted sale.

4        I asked if there was anything in particular he

5  could recall on this particular transaction that would

6  cause him to think it was a straw purchase.  He was quite

7  adamant that based on his training and experience that

8  had a straw purchase been attempted, he would have been

9  able to identify.

10       But neither, if he's -- if either one of them

11  would have made any indication that the weapon was for

12  somebody else or reacted differently than a normal sale,

13  he'd scoped it.  He would have been key to that

14  (indiscernible) preventing the sale.  Following --

15       Q    In your experience as a Special Agent when he

16  went over the different scenarios, did you find those to

17  be correct and credible scenarios for attempting to

18  interdict a straw purchase?

19       A    Yes.  I mean, his description was very typical

20  of a straw purchase set up and nothing that he felt -- if

21  there would have been there, he would have keyed into it.

22       Q    With regard to Mr. Jason Brady, did you have --

23  you conducted an interview with him as well, correct?

24       A    That's correct.

25       Q    And how long ago was that interview conducted;

1    we have here January 26th if that refreshes your

2    recollection?

3         A    Okay.  I just looked at a copy; yes, it was

4    January 26th.

5         Q    Can you summarize for the Hearing Officer what

6    you found from Mr. Brady's testimony or information?

7         A    Mr. Brady was, well, first of all, he was very

8    cordial and really quite apologetic.  If he got, if

9    something happened, it would require the store to be

10   somehow, any corrective action taken against the store.

11        Actually when he went in to purchase the

12   shotgun in (indiscernible) the actual purchase was

13   preceded by discussions with his wife who was going to

14   participate in an upcoming pheasant hunt and she did not

15   have a shotgun.

16        He personally owned a shotgun, a rifle, a

17   pistol, at the time, but that he wanted to get his wife,

18   buy her a present, a surprise gift of this shotgun for

19   this intending hunt.

20        As reported, he goes to Dick's Sporting Goods.

21   Based on the for sale price was, he recollected it was

22   100 and some dollars for this shotgun.  I don't know if,

23   how accurate his recollection of that was.

24        But he goes to the store, looks at the shotgun,

25   believes it would be the one that's for her to be able to

1 participate in this hunt, attempts to make the sale

2 and is told that he was denied. Well, I guess that

3 particular store is denied but that his purchase was

4 denied.

5       He left the store thinking it was a paper mix

6 up 'cause he was not aware that he was a prohibited

7 person.

8       At the time of the purchase, he had a concealed

9 weapons permit issued by the State of Tennessee as well

10 as a fishing and hunting license. And he had, like I

11 said, purchased a couple other weapons through legitimate

12 Federal Firearms Licensed dealers preceding this date.

13       He gets home, tells his wife that he found a

14 shotgun that he thinks would fit her, there's a

15 (indiscernible) that if she wants it, she needs to go buy

16 it herself because there was a mix up with his paperwork

17 when he attempted to buy it.

18       They trade off babysitting duties; they have a

19 couple of children, he was watching the children. She

20 goes to the store, approaches the counter and purchased

21 the shotgun. Then she returns home and (ph.) Mr. Brady

22 that she has a shotgun.

23       A few days later, he is contacted

24 telephonically by the State of Tennessee and advised that

25 he is prohibited from purchasing, any further purchases

of weapons and that his concealed weapons permit was
being revoked.

A short (indiscernible) says to the effect that
what do I do about the weapons that I have now, she said
she was told that he couldn't buy any further weapons but
that wouldn't impact the ones that he currently
possessed.

A short time after that, he was visited by
officers from the Memphis Police Department who advised
him that based on the (indiscernible) of the State of
Tennessee, he would be a prohibited person that they
needed to recover his firearms.

He surrendered his rifle, his shotgun, his
pistol and asked about his wife's shotgun.  They said
they had to take all weapons in the house so that was
also surrendered, the shotgun in question.

Unfortunately, Mr. Brady doesn't have any
specific recollection of the exact month and day but
approximately two months ago, he was visited by two
individuals who identified themselves as ATF Special
Agents indicating that they were there to take a shotgun
that he had attempted to purchase sometime ago.

And he then told them that the shotgun had been
picked up by Memphis Police Department, that it was no
longer in his possession; enquired as to, you know, why

1  this was coming down now.  And he was told by one of

2  the agents that there was suspicion that the shotgun was

3  involved in a straw purchase.

4        He says that he told the officer, or the agents

5  that the weapon that was purchased was purchased by his

6  wife for her, that he had attempted to do it as a gift

7  for her.  But if he was denied, he then instructed her to

8  go get it herself.

9        Actually that's about the basis of Mr. Brady's

10 report.

11    Q    Did you then have an occasion to interview the

12 wife, Mrs. Brady?

13    A    I did.  And Mrs. Brady recounts the situation

14 up to the purchase of the shotgun similar to Mr. Brady in

15 that she was going to go to a pheasant hunt and not have

16 a shotgun.  When Mr. Brady came home from the store,

17 advised her that he had attempted to buy as a gift a

18 surprise gift shotgun for her and there was some paper

19 mix up.

20       At this point I asked her if she was aware that

21 her husband was a prohibited person, and she said no.

22 And they needed a little explanation as to what a

23 prohibited person was.  I explained to her under ATF

24 guidelines what a prohibited person was, and she had no

25 knowledge of him being in a prohibited status.

1    That being aside, she then goes to the

2  store, in fact, returns to Dick's Sporting Goods, goes up

3  to the firearms counter, tells the attendant that she was

4  looking for a 12 gauge shotgun to go hunting.  And I

5  believe she indicated a 12 gauge Mossberg because that's

6  what her husband said he had looked at.  She did not

7  reveal her identity as to who, you know, she was and made

8  no reference to her husband having been there previously.

9    The attendant brings her a shotgun, she looks

10 at, feels it, likes it and buys it then takes it home.

11 And then proceeds to participate in the pheasant hunt

12 that was in the next week or so.

13    Q    Okay.  Did Mr. Brady indicate to you that he

14 had made a statement to the Special Agents who came to do

15 a "NICS pickup" that, in fact, it was his shotgun and

16 that he was the one who was going to go hunting; did he

17 say anything like that to you during your interview?

18    A    No, he did not.

19        MR. BARNES:  I have no further questions.

20                  CROSS EXAMINATION

21        BY MR. MARTIN:

22    Q    Mr. Wittman, this is Todd Martin, Division

23 Counsel for Nashville Field Division.

24    A    Yes, sir.

25    Q    Mr. Wittman, during the course of your inquiry

1  into this matter, did you talk to him about whether or

2  not he still had any firearms?

3      A    Yes, I did.

4      Q    And what did he say?

5      A    I think he mentioned, well, he said he had a

6  rifle, another shotgun and a handgun, all three of which

7  were surrendered to the Memphis Police Department.

8      Q    Did he say why they were surrendered to the

9  Memphis Police Department?

10     A    When the officers arrived at his home, they

11 told him, as directed by the Tennessee Bureau of

12 Investigation, that he was a prohibited person and he

13 couldn't possess firearms.

14     Q    Did he say why the officers responded to his

15 home in the first place?

16     A    No.

17     Q    Did you look into why the officers came to his

18 house and took the firearms away?

19     A    Did I look into it?

20     Q    Yes.

21     A    I'm sorry, no, I did not.  As I indicated, he

22 was under the assumption that based on his attempted

23 purchase of the weapon earlier and the denial that that

24 generated action.

25          MR. MARTIN:  Okay, thank you.  I have nothing

1  further.

2        MR. BARNES:  Nothing further.

3        HEARING OFFICER:  Thank you, Mr. Wittman.

4        MR. WITTMAN:  All right, sir.

5        MR. BARNES:  Thank you for being on a standby,

6  we appreciate it.  Bye now.

7        I would ask that Licensee Exhibit Number 5 then

8  be entered into the record which are Mr. Wittman's

9  reports of interviews.

10        HEARING OFFICER:  Licensee Exhibit 5 entered

11  into the record.

12                        (Whereupon, Licensee's

13                        Exhibit Number 5 was marked

14                        for identification and

15                        received into evidence.)

16        MR. BARNES:  We're ready for our last and final

17  witness.

18        HEARING OFFICER:  Okay.

19        MR. BARNES:  Calling Wally Nelson to testify.

20  (Whereupon,

21                  WALLY NELSON

22  was called as a witness, and after having been first duly

23  sworn, was examined and testified as follows:)

24                DIRECT EXAMINATION

25        BY MR. BARNES:

1    Q    Mr. Nelson, can you state your full name for

2  the record, please?

3    A    Walfred A. Nelson; I go by Wally.

4  W-A-L-F-R-E-D, middle initial A, N-E-L-S-O-N.

5    Q    Can you state your professional record and your

6  current occupation, please?

7    A    I was a career ATF employee on the regulatory

8  side.  I started out as an inspector then alcohol

9  compliant industry operations inspectors.  If I lapse

10  into calling it an inspector, I apologize.

11        I started out in 1972 with ATF in Illinois.  In

12  1973, I was one of the very first inspectors who started

13  doing firearms inspections.  I was trained by ATF Special

14  Agents from the Chicago Field Division on how to do

15  compliance work which previously had been done by the

16  criminal side of the house.

17        I then went to Kansas City, Omaha, Minnesota

18  then I was area supervisor in Detroit for seven and a

19  half years.  I then had a tour in Washington on the staff

20  of the Assistant Director.

21        And then for nine years, I was chief of field

22  operations in Chicago which is akin to a DIO and then I

23  supervised area supervisors.

24        In 1996, I was transferred back to headquarters

25  to be the chief of the Firearms and Explosives Regulatory

1  Division which had all the licensing NFA imports, and

2  regulatory policy for firearms and explosives.

3          And from 1998 until my retirement in 2005, I

4  was the deputy assistant director for the, part of the

5  Agency and Alcohol Enforcement programs and services.  As

6  such, I was responsible for the tracing center, the

7  licensing, the firearms technology branch, international

8  operations and many other operations but in particular

9  regulatory policy and compliance policy.

10          And since 2005, I have been a private

11  consultant to the firearms and explosives industry

12  specializing in compliance work, helping them to comply

13  with the laws and regulations.

14      Q    Mr. Nelson, over the course of your ATF career

15  were you involved in revocation cases?

16      A    I was involved in a number of revocation cases

17  as an inspector, as a supervisor, a CFO involved in quite

18  many -- I dare say, the Midwest region when I was CFO

19  there, I was probably revoking more licenses than any

20  place in the country, any region in the country.

21      Q    Do you have an occasion to remember any

22  significant cases that actually went up for federal court

23  review that you were personally involved in?

24      A    I do.  One of the cases I worked on in Kansas

25  City, I transferred there in 1974, was a case that's

1  often cited by ATF attorneys; I was the inspector on

2  the case.  We call it George's Jewelry and Loan, but it's

3  cited as <u>Lewin v. Blumenthal</u> out of the 8th Circuit.

4  This was the first case I am aware of at least

5  at the Circuit Court of Appeals level where the doctrine

6  of plain indifference was written up by a court, that is,

7  the failure to perform a known legal duty.

8  What was Lewin doing, what was George's Jewelry

9  and Loan doing that was plainly indifferent to the

10  regulations and the law?

11  Among other things, if a person in Kansas City

12  came to that shop and filled out the 4473 and said I am a

13  felon, they transferred a firearm to them.  If a person

14  came to redeem a pawn and they said I am a felon, they

15  pawned the gun to them.

16  We did the inspection, actually, it was a

17  denial of renewal; we recommended denial of renewal.  We

18  had a hearing, and ATF denied it.  And the licensee

19  appealed to the Circuit, the U. S. Court in Kansas City

20  and unbelievably to me, the judge said ATF, give him his

21  license.  So the Justice Department appealed to the 8th

22  Circuit.

23  And this took a number of years, and I think

24  the case didn't come out until 1978.  I think I did the

25  inspection in '74-'75, but they did uphold the denial of

1  renewal and the doctrine of plain indifference.

2      Q    Mr. Nelson, during the course of your

3  professional career at ATF and over the course of years,

4  were you required to train new inspectors on the concept

5  of willfulness?

6      A    Well, yes.  I think we, I trained many people

7  on the on-the-job instructor.  As a supervisor, I

8  provided roll call training.

9          I think the most significant training that I

10 would want to talk about today was something we did, and

11 I think it was in 2003, we had all the area supervisors

12 and DIOs in one room together which is a rare occurrence.

13 And we wanted to provide national training on firearms,

14 in particular, on firearms revocation policy, denials,

15 revocations and so forth to get national consistency

16 because we saw that what was being revoked in one part of

17 the country was not even being, was maybe just being

18 cited for a violation in another part of the country.

19 And that was something I couldn't stand.

20         So we had training there and it was, and a lot

21 of it was provided by ATF counsel.  And one particular

22 part of the training was provided by a gentleman, a

23 former ATF attorney that I greatly respected,

24 Paul Pendley, which some may have met in this room.

25         Paul provided training on willfulness, and I

1  remember distinctly one thing that he said.  He talked

2  about willfulness and he says, you know, we may not

3  exactly agree on the exact language of what willfulness

4  is, but we know what it's not.  He said it's not

5  accident, happenstance or human error.  And that was the

6  training provided by Mr. Pendley in 2003, and I took that

7  to heart.  I took that to heart that people do make

8  errors.

9       And I certainly think that's what occurred in

10  this case.

11     Q    You were retained in this matter to help review

12  the facts and circumstances surrounding it.  Have you had

13  a full opportunity to review the gun manual, the internal

14  audits, the training at the stores?  And, in fact, did

15  you not even go out to Wolfchase store yourself and look

16  at their systems and their inventory?

17     A    Yes.  I did have a chance to review the

18  materials that they have in their gun manual and some of

19  the forms that have been introduced as evidence today.

20     Q    Looking back at all your experience as an ATF

21  officer, can you summarize for the Hearing Officer what

22  in your professional opinion the practices are at that

23  store and, indeed, the Dick's national system?

24     A    Well, in my opinion, the Dick's efforts at

25  compliance, taking the extra step; spending probably

1 millions of dollars to create these programs, these

2 electronic data systems; to have a whole national staff

3 of internal auditors; the training they go through is

4 exemplary.  I mean, it's number 1.  If it's not

5 number 1, it's darn close to it as far as a national

6 exercise by any FFL.

7    Q    When you visited the Wolfchase store, did you

8 have an occasion to look at the denial log system?

9    . A    Yes, I did.

10    Q    And can you compare that in your experience not

11 only as your experience as an ATF officer but your

12 current consultancy to the entire trade where you have an

13 occasion to view many different firearms operations?

14    A    Yes.  It's uncommon.  Some people will have

15 maybe a chalkboard or a grease board where they put up a

16 pencil, you know, so and so was denied or something like

17 that.  But no one to my knowledge has such a systematic

18 effort as Dick's does.

19    Q    Okay.  Did you have an occasion to look at the

20 facts and circumstances surrounding the allegations in

21 the Notice of Revocation given by the Bureau?

22    A    Yes.

23    Q    And in your professional opinion, is the Bureau

24 well founded in proceeding in this manner?

25    A    I don't think so.  I attribute this to human

1  error.  Looking at the facts and the records that are

2  there, that the employee didn't do his duty, you know,

3  and shame on him.  And I have never heard of a licensee

4  being cited for a false bound book, disposition record in

5  the case of an undetected straw purchase.

6      Q    You're saying that in the Notice of Revocation,

7  the allegations that were asserted with failure to record

8  the actual purchaser in A&D system, that is failure to

9  record Mr. Brady's information as opposed to

10 Laura Brady's information, you've never seen that cited?

11     A    I have not seen that.  When I saw the

12 violation, I thought well, perhaps there was evidence

13 that Mr. Brady actually was next to her and picked up the

14 gun.  And in that case, that would be a proper citation.

15 But that didn't seem to be the case here.

16     Q    In the case where there's actual willfulness

17 demonstrated to the Bureau or to an Industry Operations

18 Investigator, is the Bureau obligated to proceed with a

19 revocation even if they believe that there was

20 willfulness in a particular matter?

21     A    The pertinent statute is, I believe, 18 U.S.C.

22 923(e), and it says that the Bureau may revoke if they

23 find a violation of the law or the regulations; the key

24 word may.  There's no duty, it's not shall revoke, must

25 revoke; it's may revoke.  So there is some discretion.

1   And in my opinion, this is a case where that

2   discretion should be exercised because many stores miss

3   straw sales, despite their best efforts, they miss them.

4   And if a licensee is going to be revoked because they

5   missed a straw sale, a lot of licenses are going to get

6   revoked because they do miss them.

7   And I'm not aware of a case of someone being

8   revoked for a missed straw sale on a single instance, a

9   single fact situation on their first inspection after six

10  years in business and that's basically the only

11  violation.

12   MR. BARNES:  I have no further questions.

13   HEARING OFFICER:  Mr. Martin?

14                  CROSS EXAMINATION

15   BY MR. MARTIN:

16   Q   Mr. Nelson, you talked about 923(e) and there's

17  a bit of leeway there whether or not a license is

18  revoked, right?

19   A   Right.

20   Q   And you said, in fact, that you've never heard

21  of anyone being, had their license revoked because of one

22  instance, right, of a straw purchase?  They missed one

23  instance of straw purchase, you've never heard anybody --

24   A   They failed to detect a straw, a possible straw

25  purchase, yes.  I've not heard it.

1    Q    Let me ask this.  Do you disagree that this

2  is a straw purchase?

3    A    Based on the information we developed in our

4  investigation, I do not believe it was a straw purchase.

5    Q    You've heard other testimony here today, do you

6  believe it was a straw purchase?

7    A    I believe it's in doubt.

8    Q    You believe it could be or couldn't be, you

9  don't know now?

10   A    It's a no.

11   Q    It's a -- okay.  What's in doubt for you?

12   A    I'm not sure.

13   Q    What are you not sure about?

14   A    Whether it was a straw purchase or not.

15   Q    Do you believe that Mr. Brady came in to

16  purchase that firearm?

17   A    Yes and based on the --

18   Q    I just asked that question.

19   A    Yes.

20   Q    Do you believe that Mrs. Brady later came in to

21  purchase that firearm?

22   A    Yes.

23   Q    And you believe that she put down -- you've

24  looked at the 4473 that Mr. Brady filled out, didn't you?

25   A    Yes.

1    Q    And you've looked at the 4473 that Mrs.

2    Brady filled out, right?

3    A    Yes.

4    Q    You looked at the time between the time

5    Mr. Brady was denied and the time that Mrs. Brady picked

6    up the firearm, right?

7    A    Yes.

8    Q    And you've looked at who the clerk was during

9    those transactions, right?

10    A    Yes.

11    Q    Same clerk, same address, same firearm, same

12    last name on the 4473s, right?

13    A    Yes.

14    Q    And you've heard the testimony from the agent

15    for ATF that says when I talked to Mr. Brady, he said I

16    wanted the firearm, I was going to buy the firearm then

17    he sends his wife back in.  You heard that testimony,

18    right?

19    A    Yes.

20    Q    And that was in September of, well, your agent

21    interviewed Mr. Brady in January of 2014, right?

22    A    Yes.

23    Q    September previous to this when it would have

24    been closer in time for him, ATF sent an agent to talk to

25    him to pick the firearm up, right?

1    A    Yes.

2    Q    And Mr. Brady told that agent something

3  completely different than what he told the former agent

4  that you all hired as an investigator, correct?

5    A    Yes.

6    Q    And so why do you have doubt that this was a

7  straw purchase?

8    A    Because we have conflicting information from

9  Mr. Brady.

10    Q    And does it help your cause for it not to be a

11  straw purchase?

12    A    Would you rephrase that, please?

13    Q    What part did you not understand that I can

14  help you --

15    A    My cause.

16    Q    Who are you employed by?

17    A    Mr. Barnes.

18    Q    And Mr. Barnes has hired you to assist him in

19  this case?

20    A    Yes.

21    Q    And so does it help Mr. Barnes' client if it's

22  not a straw purchase?

23    A    Yes.

24    Q    And so is that why you have doubt that this is

25  a straw purchase, Mr. Nelson?

1      A    I have doubt because our investigator talked

2    to both Mr. and Mrs. Brady, and Mrs. Brady said she

3    bought it for herself to go hunting.

4      Q    And that's in direct conflict with what

5    Mr. Brady said, isn't it?

6      A    Not to our investigator.

7      Q    From the testimony here today, you've heard

8    that there was another story, right?

9      A    Yes.

10     Q    Okay.  Now you said that you disagree with

11   revocation, right?

12     A    No, I approve of revocation where it's willful.

13     Q    In this instance, you disagree with the

14   revocation of the license of Dick's Sporting Goods?

15     A    Absolutely.

16     Q    And that's not your call though, is it?

17     A    Well, no, it's not my call, obviously.

18     Q    You talked about millions of dollars that

19   Dick's Sporting Goods has spent.  And I think you said if

20   it's not number 1, it's very close to number 1 for

21   efforts that they have out there to try to track the

22   firearms and engage in the business of being a federal

23   firearms dealer?

24     A    Absolutely.

25     Q    And yet despite all these millions of dollars,

153

1  all of these hoops and hurdles that Dick's Sporting

2  Goods has put up, in this instance, a firearm got into

3  the hands of a person who is prohibited to have the

4  firearm; isn't that correct?

5      A    Again, Mrs. Brady testified she bought the gun

6  for herself.

7      Q    Do you recall that, do you know -- have you

8  looked into the Memphis Police Department's report, have

9  you looked at that?

10     A    I have not.

11     Q    So you don't know if Memphis Police Department

12 picked them up just from him or from his wife, right?

13     A    Well the investigator said that they picked

14 them up, Mr. Brady said they picked up the wife's gun as

15 well.

16     Q    Okay.  You mentioned a case that you worked on,

17 the very first case that they discussed plain

18 indifference I think is what you said, right?

19     A    Yes.

20     Q    That was in '73-4, but the case came out in --

21     A    '78 --

22     Q    Yeah.

23     A    -- I think it was.

24     Q    And so that's the 8th Circuit, we're talking

25 about the 6th Circuit here, correct; you're aware that

1    this is the 6th Circuit?

2         A    That's right.

3         Q    And that's Circuits disagree at times about

4    whether or not something is going to be upheld or not

5    upheld, right?

6         A    Yes.

7              MR. MARTIN:  Okay, that's all.

8              MR. BARNES:  Just some brief redirect.

9                         REDIRECT EXAMINATION

10             BY MR. BARNES:

11        Q    Mr. Nelson, as Mr. Martin pointed out, you

12   heard some testimony today from Special Agent Howard.

13   Special Agent Howard said that he did not interview

14   Mrs. Brady, is that correct?

15        A    That's correct.

16        Q    And the report of investigation or the report

17   of interviews that you reviewed had three interviews, is

18   that correct?

19        A    That's correct.

20        Q    Mr. Krueger, Mrs. Brady and Mr. Brady.

21        A    That's right.

22        Q    From your standpoint, were any of those

23   renditions or information provided by the witnesses

24   inconsistent with one another?

25        A    No.

1    Q    You also heard Special Agent Howard say that

2 he did make a record of interview of the so called NICS

3 pickup attempt because he didn't recover the gun; the

4 Memphis Police have the gun.  His reference to a record

5 of interview -- have you read that record of interview?

6    A    I have not.

7         MR. BARNES:  I have no further questions.

8         MR. MARTIN:  Nothing on recross.

9         HEARING OFFICER:  Okay, Mr. Barnes.  Where are

10 we in your presentation?

11        MR. BARNES:  We're done with our witnesses and

12 our -- I want to make sure that we didn't fail to do one

13 thing which was -- no, we got everything into evidence,

14 Mr. Reilly.

15        HEARING OFFICER:  We're at five, right?

16        MR. BARNES:  Yes, sir.

17        HEARING OFFICER:  Okay.  Government Exhibits 1

18 through 5 --

19        MR. BARNES:  The Licensee Exhibits 1 through 5.

20        HEARING OFFICER:  Sorry, one through five

21 entered into the record.

22        MR. BARNES:  Right.

23        HEARING OFFICER:  Does that conclude your

24 presentation?

25        MR. BARNES:  It does, Mr. Reilly.

1    HEARING OFFICER:  Okay.  We've been going

2  about an hour and a half.  If we only have closings then

3  do we want to plow forward?

4    MR. BARNES:  I agree.

5    MS. LANCASTER:  Plow away.

6    HEARING OFFICER:  The Government's up first and

7  the Licensee gets the last word.  How's that, Mr. Barnes?

8    MR. BARNES:  Fine.

9    MR. MARTIN:  Shall I (indiscernible).

10    HEARING OFFICER:  I'm sorry?

11    MR. MARTIN:  Should we proceed?

12    HEARING OFFICER:  Yes.

13    MR. MARTIN:  Today's a good day.  Today's a

14  good day for Dick's Sporting Goods, a good day for the

15  Nashville Field Division, for the people of Tennessee,

16  for Federal Firearms Licensees and purchasers of firearms

17  across this country because today we're talking about

18  solely the revocation of a firearm due to a straw

19  purchase in the records and books.

20    You don't have to look very far in this country

21  to hear of tragedies that befall people.  And invariably,

22  you hear people say, you know, it's sort of odd but I

23  really didn't know about that, didn't think about that,

24  something weird was going on.  But that purchase then

25  goes, that person goes out and takes a firearm and they

1  do something that hurts firearm owners, firearm

2  dealers across the country.

3         Today's a good day because that didn't happen

4  in this instance despite the fact that the firearm was

5  purchased and was held by Mr. Brady for a number of

6  months.

7         When the Memphis Police Department went out

8  there, they went out there solely to address the

9  disturbance and as a result, they took those firearms.

10  So today's a good day for Dick's, Tennessee and gun

11  owners and gun sellers across the country.

12         We're not talking about tragedy, we're talking

13  about responsibility and accepting that responsibility.

14         Dick's Sporting Goods goes through a number of

15  hoops and you've put a number of things up. And as

16  Mr. Nelson said, you spend millions of dollars to do so.

17  And there are federal firearms dealers across this

18  country who are mom and pop shops that don't need to do

19  that because of volume, but they still can comply and

20  they can still accept responsibility when they do make a

21  straw purchase sale.

22         Now, the testimony is that this purchase was

23  attempted by Mr. Brady so Mr. Brady didn't have to borrow

24  a firearm, and he think he could go out and he could hunt

25  on his own.  When that firearm was denied him, as it

1  should have been, he then took some action to get his

2  wife to go back and purchase it for him.

3        Now, sadly, all the hoops and hurdles that were

4  put up didn't work, and he got access to that firearm.

5  So we don't have to talk about that, that tragedy.  We

6  don't have to talk about whether it's dove hunting or

7  pheasant hunting or whether it's anything else.  But what

8  we do know is that he had access to the firearm, and it

9  should have been stopped when the person with the same

10  last name, the same address, got the same make and model

11  of firearm on the same day from the same clerk.  All of

12  those things are in evidence.

13        So this is about an FFL, a large FFL, Dick's

14  Sporting Goods, who's accepted the responsibility of

15  being a Federal Firearms Licensee and all the things that

16  come with that.  And that's compliance with the law,

17  making sure prohibited people don't have those firearms,

18  keeping your records and as the IOI said,

19  chronologically, alphabetically.

20        You walk back and you look at the sheet and you

21  see Jason Brady's name and that address, you don't even

22  have to go -- there are 24 other letters of the alphabet

23  that he would have had to look at.  It's the same day

24  within three transactions.  The only denial that day.  If

25  it was done chronologically, he wouldn't have to look at

1 the other 364 days of the year preceding it. He could

2 have looked at that that fast and known.

3 Now, there's been some talk about the

4 8th Circuit and other Circuits, but the standard is that

5 if you know of that obligation, you fail to abide by it

6 then you're acting willfully at that point. And the

7 actions of your employee are imputed to you. Those mom

8 and pop shops may be a one-man operation. Certainly

9 Dick's Sporting Goods has more than one person that

10 stands behind the counter, that's not in evidence but

11 it's just a fact that Dick's Sporting Goods is going to

12 have more people, more customers and more people.

13 But in this instance, it's the same clerk, the

14 same day, less than nine hours separate that. It was his

15 only denial that day. The fact that it's one instance as

16 Mr. Barnes pointed out doesn't matter. The laws clear,

17 one instance suffices. You only have to do one, and your

18 license can be revoked. And that's a 6th Circuit case.

19 The fact that Dick's didn't do this to say I

20 want Mr. Brady to have this firearm as Mr. Nelson was

21 talking about. When someone comes in and they're a felon

22 and they say we don't care if you're a felon, we're still

23 going to give you a firearm.

24 An evil motive is not required, not in the 6th

25 Circuit. The fact that you have that responsibility and

1  you deny that responsibility, that is sufficient.   In

2  this case, this is adequate.

3          Again, this is a lucky day for Dick's;

4  Nashville, Tennessee; and quite honestly, all Federal

5  Firearms Licensees and firearms owners.   Thank you.

6          HEARING OFFICER:   Mr. Barnes.

7          MR. BARNES:   Well, it may be a lucky day in one

8  sense, but I think the most important point of this

9  entire proceeding today is the point that the Gun Control

10  Act does not demand perfection, it demands persistence,

11  and where that persistence is attended to in a

12  responsible manner which Dick's does every day.   Dick's

13  has dedicated itself to having one of the finest

14  compliance systems in the United States.

15          So there is no question and there can be no

16  doubt that they are dedicated to public safety and to

17  compliance.   And they've shown that day in and day out

18  with over 500 stores that conduct firearms operations.

19          To show why I think this revocation is

20  unwarranted is that there's been no taking into account

21  any of the mitigating factors and a major one being human

22  error.   There is no question that Dick's has admitted

23  that there was human error.

24          But I think that the 4th Circuit in RSM v.

25  Herbert sums it up pretty well.   To be sure, a single or

1  even a few inadvertent errors in failing to complete

2  forms may not amount to willful failures even when the

3  legal requirement to complete the forms was known.  Yet

4  at some point when such errors continue or even increase

5  in the face of repeated warnings given by enforcement

6  officials, a company by explanations of the severity of

7  the failure is one may infer as a matter of law that the

8  licensee simply does not care about the legal

9  requirements.

10        The Government has failed to show that,

11  number 1, the Licensee didn't care.  The Licensee did

12  care very, very much, and it took all the appropriate

13  measures to ensure that the law would be complied with,

14  the training, the auditing, the internal compliance

15  systems.

16        Yes, it's true that a mom and pop operation

17  can't afford those systems and yes, it's true, that in

18  those cases they have more simplified systems. And I've

19  seen many small dealers that have fairly sophisticated

20  ways of detecting straw purchases as well.

21        But whether you're large or small, if you are

22  conducting your operations in generally an exemplary

23  manner, the government has never revoked a license simply

24  because human error was involved and that is the case in

25  this particular matter.

1    It may be true that we have evidence that's
2 disputed as to what Mr. Brady's intent was on the day
3 that he came to purchase the gun and ought to leave that
4 to the tryer of fact maybe to look at that.  We're
5 convinced that he came to buy the gun as a gift and that
6 Mrs. Brady subsequently bought it for her own account.

7    But even if we accepted the Government's
8 theory, the Government hasn't proved willfulness at all.
9 All we have is a situation where we had a clerk that
10 simply had a forgetful moment and went and did his
11 procedure, and he was so mechanically involved in it, he
12 can't even recall the sale now because it's not
13 remarkable; everything was normal.  Nor were any
14 statements according to Mrs. Brady ever made to him to
15 give him a hint that there might be a prior transaction
16 that he needed to be worried about.  It was just simple
17 forgetfulness, an inadvertent error.

18    And when we take a look at all the facts and
19 circumstances, all the mitigating factors that come into
20 this case, and there are many including the IOI not even
21 wanting to recommend revocation or he didn't recommend
22 revocation, and the fact that there was an immediate
23 improvement that's been put into place by Dick's for
24 their national system to try to even eliminate this human
25 error.

1   So the fact of the matter is there was no

2   willfulness in this case.  And that alone when you look

3   at the entire inspection and you look at the entire store

4   operations really shouldn't be the final basis for going

5   and proceeding with a revocation in this case.  Thank

6   you.

7        HEARING OFFICER:  Thank you, Mr. Barnes.  Thank

8   you to everyone who participated in the hearing.  I

9   appreciate the efforts putting into addressing the

10  notice.

11       The Director of Industry Operations for the

12  Nashville Field Division is going to make the final

13  decision on this license based upon this hearing.  If

14  that decision is that the license is not revoked, you'll

15  be notified in writing as such, okay.

16       In the event that the Director of Industry

17  Operations reaches the decision that the license will be

18  revoked, the final Notice of Revocation on Form 4501 will

19  be issued along with a copy of the findings and

20  conclusions made by the DIO.

21       If a final Notice of Revocation is received on

22  the ATF Form 4501, the Licensee may file a request in

23  federal district court in the district where they conduct

24  business for what is called *de novo* review.  And that can

25  be filed under the provisions of § 923(f)(3), Title 18,

1    the United States Code.  The important note to make

2    with regards to that is that the request needs to be made

3    within 60 days of receiving the notice.

4            Unless anyone else has anything further to add.

5            MS. LANCASTER:  Nothing for the Government.

6            MR. MARTIN:  Nothing from the Government.

7            MR. BARNES:  Nothing further.

8            HEARING OFFICER:  Thank you.  The time is 1:05,

9    and I declare this hearing closed.

10            (Whereupon, the hearing was closed at 1:06 p.m.

11    on February 5, 2014.)

CERTIFICATE

I hereby certify that the testimony given in
the matter of:

Dick's Sporting Goods

FFL # 1-62-157-01-3K-03207

Before MICHAEL T. REILLY, Hearing Officer, was
transcribed by the undersigned for FREE STATE REPORTING,
INC., and said transcript is a true record, to the best
of my ability, of said testimony.

*Christina H. Neilson*

Christina H. Neilson, Transcriber

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947