**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| DICK'S SPORTING GOODS, INC. d/b/a DICK'S SPORTING GOODS, INC. #375, | )<br>)<br>) |
|     Petitioner, | )<br>) |
| v. | )<br>) |
| KEVIN L. BOYDSTON, Director of Industry Operations, Bureau of Alcohol, Tobacco, Firearms and Explosives, | )<br>)<br>)<br>)<br>) |
|     Respondent. | ) |

No. 2:14-cv-02360-JPM-dkv

**OPINION AND ORDER FOLLOWING NON-JURY TRIAL**

Petitioner Dick's Sporting Goods, Inc. ("Petitioner" or "Dick's") brings this action against Kevin Boydston, Director of Industry Operatives, Bureau of Alcohol, Tobacco, Firearms and Explosives, ("Respondent" or "ATF") pursuant to 18 U.S.C. § 923(f)(3), for judicial review of the revocation of a federal license as a dealer in firearms other than destructive devices. (Pet. for Judicial Review ¶ 1, ECF No. 1.)

The Court held a bench trial in this case on June 1, 2015. (ECF No. 67.) Petitioner was represented by John Gibbons and Thomas Parker. Respondent was represented by David Brackstone. Petitioner called the following witnesses: Kevin Dodson, Laura Brady, and Matthew Krueger. (Ex. List, ECF No. 68.) Respondent called no witnesses. (Id.)

For the reasons set forth below, the Court finds that the decision to revoke Petitioner's Federal Firearms License ("FFL") was not authorized and the decision is reversed.

## I. FINDINGS OF FACT

### A. Stipulated Facts

Below are the stipulated facts from the Joint Pretrial Order:

1. Dick's is a national retailer that sells firearms, among other items, in hundreds of stores across the country. Dick's principal place of business is 345 Court Street, Corapolis, Pennsylvania 15108. Dick's Store #375, located at 2393 North Germantown Parkway, Memphis, TN 38016, has been a federally licensed firearms dealer since 2007. [Petition]

2. Respondent Kevin Boydston ("ATF") is ATF's Director of Industry Operations, Nashville Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives. [Petition]

3. On November 6, 2012, Jason Wayne Brady[] went to Store #375 and tried to purchase a Mossberg Maverick 12 gauge shotgun, serial number MV84994S (the "Shotgun"). Dick's Sales Associate, Matthew Kru[e]ger, assisted Mr. Brady during this attempted transaction. After the required information was recorded on Sections A and B of ATF Form 4473, showing in part that Mr. Brady resided at 70 Grove Dale Street, Memphis, Tennessee 38120, Mr. Krueger initiated the required Tennessee Instant Check System ("TICS") prohibited person background inquiry for Mr. Brady. When Mr. Krueger received a "Pending" response from TICS, the transaction was terminated and the Shotgun was not delivered to Mr. Brady. [ATF Findings ¶¶ 8-11]

4. A "Firearm Sign-Off Sheet" or "Denied/Delay Log" is a Dick's internal control document that is not required by the [Gun Control Act] or its regulations. Store #375 uses it to record the name

of any person that received a "Denied" or "Delayed" response to a [National Instant Check System ("NICS"]/TICS inquiry. On November 6, 2012, Mr. Krueger failed to enter Mr. Brady's name on Store # 375's "Denied/Delay Log" as required by Dick's internal policy. [ATF Findings ¶¶ 8-11]

5. That same day, approximately eight to nine hours later, Laura Carolyn Brady, who also then resided at 70 Grove Dale Street, Memphis, Tennessee 38120, went to Store #375 and sought to purchase a Mossberg Maverick 12 gauge shotgun. Mr. Krueger was the Sales Associate who assisted Mrs. Brady. After Mrs. Brady recorded the required information on Sections A and B of ATF Form 4473, showing in part that she resided at 70 Grove Dale Street, Memphis, Tennessee 38120, Mr. Krueger initiated the TICS inquiry for Mrs. Brady and when an "Approved" response was received, the transaction was completed and the Shotgun was delivered to Mrs. Brady. [ATF Findings ¶¶ 8-11]

6. According to Dick's internal policy, prior to conducting the sale of any firearm, an employee at Store #375 is required to check the "Denied/Delay Log" to see if there are any similarities suggesting a straw purchase involving the current purchaser with any past attempts by someone who received a "Delay or Denial" NICS/TICS response. Mr. Krueger designated by his signature that he had reviewed Dick's Delay/Denied Log for a possible "straw purchase" before delivering the Mossberg Shotgun to Mrs. Brady. [ATF Findings ¶¶ 8-11]

7. Laura Carolyn Brady and Jason Wayne Brady are husband and wife and in November 2012, they resided together at 70 Grove Dale Street, Memphis, Tennessee 38120. The Shotgun that was delivered to Mrs. Brady was the same shotgun that Mr. Brady attempted to purchase earlier that same day. [ATF Findings ¶¶ 8-11]

8. From June 11, 2013, through June 14, 2013, Industry Operations Investigator ("IOI") Thomas Williams conducted ATF's first compliance inspection of Store #375's inventory of firearms at its licensed premises and the records and documents required to

be kept by the Gun Control Act of 1968 (the "GCA"), as amended, Title 18, United States Code, Chapter 44, and the regulations thereunder, for the purpose of determining compliance with the GCA's requirements and regulations. [ATF Findings ¶ 7]

9.  IOI Williams' inspection disclosed Mr. Brady's November 6, 2012, attempted purchase and Mrs. Brady's November 6, 2012 purchase of the Shotgun. Based upon the fact that: (a) Mr. Krueger was involved in both of the Bradys' attempts to purchase, (b) the firearm was the same, (c) the Bradys shared the same last name and the same address, and (d) there were only three intervening gun sale transactions, IOI Williams concluded that the firearm was transferred to Mr. Brady as the actual buyer and that Mr. Brady was a person whom Mr. Krueger knew or had reasonable cause to believe was prohibited from possessing a firearm. IOI Williams therefore concluded that Dick's Store #375's records of the purchaser's name in the Acquisition and Disposition Record ("A&D Record") and on ATF Form 4473 were false. [ATF Findings ¶¶ 8-10]

10. IOI Williams did not interview Mr. Krueger as part of his inspection and he never attempted to speak to either Mr. or Mrs. Brady. (Tr. At 42-44.)

11. On June 18, 2013, IOI Williams issued a Report of Violations to Store #375 citing two GCA regulations related to Laura Brady's purchase. These violations were: (a) "Failure to enter the true identity of a buyer into the A&D Record (by entering a straw purchaser into the record[)]" in violation of 27 CFR [§] 478.128(e); and "Failure to stop the transfer of a firearm to a person while knowing or having reasonable cause to believe that such person is prohibited (by transferring a firearm thru a straw purchaser)" in violation of 27 CFR 478.99(c).

12. IOI Williams' "field report" of his inspection of Store #375[] did not recommend that Store #375's federal firearms dealer's license be revoked based upon these violations. (Tr. at 73)

13. On September 20, 2013, ATF Special Agents Richard Howard and Jason Crenshaw went to the Bradys' residence at 70 Grove Dale Street, Memphis, Tennessee 38120, to retrieve the Shotgun. The Agents spoke with Jason Brady, who told them that the Shotgun was in the possession of the Memphis Police Department. Special Agents Howard and Crenshaw never spoke or tried to speak to Laura Brady.

14. ATF never conducted a Warning Conference with Store #375 related to IOI Williams' Report of Violations.

15. On November 21, 2013, ATF issued a Notice of Revocation of License to Store # 375. The Notice of Revocation cited the same two GCA regulation violations cited in IOI Williams' earlier Report of Violations: (a) 18 U.S.C. § 922(d) and 27 C.F.R. [§] 478.99(c) ("Transfer to person with Reason to Believe Prohibited[")]; and (b) 18 U.S.C. § 923(g)(a)(A) and 27 C.F.R. § 478.125(e) ("False Information in A&D Record as to Purchaser"). In addition, the Notice of Revocation of License cited Store #375 for violating 18 U.S.C. § 923(g)(1)(A) and 27 C.F.R. § 478.124(c) ("False Information on ATF Form 4473 as to Purchaser").

16. Store #375 timely requested a hearing and, on February 5, 2014, an informal hearing on this matter was held at the ATF Memphis Field Office pursuant to the provisions of 18 U.S.C. § 923(f) and 27 C.F.R. § 478.74. [ATF Findings ¶¶ 3-5]

17. The Certified Administrative Record, previously filed in support of Respondent's Motion for Summary Judgment, is an uncontested record of the February 5, 2014 proceedings.

18. On March 25, 2015, ATF issued a Final Notice of Denial of Application or Revocation of Firearms License ("Final Notice of Revocation") to Store #375 revoking its license as a dealer in firearms other than destructive devices. Pursuant to the Findings of Fact and Conclusions of Law attached to ATF's Final Notice of Revocation, ATF revoked Store #375's license based upon ATF's findings that Store #375 "committed the following willful violations:

> 1. Transfer to a prohibited person with reasonable cause to believe such person was prohibited, in violation of 18 U.S.C. § 922(d) and 27 C.F.R. § 478.99(c);
>
> 3. False Information on ATF Form 4473 as to Purchaser in violation of 18 U.S.C. §§ 922(g)(1)(A), 923(g)(1)(A), 922(m), and 924(a)(3)(A); and 27 C.F.R. §§ 478.124(c)(1) and 478.128(c)."

19. On May 15, 2014, Dick's timely filed its Petition for Judicial Review of the Final Notice of Revocation pursuant to 18 U.S.C. § 923(f)(3) and its related regulations.

(Joint Pretrial Order at 5-9, ECF No. 66 (emphasis added).)

## B. Testimony and Evidence Introduced During Trial

### 1. Kevin Dodson

Petitioner's first witness, Kevin Dodson, is currently the Loss Prevention Director of Compliance for Dick's and was employed by Dick's as a Loss Prevention Manager of Compliance in November 2012. (Trial Tr. 25:10-19, June 1, 2015, ECF No. 69.) Dodson testified as to Dick's training and policies regarding the sale of firearms and Dick's internal audits of federal firearm compliance.

Dodson testified that his responsibilities include creating policies and procedures and training to ensure that Dick's is in compliance with federal firearm regulations when it sells firearms. (Trial Tr. 25:20-26:1.) According to Dodson, Dick's developed a gun manual "to serve as a reference for [its] store

associates and management team related to the sale of firearms."
(Trial Tr. 27:16-21.) Dodson testified that each employee must
read the gun manual and answer electronically verified questions
related to the gun manual before he can sell guns at Dick's
stores. (Trial Tr. 27:22-28:11.) Dodson further testified that
the manual and online training specifically include a straw
purchase section. (Trial Tr. 34:22-37:3.) Dodson explained
that, before an individual could purchase a firearm, the
individual must complete a Form 4473, and affirm that he or she
is the actual buyer. (Trial Tr. 37:13-20, 39:8-18.)
Additionally, Dodson explained that sales associate typically go
through a minimum of two weeks of on-the-job training before
they can manage the gun counter alone. (Trial Tr. 42:23-43:5.)
The purpose of this training is to learn the requirements of a
gun sale "from start to finish." (Trial Tr. 43:6-17.)

        With respect to Dick's internal procedures for suspicious
transactions, Dodson described the denied/delayed transaction
binder and logbook. (Trial Tr. 39:25-40:9.) Dodson testified
that in 2012, if a response came back from TICS that the sale
was denied, the sales associate was supposed to "[r]ecord the
denied transaction information, including name, address, type of
firearm and date in the denied/delayed log." (Trial Tr. 40:19-
24.) According to Dodson, Dick's monitored this log "through
auditing, and if an associate didn't record the information,

[Dick's] would issue corrective action, up to and including termination . . . ." (Trial Tr. 41:9-16.) Dodson testified that these loss prevention audits took place "a minimum of once a quarter." (Trial Tr. 43:18-44:6.) Dodson further testified that, during the course of the audits, there had not been "any red flag raised in relation to Matt Krueger or any other sales associate in relation to not performing their duties in relation to federal firearm compliance." (Trial Tr. 55:12-16.)

Dodson also testified that both November and December 2012 were very busy months for the lodge area of the store. (Trial Tr. 66:15-22.) Dodson was later recalled as a witness, and clarified that December 2012 was the busiest month in terms of both unit and dollar sales volume, but that both November and December 2012 were very busy months. (Trial Tr. 173:18-174:15.)

Respondent's cross-examination of Dodson was focused on whether Krueger acted appropriately in completing the gun sale to Mrs. Brady. Dodson agreed that it is company policy to deny "any suspicious transaction," and specifically, "to deny sales of suspected straw purchases." (Trial Tr. 81:20-25.) Dodson agreed that Mr. and Mrs. Brady have the same last name, the same address, and attempted to purchase the same gun. (Trial Tr. 82:13-83:9.) Dodson further testified that he is aware that Krueger did not record the denial of Mr. Brady's attempted purchase and that he did not send a "be on the lookout" ("BOLO")

alert.  (Trial Tr. 83:18-23.)  Dodson also agreed that "the sale
to Mr. and/or Mrs. Brady . . . wasn't picked up in any of
[Dick's] internal audits."  (Trial Tr. 84:16-18.)

On re-direct, Dodson testified that, although the handbook
listed "same last name, same address, [and] same gun" as factors
likely to indicate a straw purchase, more inquiry may be needed
to determine whether a transaction is actually a straw purchase.
(Trial Tr. 87:11-88:2.)

### 2. Laura Brady

Petitioner's second witness was Laura Brady.  (Trial Tr.
88:9-11.)  Mrs. Brady testified regarding the circumstances
surrounding her purchase of the Mossberg Shotgun.

Specifically, Mrs. Brady testified that, in November 2012,
her husband had gotten an invitation to go on a pheasant hunt.
(Trial Tr. 94:9-16.)  She testified that several of the wives
had discussed going as well, and that she was interested in
going on the hunt.  (Trial Tr. 94:16-19.)  Mrs. Brady explained
that she had never gone on a group hunt like that before and did
not have the right type of gun.  (Trial Tr. 94:17-21.)  Mrs.
Brady found an ad for a Mossberg gun on sale and knew that she
liked the Mossberg brand.  (Trial Tr. 95:3-7.)

Mrs. Brady testified that she had a conversation with her
husband about the gun and that he was going to purchase the gun
because he had a more flexible schedule during the day.  (Trial

Tr. 95:20-96:3.) She testified that, although Mr. Brady went to buy the gun, she was going to be the ultimate owner. (Trial Tr. 97:1-3.) At some point, Mrs. Brady was informed that Mr. Brady was not authorized to purchase the gun. (Trial Tr. 97:4-12.) Mr. Brady told Mrs. Brady that if she wanted to go on the hunting trip, she would have to make sure she bought the gun before the weekend. (Trial Tr. 97:13-18.)

Mrs. Brady testified that she went to the store later that day and asked for the 12 gauge Mossberg in the advertisement. (Trial Tr. 98:11-14.) She testified that the sales associate brought over the gun, that she showed her nine-year old daughter how to hold it, and that she made sure it was not too heavy and felt right for her. (Trial Tr. 98:18-25, 99:15-100-18.) She testified that she then decided to purchase the gun. (Trial Tr. 98:25, 100:22-24.) According to Mrs. Brady, if she had not liked the way that the gun felt, she would have "[l]eft and not purchased it." (Trial Tr. 100:19-21.)

Mrs. Brady further testified that she signed the Form 4473, affirming that she was the actual buyer, and testified that this statement was accurate. (Trial Tr. 101:21-103:4.) She explained that after she took the gun home, she locked it in her personal gun case and that Mr. Brady did not have a key to this case. (Trial Tr. 103:8-104:1.)

On cross-examination, Mrs. Brady again testified that she purchased the gun because she and Mr. Brady were going to go on the pheasant hunt together and each needed a shotgun. (Trial Tr. 105:14-21.) She testified that the Mossberg was the same brand as a weapon she already owned. (Trial Tr. 106:3; see also Trial Tr. 93:14-23, 99:9-14.) She further testified that Mr. Brady did not affect her purchase decision one way or the other. (Trial Tr. 106:3-6.)

On re-direct examination, Mrs. Brady testified that Mr. Brady was planning on borrowing a gun from his brother for the hunt. (Trial Tr. 109:7-10.)

### 3. Matthew Krueger

Petitioner's third witness was Matthew Krueger. Krueger was employed at Dick's Store in Cordova, Tennessee, in November 2012. (See Trial Tr. 114:4-8.) On direct examination, Krueger testified on two main points: (1) Krueger's training and Dick's policies and procedures regarding the sale of firearms; and (2) the events of November 6, 2012.

Krueger testified that before working as a sales associate in the gun department in the lodge area, he received formal training on gun sales. (Trial Tr. 118:18-21.) He testified that he completed an online training program, and that he needed to answer every question correctly in order to earn his certification. (Trial Tr. 118:22-119:1.) The training program

follows the gun manual step-by-step and provides scenarios on
how to manage customers and how to identify straw purchases.
(Trial Tr. 119:2-120:7.) Krueger further testified that he
received on-the-job training with a lodge associate for
approximately two weeks, which involved learning every facet of
gun sales. (Trial Tr. 121:12-122:8.) He testified that he
learned about straw purchases in this context as well and that
the lodge associate who trained him told him what to look for
and discussed the denial log with him. (Trial Tr. 122:9-18.)
Krueger testified that when a gun sale is denied, the denial is
logged, and other stores in the network are alerted of any
potential issues. (Trial Tr. 122:19-123:20.)

    Krueger further testified that he had encountered only one
straw purchase previously. (Trial Tr. 124:6-12.) According to
Krueger, this encounter involved a group of three individuals
who wanted to purchase a sale shotgun. (Trial Tr. 124:13-16.)
He overheard one of the individuals say that they had been
denied at Wal-Mart. (Trial Tr. 124:16-18.) Krueger believed
that this was a straw purchase because the statement indicated
that one of the individuals would try to buy the gun for the
individual who had been denied. (Trial Tr. 124:19-23.)

    With respect to November 6, 2012, Krueger testified that he
worked from "approximately 7:00 in the morning until 9:39 that
night." (Trial Tr. 127:11-13.) According to Krueger, November

and December are probably the two busiest months in the store
(Trial Tr. 127:25-128:6; see also Trial Tr. 118:5-11), and he
would see fifty to sixty customers in any given day (Trial Tr.
128:7-12). Krueger testified that he ran Mr. Brady's
information in TICS on November 6, 2012. (Trial Tr. 130:8-
132:21.) He testified that the background check was "denied"
(Trial Tr. 132:24-25), and that he noted that the check was
pending and denied on the 4473 form (Trial Tr. 134:14-135:9).
After the attempt was denied, Krueger notified the store
manager. (Trial Tr. 137:7-9.) Krueger testified that after the
attempt was denied, he was supposed to fill in the customer
information on the denied log, but that he did not do it that
day. (Trial Tr. 138:24-139:2, 139:8-9.) Krueger was unsure why
he did not do it, but thought "[i]t's more than likely that . .
. [he] had a bunch of customers" and "set [the form] aside to
put in later in the day." (Trial Tr. 139:8-15.) He testified
that he did not deliberately disregard the policy to effectuate
the sale to Laura Brady and that he has never made any other
mistake like that as far as he is aware. (Trial Tr. 141:17-
142:3)

    Krueger testified that, later that day, he assisted Mrs.
Brady in her purchase. (See Trial Tr. 143:14-19.) Krueger
input Mrs. Brady's information into TICS and received an
approval. (Trial Tr. 142:23-143:1, 146:2-4.) In determining

that the sale was not a straw sale, he took into consideration
her answers on the Form 4733, her TICS result, and how she
handled the gun. (Trial Tr. 143:2-13, 147:20-148:20.)  Krueger
testified that there were no red flags or warning signs "at all"
when he was interacting with Mrs. Brady in relation to this gun
transaction.  (Trial Tr. 148:21-24.)

     On cross-examination, Krueger acknowledged that he made a
mistake in not filling out the denied transaction log.  (Trial
Tr. 154:23-155:1.)  He further acknowledged that he had been
told that some of the signs of a straw sale include a person
with the same last name and same address as someone who was
denied.  (Trial Tr. 156:24-157:7.)  He testified that it is not
necessarily a sign of a straw sale if a person is trying to
purchase the same firearm as a person who has been denied.
(Trial Tr. 157:8-16.)  Krueger testified that if he had seen a
transaction in the denied/delay log on the same day from two
people with the same last name residing at the same address for
the same firearm, it would have indicated to him that a straw
purchase was being attempted.  (Trial Tr. 164:2-7.)

     On redirect, Krueger testified that he did not know how
many Mossberg shotguns like the one sold to Mrs. Brady were in
inventory as of 8:00 p.m. on November 6, 2012.  (Trial Tr.
165:9-12.)  He further testified that, standing alone, there is
nothing suspicious about the fact that he showed two different

customers the same gun eight hours apart.  (Trial Tr. 165:13-16.)

### 4. ATF Special Agent Jason Crenshaw – Deposition Testimony

The parties designated portions of ATF Special Agent Jason Crenshaw's deposition testimony for consideration by the Court. Crenshaw testified that he had investigated approximately fifteen straw purchases during his time with the ATF.  (Crenshaw Dep. 6:12-16, Ex. 12, ECF No. 68.)  He further testified that if, during a straw purchase investigation, an individual admitted to being a straw purchaser, he would usually note that in a report of the investigation.  (Crenshaw Dep. 7:7-16.) According to Crenshaw, such an admission would be important to an investigation of a potential straw purchase.  (Crenshaw Dep. 7:24-8:6.)  Additionally, Crenshaw testified that he recalled Mr. Brady saying that Mrs. Brady had offered to go purchase the firearm because she knew Mr. Brady would need it for the hunting trip.  (Crenshaw Dep. 32:8-23.)  On cross-examination, Crenshaw clarified that when he went to the Brady residence, the purpose was to do a NICS retrieval, not to investigate a straw purchase. (Crenshaw Dep. 49:21-50:2.)

### 5. Richard Howard – Deposition Testimony

The parties also designated portions of ATF Special Agent Richard Howard's deposition testimony.  Howard had never done an

NICS retrieval before and accompanied Crenshaw to retrieve the
firearm from the Brady residence.  (Howard Dep. 22:23-25, Ex.
13, ECF No. 68.)  Howard testified that Mr. Brady told him that
he was going on a hunt and that he needed a shotgun and did not
want to borrow one.  (Howard Dep. 47:19-21, 48:9-14, 48:22-
49:2.)  According to Howard, Mr. Brady told him that Mrs. Brady
got the gun for him when she was done with work, but Howard did
not "remember that [Mr. Brady] said those words exactly."
(Howard Dep. 49:7-23.)  Howard further testified that the report
was "not the entirety of" their conversation, but that the gist
of the conversation was that Mr. Brady "was going on a dove hunt
and wanted to buy a shotgun so he did not have to borrow one
from a friend."  (Howard Dep. 65:18-25.)  On cross-examination,
Howard acknowledged that he went to the Brady residence to
retrieve a firearm, not to investigate a straw purchase, and
therefore, that he did not need to interview Mrs. Brady.
(Howard Dep. 76:20-77:3.)

### 6. Report of Investigation

The Report of Investigation was prepared by Howard on
September 20, 2013, the date that Howard and Crenshaw went to
the Brady residence to retrieve the firearm.  (Ex. 14, ECF No.
68.)  The ATF ordered this retrieval because it believed that
Mr. Brady was the true owner of the firearm.  The report
reflects Howard's understanding that Mr. Brady advised that he

was going on a hunt and wanted to purchase a shotgun so that he
did not have to borrow one from a friend.  (Ex. 14 at 1, ECF No.
68.)  The report also indicates that "Laura Brady[] went to
Dick's Sporting Goods later that day and completed the
transaction."  (Id.)

### 7. The Administrative Record

In addition to the testimony and exhibits provided at
trial, the Government introduced the Administrative Record,
which detailed the investigation and revocation hearing in this
matter.  (Ex. 11, ECF No. 68.)  At the revocation hearing, the
Government presented testimony of Industry Operations
Investigator Thomas Williams and Special Agent Richard Howard.
Dick's presented testimony of Mr. Kevin Dodson, former Assistant
Special Agent in Charge Tommy Wittman, and Industry Consultant
Wally Nelson.

The Court has scrutinized the administrative record and
supplementary evidence presented at trial with careful
consideration of the new testimony provided at trial.  The Court
finds as a matter of fact (1) that Mrs. Brady purchased the gun
for herself and was the actual buyer, and (2) that Mr. Krueger's
failure to record Mr. Brady's denied attempted purchase was the
result of inadvertent, human error.

## II. CONCLUSIONS OF LAW

"The Attorney General may, after notice and opportunity for hearing, revoke any license issued [pursuant to 18 U.S.C. § 923] if the holder of such license has willfully violated any provision of [the GCA] or any rule or regulation prescribed by the Attorney General under [the GCA] . . . ." 18 U.S.C. § 923(e). A district court's review of the Attorney General's decision to revoke an FFL is de novo. § 923(f)(3). A reviewing court "may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered" at the revocation hearing. Id. "The language of § 923(f)(3) does not call upon this Court to decide whether it would revoke the license in it[']s own judgment, but whether all of the evidence presented is sufficient to justify the Attorney General's revocation of the license." Pinion Enters., Inc. v. Ashcroft, 371 F. Supp. 2d 1311, 1315 (N.D. Ala. 2005).

Eighteen U.S.C. § 922(d) and 27 C.F.R. § 478.99(c) prohibit the sale of "any firearm or ammunition to any person knowing or having reasonable cause to believe that such person" is a prohibited person. There is no allegation that Laura Brady is a prohibited person under federal law. As a result, § 922(d) can only be violated if the person who was sold the gun, by straw purchase or otherwise, is a prohibited person. See Abramski v. United States, 134 S. Ct. 2259, 2269 (2014) (holding that

references in § 922 refer "not to the fictitious but to the real buyer"). As stated above, the Court finds that Laura Brady was the actual buyer of the firearm. Accordingly, there can be no violation of § 922(d).

Additionally, ATF concluded that Petitioner violated 18 U.S.C. §§ 922(g)(1)(A), 922(m), 923(g)(1)(A), and 924(a)(3)(A) and 27 C.F.R. §§ 478.124(c)(1) and 478.128(c) because Petitioner "obtained and maintained an ATF Form 4473 in the name of the purported, yet false, purchaser, rather than the name of the true purchaser" with respect to the sale to Mrs. Brady. (Final Notice of Denial of Appl. or Revocation of Firearms License ¶ 28, Ex. 11, ECF No. 68.) As discussed above, Mrs. Brady was the true purchaser of the firearm. Accordingly, Petitioner did not violate any provision of the Gun Control Act or its implementing regulations by obtaining and maintaining an ATF Form 4473 that identified her as the true purchaser.

Moreover, ATF has the authority to revoke an FFL only following a willful violation of the Gun Control Act. See Garner v. Lambert, 345 F. App'x 66, 71-72 (6th Cir. 2009). A violation is willful if the dealer "intentionally, knowingly, or recklessly violates known legal requirements" of the Gun Control Act. Armalite, Inc. v. Lambert, 544 F.3d 644, 648 (6th Cir. 2008). The alleged violations of the Gun Control Act stem from Mr. Krueger's failure to record the denied gun sale to Mr. Brady

in Dick's denied/delay log.  As a result, he did not consider the possibility that the sale to Mrs. Brady was a straw purchase.  Because there was no straw sale, there can be no violation of the Gun Control Act.

Even if a violation had occurred, however, it was not willful, but rather the result of inadvertent human error.  ATF had not issued any warnings regarding compliance deficiencies of Store #375 in the past, and there had been no concerns about Mr. Krueger's performance of his duties in relation to federal firearm compliance before.  (See Trial Tr. 54:24-55:25.)  Mr. Krueger's failure to record the denied sale to Mr. Brady was a one-time mistake.  Although, "[a]t some point, repeated negligence becomes recklessness," Armalite, 544 F.3d at 650, a single error alone does not reach this level.  See Garner, 345 F. App'x at 73-74 ("A simple mistake does not on its own constitute willfulness."); Am. Arms. Int'l v. Herbert, 563 F.3d 78, 84-85 (4th Cir. 2009) ("The standard of willfulness . . . does not demand perfection from licensees — it leaves room for the occasional incident of human error.").  Accordingly, the Court finds that any error on the part of Mr. Krueger did not reach the level of willfulness.

For these reasons, the Court holds that there is insufficient evidence to justify the Attorney General's revocation of Petitioner's federal firearm license.

Petitioner is not, however, entitled to fees and costs under 18 U.S.C. § 924(d)(2)(B).  Although the assumption underlying ATF's investigation — that Mr. Brady was the true purchaser — was flawed, ATF's investigation involved an audit of Dick's Store #375, as well as a firearm retrieval and an interview with Mr. Brady.  Accordingly, the action was not "without foundation," nor was it "initiated vexatiously, frivolously, or in bad faith . . . ."  18 U.S.C. § 924(d)(2)(B).  Petitioner is also not entitled to recover fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  Section 2412 applies only to claims for attorneys' fees when no other specific statute deals with an award of attorneys' fees against the government.  Stephens v. US Airways Grp., 555 F. Supp. 2d 112, 123 n.13 (D.D.C. 2008); Disabled Patriots of Am., Inc. v. Odco Invs., Ltd., No. 3:04 CV 7399, 2009 WL 1767582, at *1 (N.D. Ohio June 23, 2009).  The Gun Control Act has an explicit attorneys' fees provision at 18 U.S.C. § 924(d)(2)(B).  Accordingly, the EAJA does not apply here.

## III. CONCLUSION

For the reasons set forth in this opinion, the Court finds that the decision to revoke Petitioner's Federal Firearms License was not authorized and the decision is reversed.  The Court hereby ORDERS Respondent to reinstate Petitioner's Federal Firearms License.

**IT IS SO ORDERED**, this 26th day of October, 2015.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE